**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| SKYWAVE NETWORKS, LLC, | |
| Plaintiff, | Civil Action No. 1:24-cv-9650-XXX |
| v. | _____ |
| WILLIAM J. DISOMMA,<br>PAUL A. GURINAS,<br>MATTHEW HINERFELD,<br>WILLIAM DISOMMA TRUST,<br>PAUL A. GURINAS TRUST,<br>JUMP FINANCIAL, LLC,<br>JUMP TRADING HOLDINGS, LLC,<br>JUMP TRADING, LLC,<br>ECW WIRELESS, LLC,<br>WORLD CLASS WIRELESS, LLC,<br>VIRTU FINANCIAL, INC.,<br>NLN HOLDINGS, LLC,<br>NEW LINE NETWORKS, LLC, AND<br>10BAND, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

Skywave Networks, LLC ("Skywave") files this Complaint against Defendants William J.

DiSomma ("DiSomma"); Paul A. Gurinas ("Gurinas"); Matthew Hinerfeld ("Hinerfeld"); William

DiSomma Trust ("DiSomma Trust"); Paul A. Gurinas Trust ("Gurinas Trust"); Jump Financial,

LLC ("Jump Financial"); Jump Trading Holdings, LLC ("Jump Trading Holdings"); Jump

Trading, LLC ("Jump Trading"); ECW Wireless, LLC ("ECW Wireless"); World Class Wireless,

LLC ("World Class Wireless"); Virtu Financial, Inc. ("Virtu"); NLN Holdings, LLC ("NLN

Holdings"); New Line Networks, LLC ("NLN"); and 10Band, LLC ("10Band") (collectively,

"Defendants") and alleges as follows, based on personal knowledge as to Skywave and Skywave's

acts and on information and belief as to all other matters.

**CONTENTS**

**INTRODUCTION** ....................................................................................................................**3**

**PARTIES, JURISDICTION, AND VENUE** .......................................................................**4**

**FACTS UNDERLYING THE CAUSES OF ACTION** ........................................................**9**

Skywave ..................................................................................................................................9

  Skywave's Technology ........................................................................................................9

  Background on FCC Licensing ..........................................................................................13

  Skywave's Discovery of Defendants' Racketeering Scheme ............................................15

Defendants' Enterprise .........................................................................................................20

  Relationships Between Defendants ...................................................................................21

  Defendants' Worldwide Trading Network and Associated Trading on that Network ..........23

    Defendants' Worldwide Trading ...................................................................................24

    Defendants' Trading Infrastructure: Illinois ..................................................................27

    Defendants' Trading Infrastructure: New York/New Jersey .........................................29

    Defendants' Trading Infrastructure: Washington ..........................................................30

    Defendants' Trading Infrastructure: United Kingdom ...................................................30

    Defendants' Trading Infrastructure: Continental Europe ...............................................31

    Defendants' Trading Infrastructure: Japan ...................................................................32

    Defendants' Trading Infrastructure: Brazil....................................................................32

    Defendants' Trading Infrastructure: Canada ..................................................................33

Defendants' Experimental Licenses ......................................................................................36

  Elburn I Experimental License .........................................................................................36

  Elburn II Experimental License ........................................................................................40

  Wayne Experimental License ...........................................................................................42

  Everett Experimental License ...........................................................................................44

  Lynnwood Experimental License......................................................................................46

Defendants' Racketeering......................................................................................................48

  Defendants' Predicate Acts: Fraud in Applying for, Modifying, and Renewing Experimental Licenses in Violation of 18 U.S.C. § 1343................................................48

  Defendants' Predicate Acts: Unlawful Use of Experimental Licenses for Commercial Trading in Violation of 18 U.S.C. § 1343 ........................................................................51

Skywave's Injury Caused by Defendants' Unlawful Racketeering Conduct ........................... 53

**CAUSES OF ACTION** ............................................................................................................ **55**

COUNT I: Violation of 18 U.S.C. § 1962(c) ......................................................... 55

COUNT II: Violation of 18 U.S.C. § 1962(d) ........................................................ 56

**Prayer For Relief** ................................................................................................................... **57**

**Demand For Jury Trial** ......................................................................................................... **57**

## INTRODUCTION

1.      This action arises from Defendants' long-term, continuous racketeering and conspiracy scheme to fraudulently obtain experimental shortwave radio licenses from the Federal Communications Commission ("FCC") to create a commercial trading network,[1] unlawfully use those experimental licenses for commercial trading of financial instruments ("Commercial Trading"), and leverage the ill-gotten advantages of experimental licenses to maximize their own financial benefit and to the detriment of their competitors.

2.      From 2013 to 2016, the Skywave founders developed and began to patent revolutionary trading network technology, which it has continued to develop and improve through the present.  In 2016, Skywave was formed and entered into a ███████████ partnership to commercialize its network technology.  With the funding from that partnership, Skywave started to commercialize its trading network technology, including beginning the process to obtain a commercial FCC license to operate a shortwave transmitter under 47 C.F.R. § 73 ("Commercial License").

3.      Skywave's commercialization efforts came to a halt because of Defendants' unlawful activities detailed in this Complaint.  In short, Defendants circumvented U.S. law by fraudulently obtaining experimental FCC licenses—not Commercial Licenses—to operate

_____

[1] This Complaint uses the term "trading network" to refer to networks used to trade financial instruments.

shortwave transmitters under 47 C.F.R. § 5 ("Experimental Licenses"). Defendants then unlawfully used and continue to use those Experimental Licenses for Commercial Trading. Defendants custom-designed the parameters of their Experimental Licenses to separately and collectively give Defendants a dominant speed advantage over traders using other communications systems, including Skywave's planned trading network using a shortwave transmitter under a Commercial License. As a result of Defendants' unlawful activities detailed in this Complaint, Skywave's partnerships fell apart, and its efforts to commercialize its technology were halted.

4.      Defendants concealed the true nature of their commercial activities behind an artifice of confidential experimental work and a web of shell companies that directed and controlled (and continue to direct and control) Defendants' racketeering scheme to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.

## PARTIES, JURISDICTION, AND VENUE

5.      Skywave is a limited liability company organized and existing under the laws of Delaware, with its principal place of business at 10525 West US Highway 30, Building 4 C, Wanatah, Indiana 46390.

6.      DiSomma is an individual with a business address at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654. Disomma is also a resident of Illinois.

7.      Gurinas is an individual with a business address at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

4

8.    Hinerfeld is an individual with a business address at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

9.    DiSomma Trust is a trust with a business address at 600 West Chicago Avenue, Suite 840, Chicago, Illinois 60654.

10.    Gurinas Trust is a trust with a business address at 600 West Chicago Avenue, Suite 840, Chicago, Illinois 60654.

11.    Jump Financial is a limited liability company registered to do business in Illinois with its principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

12.    Jump Trading Holdings is a limited liability company registered to do business in Illinois with its principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

13.    Jump Trading is a limited liability company registered to do business in Illinois with its principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

14.    ECW Wireless is a limited liability company organized and existing under the laws of Delaware with a registered agent address at 1209 Orange Street, Wilmington, Delaware 19801.

15.    World Class Wireless is a limited liability company registered to do business in Illinois with its principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

16.    Virtu is a corporation organized and existing under the laws of Delaware with a place of business at 233 Sout Wacker Drive, Suite 4020, Chicago, Illinois 60606.

17.     NLN Holdings is a limited liability company organized and existing under the laws of Delaware with a registered agent address at 1209 Orange Street, Wilmington, Delaware 19801.

18.     NLN is a limited liability company registered to do business in Illinois, with its principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

19.      10Band is a limited liability company organized and existing under the laws of Delaware and has a place of business at 600 West Chicago Avenue, Suite 840, Chicago, Illinois 60654.

20.     This is a civil action, arising under the Racketeer Influenced Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*

21.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

22.     Personal jurisdiction is proper against Jump Financial because it has a principal place of business in the Northern District of Illinois.

23.     Personal jurisdiction is proper against Jump Trading Holdings because it has a principal place of business in the Northern District of Illinois.

24.     Personal jurisdiction is proper against Jump Trading because it has a principal place of business in the Northern District of Illinois.

25.     Personal jurisdiction is proper against DiSomma and DiSomma Trust because DiSomma, through DiSomma Trust, is an owner of Jump Financial, Jump Trading Holdings, and Jump Trading, which all have principal places of business in the Northern District of Illinois.

26.     Personal jurisdiction is proper against Gurinas and Gurinas Trust because Gurinas, through Gurinas Trust, is an owner of Jump Financial, Jump Trading Holdings, and Jump Trading, which all have principal places of business in the Northern District of Illinois.

27.     Personal jurisdiction is proper against Hinerfeld because he regularly transacts business on behalf of Jump Trading in the Northern District of Illinois as Jump Trading's general counsel.

28.     Personal jurisdiction is proper against ECW Wireless because it participated in the activities alleged in this Complaint, a substantial portion of which occurred in the Northern District of Illinois.  ECW Wireless has also purposefully availed itself of the benefits and protections of Illinois law through its effective 100 percent interest in World Class Wireless, 50 percent interest in NLN, and 50 percent interest in 10Band, all registered in Illinois and with principal places of business in Illinois.  *See supra* ¶¶ 15, 18–19; *infra* Fig. 4.  Further, the interests of justice require that co-conspirators not residing in this state be brought before the Court in a single trial.

29.     Personal jurisdiction is proper against World Class Wireless because it has a principal place of business in the Northern District of Illinois.

30.     Personal jurisdiction is proper against NLN Holdings because it participated in the activities alleged in this Complaint, a substantial portion of which occurred in the Northern District of Illinois.  NLN Holdings has also purposefully availed itself of the benefits and protections of Illinois law through its effective 50 percent interest in NLN and 50 percent interest in 10Band, both registered in Illinois and with principal places of business in Illinois.  *See supra* ¶¶ 18–19; *infra* Fig. 4.  Further, the interests of justice require that co-conspirators not residing in this state be brought before the Court in a single trial.

31.     Personal jurisdiction is proper against Virtu because it has a place of business in the Northern District of Illinois, and it participated in the activities alleged in this Complaint, a substantial portion of which occurred in this District.  Further, Virtu owns approximately 50

percent of the control of 10Band—through NLN Holdings and NLN—which operates radio transmission links in this District related to the activities and claims alleged in this Complaint.

32.     Personal jurisdiction is proper against NLN because it has a principal place of business in the Northern District of Illinois.

33.     Personal jurisdiction is proper against 10Band because it participated in the activities alleged in this Complaint, a substantial portion of which occurred in the Northern District of Illinois.  Further, it operates radio transmission links in this District related to the activities and claims alleged in this complaint.

34.     Personal jurisdiction is also proper against all Defendants in the Northern District of Illinois because they engaged in a years' long racketeering scheme to, among other things, defraud the FCC to obtain a shortwave Experimental License to operate a shortwave transmitter located in Elburn, Illinois (which is within this District) and then unlawfully use that transmitter for Commercial Trading.  Defendants have engaged in activities in furtherance of that racketeering scheme in this District by, among other things, engaging in systematic and continuous Commercial Trading using the Elburn, Illinois transmitter.

35.     Venue is proper in this District under 28 U.S.C. § 1391 and 18 U.S.C. § 1965. Defendants DiSomma Trust, Gurinas Trust, Jump Financial, Jump Trading Holdings, Jump Trading, World Class Wireless, and NLN are all residents of the Northern District of Illinois. Defendants DiSomma, Gurinas, Hinerfeld, ECW Wireless, Virtu, NLN Holdings, and 10Band all transact business in the Northern District of Illinois, including through activities in furtherance of all Defendants' racketeering scheme in this District by, among other things, engaging in systematic and continuous Commercial Trading using the Elburn, Illinois transmitter.  In addition, Jump and NLN have regular and established places of business in the Northern District of Illinois and they,

as well as Virtu and 10Band, engage in trading activities and network operations activities in this District.

## FACTS UNDERLYING THE CAUSES OF ACTION

### Skywave

36. In 2016, entrepreneur Timothy Eloe and inventor Kevin Babich founded Skywave to commercially deploy technology for transcontinental wireless networks for trading. Skywave's shortwave trading network technology is ideal for all trading strategies that rely on the transmission of time-sensitive data between distant financial markets, like the practice of latency arbitrage in high-frequency trading ("HFT").

*Skywave's Technology*

37. Skywave developed trading network technology that provides traders with a quantum leap in communications speed, particularly for transoceanic communications. For example, using Skywave's innovations, trade information can traverse the Atlantic Ocean faster than over traditional networks using a combination of transoceanic optical fiber and microwave, previously the fastest communication method.

38. Skywave's technology uses shortwave radio to transmit trade information over long distances. Shortwave radio, which is commonly associated with older technologies like AM radio, had generally been considered antiquated for modern communications before Skywave developed methods to leverage it in new ways.

39. Radio transmissions typically travel faster than transmissions via optical fiber. However, unlike optical fiber transmissions, most common radio technology—*e.g.*, microwave—require a line of sight between transmitter and receiver. Such technology is not economically feasible for transcontinental communication because the curvature of the earth blocks line of sight.

40.     Shortwave radio, in contrast, is well-suited for transcontinental communication because it does not require a line of sight between transmitter and receiver. Shortwave radio signals can be refracted—*i.e.*, bounced—off the Earth's ionosphere to effectively transmit information around the curvature of the earth.

41.     But the properties of shortwave radio signals also create challenges for transmitting trading information over long distances. One such challenge is low bandwidth. Shortwave radio can only carry a small fraction of the amount of information carried by optical fiber or microwave. As a result, shortwave signals alone are insufficient to operate a trading network.

42.     Skywave overcame the challenges of trading via shortwave radio signals through its innovative and patented shortwave trading network technology.

43.     The advantages of the increased communications speed provided by Skywave's technology is perhaps best illustrated via HFT and latency arbitrage examples.

44.     HFT is a trading strategy where financial instruments, like stocks and futures, are traded at high frequency to take advantage of small but frequent changes in financial markets. HFT traders seek to make profits from these small changes by aggregating large quantities of high-frequency trades over time. While HFT traders might only make a relatively small profit on a single trade, they might make thousands of such trades per minute.

45.     In HFT, successful trades are determined by small fractions of time—nanoseconds, microseconds, and milliseconds. The opportunities that HFT traders seek are often only available at the thinnest slices of time increments.

46.     The fleeting nature of HFT opportunities dictates that the speed of the networks, computers, and algorithms used by each HFT trader will determine whether that trader will be fast enough to capture an opportunity or lose it to a faster trader. The HFT traders with the fastest

networks can dominate the opportunities presented by changing conditions in national and international financial markets.

47.     Put simply, for HFT, the fastest network wins and every single millisecond counts. As a matter of illustration, one HFT networking firm spent approximately $300 million to build a domestic network to save 3 milliseconds[2] while another HFT networking firm spent $250 million to build an intercontinental network to save 5 milliseconds.[3]

48.     Similarly, latency arbitrage trading is a form of trading that takes advantage of the time it takes for overseas financial markets to adjust to one another's changes. Latency arbitrage traders leverage the fact that they can receive signals about overseas market changes several milliseconds before other traders and then make trades before other traders are aware of those overseas changes.

49.     To further illustrate, one example of latency arbitrage trading is trading based on the correlation between the S&P 500 E-Mini ("E-Mini"), which is traded on the Chicago Mercantile Exchange ("CME"), and the DAX future ("FDAX"), which is traded on the Eurex market in Germany. Specifically, an E-Mini price change can be a predictor of a future FDAX price change—*e.g.*, if the E-Mini price goes up or down, the FDAX price is likely to follow in the same direction. Critically, however, it takes time (albeit milliseconds) for the FDAX to catch up to the E-Mini, and that delay gives rise to a latency arbitrage trading opportunity. For instance, when the E-Mini price goes up in Chicago, a U.S. trader with a low latency network can send a

---

[2]     Christopher Steiner, *Wall Street's Speed War*, Forbes (July 16, 2012), https://www.forbes.com/forbes/2010/0927/outfront-netscape-jim-barksdale-daniel-spivey-wall-street-speed-war.html.
[3] *Ultra-Fast Telecom Cable from Herring Cove to Europe Nearly Complete*, Can. Broad. Corp. (Aug. 12, 2015), https://www.cbc.ca/news/canada/nova-scotia/ultra-fast-telecom-cable-from-herring-cove-to-europe-nearly-complete-1.3188581.

trading trigger to buy the FDAX in Germany before the rest of the market drives up the price. Then, having purchased the FDAX at a lower price than the rest of the market, the trader can turn a profit by selling the FDAX at the higher price.

50.     By 2016, Skywave was ready to commercialize its innovative shortwave trading network technology and went to the market in search of development partners.

51.     In October 2016, Skywave executed agreements with  and ▆▆▆▆▆▆▆▆▆▆. Under the terms of those agreements, ▆▆ would provide ▆▆▆▆▆▆▆ and ▆▆▆▆▆▆▆▆▆▆▆.

52.     Skywave planned to implement its innovative shortwave trading network technology through a transcontinental network between the United States and Europe ("Skywave Network"). The Skywave Network would include a shortwave transmitter that Skywave planned to operate under a Commercial License.

53.     Using ▆▆▆▆▆▆▆▆▆▆ under the Agreements, Skywave engineered and designed the Skywave Network and supporting infrastructure. From October 2016 through March 2017, Skywave completed the following tasks in building the Skywave Network: (1) assessed and selected transmitter and receiver sites in the United States and Europe; (2) designed, engineered, and completed component specifications for customized transmitters, antennas, and patented fiber back-channel modems and shortwave optimization methods; (3) completed installation of a data center, security elements, connective elements, and microwave dishes; and (4) prepared FCC construction permits and related filings, including applications for

developmental FCC licenses.  Skywave also entered into contracts with third parties for the manufacture of transmitters, antennas, and modems for the Skywave Network.

*Background on FCC Licensing*

54.     Transmitting shortwave signals requires a license from the FCC.  FCC licenses not only give a party permission to transmit signals, but they also dictate the details of what can be transmitted, where transmissions can originate, and how those transmissions are sent.  *See* 47 U.S.C. §§ 301, 314.  Section 301 makes clear that any such license is limited to the express terms and conditions of the license: "no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license."  *Id.* at § 301.

55.     The FCC forbids "[w]illful false statements made" in FCC license "applications, amendments, and related statements of fact." 47 C.F.R. §§ 5.57(d), 73.3513(d).  Such willful false statements are "punishable by fine and imprisonment" pursuant to 18 U.S.C. § 1001.  *Id.*

56.     There are two types of FCC licenses for shortwave radio transmission relevant to the allegations in this Complaint: commercial and experimental.  The FCC issues Commercial Licenses under 47 C.F.R. § 73 ("Part 73").  A Commercial License provides access for commercial use with certain restrictions.  Specifically, Commercial Licenses (i) have limited bandwidth to transmit data; (ii) are limited to fixed operation frequencies during specified hours; (iii) require emissions masking; and (iv) have high minimum transmission power requirements.  *See* 47 C.F.R. §§ 73.702, 73.751, 73.758.

57.     Experimental Licenses issue under 47 C.F.R. § 5 ("Part 5") and are limited to "experimentation" and "product development."  *Id.* § 5.1(b).[4]  Given that limited purpose,

---

[4] The FCC also issues Experimental Licenses specific to "market trials" under Part 5, but there are no market trial licenses at issue in this Complaint.

applicants for Experimental Licenses are allowed to specify their own technical operating parameters.

58.     Defendants custom-designed a portfolio of Experimental Licenses to separately and collectively comprise operating parameters that offer significant advantages over Commercial Licenses.  Specifically, Defendants' Experimental Licenses (i) have more bandwidth than a Commercial License; (ii) provide access to and allow instant and frequent switching across a wide frequency range—*i.e.*, "frequency hopping;" (iii) do not have emissions-masking requirements; and (iv) do not have transmission power requirements.  With increased bandwidth, Defendants can transmit more data and do so more quickly.  With frequency hopping, Defendants can adjust and select the ideal frequency for given ionosphere conditions, which are constantly changing, and thus transmit data at the optimal latency.  By relaxing emissions-masking, Defendants reduce the latency attributable to that process, gaining a further speed advantage.  Finally, by avoiding the high transmission power requirements, Defendants also avoid the high costs and operational complexities of using high powered tube transmitters.

59.     Importantly, Experimental Licenses do not authorize use of shortwave transmitters for commercial uses, such as Commercial Trading or Defendants' use of the shortwave transmitters in the manner described in this Complaint.  For example, 47 C.F.R. § 5.3 sets the operations that are permitted under an Experimental License.  None of those operations include Commercial Trading or Defendants' use of the shortwave transmitters in the manner described in this Complaint.  While Part 5 also includes "[p]roduct development and market trials," *id.*, those do not authorize Commercial Trading or Defendants' use of the shortwave transmitters in the manner described in this Complaint.  Additionally, 47 C.F.R. § 5.601 provides that, for product development trials, "[m]arketing of devices . . . or provision of services for hire is not permitted."

14

By way of another example, 47 C.F.R. § 5.602 enables "provision of services for hire . . . before the radio frequency device has been authorized by the Commission" only if the "device will be operated in compliance with existing Commission rules, waivers of such rules that are in effect at the time of operation, or rules that have been adopted by the Commission but that have not yet become effective." No such rules, waivers, or adopted rules exist that permit Commercial Trading or Defendants' use of the shortwave transmitters pursuant to an Experimental License in the manner described in this Complaint.

*Skywave's Discovery of Defendants' Racketeering Scheme*

60.     In December 2016, Skywave learned that 10Band had filed applications with the FCC to obtain Experimental Licenses to operate shortwave transmitters. 10Band had filed an application to operate in Elburn, Illinois, and the FCC granted that license. Around that time, Skywave and its investors heard rumors in the industry that Jump or Virtu (both trading firms) may be affiliated with 10Band.

61.     In 2017, ███ became concerned that if anyone were to use 10Band's shortwave transmitter under an Experimental License for Commercial Trading, they would have a dominant latency (*i.e.*, speed) advantage over other traders using optical fiber and microwave networks and the Skywave Network, which would operate under Commercial License conditions. *See supra* ¶¶ 56–59. At that time, Skywave was not aware of any information confirming the rumors that Jump or Virtu were affiliated with 10Band or using 10Band's shortwave transmitter for Commercial Trading. Nor was Skywave aware of any data showing or any method to determine whether Jump, Virtu, or others were using Experimental Licenses for Commercial Trading.

62.     ███ did not believe the partnership could reasonably compete against any unlawfully used 10Band Experimental License for Commercial Trading. Given its concern about

this possibility, ■■■ sought to exit the partnership with Skywave and ■■■. In March 2017, Skywave, ■■■■■■ agreed to release ■■■ from the partnership.

63.    Without ■■■■■■, Skywave was forced to pause or cancel aspects of its network construction. Although ■■■ remained committed to the partnership, ■■■ did not provide ■■■■■■■■■ that Skywave lost when ■■■ left.

64.    In the Fall of 2018, Skywave found ■■■■■■■■■■■ ■■■■■■■■■■■■■■ Skywave to further develop its innovative shortwave network technology. ■■■■■■■ did not, however, agree to ■■■■■■■■ ■■■■ to complete construction of the Skywave Network.

65.    In early 2019, Skywave and ■■■■■■ went to the market for additional capital investment, but they were unable to raise the funds necessary to complete construction of the Skywave Network.

66.    In 2020, ■■■■■■ asked ■■■■■■■■ of the Skywave Network construction, but ■■■ declined because of its concerns that trading firms may have been using Experimental Licenses for Commercial Trading. ■■■ also requested, and Skywave agreed, to dissolve the original partnership. At that time, Skywave was still not aware of any information showing Jump, Virtu, or any other trading firm was affiliated with 10Band or using 10Band's Experimental Licenses for Commercial Trading. Nor was Skywave aware of any data showing or any method to determine whether Jump, Virtu, or others were using Experimental Licenses for Commercial Trading.

67.    In October 2020 ■■■■■■ and Virtu entered into a non-disclosure agreement to discuss Skywave's innovative shortwave network technology. Representatives of ■■■■■■, Skywave, and Virtu subsequently met on or about October 8, 2020. ■■■■■■■■■

16

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

68.     In 2022, Skywave discovered that a German company, Deutsche Börse, offered a market analytics tool called A7.  The A7 tool enabled examination of CME and Eurex trading data for evidence of trading using shortwave networks.

69.     Using the A7 tool, Skywave discovered evidence of shortwave trading.  For example, the A7 tool showed two different latencies for latency arbitrage trading of the E-Mini (abbreviated as "ES" in Figure 1) and the FDAX (as described above).  *See* Fig. 1.  First, E-Mini price moves on the CME correlated with FDAX trading activity on the Eurex peaking approximately 37 milliseconds later.  That 37-millisecond latency indicates trading over networks comprised of conventional optical fiber and microwave transmitters.  Second, the A7 data also showed E-Mini price moves on the CME correlated with FDAX trading activity on the Eurex peaking approximately 28 milliseconds later.  That relatively low 28-millisecond latency indicates trading over networks that included shortwave transmissions.



**Figure 1: XCME/XEUR Latency Data**[5]

70.     In fact, Deutsche Börse's head of quantitative analytics concluded that the A7 latency data showing an approximately 9-millisecond advantage in some trades was evidence of shortwave trading.  Fig. 2.

---

[5]     Stefan      Schlamp,      *Stefan      Schlamp's      Post*,      LinkedIn, https://www.linkedin.com/posts/stefanschlamp_cmegroup-eurex-marketdata-activity-6948926555855192064-eXrF/ (indicating a time of publication 2 years prior to Sept. 2024).



**Figure 2: Stefan Schlamp's A7 Analysis**[6]

71.     According to Deutsche Börse's retroactive A7 analysis, trading at shortwave latencies began in 2017, accelerated in 2019, and has dominated CME/EUREX latency arbitrage trading, such as E-Mini-FDAX trading, since 2020.   Correspondingly, trading activity at the relatively slower optical fiber and microwave network latency gradually decreased after shortwave trading commenced.  Fig. 3 (heatmap showing shortwave network trading on "Short-Wave" dotted line and optical fiber and microwave network trading on "MW/Hibernia/MW" line, with white indicating activity and red indicating higher activity).

---

[6]     Stefan     Schlamp,     *Stefan     Schlamp's     Post*,     LinkedIn, https://www.linkedin.com/posts/stefanschlamp_cmegroup-eurex-marketdata-activity-6948926555855192064-eXrF/ (indicating a time of publication 2 years prior to Sept. 2024).



**Figure 3: XCME/XEUR Network Data**[7]

72.     The rise in shortwave network trading evidenced by these low latencies precisely matches the decline of CME traders who used conventional network technologies (*e.g.*, optical fiber and microwave) and eventually ceased CME/EUREX arbitrage trading because they could not compete due to the low latencies enabled by shortwave networks.

<u>**Defendants' Enterprise**</u>

73.     Since 2016, DiSomma, Gurinas, Hinerfeld, DiSomma Trust, Gurinas Trust, Jump Financial, Jump Trading Holdings, Jump Trading, ECW Wireless, World Class Wireless, Virtu, NLN Holdings, NLN, and 10Band have worked and continue to work in concert to advance their shared purpose to defraud the FCC to obtain shortwave Experimental Licenses for Commercial

---

[7]     Stefan     Schlamp,     *Stefan     Schlamp's     Post*,     LinkedIn, https://www.linkedin.com/posts/stefanschlamp_cme-eurex-microwave-activity-7027298230296051712-bW6x (indicating a time of publication 1 year prior to Sept. 2024).

Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.

*Relationships Between Defendants*

74. Defendants form a complex network of individuals, trusts, shell companies, trading companies, and other entities that are an association-in-fact enterprise under 18 U.S.C. § 1961(4) to facilitate and conduct Defendants' racketeering scheme.

75. Figure 4 provides an overview of the relationships between the Defendants.[8]

**Defendants' Enterprise**



**Figure 4: Defendants' Enterprise Overview**

---

[8] Figure 4 represents a compilation of the information in Exhibit 1 (FINRA BrokerCheck Report for Jump Trading), Exhibit 2 (10Band Ownership Structure as Submitted to FCC), and Exhibit 3 (Declaration of John P. Madigan on Behalf of NLN Holdings as Submitted to FCC).

76.     DiSomma (labeled "2" in Fig. 4), Gurinas (labeled "3" in Fig. 4), and Hinerfeld (labeled "1" in Fig. 4) are central figures in the coordination of the racketeering and conspiracy scheme.  DiSomma and Gurinas collectively own a controlling interest in Jump Financial (labeled "6" in Fig. 4) through DiSomma Trust and Gurinas Trust, respectively.  Jump Financial owns a controlling interest in Jump Trading Holdings (labeled "7" in Fig. 4).  Jump Trading Holdings owns a controlling interest in Jump Trading (labeled "8" in Fig. 4).  DiSomma and Gurinas are involved in the management and operation of Jump Financial, Jump Trading Holdings, and Jump Trading (collectively, "the Jump Defendants").  As part of the association-in-fact, the Jump Defendants engage in Commercial Trading using one or more shortwave transmitters operated by 10Band (labeled "13" in Fig. 4) under an Experimental License.

77.     Hinerfeld is the General Counsel for Jump Trading.  Ex. 4.  Hinerfeld signed multiple fraudulent Experimental License applications and other filings on behalf of 10Band.  *See infra* ¶¶ 142–180.  Hinerfeld is also a Board Manager for NLN Holdings (labeled "11" in Fig. 4). Ex. 5.

78.     Virtu (labeled "14" in Fig. 4) engages in Commercial Trading using one or more shortwave transmitters operated by 10Band under an Experimental License.

79.     NLN Holdings is a joint venture between DiSomma, Gurinas, and Virtu.  Virtu owns a 50 percent interest of NLN Holdings.  DiSomma and Gurinas own a 50 percent interest of NLN Holdings through a web of corporate shells.  DiSomma and Gurinas collectively own a controlling interest in ECW Wireless (labeled "9" in Fig. 4) through DiSomma Trust and Gurinas Trust, respectively.  ECW Wireless owns a controlling interest in World Class Wireless (labeled "10" in Fig. 4).  World Class Wireless owns a 50 percent interest in NLN Holdings (labeled "11"

in Fig. 4). NLN Holding is therefore ultimately owned and controlled by DiSomma, Gurinas, and Virtu, which direct the Commercial Trading of the association-in-fact enterprise.

80. NLN Holdings owns a controlling interest in NLN (labeled "12" in Fig. 4). NLN is also a joint venture of DiSomma, Gurinas, and Virtu. NLN's Board of Directors has been comprised of employees of the Jump Defendants (*e.g.*, John Madigan and Marcus Washko) and Virtu (*e.g.*, Mike Rosenthal and Jason Vopni). NLN owns a controlling interest in 10Band.

81. 10Band applied for Experimental Licenses to operate multiple shortwave transmitters (as explained further below), and in so doing, knowingly made material misrepresentations. 10Band operates shortwave transmitters under Experimental Licenses, and the Jump Defendants and Virtu use those transmitters to engage in Commercial Trading.

82. DiSomma, Gurinas, Hinerfeld, DiSomma Trust, Gurinas Trust, ECW Wireless, World Class Wireless, Virtu, NLN Holdings, NLN, and 10Band form an association-in-fact enterprise under 18 U.S.C. § 1961(4) to facilitate and conduct Defendants' racketeering scheme. Its purpose is to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.

*Defendants' Worldwide Trading Network and Associated Trading on that Network*

83.     Figure 5 provides an overview of Defendants' worldwide trading network ("Defendants' Worldwide Trading Network").



**Defendants' Worldwide Trading Network**

**Figure 5: Defendants' Worldwide Trading Network Overview**

Defendants' Worldwide Trading

84.     Defendants operated and continue to operate a worldwide trading network that connects major trading exchanges throughout the world.  Defendants assembled this network using the shortest possible paths between exchanges to ensure that Defendants' trading signals arrive faster than competing signals—allowing Defendants to dominate the trades between these exchanges.  Defendants' network uses a combination of optical fiber, microwave, and shortwave connections between trading exchanges.

85.     Defendants operate computer servers or other equipment inside the data centers where trading exchanges are managed.  These servers are connected to the Defendants' Worldwide

Trading Network and allow their trades to execute. Operating their servers inside the data centers where trading exchanges are managed, in combination with the unlawful use of experimental shortwave transmitters, provides Defendants with a low-latency network that is faster than networks that do not unlawfully operate shortwave transmitters under Experimental Licenses. Defendants use the lower-latency advantage of their trading network to dominate certain trades across worldwide trading markets.

86. The following example illustrates how Defendants engage in Commercial Trading across the globe using Defendants' Worldwide Trading Network:

a. Defendants operate or use servers in the CME Group Data Center in Aurora, Illinois.

b. When a price change occurs in the E-Mini (managed by servers in the CME Group Data Center), Defendants' servers inside the CME Group Data Center will detect the change faster than other traders' servers that are not co-located in the data center because there are only a few meters of physical separation between Defendants' servers and the servers that manage the E-Mini.

c. Defendants' servers will send a signal to one of their servers at another location that manages a financial instrument that pairs with the E-Mini, such as the FDAX.

d. In this example, Defendants' servers in the CME Group Data Center will send a shortwave trading signal to Defendants' servers in the Deutsche Börse's FR2 Data Center in Frankfurt, Germany, where the FDAX is managed.

e. Because the FDAX is correlated to the price of the E-Mini, when the E-Mini drops in price, Defendants know that the FDAX will likely adjust downward, and they in turn want to sell the FDAX before other traders receive the E-Mini's drop information and the imminent FDAX

drop. After the FDAX drops in price, the Defendants can purchase the FDAX at the lower price to capture a profit.

f.      With this information and infrastructure, Defendants can use their Experimental Licenses to transmit that trading signal from Illinois to Germany to initiate the sale and buy orders faster than any other trader can legally do via optical fiber and microwave networks alone or a network that includes shortwave transmitters operated under a Commercial License.

87.     Pursuant to the example above, Defendants will transmit the trading signal knowing that the FDAX is likely to adjust.  That signal starts at Defendants' server inside the CME Group Data Center and travels to a microwave link just outside the building where it will be transmitted via microwave until it arrives at Defendants' Elburn, Illinois shortwave transmitter station, which is operated under an Experimental License.  The Elburn shortwave transmitter then sends the trading signal to Germany.  When it arrives, the signal will be received by a shortwave receiving station and then sent via microwave to Defendants' server in Deutsche Börse's FR2 Data Center in Germany.  That server will then send the buy and sell orders to the server that manages the FDAX, which is also housed in the same FR2 Data Center.

88.     In this example, Defendants can sell the FDAX and avoid a loss and position themselves for profit because Defendants' trade signal to sell the FDAX arrives at the Deutsche Börse and is executed before other traders' signals to sell the FDAX over other networks even arrive.  Once the other traders' signals to sell arrive at Deutsche Börse, the market catches up, and the price of the FDAX begins to drop.  Defendants can then unwind the trade for a profit by purchasing the FDAX at the lower market price.  Thus, Defendants beat the market—avoiding a loss and making a profit—through the low latency afforded by their unlawful use of an Experimental License to operate the Elburn transmitter.

89.     Defendants have constructed a worldwide network of optical fiber, microwave transmitters, and shortwave transmitters (including U.S. transmitters operated unlawfully under Defendants' Experimental Licenses) to, among other things, leverage the speed of shortwave transmissions to profit from latency arbitrage trading.  Through their network, Defendants trade financial instruments on exchanges across the world, including NASDAQ, ICE, CME, CBOT, NYMEX, COMEX, NYSE, CBOE, BATS, BZX, BYX, Chi-X, LSE, Deutsche Börse, JPX, TSE, OSE, TOCOM, and B3.

<u>Defendants' Trading Infrastructure: Illinois</u>

90.     Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the CME Group Data Center, located at 2905 Diehl Road, Aurora, Illinois 60502.  Trading exchanges hosted at this data center include the CME, CBOT, NYMEX, and COMEX.[9]

91.     NLN maintains one or more microwave transmission links that transmit data to and from the CME Group Data Center, including transmission links with FCC call signs WRBQ634, WQYE600, WQTW361, WQWG200, and WQZD637.  Exs. 6–9, 49.

92.     10Band maintains one or more microwave transmission links that transmit data to and from the CME Group Data Center, including the transmission links with FCC call signs WRDY580, WRFA817, and WRJC512.  Exs. 10–12.

---

[9] CME Group, Inc. ("CME Group") operates CME, CBOT, NYMEX, and COMEX. William Shepard (labeled "4" in Fig. 4) serves on the Board of Directors of the CME Group. Shepard also owns an interest in Jump Trading.  Saijel Kishan & Matthew Leising, *Don't Tell Anybody About This Story on HFT Power Jump Trading*, Bloomberg (July 23, 2014), https://www.bloomberg.com/news/articles/2014-07-23/don-t-tell-anybody-about-this-story-on-hft-power-jump-trading.

93.     Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the data centers located at 350 East Cermak Road, Chicago, Illinois 60616, including the CH4 Data Center and the CME (collectively, "Cermak Road Data Centers"). Trading exchanges hosted at these data centers include the NASDAQ, ICE, CME, CBOT, NYMEX, and COMEX.

94.     NLN maintains one or more microwave transmission links that transmit data to and from the Cermak Road Data Centers, including the transmission links with FCC call sign WQPE497 and WQZD637. Exs. 13, 49.

95.     10Band operates two shortwave transmission stations in Elburn, Illinois that transmit trading signals to Europe, Japan, and Washington with FCC call sign WI2XNX.

96.     10Band operates one or more shortwave receiving stations in Elburn, Illinois that receive trading signals from Europe (48 kHz), the British Isles (48 kHz), South America (24 kHz), and Asia (12 kHz).

97.     NLN operates a series of microwave transmission links that relay trading signals between Illinois and New York/New Jersey. These include links with FCC call signs WQWX694, WQWX695, WQXF336, WQUL202, WQYX983, WQPP781, WQUL201, WQYT727, WQXK971, WQWF975, WQPI470, WQWF990, WQWF989, WQPZ816, and WQZD637. Exs. 14–27, 49.

98.     NLN, directly or through an intermediary, operates a series of microwave transmission links that relay trading signals between Illinois, New Jersey, and Canada. These include links with FCC call signs WROY220, WQQE624, and WQZD637. Exs. 28–29, 49.

99.     Defendants' facilities in Illinois are connected, through optical fiber or microwave intermediaries, to facilities in Washington.

<u>Defendants' Trading Infrastructure: New York/New Jersey</u>

100.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the NYSE Data Center, located at 1700 MacArthur Boulevard, Mahwah, New Jersey 07430.  Trading exchanges hosted at this data center include the NYSE.

101.    NLN maintains one or more microwave transmission links that transmit data to and from the NYSE Data Center, including the transmission links with FCC call signs WQYZ771, WRZQ793, and WQZD637.  Exs. 30–31, 49.

102.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at a series of affiliated data centers in Secaucus, New Jersey, including the NY2 Data Center, located at 755 Secaucus Road, Secaucus, New Jersey 07094; the NY4 Data Center, located at 275 Hartz Way, Secaucus, New Jersey 07094; and the NY5 Data Center, located at 800 Secaucus Road, Secaucus, New Jersey 07094 (collectively, "Secaucus Data Centers").  Trading exchanges hosted at these data centers include the NYSE, CBOE, BZX, BYX, and BATS.

103.    NLN maintains one or more microwave transmission links that transmit data to and from the Secaucus Data Centers, including the transmission links with FCC call signs WQVP918, WQZD536, WRCR823, and WQZD637.  Exs. 32–34, 49.

104.    10Band maintains one or more microwave transmission links that transmit data to and from the Secaucus Data Centers, including the transmission links with FCC call sign WRFL965.  Ex. 35.

105.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the NY11 Data Center, located at 1400 Federal Boulevard Carteret, New Jersey 07008.  Trading exchanges hosted at this data center include the NASDAQ.

106.    NLN maintains one or more microwave transmission links that transmit data to and from the NY11 Data Center, including the transmission links with FCC call signs WQWH561, WQWE641, WQXF496, WQXM804, WRPF418, and WQZD637.  Exs. 36–40, 49.

107.    10Band operates a shortwave transmission station in Wayne, New Jersey that transmits trading signals to Europe with FCC call sign WI2XNX.

108.    Defendants' facilities in New Jersey are connected, through optical fiber or microwave intermediaries, to a cross-ocean optical fiber network over which they transmit signals to Europe and Brazil.

### Defendants' Trading Infrastructure: Washington

109.    10Band operates a shortwave transmission station in Snohomish, Washington that transmits trading signals to Asia with FCC call sign WI2XNX.

110.    10Band operates one or more shortwave receiving stations in Washington to accept incoming shortwave transmissions from transmitters in Illinois and Canada.  For example, 10Band operates a shortwave receiving station at or near 47°5'12.6"N 121°55'21.3"W—a location near Lake Roesiger, Washington.

111.    Defendants' facilities in Washington are connected, through optical fiber or microwave intermediaries, to a cross-ocean optical fiber network over which they transmit signals to Japan.

### Defendants' Trading Infrastructure: United Kingdom

112.    10Band has a shortwave reception loop array station located in Burchett's Green, Maidenhead, SL6 6QR in the United Kingdom.  This location receives shortwave signals from Defendants' shortwave transmission stations in New Jersey, Illinois, and Canada.

113.    Defendants operate a shortwave transmission station in the British Isles that transmits trading signals to the United States (48 kHz).

114.    NLN operates a series of microwave links that relay signals between that location and London, including providing transmission links to the LD4, LD5, and LD6 Data Centers, the LSEG Data Center Docklands, and the NYSE Data Center. These microwave links transmit on over 200 microwave licenses issued to NLN throughout Europe.

115.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the LD4, LD5, or LD6 Data Centers, located at 2 Buckingham Avenue, Slough Trading Estate Slough, United Kingdom, SL1 4NB. Trading exchanges hosted at these data centers include the BATS Chi-X.

116.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the LSEG Data Center Docklands, located at Coriander Avenue, London E14 2AA. Trading exchanges hosted at this data center include the LSE.

117.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the NYSE Euronext Data Center, located at 20 Cranes Farm Road Basildon SS14 3JD. Trading exchanges hosted at this data center include the NYSE.

Defendants' Trading Infrastructure: Continental Europe

118.    Defendants receive shortwave signals in Germany, either directly or when relayed through microwave transmissions from shortwave receiver sites in other locations in Europe, from Defendants' shortwave transmission stations in New Jersey, Illinois, and Canada.

119.    Defendants operate one or more shortwave transmission stations in continental Europe that transmit trading signals to the United States (48 kHz).

120.    NLN operates a series of microwave links that relay those signals to and from Frankfurt, including providing transmission links to the FR2 Data Center.

121.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the FR2 Data Center, located at Kruppstraße 121, 60388 Frankfurt am Main, Germany.  Trading exchanges hosted at this data center include the Deutsche Börse.

Defendants' Trading Infrastructure: Japan

122.    Defendants, directly or through an intermediary, operate a shortwave receiving site near 1342-6 Chikurachō Kawato, Minamiboso, Chiba 295-0014, Japan. This location receives shortwave signals from Defendants' shortwave stations in Washington and Canada.

123.    Defendants operate one or more shortwave transmission stations in Japan that transmit trading signals to the United States (12 kHz).

124.    Defendants, directly or through an intermediary, operate a series of microwave links that relay signals between that location and Tokyo, including providing transmission links to one or more Japan Exchange Group Data Centers.

125.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at one or more of the Japan Exchange Group's data centers, including the OSE data center, located in Koto-ku, Tokyo, Japan.  Trading exchanges hosted at this data center include the TSE, OSE, and TOCOM.

Defendants' Trading Infrastructure: Brazil

126.    Defendants, directly or through an intermediary, operate a shortwave receiving site near Bairro do Castanho, Jundiaí - State of São Paulo, Brazil.  This location receives shortwave signals from Defendants' shortwave stations in Canada.

127.    Defendants operate one or more shortwave transmission stations in Brazil that transmit trading signals to the United States (24 kHz).

128.    Defendants, directly or through an intermediary, operate a series of microwave links that relay signals between that location to Sao Paolo, including providing transmission links to the B3 Data Center.

129.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the B3 Data Center, located at R. Ricardo Prudente de Aquino, 85 - Res. Tambore III, Santana de Parnaíba - SP, Brazil.  Trading exchanges hosted at this data center include the B3.

<u>Defendants' Trading Infrastructure: Canada</u>

130.    To expand the scope of their scheme, Defendants constructed or had constructed and operated and continue to operate a shortwave transmission station in Ontario, Canada.

131.    The Canadian government issues HF Developmental Licenses, which are comparable to U.S. Experimental Licenses.  Similar to U.S. Experimental Licenses, Canadian HF Developmental Licenses are issued for the purpose of testing new wireless technologies and provide their licensees with advantages that can reduce latency and cost. *See Developmental License Playbook*, Gov't of Can. (Sept. 28, 2022), https://ised-isde.canada.ca/site/spectrum-management-telecommunications/en/licences-and-certificates/developmental-licence-playbook.

132.    In March 2021, Defendants' enterprise formed Canadian company 1291956 B.C. Unlimited Liability Company, which does business as Green Wave Radio.  Although Defendants have attempted to hide their relationship with Green Wave Radio, Jump Trading's affiliate company Jump Operations, LLC ("Jump Operations") registered Green Wave Radio's website address, greenwaveradio.net, on July 20, 2023. *Greenwaveradio.net*, Whois,

https://www.whois.com/whois/greenwaveradio.net (last accessed Sept. 27, 2024). Jump Operations shares an address with Jump Trading at 600 West Chicago Avenue Suite 600, Chicago, Illinois 60654, and Matthew Hinerfeld lists that same address as his address with the California State Bar.[10]

133.  Green Wave Radio currently transmits shortwave trading signals from Defendants' shortwave transmission station in Ontario, Canada under a Canadian HF Developmental License with call sign CGA984.  This link transmits signals to Defendants' receiving stations in the United Kingdom, Germany, Japan, Brazil, and Washington.

134.  Defendants went to considerable lengths to obfuscate the connection between Green Wave Radio in Canada and 10Band in the United States.  Because the relationship between their respective broadcasting networks could have alerted U.S. authorities to Defendants' scheme to trade on networks which they claimed were merely experimental, Defendants constructed a hidden intermediary to connect their U.S. and Canadian networks rather than connecting them openly.

135.  Defendants created a company called RuralConnect, LLC ("RuralConnect"), which masquerades as a local internet service provider and serves as an intermediary to Defendants. RuralConnect owns a microwave path from Green Wave Radio's transmitter in Ontario to a field near Dunbridge, Ohio, operating with FCC call sign WROX998.  Ex. 41.  Figure 6 below shows an aerial photograph of that link, labelled WROX998.

---

[10] *See Attorney Profile, Matthew Ben Hinerfeld #160961*, State Bar of Cal. (Sept. 2024), https://apps.calbar.ca.gov/attorney/Licensee/Detail/160961.



**Figure 6: Hidden Connection Between Defendants' U.S. and Canadian Networks**

136.    NLN operates a microwave link with FCC call sign WQQE624, Ex. 29, which is located across the street from RuralConnect's microwave link near Dunbridge, Ohio.  There are no FCC licenses for microwave links between the NLN link and the RuralConnect link across the street.  Figure 6 shows an aerial photograph of that link, labelled WQQE624.

137.    Instead of connecting these two microwave network links through an FCC license, which might have alerted U.S. regulators, Defendants built or caused to be built a hidden optical fiber cable that travels under a private driveway to connect the RuralConnect microwave link to the NLN microwave link.  Figure 6 shows an aerial photograph of the hidden optical fiber's path between the link labelled WROX998 and the link labelled WQQE624.

138.    This hidden optical fiber cable connects Defendants' shortwave transmission station in Ontario, Canada to Defendants' Worldwide Trading Network.

**Defendants' Experimental Licenses**

*Elburn I Experimental License*

139.    Defendants applied for their first Experimental License on September 21, 2016 under FCC Experimental Licensing System File Number 0089-EX-CN-2016 for a 60-month term at a station location in Elburn, Illinois ("Elburn I Experimental License Application"). Ex. 42-A.

140.    The Elburn I Experimental License Application listed 10Band as the applicant. Ronald Riley signed the application as an "[a]uthorized employee" of 10Band. The application identified 10Band as a "[c]orporat[e]" applicant. The application also directed mail to a Duane Morris LLP office and email correspondence to a Duane Morris LLP email domain. 10Band requested that the Elburn I Experimental License Application be "withheld from public inspection" because, according to 10Band, disclosure of 10Band's narrative statement of its proposed research and experimentation "would cause significant commercial, economic, and competitive harm to 10Band and its affiliates." Ex. 42-B.

141.    The FCC granted the Elburn I Experimental License with an effective date of November 10, 2016 and an expiration date of November 1, 2021 ("Elburn I Experimental License"). Ex. 42-C.

142.    On August 31, 2021, 10Band submitted a renewal application for the Elburn I Experimental License under FCC Experimental Licensing System File Number 0078-EX-TC-2020 ("Elburn I Experimental License Renewal I"). Ex. 42-D. Hinerfeld—an "[a]uthorized [r]epresentative" of the 10Band "[c]orporation"—signed the Elburn I Experimental License Renewal I. The application directed mail to a 10Band office but all email correspondence to a NLN email domain. The FCC granted the Elburn I Experimental License Renewal I, extending the expiration date of the Elburn I Experimental License by 2 years—to November 1, 2023. Ex.

36

42-E.  10Band requested that the Elburn I Experimental License Renewal I be "withheld from public inspection" because, according to 10Band, disclosure of 10Band's narrative statement of its proposed research and experimentation "would cause significant commercial, economic, and competitive harm to 10Band and its affiliates."  Ex. 42-F.

143.    On August 8, 2023, 10Band submitted a renewal application for the Elburn I Experimental License under FCC Experimental Licensing System File Number 0277-EX-CM-2022 ("Elburn I Experimental License Renewal II").  Ex. 42-G.  Hinerfeld—an "[a]uthorized [r]epresentative" of the 10Band "[c]orporation" —signed the renewal application.  The application directed mail to a 10Band office but all email correspondence to a NLN email domain.   The FCC granted the Elburn I Experimental License Renewal II, extending the expiration date of the Elburn I Experimental License by an additional 2 years—to November 1, 2025.  Ex. 42-H.

144.    10Band submitted several other applications for modifications to the Elburn I Experimental License.

a.      The modification application filed on May 1, 2020 under FCC Experimental Licensing System File Number 0078-EX-TC-2020 listed 10Band as the applicant.  Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band.  Ex. 42-I.  The application identified 10Band as an "[o]ther" applicant.  It directed mail to a 10Band office but all email correspondence to a NLN email domain.

b.      The modification application filed on October 19, 2021 under FCC Experimental Licensing System File Number 0234-EX-CM-2021 listed 10Band as the applicant.  Hinerfeld signed the application as an "[a]uthorized employee" of 10Band.  Ex. 42-J.  The application identified 10Band as a "[c]orporate" applicant.  It directed mail to a 10Band office but all email correspondence to a NLN email domain.

c.     The modification application filed on November 25, 2022 under FCC Experimental Licensing System File Number 0277-EX-CM-2022 listed 10Band as the applicant.  Hinerfeld signed the application as an "[a]uthorized employee" of 10Band.  Ex. 42-K.  The application identified 10Band as a "[c]orporate" applicant.  It directed mail to a 10Band office but all email correspondence to a NLN email domain.

145.     In each license application, modification application, and renewal application for the Elburn I Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge.   In each license application, modification application, and renewal application for the Elburn I Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were considered material representations.  In each license application, modification application, and renewal application for the Elburn I Experimental License, 10Band or Hinerfeld acknowledged to the U.S. government that willful false statements made in those applications were punishable by fine, imprisonment, license revocation, and license forfeiture.  *See* Fig. 7.

---

**Certification**

THE APPLICANT CERTIFIES THAT:

    a. Copies of the FCC Rule Parts 2 and 5 are on hand; and
    b. Adequate financial appropriations have been made to carry on the program of experimentation which will be conducted by qualified personnel; and
    c. All operations will be on an experimental basis in accordance with Part 5 and other applicable rules, and will be conducted in such a manner and at such a time as to preclude harmful interference to any authorized station; and
    d. Grant of the authorization requested herein will not be construed as a finding on the part of the Commission:
        1. that the frequencies and other technical parameters specified in the authorization are the best suited for the proposed program of experimentation, and
        2. that the applicant will be authorized to operate on any basis other than experimental, and
        3. that the Comission is obligated by the results of the experimental program to make provision in its rules including its table of frequency allocations for applicant's type of operation on a regularly licensed basis.

THE APPLICANT FURTHER CERTIFIES THAT:

    e. All the statements in the application and attached exhibits are true, complete and correct to the best of the applicant's knowledge; and
    f. The applicant is willing to finance and conduct the experimental program with full knowledge and understanding of the above limitations; and
    g. The applicant waives any claim to the use of any particular frequency or of the electromagnetic spectrum as against the regulatory power of the USA.

WILLFUL FALSE STATEMENTS MADE ON THIS FORM ARE PUNISHABLE BY FINE AND/OR IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001), AND/OR REVOCATION OF ANY STATION LICENSE OR CONSTRUCTION PERMIT (U.S. CODE, TITLE 47, SECTION 312(A)(1)), AND/OR FORFEITURE (U.S. CODE, TITLE 47, SECTION 503).

**Figure 7: Exemplary Certification Excerpts from Exhibit 42-A**

146.    10Band or Hinerfeld willfully made at least the following material misrepresentations, *infra* ¶¶ 172–180, with respect to the Elburn I Experimental License:

a.    Each license application and modification application falsely certified that "[a]ll operations" under Defendants' Experimental Licenses would "be on an experimental basis." 10Band and Hinerfeld knew at the time of the certifications that 10Band had operated or would soon thereafter operate a shortwave transmitter under the Elburn I Experimental License for Commercial Trading by the Jump Defendants and Virtu. In other words, 10Band and Hinerfeld knew at the time of the certifications that 10Band would be operating a shortwave transmitter under the Elburn I Experimental License for purposes other than experimentation in contravention of the certification.

b.    Each license application and modification application falsely stated that equipment used under Defendants' Experimental Licenses was not capable of station identification. 10Band and Hinerfeld knew at the time of the certifications that 10Band's equipment was capable of station identification.

c.　　Each renewal application falsely certified that the "[n]ature" of Defendants' activities under Defendants' Experimental Licenses were "experimental."　10Band and Hinerfeld knew at the time of the certifications that 10Band had operated or would soon thereafter operate a shortwave transmitter under the Elburn I Experimental License for Commercial Trading by the Jump Defendants and Virtu.　In other words, 10Band and Hinerfeld knew at the time of the certifications that 10Band would be operating a shortwave transmitter under the Elburn I Experimental License for purposes other than experimentation in contravention of the certification.

*Elburn II Experimental License*

147.　Defendants applied for another Experimental License on January 22, 2020 under FCC Experimental Licensing System File Number 0074-EX-CN-2020 for a 24-month term at a station location in Elburn, Illinois ("Elburn II Experimental License Application").　Ex. 43-A.

148.　The Elburn II Experimental License Application listed 10Band as the applicant. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band.　The application identified 10Band as a "[c]orporat[e]" applicant.　The application also directed mail to a Duane Morris LLP office and email correspondence to a Duane Morris LLP email domain.　10Band requested that the Elburn II Experimental License Application be "withheld from public inspection" because, according to 10Band, disclosure of 10Band's narrative statement of its proposed research and experimentation "would cause significant commercial, economic, and competitive harm to 10Band and its affiliates."　Ex. 43-B.

149.　The FCC granted the Elburn II Experimental License with an effective date of February 12, 2020 and an expiration date of February 1, 2022 ("Elburn II Experimental License"). Ex. 43-C.

150.    10Band filed a modification application for the Elburn II Experimental License on May 1, 2020 under FCC Experimental Licensing System File Number 0079-EX-TC-2020.  Ex. 43-D.  The modification application listed 10Band as the applicant. Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band.  The application identified 10Band as an "[o]ther" applicant.  The application also directed mail to a 10Band office but all email correspondence to a NLN email domain.

151.    In each license application and modification application for the Elburn II Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge. In each license application and modification application for the Elburn II Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were considered material representations.  In each license application and modification application for the Elburn II Experimental License, 10Band or Hinerfeld acknowledged to the U.S. government that willful false statements made in those applications were punishable by fine, imprisonment, license revocation, and license forfeiture.

152.    10Band or Hinerfeld willfully made at least the following material misrepresentations, *infra* ¶¶ 172–180, with respect to the Elburn II Experimental License:

a.    Each license application and modification application falsely certified that "[a]ll operations" under Defendants' Experimental Licenses would "be on an experimental basis." 10Band and Hinerfeld knew at the time of the certifications that 10Band had operated or would soon thereafter operate a shortwave transmitter under the Elburn II Experimental License for Commercial Trading by the Jump Defendants and Virtu.  In other words, 10Band and Hinerfeld knew at the time of the certifications that 10Band would be operating a shortwave transmitter

under the Elburn II Experimental License for purposes other than experimentation in contravention of the certification.

b. Each license application and modification application falsely stated that equipment used under Defendants' Experimental Licenses was not capable of station identification. 10Band and Hinerfeld knew at the time of the certifications that 10Band's equipment was capable of station identification.

*Wayne Experimental License*

153. Defendants applied for another Experimental License on January 22, 2020 under FCC Experimental Licensing System File Number 0075-EX-CN-2020 for a 24-month term at a station location in Wayne, New Jersey ("Wayne Experimental License Application"). Ex. 44-A.

154. The Wayne Experimental License Application listed 10Band as the applicant. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band. The application identified 10Band as a "[c]orporat[e]" applicant. The application also directed mail to a Duane Morris LLP office and email correspondence to a Duane Morris LLP email domain. 10Band requested that the Wayne Experimental License Application be "withheld from public inspection" because, according to 10Band, disclosure of 10Band's narrative statement of its proposed research and experimentation "would cause significant commercial, economic, and competitive harm to 10Band and its affiliates." Ex. 44-B.

155. The FCC granted the Wayne Experimental License with an effective date of February 14, 2020 and an expiration date of February 1, 2022 ("Wayne Experimental License"). Ex. 44-C.

156. 10Band filed a modification application for the Wayne Experimental License on May 1, 2020 under FCC Experimental Licensing System File Number 0080-EX-TC-2020. Ex.

44-D.   The modification application listed 10Band as the applicant.   Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band.  The application identified 10Band as an "[o]ther" applicant.   The application also directed mail to a 10Band office but all email correspondence to a NLN email domain.

157.   In each license application and modification application for the Wayne Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge. In each license application and modification application for the Wayne Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were considered material representations.  In each license application and modification application for the Wayne Experimental License, 10Band or Hinerfeld acknowledged to the U.S. government that willful false statements made in those applications were punishable by fine, imprisonment, license revocation, and license forfeiture.

158.   10Band or Hinerfeld willfully made at least the following material misrepresentations, *infra* ¶¶ 172–180, with respect to the Wayne Experimental License:

a.      Each license application and modification application falsely certified that "[a]ll operations" under Defendants' Experimental Licenses would "be on an experimental basis." 10Band and Hinerfeld knew at the time of the certifications that 10Band had operated or would soon thereafter operate a shortwave transmitter under the Wayne Experimental License for Commercial Trading by the Jump Defendants and Virtu.  In other words, 10Band and Hinerfeld knew at the time of the certifications that 10Band would be operating a shortwave transmitter under the Wayne Experimental License for purposes other than experimentation in contravention of the certification.

b.      Each license application and modification application falsely stated that equipment used under Defendants' Experimental Licenses was not capable of station identification.  10Band and Hinerfeld knew at the time of the certifications that 10Band's equipment was capable of station identification.

*Everett Experimental License*

159.    Defendants applied for another Experimental License on January 22, 2020 under FCC Experimental Licensing System File Number 0077-EX-CN-2020 for a 24-month term at a station location in Everett, Washington ("Everett Experimental License Application").  Ex. 45-A.

160.    The Everett Experimental License Application listed 10Band as the applicant.  Hinerfeld signed the application as an "[a]uthorized employee" of 10Band.  The application identified 10Band as a "[c]orporat[e]" applicant.  The application also directed mail to a Duane Morris LLP office and email correspondence to a Duane Morris LLP email domain.  10Band requested that Everett Experimental License Application be "withheld from public inspection" because, according to 10Band, disclosure of 10Band's narrative statement of its proposed research and experimentation "would cause significant commercial, economic, and competitive harm to 10Band and its affiliates."  Ex. 45-B.

161.    The FCC granted the Everett Experimental License with an effective date of February 14, 2020 and an expiration date of February 1, 2022 ("Everett Experimental License").  Ex. 45-C.

162.    10Band filed a modification application for the Everett Experimental License on May 1, 2020 under FCC Experimental Licensing System File Number 0081-EX-TC-2020.  Ex. 45-D.  The modification application listed 10Band as the applicant.  Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band.  The application identified 10Band as an

"[o]ther" applicant.  The application also directed mail to a 10Band office but all email correspondence to a NLN email domain.

163.    In each license application and modification application for the Everett Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge. In each license application and modification application for the Everett Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were considered material representations.  In each license application and modification application for the Everett Experimental License, 10Band or Hinerfeld acknowledged to the U.S. government that willful false statements made in those applications were punishable by fine, imprisonment, license revocation, and license forfeiture.

164.    10Band or Hinerfeld willfully made at least the following material misrepresentations, *infra* ¶¶ 172–180, with respect to the Everett Experimental License:

a.      Each license application and modification application falsely certified that "[a]ll operations" under Defendants' Experimental Licenses would "be on an experimental basis." 10Band and Hinerfeld knew at the time of the certifications that 10Band had operated or would soon thereafter operate a shortwave transmitter under the Everett Experimental License for Commercial Trading by the Jump Defendants and Virtu.  In other words, 10Band and Hinerfeld knew at the time of the certifications that 10Band would be operating a shortwave transmitter under the Everett Experimental License for purposes other than experimentation in contravention of the certification.

b.      Each license application and modification application falsely stated that equipment used under Defendants' Experimental Licenses was not capable of station identification.  10Band

and Hinerfeld knew at the time of the certifications that 10Band's equipment was capable of station identification.

*Lynnwood Experimental License*

165.    On or about March 2020, NLN acquired substantially all of Western Maritime Broadcast LLC ("Western Maritime"), including Western Maritime's Experimental License, which was initially granted under FCC Experimental Licensing System File Number 0885-EX-CN-2018 for a 24-month term at a station location in Lynnwood, Washington with an effective date of February 8, 2020 and an expiration date of February 1, 2021 ("Lynnwood Experimental License"). Ex. 46-A. On or about March 2020, NLN assigned its rights to the Lynnwood Experimental License to 10Band. *See* Exs. 5, 46-B.

166.    10Band filed an application for consent of assignment of the Lynnwood Experimental License on March 6, 2020. Ex. 46-B. The application listed 10Band as the applicant-assignee. Hinerfeld signed the application as an "[o]fficer" of 10Band.

167.    The FCC granted the assignment of the Lynnwood Experimental License to 10Band effective April 3, 2020. Ex. 46-C.

168.    10Band submitted several other applications for modifications to the Lynnwood Experimental License.

a.    The modification application filed on April 17, 2020 under FCC Experimental Licensing System File Number 0005-EX-AL-2020 listed 10Band as the applicant. Hinerfeld signed the application as an "[o]ffice[r]" of 10Band. Ex. 46-D. The application identified 10Band as a "[c]orporat[e]" applicant. The application also directed mail to a Duane Morris LLP office and email correspondence to a Duane Morris LLP email domain.

b. The modification application filed on November 25, 2020 under FCC Experimental Licensing System File Number 0268-EX-CM-2020 listed 10Band as the applicant. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band. Ex. 46-E. The application identified 10Band as a "[c]orporat[e]" applicant. The application also directed mail to a Duane Morris LLP office and email correspondence to a Duane Morris LLP email domain.

c. The modification application filed on December 8, 2020 under FCC Experimental Licensing System File Number 0118-EX-TC-2020 listed 10Band as the applicant. Hinerfeld signed the application as an "[o]ffice[r]" of 10Band. Ex. 46-F. The application identified 10Band as an "[o]ther" applicant. The application also directed mail to a 10Band office but all email correspondence to a NLN email domain.

169. In each consent of assignment application and modification application for the Lynnwood Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge. In each consent of assignment application and modification application for the Lynnwood Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were considered material representations. In each consent of assignment application and modification application for the Lynnwood Experimental License, 10Band or Hinerfeld acknowledged to the U.S. government that willful false statements made in those applications were punishable by fine, imprisonment, license revocation, and license forfeiture.

170. 10Band or Hinerfeld willfully made at least the following material misrepresentations, *infra* ¶¶ 172–180, with respect to the Lynnwood Experimental License:

a.   Each consent of assignment application and modification application falsely certified that "[a]ll operations" under Defendants' Experimental Licenses would "be on an experimental basis." 10Band and Hinerfeld knew at the time of the certifications that 10Band had operated or would soon thereafter operate a shortwave transmitter under the Lynnwood Experimental License for Commercial Trading by the Jump Defendants and Virtu. In other words, 10Band and Hinerfeld knew at the time of the certifications that 10Band would be operating a shortwave transmitter under the Lynnwood Experimental License for purposes other than experimentation in contravention of the certification.

b.   Each modification application falsely stated that equipment used under Defendants' Experimental Licenses was not capable of station identification. 10Band and Hinerfeld knew at the time of the certifications that 10Band's equipment was capable of station identification.

### **Defendants' Racketeering**

171.   Defendants have fraudulently obtained and renewed several Experimental Licenses for shortwave communications to unlawfully dominate the Commercial Trading market.

<u>Defendants' Predicate Acts: Fraud in Applying for, Modifying, and Renewing Experimental Licenses in Violation of 18 U.S.C. § 1343</u>

172.   Defendants' predicate acts of racketeering include the submission of each license application, modification application, renewal application, consent of assignment application, and confidentiality request for Defendants' Experimental Licenses—each of which constitutes the use of wire for the purpose of executing Defendants' racketeering scheme and is an act of wire fraud in violation of 18 U.S.C. § 1343.

173.   Defendants purposefully made the material misrepresentations described in at least Paragraphs 146, 152, 158, 164, and 170 for the purpose of executing Defendants' scheme to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully

use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages

of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from

trading financial instruments at their competitors' expense.

174.     Each of Defendants' material misrepresentations was false when it was made, and

10Band or Hinerfeld knew it was false.  10Band or Hinerfeld falsely represented that all 10Band's

activities and operations under the Experimental Licenses were "experimental" in nature.  Yet

10Band applied for and received Defendants' Experimental Licenses for the purposes of allowing

Jump Trading and Virtu to exploit the technical advantages of shortwave transmitters operated

under the custom-designed parameters of Defendants' Experimental Licenses to gain a speed

advantage over competitors for Commercial Trading.

175.     10Band or Hinerfeld also falsely represented that the modem equipment used under

each of Defendants' Experimental Licenses—TrellisWare TW-621—was not capable of

broadcasting station identification.  Broadcasting station identification has been possible since the

advent of radio broadcasting though the use of equipment that could produce Morse code.  In

addition, the TrellisWare TW-621 is an advanced, modern modem.  10Band uses the TrellisWare

TW-621 to broadcast station identification information in Canada.  FirstToken, *Shortwave HFT*

*(High Frequency Trading) Station, CGA984 with Morse ID, 20152 kHz, 30 October, 2022*,

YouTube (Nov. 5, 2022), https://www.youtube.com/watch?v=yLWMnrRJd7U; Ex. 47.

176.     10Band or Hinerfeld transmitted or caused to be transmitted the identified material

misrepresentations over wire communications between 10Band (in Chicago, Illinois) and the FCC

(in Washington, DC) in interstate and foreign commerce and did so for the purpose of executing

Defendants' scheme to defraud the FCC to obtain shortwave Experimental Licenses for

Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and

leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.

177.    Through Defendants' electronic communications to the FCC, Defendants unlawfully acquired Experimental Licenses under false pretenses. Defendants could not have obtained their Experimental Licenses without Defendants' material misrepresentations that all of 10Band's activities and operations under the Experimental Licenses were "experimental" in nature. *Supra* ¶¶ 54–59, 172–176.

178.    Through Defendants' electronic communications to the FCC, Defendants also unlawfully extended the Elburn I Experimental License under false pretenses. Defendants could not have obtained either the Elburn I Experimental License Renewal I or the Elburn I Experimental License Renewal II without Defendants' material misrepresentations that all of 10Band's activities and operations under the Elburn I Experimental License were "experimental" in nature. *Supra* ¶¶ 54–59, 172–176.

179.    Through Defendants' electronic communications to the FCC, Defendants frustrated and obfuscated identification or investigation of the true commercial nature of the operations Defendants conducted under Defendants' Experimental Licenses for the purpose of executing Defendants' scheme. By repeatedly requesting that the FCC "with[o]ld from public inspection" 10Band's narrative description of its purported experimental work under Defendants' Experimental Licenses, Defendants prevented Skywave and other competitors from investigating and uncovering Defendants' unlawful scheme.

180.    Defendants further frustrated and obfuscated the investigation with material misrepresentations that the equipment used under each of Defendants' Experimental Licenses was not capable of station identification. As a result of those material misrepresentations, Defendants

50

prevented the FCC, Skywave, and other competitors from investigating the connections between Defendants' network infrastructure. *See supra* ¶¶ 83–138. Had Defendants complied with the station identification requirements for their Experimental Licenses, the FCC, Skywave, and other competitors would have been able to more readily track precisely when Defendants were using 10Band's shortwave transmitters to send shortwave signals and then tie those signals to Commercial Trading data.

181. Skywave is not the only victim of Defendants' fraud in applying for, modifying, and renewing their Experimental Licenses. Defendants' racketeering has also injured financial "pairs traders," who trade pairs, such as the E-Mini/FDAX arbitrage.

182. Skywave has knowledge of pairs traders that have ceased operations due to Defendants' racketeering. Because Defendants unlawfully used and continue to use 10Band's shortwave transmitters under Defendants' Experimental Licenses, they have achieved an approximately 9-millisecond advantage over pairs traders using conventional optical fiber and microwave networks, which enables Defendants to manipulate the pricing of paired assets and to take advantage of favorable asset prices. *See* Fig. 1.

<u>Defendants' Predicate Acts: Unlawful Use of Experimental Licenses for Commercial Trading in Violation of 18 U.S.C. § 1343</u>

183. Defendants' predicate acts of racketeering include each commercial trade made by Defendants using shortwave networks granted to 10Band under the Elburn I Experimental License, Elburn II Experimental License, Wayne Experimental License, Everett Experimental License, and Lynnwood Experimental License—each of which constitutes the use of wire for the purpose of executing Defendants' racketeering scheme and is an act of wire fraud in violation of 18 U.S.C. § 1343.

184. Defendants use Defendants' Experimental Licenses to engage in Commercial Trading, contrary to 10Band's and Hinerfeld's sworn representations to the U.S. government that the licenses would be used for research or experimentation. Defendants developed their extensive, global network to engage in Commercial Trading at major worldwide market exchanges, including the NASDAQ, ICE, CME, CBOT, NYMEX, COMEX, NYSE, CBOE, BATS, BZX, BYX, Chi-X, LSE, Deutsche Börse, JPX, TSE, OSE, TOCOM, and B3. *See* Fig. 7.

185. To date, Defendants have regularly engaged in unlawful Commercial Trading since approximately January 2020 using interstate or intercontinental wires. *See supra* ¶¶ 83–138.

186. Virtu has used 10Band's shortwave transmitter under an Experimental License to engage in Commercial Trading. When Skywave met with Virtu in October 2020 to discuss a potential license to Skywave's network technology, Virtu declined Skywave's licensing offer. Virtu mentioned during the meeting that it had access to 10Band's shortwave network but did not mention whether it was trading over that network. *See supra* ¶ 67. At that time, 10Band only possessed shortwave Experimental Licenses from the FCC; it did not have any shortwave Commercial Licenses from the FCC.

187. Virtu's SEC disclosures also suggest that it is part of joint ventures that use "microwave communication networks" to engage in "trading activities." Specifically, in its 2024 SEC 10-K Form, Virtu states that it "pay[s] monthly fees for the use of the microwave communication networks" of Virtu's joint ventures "in connection with" those joint ventures' "***respective trading activities***." Ex. 48 (emphasis added). One of those joint ventures is NLN Holdings, which owns 10Band. In addition to owning 10Band, NLN Holdings owns NLN, which operates the microwave communications portions of Defendants' Worldwide Trading Network. *Supra* ¶¶ 83–138. Virtu specifies that it has a "50.0% noncontrolling interest in one of those joint

ventures." *Id.* Virtu has a 50 percent noncontrolling interest in NLN Holdings. *See* Fig. 4. The microwave and shortwave portions of Defendants' Worldwide Trading Network are interconnected into a single trading network that connects worldwide trading exchanges.

188. Jump Trading has used Defendants' Experimental Licenses to engage in Commercial Trading over the shortwave communication rights granted to 10Band. In addition to Jump Trading sharing 10Band's shortwave network with Virtu, *see supra* ¶¶ 67, 186, trading data also suggests that Jump Trading uses 10Band's shortwave network to engage in Commercial Trading, *supra* ¶¶ 83–138.

189. Defendants continue to engage in unlawful Commercial Trading over 10Band's network, including using 10Band's shortwave transmitters in Elburn, Illinois; Wayne, New Jersey; and Lynnwood, Washington, all operated under Defendants' Experimental Licenses.

### Skywave's Injury Caused by Defendants' Unlawful Racketeering Conduct

190. Due to Defendants' unlawful conduct, Skywave was unable to build and operate the Skywave Network. Defendants' racketeering scheme is the direct and proximate cause of the termination of Skywave's █████████ partnership with ███ and ███ and the associated resulting costs and losses.

191. Although Skywave received ██████████████████████████ as part of ████ Agreement, *supra* ¶ 53 Skywave did not receive the ████████████████████████ ██████████ under their agreement.

192. Pursuant to its obligations under the ████ and ████████████, Skywave ████████ ████████████████████ to develop the network infrastructure. Now, that development work is a sunk cost.

193.    Additionally, Skywave was forced to pause aspects of its network construction. This delay resulted in further opportunity costs to Skywave and an inability to leverage its innovative technology in the market. For example, Skywave was unable to (1) complete its purchase transmitters and antennas; (2) close on land acquisitions for U.S. shortwave transmitter locations; and (3) develop shortwave receiver locations in the United Kingdom and Germany. *See supra* ¶ 53.

194.    As a result of the failure to complete its network construction, Skywave was never able to operate the planned Skywave Network through which ███████████████ . Under the ███████████████ , ██ had agreed to ███████████████ over the Skywave Network with Skywave and ██ . Thus, the failure to complete the Skywave Network resulted in Skywave's loss of at least ███████████████ .

195.    Due to Defendants' unlawful conduct, Skywave was unable to license its shortwave network technology, know-how, and patents. Defendants' racketeering scheme is the direct and proximate cause of economic injury to competitor traders, including pairs traders in cross-exchange international markets, who had no choice but to cease trading operations because they could not compete with Defendants' approximately 9-millisecond advantage due to use of shortwave transmitters operated under Defendants' Experimental Licenses. As the scheme advanced over time, competitor traders relinquished such cross-exchange trading or ceased operations altogether, and Skywave lost potential customers for its shortwave network technology, know-how, and patents.

**CAUSES OF ACTION**

**COUNT I: Violation of 18 U.S.C. § 1962(c)**

196.    Skywave repeats and realleges each and every allegation set forth in Paragraphs 1–195 as if fully set forth herein.

197.    Defendants form an enterprise through association-in-fact.

198.    The shared purpose of the enterprise and sub-enterprises and the members thereof is to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.

199.    Each Defendant participated in the operation or management of Defendants' enterprise.

200.    Each Defendant contributed to directing the enterprise's affairs.

201.    Defendants and Defendants' enterprise engage in interstate commerce.

202.    Defendants' enterprise engages in a pattern of racketeering, including violations of 18 U.S.C. § 1343.  Defendants' racketeering activities affect interstate commerce.

203.    At least as of 2016, Defendants' racketeering acts exhibit open-ended or closed-ended continuity.  Defendants' racketeering acts all relate to and are in furtherance of the enterprise's shared purpose to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.

204.     Defendants' racketeering directly and proximately caused and continues to cause injury to Skywave.

## COUNT II: Violation of 18 U.S.C. § 1962(d)

205.     Skywave repeats and realleges each and every allegation set forth in Paragraphs 1–204 as if fully set forth herein.

206.     From 2016, Defendants unlawfully, knowingly and intentionally combine, conspire, and agree together to engage in the aforesaid conduct in violation of 18 U.S.C. § 1962(c), as set forth in Count I of this Complaint.

207.     By facilitating the enterprise's racketeering activities, each Defendant intended to further the shared purpose of the enterprise to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.

208.     Defendants' violations of 18 U.S.C. § 1343 were in furtherance of Defendants' conspiracy to conduct an enterprise designed to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.

209.     Defendants' violations of 18 U.S.C. § 1343 have directly and proximately caused and continue to cause injury to Skywave.

## PRAYER FOR RELIEF

WHEREFORE, Skywave requests the following relief:

A.      Entry of judgment holding each Defendant liable for violating 18 U.S.C. § 1961 *et seq.*;

B.      An injunction restraining each Defendant, and Defendants' officers, agents, employees, affiliates, and all other persons in concert with, in participation with, or for them from (i) any further unlawful direct or indirect use of Experimental Licenses in the possession of any Defendant; and (ii) any other unlawful trading practice directed towards obtaining for any Defendant maximum financial benefit or acting to the detriment of competitors;

C.       An award of damages—including without limitation Skywave's lost profits and amounts by which Defendants have been unjustly enriched—due to Defendants' racketeering together with pre-judgment and post-judgment interest;

D.      An award of damages—including without limitation treble damages, attorney fees, and litigation costs—in accordance with the civil remedy provisions of 18 U.S.C. § 1964(c); and

E.      Any and all additional legal and equitable relief that may be available under law and that the court may deem proper.

## DEMAND FOR JURY TRIAL

Skywave hereby demands a trial by jury on all issues so triable.

Dated: October 7, 2024

Respectfully submitted,

_/s/_ Jeanne M. Gills_____

Justin Wilcox (*pro hac vice* pending)
Goutam Patnaik (*pro hac vice* pending)
Jamie Dohopolski (*pro hac vice* pending)
DESMARAIS LLP
1899 Pennsylvania Avenue, NW, Suite 400
Washington, D.C. 20006
Tel: 202.451.4900
Fax: 202.451.4901
jwilcox@desmaraisllp.com
gpatnaik@desmaraisllp.com
jdohopolski@desmaraisllp.com

Steven Balcof (*pro hac vice* pending)
DESMARAIS LLP
230 Park Avenue, 26th Floor
New York, New York 10169
Tel: 202.351.3400
Fax: 202.351.3401
sbalcof@desmaraisllp.com

Jeanne M. Gills (IL 6225018)
James Dasso (IL 6193545)
Ariba A. Ahmad (IL 6343233)
FOLEY & LARDNER LLP
321 North Clark Street, Suite 3000
Chicago, Illinois 60654-4762
Tel: 312.832.4500
Fax: 312.832.4700
jmgills@foley.com
jdasso@foley.com
aahmad@foley.com

Justin M. Sobaje (*pro hac vice* pending)
FOLEY & LARDNER LLP
555 South Flower Street, Suite 3300
Los Angeles, California 90071
Tel: 213.972.4500
Fax: 213.486.0065
jsobaje@foley.com

*Attorneys for Skywave Networks, LLC*