# EXHIBIT A

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| 10Band LLC | ) | File No. 0497-EX-CR-2023 |
| Application for renewal of | ) | |
| the Experimental License WI2XNX | ) | |

To: Office of Engineering Technology

## Petition for Reconsideration

Skywave Networks LLC, by counsel, and pursuant to Section 1.106 of the Commission's rules, 47 C.F.R. §1.106, hereby requests reconsideration of the Office of Engineering and Technology's ("OET") grant of another renewal period to 10Band LLC to operate on 2-25 MHz.

10Band filed its application for renewal of the captioned license on August 8, 2023.[1] OET granted it nine days later, on August 17, 2023. There was no reasonable opportunity to comment on or informally object to the grant of the application. Because 10Band has completed its experiments and now uses the experimental authorization for regular day-to-day trading, it should not have been granted. OET should reconsider its grant and deny 10Band's renewal application.

In support, Skywave submits:

1. **Skywave's Interest**

Skywave develops technology that is capable of fixed, long-distance, non-voice communications in the 2-25 MHz Band. It is intensely interested in the operations in the 2-25 MHz Band. Further, its CTO, Kevin Babich, is an amateur radio licensee.[2] As such, he has experienced first-hand, the consequences of 10Band's experimental operations, as are more fully documented in the

---

[1] Section 5.71 of the Commission's rules specifies the License period and terms of renewal for Experimental Radio Licenses. Section 5.71(a)(2) specifies that a license may be renewed for an additional term not exceeding five (5) years upon an adequate showing of need to complete an experiment. 47 C.F.R. §5.71(a)(2). The captioned experimental license was first renewed September 21, 2021. *See* file no. 0507-EX-CR-2021.

[2] Amateur Radio License N9IAA, issued to Kevin J. Babich on November 16, 2018. Mr. Babich operates his HF amateur radio station within an area that may be affected by 10Band's operations at Elburn, Illinois.

comments in docket, RM-11953, the Shortwave Modernization Coalition's ("SMC") Petition for Rulemaking.

2. **The Experimental License**

Section 5.83 of the Commission's rules, 47 C.F.R. §5.83 notes the tentative status of experimental licenses. Section 5.83(a) provides that an experimental license does not confer any right to conduct an activity of a continuing nature. Section 5.83(b) further provides that the grant is subject to change or cancellation by the Commission at any time without notice or hearing, if in the Commission's discretion, the need for such action arises. Section 5.71(a)(2) of the Commission's rules, 47 C.F.R. §5.71(a)(2) provides that a license may be renewed … upon an adequate showing of need to complete the experiment. There is no renewal expectancy in an experimental license.

The history of the 10Band's experimental license is set forth below:

- 10Band's original application for a conventional experimental license was granted November 10, 2016 (File No. 0089-EX-CN-2016) for transmissions from the Chicago area to Europe ("Chicago/EU Link").[3]

- On February 12, 2020, an additional conventional experimental license, WK2XSY, was granted (application File No. 0074-EX-CN-2020) for transmissions from the Chicago area to Washington/Asia ("Chicago/Washington").

- On February 14, 2020, a third conventional experimental license, WK2XTI, was granted (application File No. 0077-EX-CN-2020) for transmissions from the Washington state area to Asia ("Washington/Asia").

- On February 14, 2020, a fourth conventional experimental license, WK2XTH, granted (File No. 075-EX-CN-2020) for transmissions from the New Jersey area to Europe ("NJ/Europe").

- In March of 2020, successful daily use for production operations began.

- On April 3, 2020, the Commission consented to 10Band's acquisition of facilities licensed under call sign WJ2XXI from Western Maritime Broadcast LLC.

---

[3] Under Section 5.71(a) of the Commission's rules, 47 C.F.R. §5.71(a), the application for renewal should not have been granted. Under the rule, an experimental radio licensee is allowed the regular license term of two years and one renewal term of up to five (5) years and no more. Under that calculation, 10Band's allowance expires once and for all on November 7, 2023.

- On May 1, 2020, 10Band LLC reported change of ultimate ownership documentation for 10Band.[4]

- On November 30, 2020, 10Band applied to modify the facilities acquired from Western Marine Broadcasting to use 24 kHz and 48 kHz bandwidths, consistent with 10Band's existing operations.  The application was granted on December 8, 2020.  (File No. 0268-EX-CM-2020)

- In 2020, ultra-low latency microwave links were established between transmit sites in the United States and nearby relevant exchanges.

- On September 1, 2021, 10Band filed for renewal of the conventional experimental license for the Chicago/EU link (File No. 0507-EX-CR-2021).  On September 21, 2021, the Commission renewed the conventional experimental license without modification, subject to express conditions.

- On October 19, 2021, 10Band applied to modify its conventional experimental license into a "market trial" license while combining New Jersey and Washington state locations with the Chicago/EU link (File No. 0234-EX-CM-2021).  The Commission granted the modified application on January 18, 2022.

- On November 25, 2022, 10Band filed an application to reorganize the Chicago/EU, New Jersey/EU, Chicago/Washington state, and Washington state/Asia links all under Call Sign WI2XNX for a market trial (File No. 0277-EX-CM-2022).  The Commission granted the modified application on December 23, 2022.

- On August 8, 2023, 10Band LLC submitted renewal of its market trial experimental license with no changes (File No. 0497-EX-CR-2023) (the "Application"). The Commission granted the Application on August 17, 2023.

### 3.    Grant of the Application Exceeded the Renewal Period Available Under Section 5.71(a)

The Experimental Radio License regime is set forth in Part 5 of the Commission's rules, 47 C.F.R §5.1 *et. seq.*  Under Section 5.71(a)(2) of the Commission's rules, 47 C.F.R. §5.71(a)(2), the application for renewal should not have been granted.  Under the rule, an experimental radio licensee is allowed one renewal term of up to five (5) years and no more.  10Band's license was renewed September 21, 2021.  That was its one renewal term under Section 5.71(a)(2).  Grant of the Application exceeded the bounds of the Commission's rule.

---

[4] The ultimate owners of 10Band's shortwave experimental licenses and low-latency microwave licenses, transferred their interests into trusts.  *See* file no. 0028-EX-TU-2020.

3

4.  **Application**

No supporting information is included in the Application.  Rather, 10Band relies on its Narrative Statement to justify renewal.  In a slight nod to future "experimentation," 10Band asserts that grant of renewal of the experimental authority will allow 10Band additional time to complete its program of testing, understanding of the market potential, and refinement of the customer facing market data feed.  It asserts that it needs two years to continue the experiments.[5] The 10Band Narrative Statement is insufficient to warrant renewal.

a.  *"Internal Use Case" Does not Require Market Studies*.

When considering whether an applicant is eligible for a renewal in the Experimental Radio Service,[6] Section 5.71(a) of the Commission's rules, 47 C.F.R §5.71(a) requires that the applicant provide an adequate showing of need to complete the experiment.  10Band asked the Commission to renew its Experimental License so that it may continue an almost-seven-year experiment to further understand market potential and refine its customer facing data feed.

This justification contrasts with the assertions in the SMC Petition (which 10Band cited in the Application).  Particularly, on page 9 of the SMC Petition, the SMC notes that its members' proposed use case contemplates only private internal communications.  Because only private internal communications are contemplated, there is no "customer" market to explore; there is no need to refine its customer facing data feed.

 The Narrative Statement cannot support renewal because it relates only to services to "customers" and by its own assertions in the SMC petition, 10Band does not propose service to customers.

---

[5] Somehow, the Petition for Rulemaking filed by the Shortwave Modernization Coalition ("SMC") appears to have been a precondition for grant of 10Band's renewal of its experimental authority.  *See* paragraph 4 of 10Band's Narrative Statement.  As such, the precondition links information revealed through said proceedings to the Application..

[6] Section 5.5 of the Commission's rules, 47 C.F.R. §5.5, defines Experimental Radio Service as a service in which radio waves are employed for purposes of experimentation in the radio art for purposes of providing essential communications for research projects that could not be conducted without the benefit of such communications.

b. *Real-world Assessments; Metrics*

In support of its request for another renewal term to continue its almost-seven-year-old experiment, 10Band offers real-world assessments conducted by academic researchers and metrics about content, quality and timeliness of the received data.  It references real-world assessments and metrics, but it does not provide them.

Further 10Band asserts that delivering time-sensitive financial market data across a low latency HF link presents unique challenges such as lossy, low-bandwidth data services.  10Band says that it continues to experiment with HF technology and signal processing techniques to mitigate such issues.  Empirical evidence derived from time-stamped, market data proves that the aforementioned challenges were overcome in March of 2020.

### 5.   **The Experiment**

An experimental licensee's daily operation of the Licensed facilities indicates that the experiment is over.  10Band is operating the experimental facilities as a regular full-time means of transmitting financial information to gain an edge in the financial markets.  For this reason, the Commission should not have granted renewal of 10Band's experimental license.

This is not unlike the situation in *Wilfredo G. Blanco-Pi*, 32 FCC Rcd 3100 (2017), in which the Commission found that because the experimental licensee was using the experimentally licensed facilities on a daily basis, in his regular operations, he had completed his experiments.  Without any apparent further experimental benefit to attain production level status, renewal of the experimental license was not justified.

### 5.   **Shortwave Modernization Coalition**

In its narrative, 10Band mentions the Shortwave Modernization Coalition ("SMC") Petition for Rulemaking recently filed with the Commission as fulfilment of a commitment to the Commission.  The SMC Petition for Rulemaking received over 800 comments, mostly deriding the proposal as a brazen spectrum land grab that would benefit financial traders and cause destructive interference to incumbents

and adjacent services.[7]  10Band's implementation (using wide bandwidths and relaxed emission masks) closely mirrors the heavily criticized features of the Petition.  It is stunning that 10Band would attempt to use the Petition for Rulemaking as justification for grant of a renewal of its Experimental License, when the commenters have suggested that the current experimental operations have been interfering with adjacent services.  10Band fails completely to address the allegations of interference.  For that reason alone, the application should be denied.

6.    **Layers of Users**

In 10Band's narrative to support its market trial, it states that it has "secure[d] an agreement with a provider of financial data with established customer relationships for potential trial participants and with the requisite market data licenses. This network provider will serve as the interface between 10Band and trial participants and will help ensure anonymity of survey feedback from participants."  Representations from the SMC Petition reveal that 10Band's related companies, Jump Trading and Virtu Financial, through joint venture, are 10Band's "customers" who share NLN Holdings and its subsidiary Newline Networks ("NLN") for the provision of financial services data.  Under Section 5.602(c) of the Commission's rules, 47 C.F.R. §5.602(c), NLN as the user of the experimental facilities (providing services to the related Jump Trading and Virtu Financial) must have its own experimental license to operate on facilities currently licensed to 10Band.  Clearly, NLN must have its own experimental license to provide the services to Jump Trading and Virtu Financial.  Because 10Band allowed a related company's unlicensed operations on the experimentally licensed facilities, the Application must be reconsidered and denied.

---

[7] It appears that extended and expansive use of experimental licenses for production purposes is driving deliriously flawed rulemaking proposals (e.g., regressive interference proposals and spectrum hogging) that are not in accordance with Commission principles nor are they in the long-term interest of financial industry participants outside of the SMC.

### 7.    <u>Upon Reconsideration the Application Should be Denied</u>

10Band's application for renewal of WI2XNX should never have been granted.  Section 5.71(a)(2) allows for a single renewal period of five (5) years.  As is clear from the license timeline set forth, this is not 10Band's first renewal request and, if granted, it would extend the term of the experimental license beyond that authorized by Section 5.71(a)(2).

Additionally, 10Band's assertions set forth in the Narrative Statement filed with its renewal application are in direct contradiction with its assertions set forth in the SMC Petition and acknowledged by 10Band's notation of the SMC Petition in the Narrative Statement.  The Narrative Statement presupposes that 10Band will serve customers; the SMC Petition states clearly that the use case for the experimental facilities is internal use only.

Finally, 10Band is no longer experimenting.  For years, 10Band has used and continues to use the facilities day in and day out to conduct financial trades.  After years of highly profitable production trading and market dominance, a limited "market trial" is a *non sequitur*.   No further experimentation is needed.  Under the rule established in *Blanco-Pi,* renewal of the experiment is not justified.

In light of the foregoing, Skywave asks that the Commission reconsider and deny 10Band's application for renewal of the Experimental License, WI2XNX.


Respectfully submitted,

SKYWAVE NETWORKS LLC

By: _____
      Marjorie K. Conner
      Its Counsel
      (703) 626-6980
      mkconner@mkconnerlaw.com


September 18, 2023

Declaration of Timothy J. Eloe

CEO – Skywave Networks LLC


I serve as Chief Executive Officer of Skywave Networks LLC.  I have reviewed the foregoing Petition for Reconsideration.


I hereby verify that the facts asserted in the Petition for Reconsideration are true and correct to the best of my knowledge, information, and belief.  The assertions are proffered under penalty of perjury.

_____

Timothy J. Eloe

Chief Executive Officer

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of September 2023, I transmitted a true, correct, and complete copy of the foregoing Petition for Reconsideration by electronic mail to:

William K. Keane, Esq.
Duane Morris LLP
901 New York Avenue, NW
Suite 700 East
Washington, DC 20001-4795
kkeane@duanemorris.com

Marjorie K. Conner

# EXHIBIT B

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| 10Band LLC | )    File No. 0497-EX-CR-2023 |
| Application for Renewal of | ) |
| Experimental License WI2XNX | ) |

To: Office of Engineering and Technology

**OPPOSITION TO PETITION FOR RECONSIDERATION**

10Band LLC ("10Band"), by its counsel, hereby opposes the Petition for Reconsideration ("Petition") filed by Skywave Networks, LLC ("Skywave").  Skywave seeks reconsideration of the Office of Engineering and Technology's ("OET's") grant of 10Band's renewal application.  As shown below, the Petition is procedurally deficient, and even if it were able to be considered, it lacks substantive merit.  OET's August 17, 2023 grant of the renewal application (the "License") is consistent with the Commission's rules and past practice.  Accordingly, the Petition should be denied, if not dismissed.

**I.**  **The Petition is Procedurally Deficient.**

Skywave must demonstrate compliance with basic requirements for filing a petition for reconsideration.  It fails to meet that test in two respects and should be dismissed.

**A.  Skywave Fails to Show an Adverse Effect and Therefore Lacks Standing.**

If a petition for reconsideration is "filed by a person who is not a party to the proceeding, it shall state with particularity the manner in which the person's interests are adversely affected by the action taken . . . ."[1]  This is akin to a requirement that Skywave have standing to file the

---

[1] 47 C.F.R. § 1.106(b)(1).

Petition.[2]  While Skywave has alleged that "[t]here was no reasonable opportunity to comment on or informally object" to 10Band's application prior to grant, this alone does not convey standing; Skywave's own interests must actually be adversely affected by the Commission action.[3]

However, Skywave never alleges that grant of the License actually adversely affects it. Skywave asserts it is "intensely interested" in operations within the 2-25 MHz band, but stops short of claiming harm from 10Band's operation within the same band.

Skywave also claims that its chief technology officer, Kevin Babich, has "experienced firsthand, the consequences of 10Band's experimental operations, as are more fully documented in the comments in docket, RM-11953, the Shortwave Modernization Coalition's ("SMC") Petition for Rulemaking."[4]  But once again, not only does the Petition itself fail to identify those "consequences" (much less assert any harm caused thereby), but it further fails to even cite where in the docket of that unrelated matter it allegedly shows that Mr. Babich was harmed as a consequence of 10Band's experimental operations.  These allegations do not come close to showing that Skywave has suffered a "direct injury" as a result of the License grant -- a key element of the Commission's standing analysis -- or allege that reversing the grant will prevent or redress any injury.[5, 6]

---

[2] *In re Metro. Transp. Auth. Proposed Order & OOR*, 31 FCC Rcd. 1436, 1440-41 (2016).

[3] *Id.*

[4] Petition at 1-2.

[5] *Metro. Transp. Auth.*, 31 FCC Rcd. at 1440-41.

[6] To the extent the asserted consequences relate to the SMC Petition for Rulemaking, that is a separate matter in which Skywave has already filed comments addressing its concerns.  Moreover, it may also be noted that petitioners may not sit back with vague and conclusory allusions to consequences for purposes of standing, and only later attempt to explain what those allegations mean.  *See In re Matters of Falcon First Commc'ns, L.P.*, 14 FCC Rcd. 7277, 7282 (1999) (a "tender of new, unsupported factual information for the first time in [a] reply … comes too late for Bureau consideration").

**B. The Petition is Procedurally Deficient in Other Respects.**

Perhaps the closest Skywave gets to a claim of adverse effect is its statement that Mr. Babich "operates his HF amateur radio station within an area that may be affected by 10Band's operations at Elburn, Illinois."[7] While this claim does not confer standing for the reasons stated above, it also fails for additional reasons.

First, Mr. Babich is not the petitioner; Skywave is. Skywave and Mr. Babich are two different legal "persons," and Skywave cannot piggyback off of Mr. Babich's standing (if he were to show he actually has standing).[8]

Second, a conclusory allegation that amateur radio operations "may be affected" with no further documentation or evidence of harm does not show a "concrete and particularized" injury for purposes of standing.[9] On the contrary, alleging that something "may" happen is a classic example of a "conjectural or hypothetical" harm.[10]

And third, any petition that "[o]mit[s] information required by these rules to be included . . . such as the affidavit required by paragraph (e) of [§ 1.106] (relating to electrical interference)" is an example of a petition that "plainly do[es] not warrant consideration by the Commission" and which should be dismissed or denied.[11] Here Skywave seems to rest claims of "adverse effect" on the notion that Babich's amateur operations "may" be affected by interference from 10Band. However, Skywave has not provided a qualified engineer's affidavit, or any information at all for that matter, showing "that electrical interference will be caused to [Babich's]

---

[7] Petition at n.2.
[8] *See, e.g.,* 47 C.F.R. § 5.5 ("*Person.* An individual, partnership, association, joint stock company, trust, corporation, or state or local government.").
[9] *Metro. Transp. Auth.,* 31 FCC Rcd. at 1441.
[10] *Id.*
[11] 47 C.F.R. § 1.106(p), (p)(6).

station . . ." as required by subsection (e) of Rule 1.106.[12]  This deficiency likewise warrants

dismissal of the Petition.

## II.     Renewal of the License Was Not Time-Barred.

Skywave's argument that OET could not renew the License beyond November 1, 2023

lacks merit.

Preliminarily, we note that -- unlike the case with Rule 5.71(d) covering Spectrum Horizon

licenses -- the plain language of Rule 5.71(a), (b), and (c) contains no explicit limitation on the

number of renewals available for conventional, program, medical testing, compliance testing, and

broadcast experimental licenses.  That a conventional license "may be renewed for an additional

term" does not mean that it cannot be renewed a second time "for an additional term."  Rule

5.71(d), which covers Spectrum Horizons experimental licenses, states that licenses "may not be

renewed."  Contrasting Rule 5.71(a) against Rule 5.71(d), it is apparent that when the Commission

intends to limit the renewability of an experimental license, it uses very clear language to do so.

Furthermore, we note that when the Commission made significant changes to Rule 5.71 in

2013, it noted, "Currently, the rules allow for an experimenter to apply for the conventional

experimental license to cover a single or several closely related experiments for 2-5 year periods

with options for renewal**s** for up to 5 years."[13]  The Commission did not rescind that interpretation

in the 2013 Report and Order or in any subsequent modifications to Rule 5.71.  In fact, when the

Commission adopted requirements for program experimental licenses, it expressly noted that

program licenses could also "be granted for five year, renewable term**s**," and that availability of

---

[12] Skywave's generalized reference to comments filed by amateurs in the rulemaking does not suffice for demonstrating that Skywave or Babich have suffered interference from 10Band's transmissions.

[13] *In the Matter of Promoting Expanded Opportunities for Radio Experimentation and Market Trials*, FCC 13-15, at ¶ 20 (2013) (emphasis added).

multiple renewals "followed directly from requirements already in place for conventional experimental licenses."[14]

Moreover, Skywave's argument is premised on its claim that "10Band's license was renewed September 21, 2021." However, when 10Band filed its application in October 2021, it was to modify the license in order to conduct the market trial.[15] In response, OET issued a new, modified license on January 18, 2022 authorizing the market trial.[16] The recent grant of the renewal application on August 17, 2023 amounts to the first renewal of the modified license, and should be viewed as within the 7- to 10-year term authorized by Rule 5.71, even as that rule is (mis)interpreted by Skywave.

Finally, in practice, OET extends licenses beyond ten-year terms when it is reasonable to do so. *See*, *e.g.*, Motorola Solutions, Inc., Application for Renewal of Experimental License, File No. 0502-EX-CR-2021 (granted Aug. 27, 2021) (granting license renewal application for a cumulative period of thirteen years); AT&T Corp., Application for Renewal of Experimental License, File No. 0116-EX-RR-2015 (granted Mar. 4, 2015) (granting license renewal application for a cumulative period of twelve years). It was likewise reasonable for OET to grant 10Band's renewal.[17]

---

[14] *Id*. at ¶ 47.

[15] *See* Narrative Statement, Experimental Authorization Application - Modification, File No. 0234-EX-CM-2021 (Oct. 21, 2021).

[16] Experimental License, File No. 0234-EX-CM-2021, granted January 18, 2022 to expire November 1, 2023. The market trial application in effect superseded the September 21, 2021 grant.

[17] For the sake of completeness and if, despite all of the above, OET were prepared to consider Skywave's view of Rule 5.71, it could, and should, grant 10Band a waiver pursuant to Rule 1.925. A waiver is appropriate where the "underlying purpose of the rule(s) would not be served or would be frustrated by application to the instant case, and that a grant of the requested waiver would be in the public interest." 47 C.F.R. Section 1.925(b)(3)(i). 10Band explained that its experimentation could lead to "more efficient utilization of the 2-25 MHz spectrum." Narrative Statement, File No. 0497-EX-CR-2023. Applying Rule 5.71 as advocated by Skywave would frustrate the

### III.  10Band's Experiments Are Not Complete.

Skywave claims that 10Band has "completed its experiments and now uses the experimental authorization for regular day-to-day trading." It further argues that, "Empirical evidence derived from time-stamped, market data proves that the aforementioned challenges were overcome in March of 2020." These claims -- which are unsupported by any evidence beyond Skywave's bald assertion -- are baseless.

For openers, Skywave fails to provide any of the referenced "market data," or any analysis of that data showing that the "challenges were overcome," and for a good reason -- 10Band's experimentation is not complete. As stated in its Narrative Statement accompanying its request for renewal of the License, 10Band has encountered challenges in terms of both technical factors such as bandwidth and reliability, as well as end-user challenges such as the use of a lossy data service in this ionospheric environment, and it "continues to experiment with HF technology and signal processing techniques to mitigate such issues."[18]

Skywave's citation to *In re Wilfredo G. Blanco-Pi* is unavailing. In that case, the experimental licensee "ma[de] it clear that he seeks to retain the Stations, not based on any further experimentation, but rather on their value as full-time re-broadcasters of . . . programming . . . ."[19] By contrast, 10Band's experimentation is ongoing.

10Band explained its market trial in detail, and it determined to modify its license after consultation with OET staff. Moreover, its program of experimentation appears similar to that

---

purpose of the experimental radio service.  10Band's ongoing experiment -- which includes tests of the usefulness of the HF band for the intended purpose, and enhancement of customer-facing data feeds via a market trial -- directly advances stated purposes of the experimental radio service as stated in Rule 5.1(b).

[18] Narrative Statement, File No. 0497-EX-CR-2023.

[19] 32 FCC Rcd. 3100, 3104 (2017).

approved by the OET for other parties.[20]  10Band has also fulfilled its representation that continued testing would be accompanied by a petition for rulemaking to allow regular licensed operation.

## IV.  Skywave Confuses the SMC Petition for Rulemaking with 10Band's Experimentation.

Citing SMC's Petition for Rulemaking, Skywave argues that 10Band's experimental work contemplates "only private internal communications," and thus, "there is no 'customer' market to explore."[21]  While 10Band's experimentation (and that of other SMC members) has provided a real-world foundation for adoption of proposed changes to Part 90, the ongoing experimentation conducted with industry participants and leading academics will enable 10Band to resolve for itself certain HF performance and digital signal processing issues.  Furthermore, Skywave's argument fails to consider the simple, real-world fact that a petition for rulemaking for one potential use case (i.e., internal communications) does not preclude further experimentation and market trials in other areas (i.e., a customer market).  The HF-band issues explored by 10Band affect delivery of low-latency data not just for financial firms but potentially other industries as well.[22]  In other words, there is nothing inconsistent between 10Band's License and the SMC Petition.

---

[20] *See, e.g.*, 3DB Communication Inc., File No. 0453-EX-CR2023 (granting fourth license renewal application on August 17, 2023 for a cumulative period of eight years to "advance high-frequency hardware, software, and transmission technologies"); Skycast Services LLC, File No. 0725-EX-CR-2022 (granting third license renewal application on January 4, 2023 for a cumulative period of nine years to permit applicant to continue to conduct "(i) scientific or technical radio research; (ii) technical demonstrations of equipment or techniques; and (iii) the development of radio technique, equipment, operational data, and engineering data").

[21] *Id*. at 4.

[22] *See* Narrative Statement for File No. 0497-EX-CR-2023 ("Participating academic researchers and a limited number of market trial participants have provided real-world assessments of our technology's suitability for this purpose compared to other means of delivery.  Metrics include the content, quality, and timeliness of the received data.  Delivering time-sensitive financial market data across a low latency HF link presents unique challenges in terms of both technical factors such as bandwidth and reliability, as well as end-user challenges such as the use of a lossy data service in this ionospheric environment.  10Band continues to experiment with HF technology and signal processing techniques to mitigate such issues.").

## V.     Conclusion

Skywave has failed to show standing to seek reconsideration of the License grant, and its Petition is procedurally deficient under Rule 1.106.  Accordingly, the Petition for Reconsideration should be dismissed.  Should OET nevertheless choose to consider the Petition on the merits, the Petition fails to set forth any basis for reconsidering grant of 10Band's renewal and it should be denied.

Respectfully submitted,

**10BAND LLC**

By: _____
William K. Keane
Drew T. Dorner
Duane Morris LLP
901 New York Avenue N.W., Suite 700 East
Washington, DC 20001
(202) 776-7800

*Its Counsel*

September 28, 2023

8

Attachment A
(Declaration)

DocuSign Envelope ID: EB920BA8-B57A-4641-9347-06A0804E9F50

## DECLARATION

I, John P. Madigan, declare:

1.      I am competent to provide this Declaration.

2.      My business address is New Line Networks LLC, 600 West Chicago Avenue, Suite 640, Chicago, IL 60654.

3.      I have been employed by Jump Trading Group ("Jump") as a Technologist since 2017, and in that role, I provide services to and on behalf of 10Band LLC ("10Band").

4.      In connection with my role, I am familiar with, and am responsible for, implementation of 10Band's high frequency facilities.

5.      I have read the Opposition to Petition for Reconsideration ("Opposition") to which this Declaration is attached.

6.      Based on my personal knowledge, the factual representations in the Opposition are true to the best of my belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:  September 28, 2023

DocuSigned by:

*John Madigan*

John P. Madigan

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of September, 2023, I transmitted a true, correct, and

complete copy of the foregoing Opposition to Petition for Reconsideration by electronic mail to.

Marjorie K. Conner
Attorney at Law
2413 N. Dearing Street
Alexandria, VA 22302
mkconner@mkconnerlaw.com

Drew T. Dorner

# EXHIBIT C

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C.  20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| 10Band LLC | )  File No. 0497-EX-CR-2023 |
| Application for renewal of | ) |
| the Experimental License WI2XNX | ) |

To:  Office of Engineering Technology

**Reply to Opposition to**
**Petition for Reconsideration**

Skywave Networks LLC, by counsel, and pursuant to Section 1.106 of the Commission's rules, 47 C.F.R. §1.106, hereby replies to 10Bsnf LLC's ("10Band") opposition to Skywave's petition for reconsideration of the grant of another renewal period to 10Band LLC to operate on 2-25 MHz.  In reply, Skywave submits:

**1.  The Petition is Procedurally Sufficient.**

10Band argues that Skywave failed to assert standing to file the Petition for Reconsideration ("Petition").  In fact, Skywave stated its interest with particularity.

Section 405(a) of the Communications Act of 1934, as amended, 47 U.S.C. § 405(a) provides, in relevant part:

> After an order, decision, report, or action has been made or taken in any proceeding by the Commission, or by any designated authority within the Commission pursuant to a delegation under section 155(c)(1) of this title, any party thereto, or *any other person aggrieved or whose interests are adversely affected* thereby, may petition for reconsideration …

Similarly, Section 1.106 provides, in relevant part:

> … any party to the proceeding, or *any other person whose interests are adversely affected* by any action taken by the Commission or by the designated authority, may file a petition requesting reconsideration of the action taken.

10Band seems to peg its objection to Skywave's standing on Skywave's failure to participate in the proceeding before filing the Petition.  Skywave had standing to file an Informal Objection under Section 5.95 of the Commission's rules, 47 C.F.R. §5.95, but, as Skywave noted, there was no

opportunity to file an informal objection to the application. The Commission granted it a mere nine days after it was filed. Further, Skywave has been acknowledged to be a competitor to 10Band, and so has standing as such.

### 2. **The Rule**

Section 5.71(a)(2), 47 C.F.R. §5.71(a)(2) is clear on its face. An experimental licensee gets one initial term and one renewal term. The rule provides for no further renewals.

10Band variously argues that the Commission's dicta in the Report and Order on Significant Changes to the Experimental Rules,[1] demonstrates that the Commission intended that experimental licensees would be entitled to many renewal periods and that 10Band really didn't renew its experimental license in 2021.

A quick review of the record shows that the original license for experimental radio station WI2XNX was issued November 10, 2016. It was set to expire November 1, 2021. September 1, 2021, 10Band filed a renewal application, File Number 0507-**CR**-2021.[2] In accord with Section 5.71(a)(2), the Commission granted a two (2) year renewal period. In 2021, 10Band was granted the one renewal period to which it is entitled under Section 5.71(a)(2). For this reason alone, the application for renewal should have been denied.

### 3. **The Experiment**

In the Petition, Skywave asserted that 10Band was not experimenting. 10Band challenged Skywave to bring specific detail on the transmissions and trades.[3] As is detailed in Timothy J. Eloe's

---

[1] Promoting Expanded Opportunities for Radio Experimentation and Market Trials under Part 5 of the Commission's Rules, *Report and Order,* 28 FCC Rcd 758 (2013). In the Experimental Rules Report and Order, the Commission discussed renewal periods generally and did not indicate that any experimental licensee would be entitled to multiple renewals.

[2] The "CR" designation indicates that the Commission considered the application a renewal application.

[3] Section 1.45(c) of the Commission's rules, 47 C.F.R. §1.45(c), allows replies to address matters raised in oppositions. In its opposition, 10Band argued that Skywave failed to provide data showing that the experiment was complete. Opposition at 6. The information presented in this Reply responds directly to that challenge and so is responsive, consistent with Section 1.45(c). If the Commission should feel that the information is not directly responsive to the Opposition, Skywave asks that the Commission waive any restriction in Section 1.45(c) and accept the information about daily use as essential to determination of the issues originally raised.

attached Declaration, Skywave has been observing operations from the Elburn site since early summer of 2023. Most recently, on October 3, and October 5, 2023, the Skywave team observed 24/7 duty cycles and regular transmissions from Elburn.[4]

The traffic from the Elburn platforms is more reliably demonstrated by the histogram prepared by the Skywave team based on trading information obtained from Deutsche Borse Group. The information synthesized into the histograms shows trading information transmitted from the Elburn site on various dates. Each histogram breaks the trades into microwave/fiber transmissions and HF transmissions. The speed of the transmission, set forth on the x axis, confirms that the speed of the HF transmissions could only have been accomplished by shortwave transmission via facilities licensed by the FCC on an experimental basis.

The histograms provided show information transmitted on various dates between March 2020 and December 2021, all times during which 10Band held an experimental license on the Elburn to Frankfurt route.[5] As noted in its application for renewal, 10Band "has been conducting a market trial of its technology for delivery of financial data via high frequency spectrum."[6] Given the consistent levels of message traffic, it is reasonable to assume that 10Band has transmitted messages daily.

Despite 10Band's unsupported assertion that its situation is unlike that in *Wilfredo G. Blanco-Pi*, 32 FCC Rcd 3100 (2017),[7] the situations are exactly alike, particularly with respect to the passage 10Band cites: It is clear that 10Band seeks to retain the experimental station to continue its daily practice of transmitting trade information. Without any apparent further experimental benefit to be gained from 10Band's "experiment", renewal of the experimental license was not justified.

---

[4] The FCC has authorized two platforms from Kane County Illinois: 10Band's location in Elburn and 3DB in nearby Naple Park, Illinois. 3DB Communication Inc. is licensed under Call Sign WI2XXG. Without further exploration, it is impossible to know whether the transmissions were 3DB or 10Band.
[5] *See* File No. 0089-EX-CN-2016.
[6] Narrative Statement.
[7] Opposition at 6.

### 4. Grant of the Application Should Reconsidered and Denied

Clearly, 10Band clings to its experimental authorization as a means to gain an edge in the financial markets in which it trades. But experimental authorizations are to be issued for experiments. Given the daily operations on the experimental facilities, it is clear that the experiment is over.

In light of the foregoing, Skywave asks that the Commission reconsider and deny 10Band's application for renewal of the Experimental License, WI2XNX.

Respectfully submitted,

SKYWAVE NETWORKS LLC

By: _____
Marjorie K. Conner
Its Counsel
(703) 626-6980
mkconner@mkconnerlaw.com

October 12, 2023

4

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of October 2023, I transmitted a true, correct, and complete copy of the foregoing Reply to Opposition to Petition for Reconsideration by electronic mail to:

William K. Keane, Esq.
Drew T. Dorner, Esq.
Duane Morris LLP
901 New York Avenue NW
Suite 700 East
Washington DC 20001-4795
kkeane@duanemorris.com
dtdorner@duanemorris.com

Marjorie K. Conner

**Declaration of Timothy J. Eloe**
**President and CEO of Skywave Networks LLC**

I am President and CEO of Skywave Networks LLC.  In the course of our work in the Chicago area, Kevin Babich, Skywave's Chief Technology Officer, and I monitored use of the 2-25 MHz Shortwave frequencies overnight (local time) on October 3 and 5, 2023.  We found consistent and persistent transmissions from two platforms located at sites in Kane County, Illinois.  I am aware that 10Band's Experimental Radio License is authorized to transmit from a site in Elburn, Illinois.  I am also aware that 3DB Communication Inc. is authorized to transmit from a nearby site in Maple Park, Illinois.

Skywave retained Devin D. Whitten, Ph.D., to analyze the trading data we received from Deutsche Borse Group regarding trading information transmitted from the Chicago area to the Eurex Exchange in Frankfurt.  Dr. Whitten's work is appended to the Reply to Opposition to the Petition for Reconsideration of grant of renewal of 10Band's experimental license.

Dr. Whitten's work shows daily trading from Chicago to Frankfurt via shortwave transmission.  The Commission licensed two experimental shortwave facilities in the Chicago area:  10Band's and 3 DB Communication Inc.'s.  Skywave cannot say with certainty that 10Band is the originator of all of the traffic noted in Dr. Whitten's work.  Nonetheless, in its renewal application, 10Band acknowledged that it "has been conducting a market trial of its technology for delivery of financial data via high frequency spectrum."  The license itself demonstrates that the originating site at Elburn directs its transmissions to western Europe, likely Frankfurt.  It is reasonable to conclude that 10Band is responsible for daily transmissions from Elburn to Frankfurt via the experimental facilities.

I have reviewed the Reply to Opposition to Petition for Reconsideration to which this declaration is appended.  I hereby confirm that the facts asserted in the Reply are true and correct to the best of my knowledge, information, and belief, as is foregoing declaration, and they are proffered under penalty of perjury.

_____
Timothy J. Eloe

October 12, 2023

Declaration of
Devin D. Whitten, Ph. D.

Skywave Networks LLC. Retained me to prepare the attached Analysis of High Frequency Trading Activity.

I hereby affirm that the information in my Analysis of High Frequency Trading Activity is true and correct to the best of my knowledge, information, and belief and it is proffered under penalty of perjury.

_____
Devin D. Whitten, Ph. D.

October 12, 2023

Date: Oct 12, 2023

Analysis of High-frequency Trading Activity
Author: Devin D. Whitten, PhD

Summary:
The following report outlines the results of an extensive analysis of high-frequency trading activity between correlated assets traded at the CME and Eurex exchanges, particularly as it pertains to the latencies achieved in low-latency arbitrage races between these correlated assets..

Following the work of Stefan Schlamp[1] on cross-venue reactions between the CME and Eurex Exchange, we analyzed the distribution of latencies between the EURO STOXX 50 future (FESX) and DAX future (FDAX) reaction times, based on moves in the S&P 500 E-Mini (ES).
We identify the characteristic peak associated with shortwave radio technology over a time period of March 2020 to December 2021**.** The significant volume of securities traded via shortwave technology is strongly indicative of *enterprise-level* trading activity, and is highly correlated to the volumes traded via "classical" microwave + dedicated trans-Atlantic fiber-based technologies.

Data:
All market data was obtained via the A7 Analytics Platform. Primary market data consists of un-normalized historical order book data for the CME and Enhanced Orderbook Interface for main T7 trading venues of Deutche Börse Group.

Analysis:
We begin by first identifying coupled-securities of the ES, FDAX, and FESX futures, using unnormalized historical order book data obtained from CME Group and T7.
In Figure 1, and example of the frequency of trading activity is shown for XCME ES and FDAX 589 over a duration of 800 seconds during peak trading hours on Feb 5th, 2020. We see that transient peaks of high-activity in FDAX orders made are consistent with peaks in the XCME ES asset.
These transient peaks of activity are seen to be associated with multi-increment (tick) moves in the price of this XCME ES security with high statistical significance, characteristic of the coupled CME / Eurex assets.

---

[1] Stefan Schlamp, Head of Quantitative Analytics at Deutsche Börse

Date: Oct 12, 2023

Analysis of High-frequency Trading Activity
Author: Devin D. Whitten, PhD

**Figure 1:** Identification of high-increment tick moves with associated latency-based arbitrage.



While only a comparatively short window of time is shown in Figure 1, 800 seconds, consistent correlation is observed across the window of peak trading hours, ~16:00 - 20:00 UTC. Further this activity is seen over the direction of the given FDAX and FESX securities, up to their expirations.

Next, we compute message latencies between the following transaction times:

1) transaction times of XCME orders resulting in multi-tick price movements.
2) transaction times of *order activity*, which we define as consisting of *OrderDelete, OrderAdd, OrderModify, OrderModifySamePriority* messages sent to the T7 matching engine.

An example of the resulting distribution of latencies, known as the cross-venue reaction, is shown in Figure 2 for Feb 5th, 2020, 19:00 UTC. Here, two peaks in message latencies are clearly visible.

Date: Oct 12, 2023

Analysis of High-frequency Trading Activity
Author: Devin D. Whitten, PhD

**Figure 2:** Trading Excess in the HF and microwave regimes for S&P 500 E-Mini (ES) and DAX future (FDAX) cross-venue reactions times.



In Figure 3, the location of these two peaks is determined via traditional gaussian statistics to be 28 and 36 microseconds, commensurate with the expectation for shortwave and fiber-based latencies, respectively. These characteristic peaks are observed for trading dates leading up the expirations of both securities.

Further, the volume of messages transmitted within each of these peaks is shown to be 51% of the aggregated volume for shortwave-based activity and 49% for fiber-based trades. Most importantly, the near equivalence determined in the volumes of these two trading routes is considered evidence that the shortwave trading activity is occurring at enterprise-scale.

Date: Oct 12, 2023

Analysis of High-frequency Trading Activity
Author: Devin D. Whitten, PhD
**Figure 3:** Comparison of shortwave and traditional fiber-based volumes in high-frequency arbitrage



races.

To assess the consistency of this trading activity for extended periods of time, this analysis procedure is then iterated for trading dates across a duration of 2021-09-1 to 2021-12-15.

For each date, 20min durations are observed at peak trading hours, 18:00-18:20 UTC. The ratio of message volume at shortwave and fiber-based latencies are then computed for each date. Figure 4 depicts the resulting trading ratios, along with the total trading volume for the 20 min duration.

Date: Oct 12, 2023

Analysis of High-frequency Trading Activity
Author: Devin D. Whitten, PhD

**Figure 4:** Timeseries of shortwave and traditional fiber-based volume ratios in arbitrage races at peak trading hours from 2021-09-01 to 2021-12-15.



Multiple results are evident in Figure 4. First, the FDAX and FESX securities exhibit a significant degree of correlation between their shortwave-to-fiber volume ratios. Most importantly, volume ratios – defined as the shortwave volume divided by the fiber-based volume – are consistently above parity, from which we can conclude that trading activity via shortwave technology *exceeded* that of traditional fiber-based trades, and persisted for multiple months.

The date range in Figure 4 was chosen to highlight this activity, while similar activity is seen throughout 2020 as well.

Date: Oct 12, 2023

Analysis of High-frequency Trading Activity
Author: Devin D. Whitten, PhD

Concluding Remarks:

We identify the characteristic peak associated with shortwave radio technology over a time period of September 2021 to December 2021, and show corresponding peaks in February and March 2020. The computed volume of trading activity via shortwave technology is strongly indicative of *enterprise-level* trading activity, and is highly correlated to the volumes traded via "classical" microwave + dedicated trans-Atlantic fiber-based technologies.

# EXHIBIT D

This transfer of control application relates to proposed assignments of interests in the indirect parent (ECW Wireless LLC) of the licensee (10band LLC), which are currently held by four individuals, to revocable trusts established by each such individual.  Such interests represent all of the voting interests in ECW Wireless LLC.  There will be no change in the management of the licensee. Each individual will serve as the trustee of each respective trust as well as retain the authority to revoke the trust and appoint successor trustees.

The following page illustrates the pre-transfer ownership and the proposed post-transfer ownership.

## Pre-Transfer Ownership Chart



## Post-Transfer Ownership Chart



# EXHIBIT E

# HFT Traders Dust Off 19th Century Tool in Search of Market Edge

**Published: Mon Jun 18 06:00:00 EDT 2018**

- Jump Trading, Virtu appear to be testing shortwave for trading
- Sites are located just miles away from CME's futures exchanges

By Brian Louis, Nick Baker and John McCormick

(Bloomberg) --

The latest twist in the race to be fastest in high-frequency trading sits just down the road from the Promise Equestrian Center, a sprawling stable and horse-riding complex about 45 miles west of downtown Chicago. It uses a super-charged version of techniques dear to amateur radio operators worldwide.

On a 58-acre field that grew corn last year, two towers rising about 170 feet support a military-grade antenna shaped like a giant spider's web. The array is pointed toward market centers in New York, London and Frankfurt. A third pole, topped with a single round microwave dish, is aimed at a data center 16 miles away that powers one of the world's largest trading hubs: the futures exchanges run by CME Group Inc.

The CME Group data center in Aurora, Illinois.

Photographer: Christopher Dilts/Bloomberg

The secret project in Maple Park, Illinois, was discovered -- appropriately enough -- by a ham-radio enthusiast. It remains shrouded in mystery. Even county officials and neighbors are unclear about its purpose.

But public records point to a probable explanation: Traders appear to be testing the idea of using shortwave technology to convey data between the CME facility and key exchanges around the globe -- a few millionths of a second faster than rivals. That can be the difference between winning and losing in high-frequency markets, where the ferocious battle for being first continues to escalate.

## Sophisticated Networks

The company behind this project is New Line Networks LLC, a joint venture of Chicago-based Jump Trading LLC and New York-based Virtu Financial Inc., according to Kane County records. They build sophisticated trading networks for some of the most important financial markets. Last year,

 © 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

HFT Traders Dust Off 19th Century Tool in Search of Market Edge

Bloomberg revealed how their joint venture placed an antenna right across the street from the CME data center, probably shaving a microsecond or so off transmission speeds.

Jump and Virtu declined to comment.

The backbone of the technology to gain an edge on rivals was first used in the 1800s when Thomas Edison was inventing the light bulb. Shortwave is well-known to fans of broadcasters such as Voice of America and BBC World Service. U.S. embassies and the military commonly used shortwave until the 1980s, when communications satellites started to replace it.

## Speed of Light

High-frequency radio waves send data at almost the speed of light. That performance is similar to microwave, the technology most commonly used today by traders. But shortwave has a big advantage: It can travel at that speed for very long distances.

With enough of a power boost, data could be sent from the facility to European market centers in a single burst, bouncing signals off a layer of the atmosphere called the ionosphere.

That conceivably would be a vast improvement from today's fastest route, which beams data across microwave towers spread about as much as 50 miles apart that stretch from Illinois to New Jersey -- and then through an undersea cable.

It may be that New Line is just experimenting for now. Its licenses, granted in November 2016, bar the company from selling the communications services to others.

Shortwave signals can be finicky, dependent on weather and even sunspots. But the Kane County antenna, combined with as much as 20 kilowatts of power, is "as powerful as some foreign shortwave stations," said Greg Beat, a former networking consultant and Chicago-area ham operator. It uses what's known as software defined-radio, which offers redundancy if a channel drops out, he said.

"The reason for this level of transmission power is to have a consistent, reliable signal" under various atmospheric conditions, he added.

## Tiny Fractions

Its location outside Chicago is no accident. The CME keeps the computers that run its exchange in Aurora, Illinois, making it among the most important nodes in the global financial system. Rapidly sending data from there to other important market centers -- including New York, London, Frankfurt and Tokyo -- can help the speediest traders profit from price differences for related assets. Those money-making opportunities often last only tiny fractions of a second.



© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

**// PAGE 2**

Data transmission towers stand in a field in Maple Park, Illinois.

Photographer: Christopher Dilts/Bloomberg

Credit for uncovering the Maple Park and two other similar sites -- one in a suburb called West Chicago, the other in northern Indiana -- goes to Bob Van Valzah, who used to work at Sun Trading LLC, which agreed to be sold earlier this year.

## Biking Trip

Van Valzah first stumbled upon the West Chicago site when he was out biking one day in March. He deviated from his usual path, ending up behind Aunt Millie's Bakeries beside railroad tracks. He's a radio enthusiast, so a tower erected there caught his eye. He noticed a microwave dish pointed at CME's Aurora data center and four shortwave antennae pointed toward Europe.

"I recognized the antennas on that tower as being large enough that they could send a signal across an ocean and that they were clearly not cellular antennas," he said.

This West Chicago site appears to be run by IMC BV, one of the biggest trading firms in the world. It has a microwave antenna on that tower, Federal Communications Commission records show. A company called Toggle Communications LLC has an experimental radio license for antennas on the tower. An executive with Toggle has the same name as an executive for IMC in the U.S.

IMC declined to comment.

## FCC Records

Van Valzah later combed through FCC records where he discovered another site, in Wanatah, Indiana, and also the Maple Park tract. A company that shares a Chicago address with New Line bought the Maple Park land in September 2016 for $800,000, according to Kane County records.

A sign cautions the presence of radio frequency fields in excess of FCC rules.

Photographer: Christopher Dilts/Bloomberg

Back at the horse stable, the folks are intrigued but puzzled by the neighboring antennas. Promise Equestrian's Gary Kempiak said he was told a university was behind the installation. He's seen a worker on the tower late at night and early in the morning wearing a reflective vest that "sticks out like a sore thumb."

You see people there at "just the strangest hours," he said.



© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

HFT Traders Dust Off 19th Century Tool in Search of Market Edge

To contact the reporters on this story:
Brian Louis in Chicago at blouis1@bloomberg.net;
Nick Baker in Chicago at nbaker7@bloomberg.net;
John McCormick in Chicago at jmccormick16@bloomberg.net

To contact the editors responsible for this story:
Michael J. Moore at mmoore55@bloomberg.net;
David Papadopoulos at papadopoulos@bloomberg.net
Larry Reibstein, Melinda Grenier

**Bloomberg Law**®

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

# EXHIBIT F

# The Gazillion-Dollar Standoff Over Two High-Frequency Trading Towers

**Published: Fri Mar 08 05:00:36 EST 2019**

By Nick Baker and Bryan Gruley

(Bloomberg Businessweek) --

> Overview of the battleground in Aurora, Ill., looking north. The large white building at the left is the CME data center. Beside it is the center's still-unused tower, built to hold dish antennas capable of transmitting data via microwave to points east. The proposed site for a rival tower is across the road.

> Photographer: Jason Reblando for Bloomberg Businessweek

In a weedy field 35 miles west of Chicago squats a tidy red-brick building with a peaked roof, about the size of a one-car garage. Against the eastern wall, reaching just above the roofline, are poles equipped with small dish antennas that send microwave signals to and gather them from financial markets on the East Coast. At the same time, the site communicates via subterranean cable with an enormous steel-and-glass building across the street. That fortress is home to CME Group Inc., a $63 billion exchange where some of the world's most vital financial products trade, including derivatives on oil, gold, U.S. Treasuries, and the S&P 500. If you want to be a serious player in global markets, you have little choice but to stash your trading machines here.

The little brick hut in Aurora, Ill., is part of New Line Networks LLC, a joint venture of Chicago's Jump Trading LLC and Virtu Financial Inc. of New York City, two of the nation's most successful high-frequency trading firms. In 2016, Jump Trading paid $14 million for the 31-acre plot where the building sits to be close to the CME center.

Not far away, high-frequency trading company DRW Holdings LLC of Chicago, angling to be even a few yards nearer, slapped an antenna on a light pole. Next to that stands yet another pole rigged with antennas, this one owned by McKay Brothers, an Oakland-based company that builds telecommunications networks and leases access to traders.

Up and down adjacent roads, trading companies have erected or rented space on more towers and poles, all of them arrayed with white circular dishes. These companies, too, are seeking to cozy up to

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

The Gazillion-Dollar Standoff Over Two High-Frequency Trading Towers

the CME data center, trying to shave millionths of a second off trades. They save that time by keeping their data in the air, where it travels at maximum speed, for as long as possible. The closer their dishes to the data center, the shorter their underground connections, the speedier their transmissions.

In a bid to end the gamesmanship, CyrusOne Inc., the Dallas company that owns the CME center, last year erected a 350-foot-tall wireless tower next to the building, closer than any trading firm could otherwise get. The tower was supposed to put everyone on equal footing and make those roadside antennas obsolete by letting all traders have the same very short link to CME. Not coincidentally, the traders would pay rent to CyrusOne—the tower has room for about 35 dishes.

But the CyrusOne tower stands unused, partly because a smaller company, Scientel Solutions LLC, said it planned to build its own tower about 1,000 feet east, which CyrusOne says would obstruct communication to and from the data center. CyrusOne sued to block Scientel's tower. At the moment, Scientel's development on its 2.6 acres consists of a construction trailer, a portable toilet, and a pile of metal poles.

The unlikely catalyst for this gazillion-dollar standoff is a collection of elected officials in Aurora, a quaint river town best known as the fictional setting for the *Wayne's World* movies. The Aurora City Council approved the CyrusOne tower, then turned Scientel away at CyrusOne's behest, then flip-flopped and approved the Scientel tower, which sent CyrusOne's lawyers running to the federal courthouse in Chicago, where the case has ground on for more than a year. CyrusOne, Scientel, and CME declined to comment for this story.

It isn't clear that the Aurora council fully comprehended the legal and technological issues involved in allowing the Scientel tower. Alderman Bill Donnell, a retired parks director who changed his Scientel vote from no to yes, says he didn't understand at first "how important we are" in the high-frequency trading arena. "I came from being a guy who didn't know where the cloud was to realizing speed matters," he says. "I didn't realize being a millisecond faster was all that important."

Traders' quest for the slimmest sliver of advantage is as old as markets. In the 19th century, Reuters used carrier pigeons to speed the delivery of stock prices. More recently, Chicago pit traders donned platform shoes so they could see and be seen better on crowded trading floors. Today, getting an edge is all about the speed of light: 186,282 miles per second.

In his 2014 book *Flash Boys*, Michael Lewis describes how a startup called Spread Networks dug through mountains and tore up parking lots to lay what became the straightest fiber-optic line between trading centers in New Jersey and Chicago, because the more direct the line, the faster data zipped through it. When Spread's service made its debut in 2010, it could shoot trades from Chicago to the Nasdaq data center in Carteret, N.J., in less than 7 milliseconds (a millisecond is one-

**Bloomberg Law**®

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

The Gazillion-Dollar Standoff Over Two High-Frequency Trading Towers

thousandth of a second). In other words, the data line moved information at about two-thirds the speed of light.

Scientel's tower-in-waiting.
Photographer: Jason Reblando for Bloomberg Businessweek

By the time Lewis's book came out, Spread's technology was essentially obsolete for trading, overtaken by microwave radio transmissions, which can carry data through the air at about 99 percent the speed of light. Microwaves are faster because the glass or plastic in fiber-optic lines slightly impedes signals; air poses less obstruction. Also, microwave networks generally require less work and cost to build than fiber line does, partly because the U.S. is dotted with cell towers that can accommodate microwave antennas. The usefulness of Spread's service dwindled to the point that the company, which according to Lewis spent about $300 million to launch its network, was sold for $131 million a year ago to Zayo Group Holdings Inc.

Microwave networks rely on line-of-sight transmissions—a microwave dish has to be able to see the dish it's communicating with. The Earth's curvature forces traders to relay their signals from towers that are typically spaced every few dozen miles. Tall spots that see farther can stretch those distances; some firms are licensed to use antennas atop the Willis Tower (née Sears), Chicago's tallest building.

The CME data center owned by CyrusOne sits on the southwestern corner of an intersection just south of an Interstate 88 exit. Most of the wireless dishes belonging to traders are on three tall towers kitty-corner from the center. New Line, McKay, and DRW, by getting just a few hundred feet closer, have a measurable advantage. McKay says its system can zing a trade from Aurora to Carteret, or Carteret to Aurora, in 4 milliseconds, roughly a hundredth of the time it takes a major-league fastball to reach home plate.

In March 2016, CME sold the building for $131 million to CyrusOne, a real estate investment trust that owns more than 40 such centers and now leases the Aurora site to CME. CyrusOne announced an expansion, then laid plans for its tower, which the Aurora City Council approved in March 2017. The city required CyrusOne to lease traders space on the tower at fair market rates; the intent was to "equalize wireless access to the CME," the company says in court filings. The matter seemed settled. Then, two months later, Mayor Richard Irvin took office.

Mayor Irvin
Photographer: Jason Reblando for Bloomberg Businessweek

Irvin, a former prosecutor and criminal defense attorney who was born and raised in Aurora, won the



The Gazillion-Dollar Standoff Over Two High-Frequency Trading Towers

mayoral seat partly on his vow to expand the local economy. He'd barely taken the oath of office when Scientel came calling. Irvin was keen to listen.

The company told the mayor it wanted to move its headquarters from another Illinois town to a patch of vacant Aurora land near the CME data center. There was a catch: Scientel would bring its 50 jobs and their $100,000-a-year average salaries only if Aurora let it build a 195-foot-tall communications tower on the site.

Aurora isn't a small town—with a population of 200,000, it's Illinois's second-largest city after Chicago—but it has that feel, with century-old buildings and an overhead train trestle winding through downtown. Condos and restaurants have sprouted around the grandiloquent 87-year-old Paramount Theatre and an 8,500-seat concert venue along the Fox River. Irvin thought Aurora could do even better, and in particular it could be getting more value from the fiber-optic ring the city built over the past decade on land around the I-88 interchange near the data center. The land was undeveloped, and only about 5 percent of the ring's capacity was in use.

Scientel, based 15 miles away in Lombard, Ill., designs, installs, and maintains wireless networks that help municipalities link police departments, medical centers, and other vital facilities. From a new $4.5 million headquarters at the I-88 exit, Scientel proposed to use its tower with Aurora's fiber-optic ring. The company made little if any public mention of doing any business with traders.

"This area is very attractive to us," Scientel President Nelson Santos told the Aurora Planning Commission in September 2017. "Our customers need to get to the cloud, and this is the way to do it." The Planning Commission recommended that the City Council endorse Scientel's tower plan.

This wasn't going over well at CyrusOne, which with $800 million in annual revenue dwarfs Scientel, at about $20 million. Within days of Scientel's formal tower request, CyrusOne was scheming to torpedo it. "If you can get the [Scientel] tower coordinates so we can see where exactly they want to place their tower, then we can do a [frequency] study and come up with some reasons for objecting," an outside engineer for CyrusOne emailed another engineer in June 2017, according to federal court filings. Other CyrusOne emails showed that the company "assembled a team of lawyers and technical people" to work against Scientel's tower, a federal judge found in a recent ruling.

> The dishes of New Line Networks, an early entrant in the antenna wars.
> Photographer: Jason Reblando for Bloomberg Businessweek

CyrusOne has asserted in court that its main concern was that Scientel's proposed tower would interfere with transmissions from CyrusOne's tower. The Scientel structure would "block 50 percent of the transmission from our tower," a CyrusOne attorney later told a federal judge. "So our tower will essentially be useless for the purpose that it's being built for."

**Bloomberg Law** ®

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

The Gazillion-Dollar Standoff Over Two High-Frequency Trading Towers

CyrusOne representatives pressed the point to Aurora aldermen. At a meeting in November 2017, the City Council voted 7 to 3 to deny Scientel its tower. The mayor—who didn't have a vote—wasn't pleased. "What the aldermen pretty much said was they don't want 50 jobs," he told the local *Beacon-News.* He had staffers lobby council members, emphasizing Scientel's contention that only the Federal Communications Commission—not Aurora—could legally decide whether one tower might interfere with the other.

The council reconsidered in January 2018. A top Scientel executive told the council the company couldn't afford space on CyrusOne's as-yet-unbuilt tower for at least $6,000 a month. Also, because Scientel would be working with safety agencies, it would need around-the-clock access that would be hindered by the data center's strict security procedures. Now the council swung in Scientel's favor, 9 to 3.

When Irvin made his State of the City Address in April at the Paramount, Scientel chipped in $10,000, the biggest political contribution the company had ever made. By then, CyrusOne had sued Irvin, the City Council, and Scientel.

Two unsettled questions dominate the thousands of pages filed in federal court: Would the Scientel tower in fact interfere with CyrusOne's? And what motivated Scientel to place its tower on that particular spot?

Microwave transmissions can become garbled or be blocked altogether when two entities send data over the same electromagnetic frequencies or when something—a mountain, say, or a skyscraper—blocks a network path. Part of the problem in determining whether Scientel's tower would interfere is that it doesn't yet exist, and CyrusOne's tower, though it's standing, doesn't yet have any antennas on it.

In court, arguments about interference have revolved around dueling scientific analyses that seek to anticipate where data flowing to or from one tower might encroach on data from the other. CyrusOne maintains that the Scientel structure would pose an obvious line-of-sight obstruction, particularly on the lower portion of the CyrusOne tower. If potential clients balk at placing dishes there, it could cost CyrusOne as much as $1.7 million in annual revenue, the company said in a court filing.

Scientel counters that CyrusOne has resisted providing specifics about the frequency bands that CyrusOne's trading clients could use, thus preventing Scientel from engineering its tower to avoid conflicts. All sorts of other nearby utility towers could, in theory, block CyrusOne, Scientel says, but CyrusOne isn't complaining about those. Scientel has also tried to broaden the issue. "What if Scientel sought to build a hotel due east of CyrusOne?" the company said in a court filing. "Could

**Bloomberg Law** ®

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

The Gazillion-Dollar Standoff Over Two High-Frequency Trading Towers

CyrusOne stop that?"

Scientel says it chose its site because it was affordable and offered easy access to Aurora's fiber-optic ring and I-88. "In reality, this case has nothing to do with the potential interference of radio waves," it said in court documents. The suit was about CyrusOne's "quest to be a monopolist tower landlord."

> The CyrusOne tower, center, was built with the intention of making the antennas on these poles, a few hundred feet farther from CME, obsolete.
> Photographer: Jason Reblando for Bloomberg Businessweek

Still, the case raises the obvious question of why Scientel would plant its tower right where critical streams of data are flowing if it didn't want to interfere—unless, of course, the company has designs on getting into the trading business. In court filings, Santos avers that Scientel "is not a trading firm." But the company does have a foothold in the industry.

Like trading companies, Scientel has FCC licenses to transmit between Aurora and New Jersey. Two years ago, it sued a former employee for allegedly stealing proprietary documents. The title of one allegedly pilfered file contains the phrase "ICE - NY4," an apparent reference to Intercontinental Exchange Inc.—a significant futures market and the owner of the New York Stock Exchange—and to a key data center in Secaucus, N.J. "This file contains a line-by-line cost estimate for an upcoming project for one of Scientel's largest clients in the financial industry," says a document in the lawsuit. Another file, partly titled "Aurora to NY4 Link Data," referenced Scientel's plan for a wireless network from Aurora "to a financial exchange in New York City," designed for a potential, unidentified client.

Scientel has said it will equip its Aurora tower with 28 antennas—24 for public safety and municipal use and four for "private" purposes. In court filings, the company has resisted being more specific, saying the names of its customers are proprietary. In the trading community, "everyone is trying to figure out who they are," says McKay Brothers co-founder Stéphane Tyč. These sorts of riddles are common. When traders started launching microwave networks, they operated in secrecy, seeking to avoid tipping off rivals. Today, they still work through shell companies: Webline Holdings LLC is DRW, World Class Wireless LLC is Jump, and so forth.

As for Scientel's potential trading partner, maybe the company plans to team up with an unknown up-and-comer looking to join the big leagues, or another large trader that currently uses a third party like McKay and now wants its own network. But the name that keeps coming up among industry sources is Citadel. That could be Citadel LLC, the Chicago-based hedge fund founded by billionaire Ken Griffin, but a more likely candidate is Citadel Securities, Griffin's giant trading company. Citadel Securities handles roughly a fifth of all the volume in the U.S. stock market, not to mention whatever it does at CME. If the firm currently employs one of these amped-up networks, it's not clear which it is.

**Bloomberg Law** ®

The Gazillion-Dollar Standoff Over Two High-Frequency Trading Towers

But for a company of its size and ambition, it's easy to see how Citadel Securities might want to avail itself of such a network under the cloak of a discreet partner or an anonymous shell firm. Then again, Griffin, who just spent $238 million on an apartment overlooking Central Park in New York, can probably afford to build his own wireless network. Citadel didn't respond to requests for comment for this story.

Meanwhile, local politicians such as Irvin have become unlikely kingmakers in the global trading system. Not that he wants to be. "If McDonald's decides they want to set up right next to Burger King, " Irvin says, "all I care about is now we have two retail establishments—and this makes me happy." He wishes CyrusOne and Scientel would find a way to get along so Scientel can build that new headquarters already.

To contact the authors of this story:
Nick Baker in Chicago at nbaker7@bloomberg.net
Bryan Gruley in Chicago at bgruley@bloomberg.net

To contact the editor responsible for this story:
Daniel Ferrara at dferrara5@bloomberg.net

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

**Bloomberg Law**®

# EXHIBIT G

**L.L.C. File Number:** 02184974

**Filing Deadline is Prior to:** 04/01/2008

This report must be RECIEVED in the office of the Secretary of State prior to the anniversary date to avoid late filing penalties and eventual administrative revocation of its admission.

**Form LLC-50.1**

**Jesse White**
**Illinois Secretary of State**
**Limited Liability Company**
**Annual Report**

Filing Fee: 250.00

Penalty: 0.00

Total Fee: 250.00

# Filed Electronically

## April 1, 2008

## Jesse White
## Secretary of State

1. **Limited Liability Company name:** Registerd Agent, Registered Office, City, IL, ZIP Code

   JUMP FINANCIAL, LLC

   ROBERT P. BRAMNIK

   227 W MONROE ST. #3400

   CHICAGO          IL 606060000

2. **State or Country of Organization:** DE          **Date admitted in Illinois:** 04/23/2007

3. **Address of the principal place of business:**

   600 W CHICAGO AVE. #825
   (Street Address)

   CHICAGO          IL 60610
   (City, State, Zip)

4. **Names and addresses of the managers:**

   WILLIAM DISOMMA
   600 W CHICAGO CHICAGO IL 60610
   PAUL GURINAS
   600 W CHICAGO CHICAGO IL 60610
   CAREY HARROLD
   600 W CHICAGO CHICAGO IL 60610

5. **The managers which are entities, affirm the evidence of existing on file with the Illinois Secretary of State is still intact.**

6. **Changes to the registered agent or address in item 1 above requires the filing of form LLC-1.36/1.37**

7. **I affirm, under penalities of perjury, having authority to sign thereto, that this annual report is to the best of my knowledge and belief, true, correct and complete.**

   **A late filing penalty of $300 will apply if this report is not filed within 60 days of the due date.**

   **Dated** April 1                    , 2008
   (Month/Day)                          (Year)

   CAREY HARROLD
   **Name**

   MANAGER
   **Type or Print Name of**

   If applicant is a company or other entity, state name of company

# EXHIBIT H



**BrokerCheck Report**

# PAUL ANDREW GURINAS

CRD# 3147781

| Section Title | Page(s) |
|---|---|
| Report Summary | 1 |
| Broker Qualifications | 2 - 7 |
| Registration and Employment History | 9 |



When communicating online or investing with any professional, make sure you know who you're dealing with. Imposters might link to sites like BrokerCheck from phishing or similar scam websites, or through social media, trying to steal your personal information or your money.

Please contact FINRA with any concerns.



**About BrokerCheck®**

BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
- BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
- Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.
- **Where did this information come from?**
- The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
  - o information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - o information that regulators report regarding disciplinary actions or allegations against firms or brokers.
- **How current is this information?**
- Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.
- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
- To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at https://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.
- **Are there other resources I can use to check the background of investment professionals?**
- FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.
-

**Thank you for using FINRA BrokerCheck.**



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

www.finra.org/brokercheck
Case: 1:24-cv-09650 Document #: 71-3 Filed: 12/16/24 Page 58 of 83 PageID #:1608
User Guidance



## PAUL A. GURINAS
CRD# 3147781

**Currently employed by and registered with the following Firm(s):**

**B  JUMP TRADING, LLC**
600 WEST CHICAGO AVENUE, SUITE 600
CHICAGO, IL  60654
CRD# 106124
Registered with this firm since: 11/07/2006

**B  JUMP EXECUTION, LLC**
600 WEST CHICAGO AVENUE, SUITE 600
CHICAGO, IL  60654
CRD# 313060
Registered with this firm since: 06/08/2023

# Report Summary for this Broker

This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

## Broker Qualifications

**This broker is registered with:**
- 19 Self-Regulatory Organizations
- 0 U.S. states and territories

**This broker has passed:**
- 1 Principal/Supervisory Exam
- 3 General Industry/Product Exams
- 0 State Securities Law Exams

## Registration History

**This broker was previously registered with the following securities firm(s):**

No information reported.

## Disclosure Events

All individuals registered to sell securities or provide investment advice are required to disclose customer complaints and arbitrations, regulatory actions, employment terminations, bankruptcy filings, and criminal or civil judicial proceedings.

Are there events disclosed about this broker?  **No**

©2024 FINRA. All rights reserved. Report about PAUL A. GURINAS.



# Broker Qualifications

## Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each license, and the date on which it became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

**This individual is currently registered with 19 SROs and is licensed in 0 U.S. states and territories through his or her employer.**

## Employment 1 of 2

| | |
|---|---|
| Firm Name: | **JUMP EXECUTION, LLC** |
| Main Office Address: | **600 WEST CHICAGO AVENUE, SUITE 600 CHICAGO, IL 60654** |
| Firm CRD#: | **313060** |

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | NYSE Arca, Inc. | Approved Person (NYSE) | Approved | 06/08/2023 |
| B | New York Stock Exchange | Approved Person (NYSE) | Approved | 06/08/2023 |

## Branch Office Locations

**JUMP EXECUTION, LLC**
600 WEST CHICAGO AVENUE,
SUITE 600
CHICAGO, IL 60654

## Employment 2 of 2

| | |
|---|---|
| Firm Name: | **JUMP TRADING, LLC** |
| Main Office Address: | **600 WEST CHICAGO AVENUE, SUITE 600 CHICAGO, IL 60654** |
| Firm CRD#: | **106124** |

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | Cboe BYX Exchange, Inc. | General Securities Principal | Approved | 10/04/2010 |
| B | Cboe BYX Exchange, Inc. | General Securities Representative | Approved | 10/04/2010 |
| B | Cboe BYX Exchange, Inc. | Securities Trader Principal | Approved | 09/03/2013 |

# Broker Qualifications



## Employment 2 of 2, continued

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | Cboe BYX Exchange, Inc. | Securities Trader | Approved | 01/04/2016 |
| B | Cboe BZX Exchange, Inc. | General Securities Principal | Approved | 10/04/2010 |
| B | Cboe BZX Exchange, Inc. | General Securities Representative | Approved | 10/04/2010 |
| B | Cboe BZX Exchange, Inc. | Securities Trader Principal | Approved | 09/03/2013 |
| B | Cboe BZX Exchange, Inc. | Securities Trader | Approved | 01/04/2016 |
| B | Cboe EDGA Exchange, Inc. | General Securities Representative | Approved | 08/25/2010 |
| B | Cboe EDGA Exchange, Inc. | General Securities Principal | Approved | 03/27/2015 |
| B | Cboe EDGA Exchange, Inc. | Securities Trader Principal | Approved | 03/27/2015 |
| B | Cboe EDGA Exchange, Inc. | Securities Trader | Approved | 01/04/2016 |
| B | Cboe EDGX Exchange, Inc. | General Securities Representative | Approved | 08/25/2010 |
| B | Cboe EDGX Exchange, Inc. | General Securities Principal | Approved | 03/27/2015 |
| B | Cboe EDGX Exchange, Inc. | Securities Trader Principal | Approved | 03/27/2015 |
| B | Cboe EDGX Exchange, Inc. | Securities Trader | Approved | 01/04/2016 |
| B | Cboe Exchange, Inc. | General Securities Representative | Approved | 09/14/2017 |
| B | Cboe Exchange, Inc. | Securities Trader | Approved | 09/14/2017 |
| B | Cboe Exchange, Inc. | Securities Trader Principal | Approved | 09/14/2017 |
| B | Cboe Exchange, Inc. | General Securities Principal | Approved | 08/22/2023 |
| B | FINRA | General Securities Principal | Approved | 08/21/2024 |
| B | FINRA | General Securities Representative | Approved | 08/21/2024 |
| B | FINRA | Securities Trader | Approved | 08/21/2024 |
| B | FINRA | Securities Trader Principal | Approved | 08/21/2024 |
| B | Investors' Exchange LLC | General Securities Principal | Approved | 11/03/2016 |

**Broker Qualifications**



## Employment 2 of 2, continued

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | Investors' Exchange LLC | General Securities Representative | Approved | 11/03/2016 |
| B | Investors' Exchange LLC | Securities Trader | Approved | 11/03/2016 |
| B | Investors' Exchange LLC | Securities Trader Principal | Approved | 11/03/2016 |
| B | MEMX LLC | General Securities Principal | Approved | 08/22/2023 |
| B | MEMX LLC | General Securities Representative | Approved | 08/22/2023 |
| B | MEMX LLC | Securities Trader | Approved | 08/22/2023 |
| B | MEMX LLC | Securities Trader Principal | Approved | 08/22/2023 |
| B | MIAX Emerald, LLC | General Securities Principal | Approved | 06/16/2020 |
| B | MIAX Emerald, LLC | General Securities Representative | Approved | 06/16/2020 |
| B | MIAX Emerald, LLC | Securities Trader | Approved | 08/22/2023 |
| B | MIAX Emerald, LLC | Securities Trader Principal | Approved | 08/22/2023 |
| B | MIAX PEARL, LLC | General Securities Principal | Approved | 06/16/2020 |
| B | MIAX PEARL, LLC | General Securities Representative | Approved | 06/16/2020 |
| B | MIAX PEARL, LLC | Securities Trader | Approved | 08/22/2023 |
| B | MIAX PEARL, LLC | Securities Trader Principal | Approved | 08/22/2023 |
| B | Miami International Securities Exchange, LLC | General Securities Principal | Approved | 06/16/2020 |
| B | Miami International Securities Exchange, LLC | General Securities Representative | Approved | 06/16/2020 |
| B | Miami International Securities Exchange, LLC | Securities Trader | Approved | 08/22/2023 |
| B | Miami International Securities Exchange, LLC | Securities Trader Principal | Approved | 08/22/2023 |
| B | NYSE American LLC | Approved Person (NYSE) | Approved | 07/31/2013 |

❖2024 FINRA. All rights reserved. Report about PAUL A. GURINAS.

www.finra.org/brokercheck

User Guidance

# Broker Qualifications



## Employment 2 of 2, continued

| SRO | Category | Status | Date |
|-----|----------|--------|------|
| NYSE American LLC | General Securities Principal | Approved | 09/14/2017 |
| NYSE American LLC | General Securities Representative | Approved | 09/14/2017 |
| NYSE American LLC | Securities Trader | Approved | 09/14/2017 |
| NYSE American LLC | Securities Trader Principal | Approved | 09/14/2017 |
| NYSE Arca, Inc. | General Securities Representative | Approved | 11/21/2006 |
| NYSE Arca, Inc. | General Securities Principal | Approved | 12/21/2006 |
| NYSE Arca, Inc. | Securities Trader | Approved | 09/14/2017 |
| NYSE Arca, Inc. | Securities Trader Principal | Approved | 09/14/2017 |
| NYSE Arca, Inc. | Approved Person (NYSE) | Approved | 06/07/2023 |
| NYSE Chicago, Inc. | General Securities Representative | Approved | 11/07/2006 |
| NYSE Chicago, Inc. | General Securities Principal | Approved | 12/21/2006 |
| NYSE Chicago, Inc. | Securities Trader Principal | Approved | 09/03/2013 |
| NYSE Chicago, Inc. | Securities Trader | Approved | 01/04/2016 |
| NYSE National, Inc. | General Securities Principal | Approved | 11/01/2018 |
| NYSE National, Inc. | General Securities Representative | Approved | 11/01/2018 |
| NYSE National, Inc. | Securities Trader | Approved | 11/01/2018 |
| NYSE National, Inc. | Securities Trader Principal | Approved | 11/01/2018 |
| Nasdaq BX, Inc. | General Securities Principal | Approved | 12/01/2009 |
| Nasdaq BX, Inc. | General Securities Representative | Approved | 12/01/2009 |
| Nasdaq BX, Inc. | Securities Trader | Approved | 09/14/2017 |
| Nasdaq BX, Inc. | Securities Trader Principal | Approved | 09/14/2017 |
| Nasdaq PHLX LLC | General Securities Principal | Approved | 07/11/2012 |

❖2024 FINRA. All rights reserved. Report about PAUL A. GURINAS.

# Broker Qualifications



## Employment 2 of 2, continued

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | Nasdaq PHLX LLC | General Securities Representative | Approved | 07/11/2012 |
| B | Nasdaq PHLX LLC | Securities Trader Principal | Approved | 01/16/2014 |
| B | Nasdaq PHLX LLC | Securities Trader | Approved | 01/04/2016 |
| B | Nasdaq Stock Market | General Securities Representative | Approved | 11/16/2006 |
| B | Nasdaq Stock Market | General Securities Principal | Approved | 12/21/2006 |
| B | Nasdaq Stock Market | Securities Trader Principal | Approved | 01/16/2014 |
| B | Nasdaq Stock Market | Securities Trader | Approved | 01/04/2016 |
| B | New York Stock Exchange | General Securities Principal | Approved | 08/17/2011 |
| B | New York Stock Exchange | General Securities Representative | Approved | 08/17/2011 |
| B | New York Stock Exchange | Securities Trader | Approved | 09/14/2017 |
| B | New York Stock Exchange | Securities Trader Principal | Approved | 09/14/2017 |
| B | New York Stock Exchange | Approved Person (NYSE) | Approved | 06/07/2023 |

## Branch Office Locations

**JUMP TRADING, LLC**
600 WEST CHICAGO AVENUE, SUITE 600
CHICAGO, IL  60654

# Broker Qualifications



## Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below. A passed exam or exam waiver does not permit a broker to do business without an active SRO or state registration.

**This individual has passed 1 principal/supervisory exam, 3 general industry/product exams, and 0 state securities law exams.**

### Principal/Supervisory Exams

| Exam | | Category | Date |
|------|--|----------|------|
| B | General Securities Principal Examination | Series 24 | 12/20/2006 |

### General Industry/Product Exams

| Exam | | Category | Date |
|------|--|----------|------|
| B | Securities Trader Exam | Series 57TO | 01/02/2023 |
| B | Securities Industry Essentials Examination | SIE | 10/01/2018 |
| B | General Securities Representative Examination | Series 7 | 11/06/2006 |

### State Securities Law Exams

| Exam | Category | Date |
|------|----------|------|
| No information reported. | | |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.

## Broker Qualifications



### Professional Designations

This section details that the representative has reported **0** professional designation(s).

No information reported.

## Registration and Employment History



### Registration History

The broker previously was registered with the following firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|
| No information reported. | | | |

### Employment History

This section provides up to 10 years of an individual broker's employment history as reported by the individual broker on the most recently filed Form U4.

**Please note that the broker is required to provide this information only while registered with FINRA or a national securities exchange and the information is not updated via Form U4 after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.**

| Employment | Employer Name | Position | Investment Related | Employer Location |
|---|---|---|---|---|
| 12/2001 - Present | JUMP TRADING | OWNER | Y | CHICAGO, IL, United States |

### Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

Ownership in the following:
MPG LLC--50%
MPG Management--50%
SPPW Investments LLC--100%
PXG Cali LLC--100%

All are non-securities related and concern simple asset investment and management.

**End of Report**



**This page is intentionally left blank.**

©2024 FINRA. All rights reserved. Report about PAUL A. GURINAS.



**BrokerCheck Report**

# WILLIAM JOSEPH DISOMMA

CRD# 1548789

| Section Title | Page(s) |
| --- | --- |
| Report Summary | 1 |
| Broker Qualifications | 2 - 7 |
| Registration and Employment History | 9 |

 When communicating online or investing with any professional, make sure you know who you're dealing with. Imposters might link to sites like BrokerCheck from phishing or similar scam websites, or through social media, trying to steal your personal information or your money.

Please contact FINRA with any concerns.



**About BrokerCheck®**

BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
- BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
- Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.
- **Where did this information come from?**
- The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
  - o information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - o information that regulators report regarding disciplinary actions or allegations against firms or brokers.
- **How current is this information?**
- Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.
- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
- To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at https://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.
- **Are there other resources I can use to check the background of investment professionals?**
- FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.
-

**Thank you for using FINRA BrokerCheck.**



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.



## WILLIAM J. DISOMMA
CRD# 1548789

**Currently employed by and registered with the following Firm(s):**

**B** **JUMP TRADING, LLC**
600 WEST CHICAGO AVENUE, SUITE 600
CHICAGO, IL 60654
CRD# 106124
Registered with this firm since: 11/29/2006

**B** **JUMP EXECUTION, LLC**
600 WEST CHICAGO AVENUE, SUITE 600
CHICAGO, IL 60654
CRD# 313060
Registered with this firm since: 06/08/2023

# Report Summary for this Broker

This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

## Broker Qualifications

**This broker is registered with:**

- 19 Self-Regulatory Organizations
- 0 U.S. states and territories

**This broker has passed:**

- 1 Principal/Supervisory Exam
- 4 General Industry/Product Exams
- 0 State Securities Law Exams

## Registration History

**This broker was previously registered with the following securities firm(s):**

No information reported.

## Disclosure Events

All individuals registered to sell securities or provide investment advice are required to disclose customer complaints and arbitrations, regulatory actions, employment terminations, bankruptcy filings, and criminal or civil judicial proceedings.

Are there events disclosed about this broker?    **No**

©2024 FINRA. All rights reserved. Report about WILLIAM J. DISOMMA.

www.finra.org/brokercheck

## Broker Qualifications



### Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each license, and the date on which it became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

**This individual is currently registered with 19 SROs and is licensed in 0 U.S. states and territories through his or her employer.**

### Employment 1 of 2

| | |
|---|---|
| Firm Name: | **JUMP EXECUTION, LLC** |
| Main Office Address: | **600 WEST CHICAGO AVENUE,** |
| | **SUITE 600** |
| | **CHICAGO, IL  60654** |
| Firm CRD#: | **313060** |

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | NYSE Arca, Inc. | Approved Person (NYSE) | Approved | 06/08/2023 |
| B | New York Stock Exchange | Approved Person (NYSE) | Approved | 06/08/2023 |

### Branch Office Locations

**JUMP EXECUTION, LLC**
600 WEST CHICAGO AVENUE,
SUITE 600
CHICAGO, IL  60654

### Employment 2 of 2

| | |
|---|---|
| Firm Name: | **JUMP TRADING, LLC** |
| Main Office Address: | **600 WEST CHICAGO AVENUE, SUITE 600** |
| | **CHICAGO, IL  60654** |
| Firm CRD#: | **106124** |

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | Cboe BYX Exchange, Inc. | General Securities Principal | Approved | 10/04/2010 |
| B | Cboe BYX Exchange, Inc. | General Securities Representative | Approved | 10/04/2010 |
| B | Cboe BYX Exchange, Inc. | Securities Trader Principal | Approved | 09/24/2013 |

**Broker Qualifications**



## Employment 2 of 2, continued

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | Cboe BYX Exchange, Inc. | Securities Trader | Approved | 01/04/2016 |
| B | Cboe BZX Exchange, Inc. | General Securities Principal | Approved | 10/04/2010 |
| B | Cboe BZX Exchange, Inc. | General Securities Representative | Approved | 10/04/2010 |
| B | Cboe BZX Exchange, Inc. | Securities Trader Principal | Approved | 09/24/2013 |
| B | Cboe BZX Exchange, Inc. | Securities Trader | Approved | 01/04/2016 |
| B | Cboe EDGA Exchange, Inc. | General Securities Representative | Approved | 08/25/2010 |
| B | Cboe EDGA Exchange, Inc. | General Securities Principal | Approved | 03/27/2015 |
| B | Cboe EDGA Exchange, Inc. | Securities Trader Principal | Approved | 03/27/2015 |
| B | Cboe EDGA Exchange, Inc. | Securities Trader | Approved | 01/04/2016 |
| B | Cboe EDGX Exchange, Inc. | General Securities Representative | Approved | 08/25/2010 |
| B | Cboe EDGX Exchange, Inc. | General Securities Principal | Approved | 03/27/2015 |
| B | Cboe EDGX Exchange, Inc. | Securities Trader Principal | Approved | 03/27/2015 |
| B | Cboe EDGX Exchange, Inc. | Securities Trader | Approved | 01/04/2016 |
| B | Cboe Exchange, Inc. | General Securities Representative | Approved | 09/14/2017 |
| B | Cboe Exchange, Inc. | Securities Trader | Approved | 09/14/2017 |
| B | Cboe Exchange, Inc. | Securities Trader Principal | Approved | 09/14/2017 |
| B | Cboe Exchange, Inc. | General Securities Principal | Approved | 08/22/2023 |
| B | FINRA | General Securities Principal | Approved | 08/21/2024 |
| B | FINRA | General Securities Representative | Approved | 08/21/2024 |
| B | FINRA | Securities Trader | Approved | 08/21/2024 |
| B | FINRA | Securities Trader Principal | Approved | 08/21/2024 |
| B | Investors' Exchange LLC | General Securities Representative | Approved | 11/03/2016 |

# Broker Qualifications



## Employment 2 of 2, continued

| SRO | Category | Status | Date |
|-----|----------|--------|------|
| B Investors' Exchange LLC | Securities Trader | Approved | 11/03/2016 |
| B Investors' Exchange LLC | Securities Trader Principal | Approved | 11/03/2016 |
| B Investors' Exchange LLC | General Securities Principal | Approved | 09/14/2017 |
| B MEMX LLC | General Securities Principal | Approved | 08/22/2023 |
| B MEMX LLC | General Securities Representative | Approved | 08/22/2023 |
| B MEMX LLC | Securities Trader | Approved | 08/22/2023 |
| B MEMX LLC | Securities Trader Principal | Approved | 08/22/2023 |
| B MIAX Emerald, LLC | General Securities Principal | Approved | 06/16/2020 |
| B MIAX Emerald, LLC | General Securities Representative | Approved | 06/16/2020 |
| B MIAX Emerald, LLC | Securities Trader | Approved | 08/22/2023 |
| B MIAX Emerald, LLC | Securities Trader Principal | Approved | 08/22/2023 |
| B MIAX PEARL, LLC | General Securities Principal | Approved | 06/16/2020 |
| B MIAX PEARL, LLC | General Securities Representative | Approved | 06/16/2020 |
| B MIAX PEARL, LLC | Securities Trader | Approved | 08/22/2023 |
| B MIAX PEARL, LLC | Securities Trader Principal | Approved | 08/22/2023 |
| B Miami International Securities Exchange, LLC | General Securities Principal | Approved | 06/16/2020 |
| B Miami International Securities Exchange, LLC | General Securities Representative | Approved | 06/16/2020 |
| B Miami International Securities Exchange, LLC | Securities Trader | Approved | 08/22/2023 |
| B Miami International Securities Exchange, LLC | Securities Trader Principal | Approved | 08/22/2023 |
| B NYSE American LLC | Approved Person (NYSE) | Approved | 07/31/2013 |

❖2024 FINRA. All rights reserved. Report about WILLIAM J. DISOMMA.

**Broker Qualifications**



### Employment 2 of 2, continued

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | NYSE American LLC | General Securities Principal | Approved | 09/14/2017 |
| B | NYSE American LLC | General Securities Representative | Approved | 09/14/2017 |
| B | NYSE American LLC | Securities Trader | Approved | 09/14/2017 |
| B | NYSE American LLC | Securities Trader Principal | Approved | 09/14/2017 |
| B | NYSE Arca, Inc. | General Securities Representative | Approved | 11/29/2006 |
| B | NYSE Arca, Inc. | General Securities Principal | Approved | 02/13/2007 |
| B | NYSE Arca, Inc. | Securities Trader | Approved | 09/14/2017 |
| B | NYSE Arca, Inc. | Securities Trader Principal | Approved | 09/14/2017 |
| B | NYSE Arca, Inc. | Approved Person (NYSE) | Approved | 06/07/2023 |
| B | NYSE Chicago, Inc. | General Securities Representative | Approved | 11/29/2006 |
| B | NYSE Chicago, Inc. | General Securities Principal | Approved | 02/13/2007 |
| B | NYSE Chicago, Inc. | Securities Trader Principal | Approved | 01/16/2014 |
| B | NYSE Chicago, Inc. | Securities Trader | Approved | 01/04/2016 |
| B | NYSE National, Inc. | General Securities Representative | Approved | 11/01/2018 |
| B | NYSE National, Inc. | Securities Trader | Approved | 11/01/2018 |
| B | NYSE National, Inc. | Securities Trader Principal | Approved | 11/01/2018 |
| B | NYSE National, Inc. | General Securities Principal | Approved | 06/16/2020 |
| B | Nasdaq BX, Inc. | General Securities Principal | Approved | 12/01/2009 |
| B | Nasdaq BX, Inc. | General Securities Representative | Approved | 12/01/2009 |
| B | Nasdaq BX, Inc. | Securities Trader | Approved | 09/14/2017 |
| B | Nasdaq BX, Inc. | Securities Trader Principal | Approved | 09/14/2017 |
| B | Nasdaq PHLX LLC | General Securities Principal | Approved | 07/11/2012 |

# Broker Qualifications



## Employment 2 of 2, continued

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | Nasdaq PHLX LLC | General Securities Representative | Approved | 07/11/2012 |
| B | Nasdaq PHLX LLC | Securities Trader Principal | Approved | 01/16/2014 |
| B | Nasdaq PHLX LLC | Securities Trader | Approved | 01/04/2016 |
| B | Nasdaq Stock Market | General Securities Representative | Approved | 11/29/2006 |
| B | Nasdaq Stock Market | General Securities Principal | Approved | 02/13/2007 |
| B | Nasdaq Stock Market | Securities Trader Principal | Approved | 01/16/2014 |
| B | Nasdaq Stock Market | Securities Trader | Approved | 01/04/2016 |
| B | New York Stock Exchange | General Securities Principal | Approved | 08/17/2011 |
| B | New York Stock Exchange | General Securities Representative | Approved | 08/17/2011 |
| B | New York Stock Exchange | Securities Trader | Approved | 09/14/2017 |
| B | New York Stock Exchange | Securities Trader Principal | Approved | 09/14/2017 |
| B | New York Stock Exchange | Approved Person (NYSE) | Approved | 06/07/2023 |

## Branch Office Locations

**JUMP TRADING, LLC**
600 WEST CHICAGO AVENUE, SUITE 600
CHICAGO, IL  60654

# Broker Qualifications



## Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below. A passed exam or exam waiver does not permit a broker to do business without an active SRO or state registration.

**This individual has passed 1 principal/supervisory exam, 4 general industry/product exams, and 0 state securities law exams.**

### Principal/Supervisory Exams

| Exam | Category | Date |
|------|----------|------|
| B  General Securities Principal Examination | Series 24 | 02/12/2007 |

### General Industry/Product Exams

| Exam | Category | Date |
|------|----------|------|
| B  Securities Trader Exam | Series 57TO | 01/02/2023 |
| B  Securities Industry Essentials Examination | SIE | 10/01/2018 |
| B  General Securities Representative Examination | Series 7 | 11/06/2006 |
| B  National Commodity Futures Examination | Series 3 | 03/07/1988 |

### State Securities Law Exams

| Exam | Category | Date |
|------|----------|------|
| No information reported. | | |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.

# Broker Qualifications



## Professional Designations

This section details that the representative has reported **0** professional designation(s).

No information reported.

# Registration and Employment History



## Registration History

The broker previously was registered with the following firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|
| No information reported. | | | |

## Employment History

This section provides up to 10 years of an individual broker's employment history as reported by the individual broker on the most recently filed Form U4.

**Please note that the broker is required to provide this information only while registered with FINRA or a national securities exchange and the information is not updated via Form U4 after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.**

| Employment | Employer Name | Position | Investment Related | Employer Location |
|---|---|---|---|---|
| 12/2001 - Present | JUMP TRADING | OWNER | Y | CHICAGO, IL, United States |

## Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

Ownership of the following:

Nejo Mare Management LLC--Manager/Member, 50% ownership
Nejo Mare LLC--Trustee, 50% ownership
DYSO LLC--Manager, 100% ownership

All are non-securities related and concern simple asset investment and management.

Also involved in the development and commercialization of medical training products through SIMnext.

**End of Report**



**This page is intentionally left blank.**

©2024 FINRA. All rights reserved. Report about WILLIAM J. DISOMMA.

# EXHIBIT I

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

http://online.wsj.com/article/SB10001424052702303918204577447222628346192.html

# Citadel Says Other Firm's Profit Shows Strategy Theft

*By Juliet Chung*

*June 4, 2012 10:12 pm ET*

Citadel LLC, the money manager run by Ken Griffin, has held up a division's shrinking profit as evidence that a fellow Chicago-based investment firm stole some of its proprietary trading strategies.

Citadel said in a court filing that Jump Trading LLC, a high-speed-trading firm, had recruited and hired at least 10 employees of its Tactical Trading business since 2005. Since then, Citadel said, its strategies in the area have become less profitable.

Citadel's Tactical Trading business uses mathematical and statistical models to identify fleeting price patterns and anomalies in the market, aiming to profit through rapid-fire trades. The unit pulled in about $1 billion for Citadel in 2008, during the height of the financial crisis, proving a profit engine for the firm during a year when its better-known hedge funds were hit hard by losses.

These models typically generate predictable profits, Citadel said in petition seeking documents, filed in April in Illinois state court; if a rival were to copy even part of a model, Citadel said it could lose hundreds of millions of dollars.

Jump Trading called Citadel's petition "frivolous" in a motion to dismiss in May and called Citadel's petition "a transparent attempt to obtain a commercial advantage."

Tessa Wendling, general counsel for Jump Trading, said Monday that the firm's views were represented in its motion. A Citadel spokeswoman declined to comment.

Citadel has yet to file suit against Jump Trading.

"On information and belief, the timing of unusual performance observed in Citadel's strategies roughly corresponds to the timing of some of these employees initiating trading activity at Jump and suggests that Citadel's trade secrets could have been misappropriated," Citadel said in the petition.

Former floor traders Bill DiSomma and Paul Gurinas founded the high-frequency-trading outfit in 1999; Jump Trading has offices in Chicago, London and Singapore.

Citadel requires employees to sign nondisclosure agreements and, for most employees in its Tactical Trading business, noncompete agreements. Citadel also limits access to the source code containing its trading algorithms and makes sure "that no paper copies of the source code are maintained," it said in its filing.

The court filings were reported earlier by Reuters.

Citadel manages about $12 billion in assets and is a big player in the business of handling equity and equity-option trades for retail brokers.

Tactical Trading's $1 billion figure had emerged in a court case in which Citadel alleged former employees violated noncompete agreements when they set up a firm called Teza Technologies LLC.

Citadel is asking for seven years' worth of documents it says could help discern who allegedly stole its trade secrets in its petition for discovery.

The documents Citadel seeks include: personnel files identifying all former Citadel employees or consultants who have worked at Jump, including their compensation and supervisors and reports; strategy and trading records, including a description of all of Jump's strategies in which any former Citadel employee or former employee's unit was involved; and source codes for those strategies, including logs of changes to those strategies.

The money manager is also seeking depositions of each of its former employees who work at or are connected to Jump, and may take action against them, the petition said.

**Write to** Juliet Chung at juliet.chung@wsj.com