**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SKYWAVE NETWORKS, LLC, | |
| Plaintiff, | |
| v. | Civil Action No. 1:24-cv-9650 |
| | Judge John J. Tharp, Jr. |
| WILLIAM J. DISOMMA, | |
| PAUL A. GURINAS, | |
| MATTHEW HINERFELD, | |
| WILLIAM DISOMMA TRUST, | |
| PAUL A. GURINAS TRUST, | |
| JUMP FINANCIAL, LLC, | **JURY TRIAL DEMANDED** |
| JUMP TRADING HOLDINGS, LLC, | |
| JUMP TRADING, LLC, | |
| ECW WIRELESS, LLC, | |
| WORLD CLASS WIRELESS, LLC, | |
| VIRTU FINANCIAL, INC., | |
| NLN HOLDINGS, LLC, | |
| NEW LINE NETWORKS, LLC, AND | |
| 10BAND, LLC, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

FACTUAL ALLEGATIONS AND MATTERS OF PUBLIC RECORD ................................ 3

ARGUMENT ................................................................................................................... 5

   I.   The RICO Claims Fail As a Matter of Law. ......................................................... 6

     A.   The Complaint Makes Clear That Skywave Has Not Been Injured in Its Business or Property by Reason of a Violation of RICO. ............................................................ 6

     B.   Skywave Does Not Properly Allege That Each Defendant Committed At Least Two Acts of Wire Fraud or Agreed That Someone Would Commit Two Such Acts. ..................... 17

     C.   Skywave Fails to Properly Allege a RICO Enterprise. .................................. 22

   II.   Skywave's Claims Are Time-Barred. ............................................................... 24

   III.   This Court Lacks Jurisdiction to Adjudicate Skywave's Claims. ...................... 28

CONCLUSION ............................................................................................................. 34

i

## TABLE OF AUTHORITIES

**CASES**

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
  483 U.S. 143 (1987) ................................................................................................ 24

*All–Tone Communications, Inc. v. American Information Tech.*,
  1991 WL 166532 (N.D. Ill. Aug. 26, 1991) ............................................................. 15

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) ........................................................................................ 6, 7, 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................ 13, 22

*Baker v. Atl. Richfield Co.*,
  2021 WL 3726050 (N.D. Ind. Aug. 23, 2021) ......................................................... 26

*Baker v. IBP, Inc.*,
  357 F.3d 685 (7th Cir. 2004) ................................................................................... 23

*Barr Lab'ys, Inc. v. Quantum Pharmics, Inc.*,
  827 F. Supp. 111 (E.D.N.Y. 1993) .......................................................................... 11

*Blue Book Servs., Inc. v. Farm J., Inc.*,
  435 F. Supp. 3d 912 (N.D. Ill. 2020) ........................................................................ 3

*Bobb v. Swartz-Reston P.C.*,
  2018 WL 4384292 (N.D. Ill. Sept. 14, 2018) .......................................................... 15

*Cancer Foundation, Inc. v. Cerberus Capital Management, LP*,
  559 F.3d 671 (7th Cir. 2009) .............................................................................. 24, 26

*CE Design Ltd. v. Prism Bus. Media, Inc.*,
  2009 WL 2496568 (N.D. Ill. Aug. 12, 2009) ........................................................... 30

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001) ................................................................................................ 22

*Ciminelli v. United States*,
  598 U.S. 306 (2023) ................................................................................................ 17

*Cleveland v. United States*,
  531 U.S. 12 (2000) ............................................................................................. 2, 17

*Coal. for Pres. of Hisp. Broad. v. F.C.C.*,
  931 F.2d 73 (D.C. Cir. 1991) ................................................................................... 33

*Crichton v. Golden Rule Ins. Co.*,
  576 F.3d 392 (7th Cir. 2009) .......................................................................... 23

*D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of Am.*,
  2013 WL 1286696 (N.D. Ill. March 28, 2013) ............................................... 24

*Daniels v. Union Pac. R.R. Co.*,
  530 F.3d 936 (D.C. Cir. 2008) ......................................................................... 33

*Drobny v. JP Morgan Chase Bank, NA*,
  929 F. Supp. 2d 839 (N.D. Ill. 2013) ............................................................... 21

*DT Boring, Inc. v. Chi. Pub. Blding. Comm'n*,
  2016 WL 3580756 (N.D. Ill. June 28, 2016) ................................................... 19

*Eckstein v. Balcor Film Investors*,
  58 F.3d 1162 (7th Cir. 1995) ........................................................................... 26

*Eli Lilly & Co. v. Roussel Corp.*,
  23 F. Supp. 2d 460 (D.N.J. 1998) ..................................................................... 11

*F.C.C. v. ITT World Commc'ns, Inc.*,
  466 U.S. 463, 468 (1984) .................................................................................. 29

*Gaunce v. deVincentis*,
  708 F.2d 1290 (7th Cir. 1983) ......................................................................... 31

*Goren v. New Vision Int'l, Inc.*,
  156 F.3d 721 (7th Cir. 1998) .............................................................. 19, 20, 22

*Gov't App Sols., Inc. v. City of New Haven*,
  2024 WL 1299993 (9th Cir. Mar. 27, 2024) .................................................... 13

*Green v. Morningstar Investment Mgmt. LLC*,
  2019 WL 216538 (N.D. Ill. Jan. 16, 2019) ................................................ 13, 14

*Green v. Morningstar, Inc.*,
  2018 WL 1378176 (N.D. Ill. Mar. 16, 2018) .............................................. 20, 24

*Grow Mich., LLC v. LT Lender, LLC*,
  50 F.4th 587 (6th Cir. 2022) ............................................................................... 8

*Guaranteed Rate, Inc. v. Barr*,
  912 F. Supp. 2d 671 (N.D. Ill. 2012) ............................................................... 19

*Hemi Grp., LLC v. City of New York*,
  559 U.S. 1 (2010) ......................................................................................... 6, 13

*Henson v. CSC Credit Servs.*,
29 F.3d 280 (7th Cir. 1994) ................................................................................................ 3

*Hollinger Int'l, Inc. v. Hollinger Inc.*,
2004 WL 2278545 (N.D. Ill. Oct. 8, 2004) ....................................................................... 21

*Holmes v. Securities Investor Protection Corp.*,
503 U.S. 258 (1992) ..................................................................................................... 1, 6, 7

*In re Honey Transshipping Litig.*,
87 F. Supp. 3d 855 (N.D. Ill. 2015) ................................................................................... 8

*In re NextWave Pers. Commc'ns, Inc.*,
200 F.3d 43 (2d Cir. 1999) ............................................................................................... 29

*In re Silver Lake Grp., LLC Sec. Litig.*,
108 F.4th 1178 (9th Cir. 2024) .......................................................................................... 3

*Jennings v. Auto Meter Prods., Inc.*,
495 F.3d 466 (7th Cir. 2007) ....................................................................................... 11, 19

*Jennings v. Emry*,
910 F.2d 1434 (7th Cir. 1990) .......................................................................................... 23

*Joe Schroeder Legacy, LLC v. Serv. 247 of Illinois, Inc.*,
2022 WL 408272 (N.D. Ill. Feb. 10, 2022) ...................................................................... 20

*Johnson v. Great W. Cas. Co.*,
2015 WL 4751128 (N.D. Ill. Aug. 11, 2015) ................................................................... 19

*Kelly v. United States*,
590 U.S. 391 (2020) .......................................................................................................... 18

*Lifschultz Fast Freight, Inc. v. Cons. Freightways Corp. of Del.*,
805 F. Supp. 1277 (D.S.C. 1992) ...................................................................................... 12

*Longmont United Hosp. v. Saint Barnabas Corp.*,
2007 WL 1850881 (D.N.J. June 26, 2007) ....................................................................... 10

*Longmont United Hosp. v. Saint Barnabas Corp.*,
305 F. App'x 892, 895 (3d Cir. 2009) .............................................................................. 11

*McKinney v. Panico*,
2022 WL 4551695 (N.D. Ill. Sept. 29, 2022) ................................................................... 21

*Metro Broad., Inc. v. F.C.C.*,
497 U.S. 547 (1990) .......................................................................................................... 18

iv

*Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*,
    877 F.2d 1333 (7th Cir. 1989) .......................................................................... 8

*Morris v. Wise*,
    2020 WL 1000010 (N.D. Ohio Mar. 2, 2020) ................................................. 13

*Muskegan Hotels, LLC v. Patel*,
    986 F.3d 692 (7th Cir. 2021) .......................................................................... 19

*Napleton's Arlington Heights Motors, Inc. v. FCA US LLC*,
    2018 WL 3370563 (N.D. Ill. July 10, 2018) ................................................. 14

*North Am. Catholic Educ. Programming Found., Inc. v. F.C.C.*,
    437 F.3d 1206 (D.C. Cir. 2006) ...................................................................... 29

*North v. Smarsh, Inc.*,
    160 F. Supp. 3d 63 (D.D.C. 2015) .................................................................. 33

*Opoka v. I.N.S.*,
    94 F.3d 392 (7th Cir. 1996) .............................................................................. 3

*Ordower v. Off. of Thrift Supervision*,
    999 F.2d 1183 (7th Cir. 1993) ........................................................................ 31

*Osundairo v. Geragos*,
    447 F. Supp. 3d 727 (N.D. Ill. 2020) .............................................................. 26

*Otwell v. Alabama Power Co.*,
    747 F.3d 1275 (11th Cir. 2014) ......................................................... 30, 31, 32

*Richmond v. Nationwide Cassel L.P.*,
    52 F.3d 640 (7th Cir. 1995) ............................................................................ 23

*Roger Whitmore's Auto. Servs., Inc. v. Lake County*,
    424 F.3d 659 (7th Cir. 2005) .......................................................................... 19

*Rotella v. Wood*,
    528 U.S. 549 (2000) ....................................................................... 24, 26, 31

*RWB Servs., LLC v. Hartford Computer Grp., Inc.*,
    539 F.3d 681 (7th Cir. 2008) .......................................................................... 15

*Schmude v. Sheahan*,
    312 F. Supp. 2d 1047 (N.D. Ill. 2004) ............................................................ 26

*Self v. Bellsouth Mobility, Inc.*,
    700 F.3d 453 (11th Cir. 2012) ........................................................................ 30

*Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*,
    249 F.3d 1068, 1071 (D.C. Cir. 2001) .......................................................................... 8

*Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys*,
    873 F.3d 574 (7th Cir. 2017) ....................................................................................... 13

*Slaney v. Int'l Amateur Athletic Federation*,
    244 F.3d 580 (7th Cir. 2001) ................................................................................. 19, 22

*Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*,
    884 F.3d 489 (4th Cir. 2018) ......................................................................................... 8

*Stachon v. United Consumers Club, Inc.*,
    229 F.3d 673 (7th Cir. 2000) ....................................................................................... 23

*Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*,
    990 F.3d 31 (1st Cir. 2021) ............................................................................... 8, 10, 11

*Telecommunications Rsch. & Action Ctr. v. F.C.C.*,
    750 F.2d 70 (D.C. Cir. 1984) ...................................................................................... 33

*United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*,
    719 F.3d 849 (7th Cir. 2013) ................................................................................. 22, 23

*United States v. Griffin*,
    76 F.4th 724 (7th Cir. 2023) ....................................................................................... 18

*United States v. Schwartz*,
    924 F.2d 410 (2d Cir. 1991) ....................................................................................... 18

*United States v. Weimert*,
    819 F.3d 351 (7th Cir. 2016) ....................................................................................... 19

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*,
    20 F.3d 771 (7th Cir. 1994) ................................................................................... 19, 20

*Walters v. McMahen*,
    684 F.3d 435 (4th Cir. 2012) ......................................................................................... 8

*Williams v. Dow Chemical Co.*,
    255 F. Supp.2d 219 (S.D.N.Y. 2003) .......................................................................... 18

## STATUTES AND REGULATIONS

18 U.S.C. § 1343 ............................................................................................................ 17

18 U.S.C. § 1964 .................................................................................................... 1, 6, 21

47 C.F.R. § 1.115 ................................................................................................... 28, 29

47 C.F.R. § 5.3 .......................................................................................................... 32

47 C.F.R. § 5.5 .......................................................................................................... 33

47 C.F.R. § 73.701 .................................................................................................... 16

47 U.S.C. § 151 ......................................................................................................... 18

47 U.S.C. § 153 ......................................................................................................... 16

47 U.S.C. § 155 ......................................................................................................... 33

47 U.S.C. § 402 ...................................................................................................... 2, 29

## INTRODUCTION

Plaintiff Skywave Networks, LLC ("Skywave") desired to commercialize a shortwave radio technology to license to high-frequency trading ("HFT") firms for intercontinental trading. So far as can be discerned from the Complaint, Skywave's business plan never materialized, it never built or commercialized a shortwave network, it never applied for or obtained any type of Federal Communications Commission ("FCC") shortwave license, and it never licensed its technology to anyone. It blames these failures on a purported racketeering scheme allegedly orchestrated by Defendants to defraud the FCC. Two of the Defendants, Jump Trading[1] and Virtu Financial, Inc. ("Virtu"), are financial trading firms that formed a joint venture that, among other things, developed its own shortwave transmission technology and, through a JV-controlled entity called 10Band LLC (also a Defendant), obtained a series of FCC licenses to use it.

At the heart of the case is the allegation that 10Band lied to the FCC to obtain its licenses, which alleged lies the Complaint characterizes as a series of RICO wire fraud predicates. Based on this alleged pattern of wire fraud, Skywave seeks treble damages for indirect injuries it claims to have suffered and a permanent injunction under which this Court would arrogate to itself control over spectrum licensing decisions and effectively overrule the FCC's grant of the 10Band licenses.

Accepting all the allegations of the Complaint as true, there are three fundamental problems that require the Complaint be dismissed with prejudice.

***First***, the RICO claims fail as a matter of law on essentially every element. Despite 18 U.S.C. § 1964(c) limiting civil RICO claims to the party that suffers the direct injury of the allegedly illegal activity, *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268–69

---

[1] The name Jump Trading is used throughout to encompass Defendants Jump Financial, LLC, Jump Trading Holdings, LLC and Jump Trading, LLC.

1

(1992), the Complaint makes clear that such direct injury, if any, was to Jump's and Virtu's trading competitors. Any injury to Skywave was both derivative and predicated on intervening acts of third parties. These flaws render the claims indirect, remote, and speculative, and therefore not cognizable. Indeed, Skywave cannot even allege injury-in-fact because the FCC license that Skywave claims to have wanted to (but did not) seek does not exist.

In addition, a wire fraud predicate act must be directed at obtaining *property* of the victim of the alleged fraud—here, the FCC—but a license is not property in the hands of a governmental agency, *Cleveland v. United States*, 531 U.S. 12, 26–27 (2000), and therefore the alleged false statements to the FCC do not support a RICO claim. Moreover, Skywave fails to plead (and certainly not with the requisite heightened specificity) that each Defendant committed two racketeering acts to establish a "pattern" of wire fraud; that each Defendant agreed that two racketeering acts would be committed, as would be required to state a RICO conspiracy claim; or that any enterprise distinct from the list of Defendants itself or the alleged pattern of racketeering exists.

***Second***, on the allegations of the Complaint, the four-year statute of limitations expired long ago when Skywave knew or should have known of its injury. So even if Skywave could state a viable RICO claim—and it cannot—its failure to do so within the limitations period is fatal.

***Third***, Skywave's Complaint is also barred because it asks this Court to assume the role of the FCC and inappropriately second-guess use of FCC licenses—in order to enjoin the further use of licenses expressly authorized and granted by the agency. The law is clear that this is an impermissible collateral attack on agency action, and the Court lacks jurisdiction to grant Skywave relief or hear its claims. FCC licensing decisions are reviewable only by the Court of Appeals for the District of Columbia Circuit, following a timely challenge at the agency. 47 U.S.C. § 402. But

Skywave never filed a timely administrative challenge at the FCC (or in the D.C. Circuit) to any of the license grants it seeks to overturn in the Complaint except for 10Band's most recent license renewal. The FCC's earlier license grants are thus final, non-appealable orders, and cannot be challenged in this or any court—now or ever—and the Court should dismiss with prejudice Skywave's claims related to those license grants on this basis. As to the one licensing renewal that Skywave *has* timely challenged in a Petition for Reconsideration—which its Complaint never mentions—Skywave has made the very same arguments lodged in the Complaint: that 10Band "uses the experimental authorization for regular day-to-day trading," and so its experimental license "should not have been granted." The FCC—and ultimately the D.C. Circuit—has exclusive jurisdiction over that question, and Skywave cannot seek an end-run around Congress's prescribed procedure for review of agency action. Accordingly, all of Skywave's claims are appropriately dismissed for lack of subject matter jurisdiction.

## **FACTUAL ALLEGATIONS AND MATTERS OF PUBLIC RECORD**[2]

Skywave alleges that Defendants Jump Trading and Virtu are high-frequency algorithmic trading firms that operate on exchanges worldwide. Jump Trading and Virtu indirectly formed a joint venture known as New Line Networks LLC and a subsidiary shortwave transmission research company called 10Band.[3] Compl. ¶¶ 76–81, 84.

---

[2] Defendants are required to and do accept the allegations of the Complaint as true for purposes of this motion. However, the Court can also take judicial notice of agency proceedings and other matters of public record, *Opoka v. I.N.S.*, 94 F.3d 392, 394 (7th Cir. 1996); *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994); *Blue Book Servs., Inc. v. Farm J., Inc.*, 435 F. Supp. 3d 912, 916 (N.D. Ill. 2020) (Tharp, J.), including matters before the Federal Communications Commission, *In re Silver Lake Grp., LLC Sec. Litig.*, 108 F.4th 1178, 1186 n.4 (9th Cir. 2024) ("We take judicial notice of this document, which is publicly available on the FCC website, for the proposition that the information available to the public included regular FCC-Intelsat meetings.").

[3] Plaintiffs have also named Jump Trading's owners, their owners' trusts, their general counsel, and a raft of related companies as well. Compl. ¶¶ 76–81.

In 2016, 10Band first applied to the FCC for an "[e]xperimental" license under Part 5 of the FCC regulations to test the use of shortwave radio technology to transmit financial market data. Compl. ¶¶ 57, 139–40. In December of that year, Skywave became aware of that application, and around that same time it "heard rumors" that Jump Trading or Virtu may have been affiliated with 10Band. *Id.* ¶¶ 60–61. The FCC staff granted 10Band's application for a five-year term, ending in 2021. *Id.* ¶ 141. Beginning in January 2020 and as recently as August 2023, 10Band applied for multiple renewals and modifications of this license, as well as for related licenses and their renewals and modifications, and the FCC granted the applications each time. *Id.* ¶¶ 142–44, 147–50, 153–56, 159–62, 165–68. 10Band's most recent renewal was granted for a two-year term to expire on November 1, 2025. *Id.* ¶ 143. Until the most recent license renewal, Skywave never challenged or appealed any of these license grants.

Skywave alleges that Defendants used the licenses for shortwave radio signals that transmit market data to facilitate inter-continental HFT and other low-latency trading. *Id.* ¶¶ 84–85. It contends that this usage is not authorized under an "experimental" license. *Id.* ¶ 59.

Skywave asserts that it wanted to get into the business of licensing its own shortwave radio technology and capability to other HFT firms. *Id.* ¶ 50. It alleges that it "planned" to acquire—but does not allege that it actually did receive (or even apply for)—a different type of FCC license, a "Part 73" "commercial" license. *Id.* ¶ 52. Skywave's business plan never materialized: Beginning in 2017, its prospective business partners withdrew from their venture, allegedly because the venture "could not reasonably compete" against 10Band's network. *Id.* ¶ 62.

Six years later, in September 2023, Skywave filed with the FCC staff a "Petition for Reconsideration" of 10Band's most recent license renewal. *See* Declaration of Neema Sahni ("Sahni Decl."), Ex. A ("Petition"); *see also* Fn. 2, *supra*. This Petition argues that 10Band "uses

4

the experimental authorization for regular day-to-day trading," and so an experimental license "should not have been granted." Pet. at 1. It asks the FCC staff to "reconsider and deny 10Band's application for renewal of the Experimental License"—*i.e.*, to revoke the license. *Id.* at 7. 10Band filed an Opposition to Skywave's Petition on September 28, 2023, explaining that its activity was consistent with the FCC's rules, and Skywave filed a Reply on October 12, 2023. Sahni Decl., Ex. B, C. The FCC staff has not yet ruled on Skywave's Petition—to date, the matter is still pending.

While its Petition was pending with the FCC, Skywave initiated this lawsuit on October 7, 2024. Dkt. 7. Skywave accuses the fourteen Defendants of substantive and conspiracy violations of the RICO statute based on wire fraud predicates. *Id.* It alleges that 10Band misled the FCC staff about the "experimental" nature of its shortwave licenses. Compl. ¶ 3. This in turn allegedly allowed Defendants' network to compete effectively against other HFT firms, costing other HFT traders lost profits. *Id.* ¶¶ 4, 73, 84, 173, 176, 198, 203, 207, 208. This injury to other HFT traders, according to the Complaint, in turn resulted in an injury to Skywave. *Id.* ¶¶ 190–95. Skywave seeks two forms of relief: treble damages and an injunction barring Defendants from using the licenses issued by the FCC. *Id.*, Prayer for Relief.

## **ARGUMENT**

Skywave's RICO claims fail as a matter of law: They do not and cannot satisfy the necessary elements of a RICO cause of action, and because Skywave admits it knew of its alleged injuries as early as 2017, the claims are clearly time-barred. And at an even more fundamental level, this Court cannot adjudicate Skywave's collateral attack of the FCC's licensing decisions.

I.      **The RICO Claims Fail As a Matter of Law.**

    **A. The Complaint Makes Clear That Skywave Has Not Been Injured in Its Business or Property by Reason of a Violation of RICO.**

Only a "person injured in his business or property by reason of a violation of section 1962 . . . may sue" under RICO.  18 U.S.C. § 1964(c).  This requires "a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well."  *Holmes*, 503 U.S. at 268.  Skywave has not alleged either and, in fact, has alleged facts showing that neither exists.

    **1. Skywave Has Not Alleged Proximate Causation.**

      **a. RICO claims alleging only indirect harm are not cognizable.**

When determining proximate causation, "the central question [to] ask is whether the alleged violation led *directly* to the plaintiff's injuries."  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (emphasis added).  Only "the victim directly injured" by the racketeering conduct, not an "indirectly injured victim," can sue.  *Holmes*, 503 U.S. at 274.  "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient."  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes*, 503 U.S. at 271, 274).  Where a plaintiff's "theory of causation requires [a court] to move well beyond the first step, that theory cannot meet RICO's direct relationship requirement."  *Id.* at 10.

Three important considerations underlie the direct-relationship requirement.  *First* is "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action."  *Anza*, 547 U.S. at 458.  "[T]he less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors."  *Holmes*, 503 U.S. at 269.  *Second*, "recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs

removed at different levels of injury." *Id.* *Third*, "directly injured victims can generally be counted on to vindicate the law" without the difficulties caused by allowing suits "by plaintiffs injured more remotely." *Id.* at 269–70.

Courts have applied the direct-relationship requirement rigorously to dismiss RICO complaints where a plaintiff's injury was far less attenuated from a defendant's alleged misconduct than here. The leading case is *Holmes*, 503 U.S. 258. There, the defendant lied to manipulate the price of certain stocks, brokers bought those stocks with their own money at inflated prices, the market learned of the deception, and the ensuing price collapse forced the brokers into liquidation. *Id.* at 262–63. SIPC (which oversees the liquidation of bankrupt securities brokers) asserted RICO claims for losses to customers who did not purchase the manipulated stocks, but whose losses resulted from the liquidation of the brokers who had. *Id.* The Supreme Court held that because the direct victims of the fraud were the stockbrokers, their customers were only indirect victims. *Id.* at 270–74. As the Court explained, "the link [was] too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers." *Id.* at 271.

The Supreme Court applied the same direct-relationship analysis to deny the plaintiff a cause of action in *Anza*, 547 U.S. 451. There, the defendant steel products company cheated the State of New York by not charging its customers sales taxes. *Id.* at 453–54. A rival company brought a RICO suit alleging that the defendant's failure to charge sales taxes to customers and filing of false tax returns allowed the defendant to charge lower prices to customers, causing losses to the plaintiff. *Id.* at 454, 457–58. The Court, relying on *Holmes*, found that the direct victim of the fraud was the State of New York and that the competitor was only an indirect victim and therefore could not state a claim. *Id.* at 458.

Cases applying the directness requirement to reject a downstream plaintiff's RICO claims are legion. *See Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*, 990 F.3d 31, 36 (1st Cir. 2021) (plaintiff failed to establish standing because its injury was "entirely derivative" of its potential business partner's injury); *see also Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*, 877 F.2d 1333, 1335 (7th Cir. 1989) (company's owners could not establish proximate causation to sue bank under RICO because their injury was derivative of injury to the company); *Walters v. McMahen*, 684 F.3d 435, 444 (4th Cir. 2012) (although false attestations that undocumented employees were eligible to work "are one step in the chain of events that may ultimately have resulted in employment of unauthorized aliens," depressed wages for authorized workers was not a "direct" result); *Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1071, 1074 (D.C. Cir. 2001) (dismissing RICO claims against tobacco companies brought by health trust funds because "the alleged harm arising from payment of medical expenses by the funds and the nations is itself derivative of alleged injuries to individual smokers"); *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 494 (4th Cir. 2018) (subcontractor did not have standing to bring RICO claim against building owner's insurance company because subcontractor's alleged injury was derivative of harm to building owner); *Grow Mich., LLC v. LT Lender, LLC*, 50 F.4th 587, 595–96 (6th Cir. 2022) (dismissing RICO claim where plaintiff's injury was only derivative of harm to its debtor); *In re Honey Transshipping Litig.*, 87 F. Supp. 3d 855, 863–65 (N.D. Ill. 2015) (commercial bee-keepers did not suffer direct injury under RICO from scheme by importers and suppliers to defraud the government of customs duties by misbranding Chinese honey).

**b. Skywave fails to allege that it was directly harmed by any supposed racketeering activity.**

Skywave alleges that Defendants participated in a racketeering scheme directed at defrauding the FCC, which harmed Defendants' competitors in the trading business, not Skywave. Specifically, it alleges a scheme:

> *to defraud the FCC* to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses *to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.*

Compl. ¶ 4 (emphasis added); *see also id.* ¶ 1. It makes the identical allegation twice more in describing the RICO enterprise, *id.* ¶¶ 73, 82, twice again in describing the pattern of racketeering, *id.* ¶¶ 173, 176, twice in the elements paragraphs of Count One, *id.* ¶¶ 198, 203, and, for good measure, a final two times in the elements paragraphs of Count Two, *id.* ¶¶ 207–08.

These allegations are supplemented by plenty of other references to the financial harm Defendants' actions supposedly caused to competitor HFT firms. *Id.* ¶ 88 ("Defendants beat the market—avoiding a loss and making a profit—through the low latency afforded by their unlawful use of an Experimental License"); *id.* ¶ 174 (Defendants used licenses "to gain a speed advantage over competitors for Commercial Trading"); *id.* ¶¶ 181–82 (scheme "has also injured financial 'pairs traders'").

**c. Any injury to Skywave was indirect, remote, and speculative.**

Skywave is not a competitive trading firm, but a company that "developed trading network technology" for traders, *id.* ¶ 37, which it hoped to license to potential customer trading firms, *id.* ¶ 195. This included Company 1, which it alleges was hoping to trade using Skywave's technology under a patent license but later dropped out of the arrangement. *Id.* ¶¶ 51, 66, 194. The primary injury Skywave identifies here are profits lost from its inability to license its technology to HFT

9

firms, including to Company 1 in return for a share of profits. *Id.* ¶¶ 194–95. It also alleges injury relating to the investment from Company 2 that it never received and the investment it received but spent. *Id.* ¶ 191–92.

Skywave's alleged loss of licensing fees and profits is entirely derivative of the harm suffered by its putative customers, Company 1 and other HFT firms who—as the Complaint repeatedly explains—suffered the direct financial harm. It was those firms who were traders and who were either discouraged, financially handicapped, or put out of business by the alleged speed advantage that shortwave gave to Jump and Virtu. That means that Skywave was not the directly injured party under *Holmes*, *Anza*, and their progeny.

Moreover, the Complaint plainly alleges that those injuries, as well as the lost or sunk investments by Company 2, were the direct result of independent actions by third parties ***and by Skywave itself***. *See id.* ¶¶ 61–62 (Company 2 became concerned about the ability to compete and "sought to exit" the deal, and *Skywave agreed*, to release it); *id.* ¶¶ 63, 66 (Company 1 did not provide funding); *id.* ¶ 64 (new potential investor would not invest enough money); *id.* ¶¶ 63, 66 ("[Company 1] also requested, and *Skywave agreed* to dissolve" their deal). And this is to say nothing of independent intervening acts of the FCC to grant the 10Band license applications. *See Longmont United Hosp. v. Saint Barnabas Corp.*, 2007 WL 1850881, at *4 (D.N.J. June 26, 2007) ("Where a government body is an intervening actor between an alleged RICO violation and the alleged harm, courts in this Circuit and others uniformly dismiss the claims for lack of proximate cause[.]"), *aff'd*, 305 F. App'x 892 (3d Cir. 2009).

*Sterling Suffolk Racecourse*, 990 F.3d 31, is instructive. There, plaintiff Sterling was the proposed landlord for a casino that an applicant for a gaming license hoped to build. *Id.* at 34. Sterling brought a RICO claim against the winning bidder for the license, Wynn Resorts, claiming

that Wynn lied to the Massachusetts Gaming Commission on its application, the lie cost Wynn's rival to lose out on the gaming license, and that in turn cost Sterling its opportunity to lease its land to the rival. *Id.* at 34–35. There, as here, the alleged misrepresentation was directed to a government agency in order to obtain a governmental license. There, like Company 1 here, a potential business partner of the plaintiff was allegedly injured as a result of the issuance of the license (though the injury in *Sterling* was much less speculative than the injuries alleged to other trading firms here, as Wynn's competitor plainly could not build its casino in the absence of a gaming license). And there, as here, the downstream plaintiff sought to recover under RICO. The First Circuit, applying *Holmes* and *Anza*, affirmed dismissal of the complaint, rejecting the argument that "persons who do business with an entity harmed by a RICO conspiracy may recover against the conspirators." *Id.* at 37; *accord Eli Lilly & Co. v. Roussel Corp.* 23 F. Supp. 2d 460, 485 (D.N.J. 1998) ("Lilly is an indirect victim of the alleged fraud to the FDA and therefore does not have standing to assert a claim under RICO.").

Indeed, for this reason, courts across the country routinely reject RICO claims that, like Skywave's, are predicated on allegedly fraudulent statements made to an agency to secure a certain outcome. *See, e.g.*, *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 473 (7th Cir. 2007) (rejecting RICO claim alleging "a slew of predicate racketeering acts that [plaintiff] claims were aimed at corrupting [Patent and Trademark Office] proceedings" because "the case lacks any of the hallmarks of a RICO violation"); *Barr Lab'ys, Inc. v. Quantum Pharmics, Inc.*, 827 F. Supp. 111, 115–16 (E.D.N.Y. 1993) (rejecting RICO claim based on theory that defendant "fraudulently obtained approval to market a competing product" because plaintiff's "losses depend on the intervening actions of the FDA and [defendant's] customers"); *Longmont United Hosp. v. Saint Barnabas Corp.*, 305 F. App'x 892, 895 (3d Cir. 2009) (rejecting RICO claim because

11

"government discretion played a significant role in causing [plaintiff's] alleged injuries"); *Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Del.*, 805 F. Supp. 1277, 1291 (D.S.C. 1992) (rejecting RICO claim because "[a]ny harm from the alleged conspiracy would be purely contingent on how the rate bureaus and the [Interstate Commerce Commission] acted based on the alleged predicate acts and then the customers' taking action based on the ICC action"), *aff'd*, 998 F.2d 1009 (4th Cir. 1993).

In fact, the chain of causation at issue here is far more attenuated than that at issue in *Sterling Suffolk Racehorse*, *Eli Lilly*, and, indeed, than in any other case of which Defendants are aware. On its theory, between Defendants' supposed misrepresentations to the FCC and any injury to Skywave: (1) the FCC had to grant 10Band the Part 5 experimental license without understanding how the license would be used; (2) the trading Defendants' joint venture had to build out its shortwave network; (3) the trading Defendants had to be able to trade faster than their competitors as a result of this network; (4) this would have had to cause Skywave's potential customers (that is, competitive trading firms) to suffer competitive injury and lost profits at the hands of the Defendants; (5) that would, in turn, have to discourage Skywave's potential clients from providing capital based on their assessment of the market situation (and *not* have caused them to be *more* interested in Skywave's technology to stay competitive); and also (6) drive Skywave's potential clients out of business or make it impossible for them to license its technology; leading to (7) Skywave's loss of potential profits.

But even this chain of causation is artificially abbreviated because it assumes that, even if nothing else had gone wrong, many other contingencies would have broken in Skywave's favor (absent which there could not be any injury caused by Defendants), including: (8) Skywave would have had to convince the FCC to grant it a Part 73 license that does not actually exist (*see* Section

I.B, below); (9) Skywave would have had to actually build out and commercialize its service; and (10) Skywave's technology would have had to have been proven effective and better than any competing technology.

This is a ludicrously long set of contingencies between the supposed lie to the FCC and Skywave's hypothetical lost profits. The alleged harm here was thus caused by "a set of actions . . . entirely distinct from the alleged RICO violation." *Anza*, 547 U.S. at 458. "[L]awful actions, like . . . choosing not to do business with a company, can serve as independent factors rendering the purported injury too indirect from the predicate RICO acts." *Gov't App Sols., Inc. v. City of New Haven*, 2024 WL 1299993, at *2 (9th Cir. Mar. 27, 2024). The Supreme Court has "never before stretched the causal chain of a RICO violation so far." *Hemi*, 559 U.S. at 11.[4]

### d. The principles underlying the Supreme Court's Section 1964(c) jurisprudence highlight why Skywave is not a proper RICO plaintiff.

Were any more evidence of lack of proximate causation needed, it is furnished by the reasons articulated by *Holmes* and *Anza* for the direct-relationship requirement.

There is no way to determine how much harm Skywave suffered from the alleged false statements to the FCC rather than from other independent factors and decisions outlined above. "Disentangling the effects of the [fraud on the FCC] from the many other influences on [the FCC and Skywave's potential customers and investors] would be difficult[.]" *Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys*, 873 F.3d 574, 577 (7th Cir. 2017); *see also Green v. Morningstar*

---

[4] Skywave is then left with its recitation of the statutory formula that the alleged racketeering "directly and proximately caused and continue to cause injury to Skywave." Comp. ¶¶ 204, 209. But a pleading that offers "a formulaic recitation of the elements of a cause of action will not do," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted), especially where, as here, the actual factual allegations contradict that formulaic recitation, *Morris v. Wise*, 2020 WL 1000010, at *6 (N.D. Ohio Mar. 2, 2020).

*Inv. Mgmt. LLC*, 2019 WL 216538, at \*7 (N.D. Ill. Jan. 16, 2019) ("*Green II*") (no proximate causation "because the sequence of events that must occur to injure [plaintiff] involves too many intervening and independent decisions"); *Napleton's Arlington Heights Motors, Inc. v. FCA US LLC*, 2018 WL 3370563, at \*4 (N.D. Ill. July 10, 2018).[5]

Skywave's theory of proximate causation also clashes with the second reason for requiring direct injury under *Holmes* and *Anza*: the difficulty of apportioning damages at different levels of injury. Here, that would mean *first* figuring out whether and, if so, how much each of the unidentified trading competitors who were potential Skywave clients was injured by Defendants' use of the shortwave license; *then* trying to apportion damages first among those other trading competitors; and *only after that*, trying to further apportion damages as between each of them and (assuming that some of them would have paid for Skywave's shortwave technology) Skywave.

Finally, Skywave's claim is undermined by the third *Holmes-Anza* principle: the existence of a putatively more directly-injured party who can vindicate the alleged RICO violation. According to Skywave, they abound here, encompassing every other trading firm who does not have access to shortwave technology.[6] There is thus no basis for permitting a remotely, speculatively injured party to bring suit.

---

[5] By way of example, one of many potential reasons that customers may have chosen not to do business with Skywave is that one of its co-founders—when running a former company— skimmed $680,000 in payments from a client to pay personal bills and other expenses (and, as a result, pled guilty to federal mail and wire fraud). *See United States v. Babich*, Plea Agreement, 2:14-cr-56-RLM, Dkt. No. 2 (N.D. Ind. 2015). And that co-founder was still on probation at the time Skywave was allegedly ready to commercialize its business. Compl. ¶ 50.

[6] This is not to say that as a matter of fact there is any competitor itself that suffered factual or proximate harm—there is not—but only that taking the facts alleged in this Complaint as true, there is a directly injured party that is not Skywave.

## 2. Skywave Has Not Alleged But-For Causation.

There is also a second, independent reason why this claim fails the test of Section 1964(c): Skywave has not even properly alleged but-for causation. "The typical question asked in determining cause-in-fact is counterfactual: would the claimed injury still have happened if the defendant had not engaged in the tortious conduct alleged?" *RWB Servs., LLC v. Hartford Computer Grp., Inc.*, 539 F.3d 681, 686 (7th Cir. 2008) (citing W. Page Keeton *et al.*, Prosser and Keeton on Torts 264 (5th ed. 1984); Restatement (Third) of Torts: Liability for Physical Harm § 26, cmt. b (Proposed Final Draft No. 1 2005)); *see also Bobb v. Swartz-Reston P.C.*, 2018 WL 4384292, at *8 (N.D. Ill. Sept. 14, 2018) (finding no but-for causation); *All–Tone Commc'ns, Inc. v. Am. Info. Tech.*, 1991 WL 166532, at*4 (N.D. Ill. Aug. 26, 1991) (same).

Here, to establish but-for causation, Skywave would have to plausibly allege that it could and would have entered the market for providing shortwave services to trading firms with a Part 73 license that it refers to as a "commercial license." On its theory, getting the Part 73 license was the *sine qua non* of selling shortwave services to such firms. Without such a license, it could not have made shortwave transmissions, could not have earned profits by selling its services to trading firms, and thus could not have been harmed (even remotely) by Defendants' actions in obtaining their Part 5 experimental licenses.

The Complaint offers only two allegations concerning the alleged Part 73 license: (1) there is such a thing as a Part 73 license that could be used in the context described by Skywave, Compl. ¶ 56; and (2) that it was "beginning the process" of applying for such a license, *id*. ¶ 2. Skywave does not allege that it ever actually applied for a Part 73 license. And even more critically, it does not allege that the FCC rules provide for issuance of such a license for the purpose that Skywave has posited: to transmit market or trading data between an exchange and an HFT firm using intercontinental broadcast transmissions.

It is little wonder that Skywave omits these allegations. Part 73 appears under Title 47 of the Code of Federal Regulations, Chapter I (Federal Communications Commission), Subchapter C, and is entitled "Radio Broadcast Services." The term "broadcasting" for purposes of the Federal Communications Act "means the dissemination of radio communications *intended to be received by the public*, directly or by the intermediary of relay stations." 47 U.S.C. § 153(7) (emphasis added). Skywave alleges that it wanted to engage in sending shortwave signals for "transoceanic communications." Compl. ¶ 37. Thus, Skywave has alleged that it wanted a license under Part 73, Subpart F of the FCC rules, which is entitled "International Broadcast Stations." The rules define an international broadcast station as a broadcast station using certain designated frequencies "the transmissions of which are intended to be received *directly by the general public* in foreign countries." 47 C.F.R. § 73.701(a) (emphasis added).

But, as a matter of law, Part 73 and Subpart F have nothing to do with what Skywave claims it would have done, which was "to commercially deploy technology for transcontinental wireless networks for *trading*" for "the practice of latency arbitrage in high-frequency trading[.]" Compl. ¶ 36 (emphasis added). Such trading involves sending signals by, for example, a particular, individual trading firm from its computer in Chicago to its computer located at an exchange in Germany. *Id.* ¶ 49. This would not be considered "broadcasting" under FCC rules—there is no signal "received directly by the general public." Instead, as Skywave itself alleges, these signals would be sent exclusively point-to-point. *See, e.g.*, *id.* ¶¶ 49, 69–72, 86–87. Private point-to-point communications between computers belonging to an HFT firm (or any other private party) are the opposite of "broadcasting." *See Authorizing Permissive Use of the "Next Generation" Broadcast Television Standard*, Report and Order and Further Notice of Proposed Rulemaking, 32 FCC Rcd 9930, 9936 ¶ 9 (2017).

16

Because Skywave never applied for and did not possess any license that would have enabled it to implement its claimed business model, it could never have commercialized its technology for trading, and therefore it could not have been injured by any alleged activities undertaken by Defendants using their Part 5 experimental licenses.

**B. Skywave Does Not Properly Allege That Each Defendant Committed At Least Two Acts of Wire Fraud or Agreed That Someone Would Commit Two Such Acts.**

The alleged pattern of racketeering activity here consists entirely of a supposed set of wire frauds in violation of 18 U.S.C. § 1343. In fact, the Complaint does not properly allege even a single wire fraud by any Defendant, let alone a pattern of wire fraud pled with the required particularity against each Defendant.

**1. The Alleged Misrepresentations to the FCC to Obtain Licenses Do Not Constitute Wire Fraud As a Matter of Law.**

The heart of Skywave's case is that Defendants sent misrepresentations to the FCC through interstate wire communications in order to defraud the FCC into issuing Part 5 experimental licenses to them. Compl. ¶¶ 172–73. The Supreme Court has established, however, that "the federal fraud statutes criminalize only schemes to deprive people of traditional property interests," *Ciminelli v. United States*, 598 U.S. 306, 309 (2023), and a license is not property in the hands of the licensing authority, *Cleveland*, 531 U.S. at 26–27.

*Cleveland* forecloses Skywave's wire-fraud theory. There, the defendant was charged with mail fraud for lying about the ownership of his video poker business to obtain a state license required to operate such machines. 531 U.S. at 16–17. The Court found that the State's core concern in requiring such licenses was "regulatory"—to prevent gaming activities from being infiltrated by criminal elements. *Id.* at 20–21. While the State also received application fees and made money on taxing video poker machines, the Court held that a government regulator does not

part with "property" when it issues a license because "a license is not 'property' in the government regulator's hands." *Id.* at 20; *see also Kelly v. United States*, 590 U.S. 391, 400 (2020) (reversing wire fraud conviction for scheme to restrict traffic flow over toll bridge because object of scheme was not to obtain money or property from victim but to affect regulatory interests); *United States v. Griffin*, 76 F.4th 724, 738 (7th Cir. 2023) (a "scheme to alter a regulatory decision, such as a scheme to obtain a state or municipal license from a government regulator" does not suffice as a scheme to deprive the government of property as required for wire fraud).

The same rule applies where, as here, the regulatory authority issuing the license is an agency of the United States. *See United States v. Schwartz*, 924 F.2d 410, 418 (2d Cir. 1991) ("[T]he government's interest in the unissued export licenses is ancillary to its power to regulate, and is not a property interest within the meaning of the wire fraud statute."); *Williams v. Dow Chem. Co.*, 255 F. Supp. 2d 219, 225–26 (S.D.N.Y. 2003) (alleged lie by chemical company to obtain EPA regulatory approval did not constitute mail or wire fraud because it was not directed at money or property).

There can be no doubt that the FCC's interest in issuing broadcast licenses here is—like those of the State of Louisiana in *Cleveland*, the Department of State in *Schwartz*, and the EPA in *Williams*—regulatory, not one based in property. The FCC was created "[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio . . . ." 47 U.S.C. § 151. The agency is charged with granting licenses in the "public interest, convenience, or necessity," and that licensing authority is necessitated by "the limited number of frequencies on the electromagnetic spectrum." *See Metro Broad., Inc. v. F.C.C.*, 497 U.S. 547, 597 (1990). Because the FCC is exercising sovereign powers in issuing broadcast licenses, the Part 5 licenses

at issue here are not property in the FCC's hands, and there can be no wire fraud predicated on obtaining such a license. Without wire fraud predicates, there can be no RICO claim.

### 2. Count I Fails to Allege With Particularity That Each Defendant Engaged In or Agreed to a Pattern of Racketeering Activity.

Even if fraudulent representations to obtain a government license could constitute wire fraud, Skywave's complaint fails. A valid RICO complaint must allege that each Defendant conducted the affairs of the supposed enterprise through a pattern of racketeering activity, "consist[ing] of at least two predicate acts of racketeering," as required for a substantive RICO claim. *Roger Whitmore's Auto. Servs., Inc. v. Lake County*, 424 F.3d 659, 670 (7th Cir. 2005). "In alleging a RICO pattern, liability is limited to persons who have 'personally committed' at least two predicate acts of racketeering." *Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 684 (N.D. Ill. 2012); *see also DT Boring, Inc. v. Chi. Pub. Bldg. Comm'n*, 2016 WL 3580756, at *12 (N.D. Ill. June 28, 2016). RICO claims, like Skywave's, that are premised exclusively on wire fraud or mail fraud are disfavored. *Jennings*, 495 F.3d at 475; *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 781 (7th Cir. 1994); *Johnson v. Great W. Cas. Co.*, 2015 WL 4751128, at *6 (N.D. Ill. Aug. 11, 2015) (Tharp, J.).

Skywave has failed to even plead the basic elements of wire fraud, which require that the defendant make "a material false statement, misrepresentation, or promise, or conceal[] a material fact"; have a specific intent to defraud; and have used the wires in furtherance of a scheme to defraud. *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016). Where, as here, the alleged predicate acts of racketeering involve fraud, under Federal Rule of Civil Procedure 9(b), the plaintiff must plead with specificity the "who, what, when, where, and how" of the alleged fraudulent activity. *Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 698 (7th Cir. 2021) (quotation omitted); *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001); *Goren v. New*

19

*Vision Int'l, Inc.*, 156 F.3d 721, 729 (7th Cir. 1998). The pleading must "demonstrate that *each* RICO Defendant engaged in at least two predicate acts;" here, two acts of wire fraud. *Joe Schroeder Legacy, LLC v. Serv. 247 of Ill., Inc.*, 2022 WL 408272, at *4 (N.D. Ill. Feb. 10, 2022) (emphasis added). Group pleading—that is "lumping together" of defendants as one—is insufficient to meet Rule 9(b)'s heightened pleading standard in a RICO fraud case. *Goren*, 156 F.3d at 730; *Vicom, Inc.*, 20 F.3d at 778 (same); *Green v. Morningstar, Inc.*, 2018 WL 1378176, at *9 (N.D. Ill. Mar. 16, 2018) ("*Green I*") (same).

Skywave alleges that 10Band and/or Hinerfeld made misrepresentations to the FCC. Compl. ¶¶ 146, 152, 158, 164, 170, 172–73. Those allegations, however, mention only two Defendants as having allegedly made any false statement or committing any purported fraud. The other twelve Defendants[7] are not alleged to have committed any predicate act at all or to have made any alleged misstatement to the FCC, or to have had any intent to defraud—any of which is reason alone to dismiss them entirely. Skywave's attempt to remedy that flaw by substituting group pleading, *e.g.*, "Defendants' predicate acts of racketeering," Compl. ¶ 172, fails as well. Beyond the two identified Defendants, the Complaint does not specify with particularity who made any alleged misstatements, let alone the other, *e.g.*, "what," "when," "where," and "how," elements required by Rule 9(b). *See Goren*, 156 F.3d at 729–30; *Vicom*, 20 F.3d at 778; *Green I*, 2018 WL 1378176, at *9.

Skywave also alludes to a second type of supposed wire fraud, namely, that the "Defendants' predicate acts of racketeering include each commercial trade made by Defendants using shortwave networks granted to 10Band . . . each of which constitutes the use of wire for the

---

[7] DiSomma, Gurinas, the DiSomma Trust, the Gurinas Trust, Jump Financial, LLC, Jump Trading Holdings, LLC, Jump Trading, LLC, ECW Wireless, LLC, World Class Wireless, LLC, Virtu Financial, Inc., NLN Holdings LLC, and New Line Networks LLC.

purpose of executing Defendants' racketeering scheme and is an act of wire fraud in violation of 18 U.S.C. § 1343." Compl. ¶ 183. These allegations fail for two reasons.

First, the Complaint is directed at Defendants' alleged "commercial trading of financial instruments." *See, e.g., id.* ¶ 1. It further explains that these financial instruments include "stocks and futures." *Id.* ¶ 44. But trading of "stocks" (that is, securities) is not actionable under Section 1964(c), which specifically exempts "any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). The bar extends not only to explicit securities fraud claims but also those that "plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO *if such offenses are based on conduct that would have been actionable as securities fraud*." *Hollinger Int'l, Inc. v. Hollinger Inc.*, 2004 WL 2278545, at *5 (N.D. Ill. Oct. 8, 2004) (quoting H.R. Rep. No. 104-369, at 47 (1995) (Conf. Rep.)); *see also McKinney v. Panico*, 2022 WL 4551695, at *8–9 (N.D. Ill. Sept. 29, 2022).

Second, the allegations also fail Rule 9(b)'s specificity test. They identify only two Defendants (Jump Trading, LLC and Virtu), not the other twelve, as having committed these supposed frauds, Comp. ¶¶ 186, 188; they do not specify any other details of these supposed trades; and, most importantly, *they do not even attempt to explain what was fraudulent about the trades.* There is an obvious reason for this omission: Nothing in the Complaint suggests that any trade involved a misrepresentation to an exchange or a counterparty, that there was any market manipulation or other intent to deceive, or that there was anything at all improper about the trades. *See Drobny v. JP Morgan Chase Bank, NA*, 929 F. Supp. 2d 839, 849 (N.D. Ill. 2013) (plaintiffs failed to plead predicate acts of wire fraud where the complaint "does not identify which Defendants committed which acts of fraud or why they had an intent to defraud"). In that context,

the Complaint fails not only the Rule 9(b) specificity requirement but also the plausibility requirement of *Iqbal*, 566 U.S. at 678.

### 3. Skywave Has Also Not Properly Alleged a § 1962(d) Claim.

Count Two, alleging a RICO conspiracy, must suffer the same fate as Skywave's underlying RICO claim. RICO conspiracy requires two agreements. A plaintiff must show both that "(1) the defendant agreed to . . . participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Slaney*, 244 F.3d at 600.

Skywave nowhere alleges that each Defendant agreed that someone would commit two racketeering acts as part of the alleged conspiracy. Instead, the sole allegation regarding any kind of agreement by the Defendants is the assertion that, "[f]rom 2016, Defendants unlawfully, knowingly and intentionally combine, conspire, and agree together to engage in the aforesaid conduct[.]" Compl. ¶ 206. But this is a pure legal conclusion, supported by no alleged facts that can plausibly support even the top-level conspiracy, much less any further agreement by each Defendant that two specific racketeering acts would be committed by someone. *See Goren*, 156 F.3d at 732–33 (dismissing claim where "complaint is utterly devoid of allegations indicating either a specific agreement by these defendants to participate in the affairs of the enterprise or an agreement to the commission of two specific predicate acts").

### C. Skywave Fails to Properly Allege a RICO Enterprise.

Skywave also fails to adequately allege the "enterprise" element of a RICO claim because it does not satisfy two requisite distinctiveness requirements. First, a plaintiff "must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001); *see also United Food & Com. Workers Unions & Emp'rs Midwest Health*

*Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853–54 (7th Cir. 2013). "Without a difference between the defendant and the 'enterprise,' there can be no violation of RICO." *Baker v. IBP, Inc.*, 357 F.3d 685, 692 (7th Cir. 2004); *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 647 (7th Cir. 1995) ("The amended complaint's failure to present an enterprise separate and distinct from the persons sought to be held liable is a proper basis for its dismissal.").

Second, the enterprise must be distinct from the racketeering activity alleged. *See Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990); *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 400 (7th Cir. 2009) (An enterprise is "an organization with a structure and goals separate from the predicate acts themselves.") (quoting *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000)). As the Seventh Circuit has explained, "although a pattern of racketeering activity may be the means through which the enterprise interacts with society, it is not itself the enterprise, for an enterprise is defined by what it is, not what it does." *Emry*, 910 F.2d at 1440. A RICO plaintiff "cannot establish structure by defining the enterprise through what it supposedly does." *Stachon*, 229 F.3d at 676.

The Complaint fails both distinctiveness requirements. Skywave's description of the alleged enterprise makes plain that it is nothing more than a list of defendants. Specifically, under the heading "Defendants' Enterprise," the Complaint identifies all fourteen Defendants, including individuals, trusts, and various entities. Compl. ¶¶ 6–19 (listing Defendants); *id.* ¶ 73–74 (identifying the parties associated-in-fact); *id.* ¶¶ 76–81 (explaining Defendants as being the constituents of the enterprise); *id.* ¶ 82 (again listing Defendants as the constituents of the enterprise). Indeed, the Complaint explicitly asserts that Defendants and the enterprise are one and the same: "*Defendants form* a complex network of individuals, trusts, shell companies, trading

23

companies and other entities that *are* an association-in-fact enterprise[.]"  *Id.* ¶ 74 (emphasis added).

The Complaint also fails the second distinctiveness requirement.  It explicitly defines the enterprise to be nothing more than the criminal scheme.  Skywave does not allege that Defendants "were organized for any purpose *other* than" advancing their racketeering scheme.  *Green I*, 2018 WL 1378176, at *5.  Indeed, it expressly alleges that Defendants "form[ed] [the] association-in-fact enterprise . . . to facilitate and conduct Defendants' racketeering scheme."  Compl. ¶ 82.  "The shared purpose of the enterprise . . . and the members thereof is to defraud the FCC" to get the licenses and benefit at the expense of their competitors.  *Id.* ¶¶ 198, 207.  Taking away these predicate acts, "there is nothing left in the complaint to sustain the allegation of an ongoing, structured enterprise among Defendants."  *Green I*, 2018 WL 1378176 at *5.  Because Skywave has not alleged "an organization with a common purpose separate from the predicate acts themselves," its RICO claims should be dismissed.  *D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of Am.*, 2013 WL 1286696, at *9 (N.D. Ill. March 28, 2013).

## II.  Skywave's Claims Are Time-Barred.

Even if Skywave could state a plausible RICO claim, the time has long since passed for it to bring such a claim, providing yet a further reason to dismiss the Complaint with prejudice.

Civil RICO claims have a four-year statute of limitations.  *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987).  The four-year period begins to run when a plaintiff knows "or should have known of [its] injury."  *Rotella v. Wood*, 528 U.S. 549, 553 (2000).  "A plaintiff does not need to know that his injury is actionable to trigger the statute of limitations—the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim."  *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009).  Thus,

if Skywave knew or reasonably should have known of its alleged injuries before October 2020, its claims are time-barred.

Skywave's Complaint makes clear that it knew of its injuries **by March 2017**. Skywave alleges harm from the "termination of Skywave's [valuable] partnership with [Companies 1 and 2] and the associated resulting costs and losses." Compl. ¶ 190. Skywave alleges that it knew—in 2017—that this termination purportedly resulted from the 10Band experimental licenses it complains about. Specifically, it alleges that "[Company 1] did not believe the partnership could reasonably compete against *any unlawfully used 10Band Experimental License* for Commercial Trading," and, as a result, "[i]n March 2017, Skywave . . . agreed to release [Company 1] from the partnership." *Id*. ¶ 62 (emphasis added); *see also id*. ¶ 63 ("Without [Company 1], Skywave was forced to pause or cancel aspects of its network construction."). In other words, taking its allegations as true, Skywave knew of the injuries about which it now complains by March 2017, and it knew the alleged (albeit remote) cause of those injuries was the licenses granted to 10Band.

Skywave's Complaint also includes allegations and materials showing it knew or could easily have discovered before October 2020 that *all* Defendants were affiliated with those 10Band experimental licenses. For example, Skywave (1) pleads that around December 2016 it had "heard rumors in the industry that Jump or Virtu (both trading firms) may be affiliated with 10Band," *id*. ¶ 60; (2) pleads that Defendant Hinerfeld was the signatory on 10Band's license applications in January, March, and May 2020—which were publicly available at the time, *e.g.*, *id.* ¶¶ 148, 150, 154, 156, 160, 162, 166; (3) pleads that the same publicly-available applications "directed . . . all email correspondence to [Defendant] NLN['s] email domain," *e.g.*, *id.* ¶¶ 144(a), 150, 156, 162, 168(c); and (4) includes as an exhibit an ownership chart publicly filed with the FCC in May 2020

25

that names—as direct or indirect owners of 10Band—every Defendant in this case but Jump Trading, Virtu, and Hinerfeld, *see id.* ¶ 75 n.8. *Compare* Compl. Ex. 2, *with* Sahni Decl., Ex. D[8].

Skywave attempts to plead around this knowledge by claiming it "was not aware of any information *confirming* the rumors that Jump or Virtu were affiliated with 10Band." Compl. ¶ 61 (emphasis added). That cannot rescue its untimely claim for several reasons. *First*, "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Rotella*, 528 U.S. at 555. Here, Skywave pleaded knowledge of its injury from "*any unlawfully used 10Band Experimental License* for Commercial Trading" as of March 2017 at the latest—over three years outside the limitations period. Compl. ¶ 62 (emphasis added). *Second*, plaintiffs are "not allowed to bury their heads in the sand—to know you've been injured and make no effort to find out by whom is the very laxity that statutes of limitations are designed to penalize." *Cancer Found.*, 559 F.3d at 676. Based on public records, Skywave easily could have confirmed the late-2016 "rumors that Jump or Virtu were affiliated with 10Band," Compl. ¶ 61, before October 2020. *See Eckstein v. Balcor Film Invs.*, 58 F.3d 1162, 1168–69 (7th Cir. 1995) (claims barred under the statute of limitations where registration statements available to the plaintiffs furnished information about the defendants).

---

[8] Available at https://wireless2.fcc.gov/UlsEntry/attachments/attachmentViewRD.jsp?applType=search&fileKey=1307651602&attachmentKey=20870671&attachmentInd=applAttach. The Court may consider these records in determining whether Skywave had sufficient constructive notice. *Baker v. Atl. Richfield Co.*, 2021 WL 3726050, at *1 (N.D. Ind. Aug. 23, 2021) ("Public records—such as court orders, agency decisions, administrative body reports, and government websites—are appropriate subjects of judicial notice." (collecting cases)); *Schmude v. Sheahan*, 312 F. Supp. 2d 1047, 1064 (N.D. Ill. 2004) ("[I]t is routine for courts to take judicial notice of both newspaper articles and court records, among other things."); *accord Osundairo v. Geragos*, 447 F. Supp. 3d 727, 740 n.8 (N.D. Ill. 2020) (applying *Schmude* and taking judicial notice of a Chicago Tribune article).

Indeed, it requires almost no effort to connect the Defendants named in Exhibit 2 to the Complaint—again, a publicly available May 2020 chart setting forth 10Band's owners filed with the FCC—to Jump Trading or Virtu. For example, at least as early as 2018, news articles publicly announced that New Line Networks LLC—which owns 10Band LLC, as set forth on Exhibit 2 to the Complaint—is a "joint venture of Chicago-based Jump Trading LLC and New York-based Virtu Financial Inc., according to Kane County records," and that "public records point to [New Line Networks'] testing the idea of using shortwave technology to convey data between the CME facility and key exchanges around the globe." *See* Sahni Decl., Ex. E[9]; *see also id.* Ex. F[10] (2019 Bloomberg article also announcing that New Line Networks LLC is a "joint venture of Chicago's Jump Trading LLC and Virtu Financial Inc."). As another example, the same publicly-available May 2020 ownership chart identifies Jump's co-founders—Defendants DiSomma and Gurinas, and the DiSomma and Gurinas Trusts—as indirect owners of 10Band. *See* Compl. Ex. 2. That Defendants DiSomma and Gurinas are the owners of Jump Trading, LLC and Jump Financial, LLC is very well known and has been well known for more than a decade. Citing just some judicially-noticeable sources on this point: *As early as 2008*, Jump Financial, LLC's registration with the Illinois Secretary of State (also available online) listed William DiSomma and Paul A. Gurinas as managers. *See* Sahni Decl., Ex. G[11]; *see also id.*, Ex. H.[12] (publicly-available

---

[9] Available at https://www.bloomberg.com/news/articles/2018-06-18/hft-traders-dust-off-19th-century-tool-in-search-of-market-edge.

[10] Available at https://www.bloomberg.com/news/features/2019-03-08/the-gazillion-dollar-standoff-over-two-high-frequency-trading-towers.

[11] Available at https://apps.ilsos.gov/businessentitysearch/businessentitysearch,

[12] Available at https://brokercheck.finra.org/.

"BrokerCheck" database run by the Financial Industry Regulatory Authority listing DiSomma and Gurinas as associated with Jump Trading, LLC since 2006); *id.*, Ex. I.[13]

Notably, even Skywave's 2023 Petition for Reconsideration to the FCC of 10Band's most recent license renewal grant came more than six years after it alleges it knew it was injured. Skywave could have challenged 10Band's earlier grants and renewals—including those granted in 2020 and 2021, *see, e.g.*, Compl. ¶¶ 142, 149, well after it knew of its injuries—but chose not to. The time for doing so has long since passed.[14]

Simply put, Skywave knew of its alleged financial injury and the supposed causes of that injury *seven years ago*. It further knew of every Defendant's alleged connection to that harm by around that time, and to the extent it chose to avoid such knowledge in the face of "rumors" and public records making abundantly clear the individuals and entities affiliated with 10Band, such willful blindness cannot toll the limitations period. Skywave is at least three years too late.

### III. This Court Lacks Jurisdiction to Adjudicate Skywave's Claims.

Dismissal of Skywave's claims is appropriate for yet another, independent reason: They impermissibly ask this Court to second-guess the FCC's grant and renewal of licenses to Defendants. Federal district courts must dismiss such collateral attacks on agency decisions.

Review of final FCC licensing decisions is committed to the *exclusive* jurisdiction of the Court of Appeals for the D.C. Circuit. For all but one of the seven grants and renewals alleged in the Complaint, the time for raising such a challenge in the proper forum has long since passed, so those decisions are final and may not be challenged, in this Court or anywhere else. *See* 47 C.F.R.

---

[13] Available at
http://online.wsj.com/article/SB10001424052702303918204577447222628346192.html.

[14] Thus, even if Skywave were made to wait until after it exhausted its administrative remedies to bring suit and any limitations period was tolled in the interim, *see* Section II, *infra*, it would still be too late.

§ 1.115(d) (applications for review of staff licensing decisions must be filed with the full Commission within 30 days of staff action); 47 U.S.C. § 402(b) (challenges to an FCC final licensing decision must be filed with the D.C. Circuit); *N. Am. Catholic Educ. Programming Found., Inc. v. F.C.C.*, 437 F.3d 1206, 1209–10 (D.C. Cir. 2006) (requiring dismissal of challenge to FCC licensing-related decision when complainant waited more than 30 days). As for the one license renewal for which Skywave did timely file a Petition for Reconsideration, the FCC has not even rendered a final decision yet, which is all the more reason why this Court has no jurisdiction to hear a challenge to it.

In this lawsuit, Skywave asks this Court to put itself in the shoes of the FCC and second-guess appropriate use of FCC licenses. *See* Compl. ¶ 177 ("Defendants unlawfully acquired Experimental Licenses"); *id*. at Prayer for Relief (asking the Court to enjoin "use of Experimental Licenses in the possession of any Defendant"). This is simply not appropriate. In granting the experimental license applications in question, the FCC *already* determined that 10Band was lawfully entitled to those licenses. It would invade the exclusive province of the FCC and the D.C. Circuit for this Court to second-guess that determination—even under the guise of a fraud claim.

Indeed, under the Communications Act of 1934, the FCC has exclusive jurisdiction over spectrum licensing decisions. *See, e.g.*, *In re NextWave Pers. Commc'ns, Inc.*, 200 F.3d 43, 54 (2d Cir. 1999). Accordingly, the question of whether the Part 5 experimental licenses obtained by 10Band were properly granted and renewed must be decided—and has been decided—in the first instance by the FCC. To the extent that Skywave wanted to challenge those final determinations, its only recourse would have been to obtain a final order at the FCC and, in turn, seek review of that final order in the D.C. Circuit. *F.C.C. v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984); 47 U.S.C. § 402(b) ("Appeals may be taken from decisions and orders of the Commission to the

United States Court of Appeals for the District of Columbia . . . [b]y any [] person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application[.]").  But except for the most recent license renewal in 2023—*six years* after it alleges it was injured—Skywave *never* timely challenged any license grant issued by the FCC or sought judicial review of those grants at the D.C. Circuit.

Skywave now seeks to belatedly collaterally attack final regulatory decisions that Congress committed to the FCC's and D.C. Circuit's exclusive jurisdiction—jurisdiction that Skywave neglected to avail itself of.  In asking the Court to assess whether Defendants lied to the FCC by representing that 10Band qualified for an experimental license, Skywave necessarily asks this Court to overrule the FCC's determination that 10Band *did so qualify*.  Skywave's attempt to side-step Congress's carefully-prescribed process for challenging the FCC's licensing determination by pleading to this Court that Defendants defrauded the FCC is blatantly improper.  *See CE Design Ltd. v. Prism Bus. Media, Inc.*, 2009 WL 2496568, at *12 (N.D. Ill. Aug. 12, 2009) (claim is impermissible collateral attack where "the complaint filed in the district court raise[s] the same issues and seek[s] the same relief in substance as" in the FCC's proceedings (citation omitted)), *aff'd*, 606 F.3d 443 (7th Cir. 2010); *see also Self v. Bellsouth Mobility, Inc.*, 700 F.3d 453, 462 (11th Cir. 2012) (affirming dismissal for lack of jurisdiction where "claims necessarily conflict with final orders of the FCC and thereby depend on the district court being able to collaterally review the correctness or validity of those orders"); *Otwell v. Ala. Power Co.*, 747 F.3d 1275, 1282 (11th Cir. 2014) ("[N]on-parties to the proceedings before the [agency] may not contest the agency's final decision in an alternative forum by bringing challenges that are inescapably intertwined with a review of the agency's final determination.").  And because the FCC's licensing decisions can be challenged only through the administrative process and reviewed only in the D.C.

Circuit—which Skywave failed to timely do as to the earlier license grants—Skywave's RICO claims predicated on those earlier grants cannot now be heard in *any* court.

Even more fundamentally, in seeking treble damages for use of the licenses and to enjoin any further use of them, Compl. at Prayer for Relief, Skywave is expressly asking this Court to penalize and undo a licensing decision made by the FCC. *See Rotella*, 528 U.S. at 557–78 (purpose of civil RICO treble-damages remedy is to deter and penalize the prohibited practices). But the Seventh Circuit has made clear that where, as here, "Congress places review of an administrative decision in the court of appeals, ***district judges may not enjoin or penalize action that the agency has approved*** or that is the natural outcome of the agency's decision." *Ordower v. Off. of Thrift Supervision*, 999 F.2d 1183, 1188 (7th Cir. 1993) (emphasis added). In other words, this Court has no jurisdiction to grant Skywave the remedies it seeks. *Id.*; *see also Gaunce v. deVincenti*s, 708 F.2d 1290, 1292–93 (7th Cir. 1983) (dismissing for lack of jurisdiction where lawsuit was "in derogation of the well settled principle that collateral attacks upon administrative orders are not permissible").

*Otwell v. Alabama Power Co.* is instructive. There, the Federal Energy Regulatory Commission ("FERC") renewed Alabama Power's license to operate a dam project on a lake. 747 F.3d at 1278. An association of local property owners participated in and opposed the license proceedings, and filed a petition for rehearing with the FERC. *Id.* The FERC denied the petition, and the property owners brought a number of tort claims against Alabama Power in federal district court, alleging unreasonable actions in operating the dam project. *Id.* at 1278–79. The Eleventh Circuit held that the lawsuit was an impermissible collateral attack because—under a statute analogous to that governing review of FCC orders—the court of appeals has exclusive jurisdiction to set aside an order of the FERC. *Id.* at 1281. It did not matter that the plaintiffs technically

"assert[ed] different claims and request[ed] different relief," because their requested injunction involved "proposals expressly considered and rejected by the FERC in its relicensing proceedings, in the order issuing the 2010 License, and in its order denying rehearing." *Id* at 1281–82. Because the plaintiffs were "attempting to obtain the same results and to place the same constraints on Alabama Power rejected by the agency in the exercise of its institutional expertise, and their claims [were] inescapably intertwined with a review of the FERC's final decision," the district court lacked jurisdiction to hear the claims. *Id.* at 1282.

So too here. The relief Skywave seeks—enjoining and penalizing Defendants' use of the licenses by way of treble damages—would place the same constraints on Defendants as an order from the FCC revoking 10Band's license. And it does not matter that Skywave repackaged its request for relief as RICO claims: "[Litigants] cannot escape [the statute's] strict judicial review provision by arguing that they are pursuing different claims and different relief than the parties before the [agency]." *Id.* at 1281. Because Skywave's lawsuit is an impermissible collateral attack on the FCC's decisions to grant the subject licenses to 10Band, the Court should dismiss it.

There is no better illustration of this than Skywave's currently pending Petition for Reconsideration of the Elburn I Renewal Grant—the *only* licensing decision that Skywave chose to timely challenge before the FCC (and one that issued well after Skywave's alleged harm occurred in 2017, *see* Section II, *supra*). There, Skywave makes the very same arguments to the FCC that its Complaint asks *this Court* to consider: that 10Band "uses the experimental authorization for regular day-to-day trading," and so its experimental license "should not have been granted." Pet. at 1.[15] The agency has not yet adjudicated Skywave's Petition for

---

[15] These claims are based on a false dichotomy between "experimental" and commercial activities. The FCC's rules permit experimental licensees to perform "[p]roduct development and market trials," 47 C.F.R. § 5.3(k), which the agency defines as "[a] program designed to evaluate product

Reconsideration, which was filed with the FCC's Office of Engineering & Technology. After that Office issues a decision on the Petition, Skywave would need to file an application for review of that decision to the full Commission before Skywave would be permitted to appeal *that* decision to the D.C. Circuit. 47 U.S.C. § 155(c)(7) ("The filing of an application for review under this subsection shall be a condition precedent to judicial review of any order, decision, report, or action made or taken pursuant to a delegation under paragraph (1) of this subsection."); *Coal. for Pres. of Hisp. Broad. v. F.C.C.*, 931 F.2d 73, 76–77 (D.C. Cir. 1991) ("In general, failure to exhaust administrative remedies bars judicial review of FCC orders.").

In other words, to the extent Skywave's RICO claims are based on this license renewal, this Court cannot hear those claims either. The case belongs with the FCC until Skywave's administrative remedies have been exhausted (which they have not been), and then it belongs with the D.C. Circuit, pursuant to the exclusive administrative scheme and review process that Congress has carefully delineated. *See Telecommunications Rsch. & Action Ctr. v. F.C.C.*, 750 F.2d 70, 75 (D.C. Cir. 1984) ("[W]e hold that where a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's *future* jurisdiction is subject to the *exclusive* review of the Court of Appeals." (first emphasis added)); *Daniels v. Union Pac. R.R. Co.*, 530 F.3d 936, 942 (D.C. Cir. 2008) ("the district court lacks subject matter jurisdiction over [plaintiffs' claims] because those claims, *once final*, are subject to this Court's exclusive jurisdiction" (emphasis in original)); *North v. Smarsh, Inc.*, 160 F. Supp. 3d 63, 84 (D.D.C. 2015) (dismissing claim for lack of jurisdiction where "Plaintiffs are barred from launching such collateral attacks because they 'almost certainly implicate[ ] issues that would be addressed by the

---

performance and customer acceptability," *id.* § 5.5, and the Commission found 10Band's activity consistent with the rules.

Court of Appeals upon final review of [the agency's] ruling.'" (citation omitted)).  No matter what happens with the FCC and D.C. Circuit, Skywave still cannot bring the RICO claims set forth in the Complaint, as they would still suffer from all the fatal defects identified above.  *See* Section I, *supra*.

## **CONCLUSION**

For the reasons set forth above, Defendants respectfully submit that this matter should be dismissed in its entirety with prejudice.

Dated: December 16, 2024

Neema Sahni (admitted *pro hac vice*)
J. Hardy Ehlers (admitted *pro hac vice*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
(424) 332-4757
nsahni@cov.com
jehlers@cov.com

Gerard J. Waldron (admitted *pro hac vice*)
COVINGTON & BURLING LLP
850 10th St NW
Washington, DC 20001
(202) 662-6000
gwaldron@cov.com

Respectfully submitted,

*/s/ Ingrid Yin*
Chris Gair (ARDC # 6190781)
Ingrid Yin (ARDC # 6339857)
GAIR GALLO EBERHARD LLP
1 East Wacker Drive, Suite 2600
Chicago, IL 60601
(312) 600-4900
cgair@gairgallo.com
iyin@gairgallo.com

*Attorneys for Defendants William J. DiSomma, Paul A. Gurinas, Matthew Hinerfeld, William DiSomma Trust, Paul A. Gurinas Trust, Jump Financial, LLC, Jump Trading Holdings, LLC, Jump Trading, LLC, ECW Wireless, LLC, World Class Wireless, LLC, NLN Holdings LLC, New Line Networks LLC, and 10Band LLC*

34

Robert Y. Sperling (ARDC #2688093)
Katherine B. Forrest (admitted *pro hac vice*)
Andrew G. Gordon (admitted *pro hac vice*)
Jessica S. Carey (admitted *pro hac vice*)
Kristina A. Bunting (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3148
rsperling@paulweiss.com
kforrest@paulweiss.com
agordon@paulweiss.com
jcarey@paulweiss.com
kbunting@paulweiss.com

*Attorneys for Defendant Virtu Financial, Inc.*