**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| SKYWAVE NETWORKS, LLC, | |
|                Plaintiff, | Civil Action No. 1:24-cv-9650 |
|       v. | Judge Georgia N. Alexakis |
| WILLIAM J. DISOMMA,<br>PAUL A. GURINAS,<br>MATTHEW HINERFELD,<br>JOHN MADIGAN,<br>JUMP TRADING, LLC, and<br>VIRTU FINANCIAL, INC., | **JURY TRIAL DEMANDED** |
|            Defendants. | |

## FIRST AMENDED COMPLAINT

Skywave Networks, LLC ("Skywave") files this First Amended Complaint against Defendants William J. DiSomma ("DiSomma"); Paul A. Gurinas ("Gurinas"); Matthew Hinerfeld ("Hinerfeld"); John Madigan ("Madigan"); Jump Trading, LLC ("Jump Trading"); and Virtu Financial, Inc. ("Virtu") (collectively, "Defendants") and alleges as follows, based on personal knowledge as to Skywave and Skywave's acts and on information and belief as to all other matters.

1

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 3

PARTIES, JURISDICTION, AND VENUE ...................................................................... 5

I.      BACKGROUND ..................................................................................................... 8

  A.   High-Frequency Trading (HFT) ................................................................... 8

  B.   Skywave's Efforts To Launch And Commercialize Its Shortwave Network .................. 10

  C.   FCC Licensing .............................................................................................. 13

  D.   Defendants' Shortwave Activities ............................................................... 16

     i.    Defendants' Commercial Trading Network ............................................. 16

     ii.   The HFT Enterprise's Experimental Licenses ........................................ 21

II.     DEFENDANTS' CONDUCT ................................................................................. 27

  A.   Conducting Or Participating In A RICO Enterprise ..................................... 27

     i.    Defendants' Ordinary Business .............................................................. 27

     ii.   The HFT Enterprise .............................................................................. 29

     iii.  Defendants' Association With The HFT Enterprise ................................ 30

     iv.  Defendants' Pattern Of Racketeering Activity ...................................... 31

        1.   *Fraudulent Filings With The FCC* ................................................... 32

        2.   *Unlawful Commercial Trading* ...................................................... 37

  B.   Conspiring To Conduct Or Participate In A RICO Enterprise ..................... 39

     i.    Defendants' Intent To Effect A Racketeering Scheme ........................... 39

     ii.   Defendants' Agreement To Effect A Racketeering Scheme .................... 39

     iii.  Defendants' Overt Acts In Furtherance Of Their Conspiracy ................. 40

  C.   Skywave's Discovery Of Defendants' Racketeering Scheme ........................ 41

  D.   Skywave's Injury ......................................................................................... 49

  E.   Injury To Other Traders .............................................................................. 50

III.    CAUSES OF ACTION .......................................................................................... 54

  A.   COUNT I: Violation Of 18 U.S.C. § 1962(c) ............................................. 54

  B.   COUNT II: Violation Of 18 U.S.C. § 1962(d) ........................................... 58

PRAYER FOR RELIEF ..................................................................................................... 59

DEMAND FOR A JURY TRIAL ....................................................................................... 60

## INTRODUCTION

1.     Since at least 2016, Defendants have continuously directed, controlled, managed, and conducted the affairs of an enterprise through a pattern of racketeering activity.  In 2016, Defendants created a high-frequency trading ("HFT") enterprise comprised of 10Band, LLC ("10Band") (the "HFT Enterprise").  Defendants' purpose for the HFT Enterprise was—and continues to be—to build and operate a HFT network that includes shortwave radio infrastructure (the "HFT Network").  Beginning in 2016, Defendants directed the HFT Enterprise to apply for, modify, renew, assign, and request confidentiality for *experimental* Federal Communications Commission ("FCC") shortwave radio licenses pursuant to 47 C.F.R. § 5 ("Experimental Licenses").  Experimental Licenses are limited to "experimentation," "product development," and "market trials" (*id.* § 5.1(b)) and are advantageous because they allow applicants to specify their own technical operating parameters.  Defendants directed the HFT Enterprise to falsely state, falsely promise, or materially misrepresent to the FCC that the requested licenses were for experimental use and tailored them to have significant advantages over competing networks. Then—once those Experimental Licenses were granted—Defendants directed and controlled the HFT Enterprise to trade financial instruments ("Commercial Trading")—in violation of the Experimental Licenses—unlawfully leveraging the ill-gotten advantages of the HFT Enterprise's HFT Network at the expense of other market participants, including Skywave.

2.     Defendants also conspired to direct, control, manage, and conduct the affairs of the HFT Enterprise through a pattern of racketeering activity.  At least as early as 2016, Defendants intended to obtain Experimental Licenses through false statements, false promises, or material misrepresentations and to unlawfully use the Experimental Licenses for Commercial Trading beyond the scope of "experimentation," "product development," and "market trials."  Defendants

agreed to use the HFT Enterprise to enact their scheme. Defendants devised and enacted their scheme by directing and conducting the HFT Enterprise to apply for Experimental Licenses and knowingly make false statements, false promises, or material misrepresentations in the HFT Enterprise's FCC license applications. Defendants then used those Experimental Licenses to unlawfully engage in Commercial Trading.

3. From 2013 to 2016, the founders of Skywave developed revolutionary trading network technology, which Skywave continues to develop and improve today. In 2016, Skywave was formed and entered a ███████████ partnership to commercialize its network technology. With the funding from that partnership, Skywave started to commercialize its trading network technology, including beginning the process to obtain a commercial FCC license to operate a shortwave transmitter under 47 C.F.R. § 73 ("Part 73 License").

4. Skywave's commercialization efforts were derailed by Defendants' unlawful conduct, which is detailed further below. Defendants—through the HFT Enterprise—fraudulently obtained and misused Experimental Licenses because such licenses allow applicants to tailor their own technical operating parameters. By doing so, Defendants ensured that the HFT Enterprise's HFT Network would have a dominant speed advantage over other communications networks— like Skywave's nascent HFT network with a Part 73 License or the networks of other parties granted non-Experimental Licenses by the FCC. Because it could not compete with the HFT Enterprise's HFT Network, Skywave's partnerships fell apart, it was unable to find new partners, it was forced to halt its efforts to commercialize its technology, and it lost access to markets and trading profits it would have acquired from operating its shortwave network.

5. Skywave is not the only victim of Defendants' misconduct. Defendants' misconduct also injured financial "pairs traders" like Sean and Douglas Drendel ("the Drendel

Brothers"). In 2015, the Drendel Brothers launched Bruder Trading Inc. ("Bruder") to trade pairs, such as the S&P 500 E-Mini ("E-Mini")/DAX future ("FDAX").[1] Then, in 2021, Bruder was forced to cease trading because it was unable to compete with the HFT Enterprise's HFT Network.

6. Defendants directed, controlled, managed, and conducted the affairs of the HFT Enterprise, including by creating the HFT Enterprise to build and operate the HFT Network, investing in the HFT Enterprise, holding leadership positions in the HFT Enterprise, directing the HFT Enterprise to apply for, modify, renew, assign, and request confidentiality for Experimental Licenses, submitting certifications on behalf of the HFT Enterprise in FCC filings, directing the HFT Enterprise to facilitate Defendants' Commercial Trading via its HFT Network, and conducting Commercial Trading via the HFT Network.

7. Defendants concealed the true nature of their commercial activities behind an artifice of confidential, experimental work and a web of shell companies that obscured the connection between the HFT Enterprise and Defendants' racketeering scheme. Meanwhile, Defendants shared trading infrastructure, including the HFT Network, and coordinated their activities to carry out their scheme.

**PARTIES, JURISDICTION, AND VENUE**

8. Skywave is a limited liability company organized and existing under the laws of Delaware, with its principal place of business at 10525 West US Highway 30, Building 4 C, Wanatah, Indiana 46390.

9. DiSomma is an individual with a business address at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654. DiSomma is also a resident of Illinois.

---

[1] Pairs trading is based on a correlation between two assets.

10.     Gurinas is an individual with a business address at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

11.     Hinerfeld is an individual with a business address at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

12.     Madigan is an individual with a business address at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

13.     Jump Trading is a limited liability company registered to do business in Illinois, with its principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

14.     Virtu is a corporation organized and existing under the laws of Delaware, with a place of business at 233 South Wacker Drive, Suite 4020, Chicago, Illinois 60606.

15.     This is a civil action arising under the Racketeer Influenced Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

17.     Personal jurisdiction is proper against Jump Trading because it has a principal place of business in the Northern District of Illinois.

18.     Personal jurisdiction is proper against DiSomma because DiSomma, through the William DiSomma Trust ("DiSomma Trust"), is an owner of Jump Trading, which has a principal place of business in the Northern District of Illinois.

19.     Personal jurisdiction is proper against Gurinas because Gurinas, through the Paul A. Gurinas Trust ("Gurinas Trust"), is an owner of Jump Trading, which has a principal place of business in the Northern District of Illinois.

20.     Personal jurisdiction is proper against Hinerfeld because he regularly transacts business on behalf of Jump Trading in the Northern District of Illinois as Jump Trading's general counsel.

21.     Personal jurisdiction is proper against Madigan because he regularly transacts business on behalf of Jump Trading in the Northern District of Illinois as Jump Trading's Technologist and Manager of Telecom Infrastructure.

22.     Personal jurisdiction is proper against Virtu because it has a place of business in the Northern District of Illinois, and it participated in the activities alleged in this First Amended Complaint, a substantial portion of which occurred in this District. Further, Virtu controls approximately 50 percent of 10Band, which operates radio transmission links in this District related to the activities alleged in this First Amended Complaint.

23.     Personal jurisdiction is also proper against all Defendants in the Northern District of Illinois because they devised and enacted a yearslong racketeering scheme to, among other things, defraud the FCC and the Commercial Trading market. Defendants devised and enacted their scheme by obtaining Experimental Licenses to operate shortwave transmitters located in Elburn, Illinois (which is within this District); making false statements, false promises, or material misrepresentations in applications for Experimental Licenses and modification applications, renewal applications, and confidentiality requests for those Experimental Licenses that their operations would only be experimental; misusing the Experimental Licenses for Commercial Trading; and leveraging the ill-gotten advantages of their Experimental Licenses at their competitors' expense.

24.     Venue is proper in this District under 28 U.S.C. § 1391 and 18 U.S.C. § 1965. Jump Trading is a resident of the Northern District of Illinois. DiSomma, Gurinas, Hinerfeld, Madigan,

and Virtu all transact business in the Northern District of Illinois, including through activities in furtherance of all Defendants' racketeering scheme in this District by, among other things, misusing their Experimental Licenses and engaging in systematic and continuous Commercial Trading using the Elburn, Illinois transmitters. In addition, Jump Trading has a regular and established place of business in the Northern District of Illinois, and Jump Trading and Virtu engage in trading activities and network operations activities in this District.

## I.    BACKGROUND

### A. High-Frequency Trading (HFT)

25.    HFT is a trading strategy where financial instruments, like stocks and futures, are traded at high frequency to take advantage of small but frequent changes in financial markets. High-frequency traders seek to make profits from these small changes by aggregating large quantities of high-frequency trades over time. While high-frequency traders might only make a relatively small profit on a single trade, they might make thousands of such trades per minute.

26.    In HFT, successful trades are determined by small fractions of time—nanoseconds, microseconds, and milliseconds. The opportunities that high-frequency traders seek are often only available at the thinnest slices of time increments.

27.    The fleeting nature of HFT opportunities dictates that the speed of the networks, computers, and algorithms used by each high-frequency trader determines whether a trader will be fast enough to capture an opportunity or lose it to a faster trader. Only high-frequency traders with the fastest networks can dominate the opportunities presented by changing conditions in national and international financial markets.

28.    Put simply, for HFT, the fastest network wins the trade and reaps the economic benefits, and every millisecond counts. As a matter of illustration, one HFT networking firm spent

approximately $300 million to build a domestic network to save 3 milliseconds[2] while another HFT networking firm spent $250 million to build an intercontinental network to save 5 milliseconds.[3]

29. Similarly, latency arbitrage trading is a form of trading that takes advantage of the time it takes for overseas financial markets to adjust to one another's changes. The key for latency arbitrage is the speed (or low latency) of the network used by a trader. To make a profit, latency arbitrage traders leverage the fact that they can receive signals about overseas market changes hundreds of microseconds to one millisecond before other traders and then make trades before other traders are aware of those overseas changes.

30. To further illustrate, one example of latency arbitrage trading is trading based on the correlation between the E-Mini, which is traded on the Chicago Mercantile Exchange ("CME"), and the FDAX, which is traded on the Eurex market in Germany. Specifically, an E-Mini price change can be a predictor of a future FDAX price change—*e.g.*, if the E-Mini price goes up or down, the FDAX price is likely to follow in the same direction. Critically, however, it takes time (albeit milliseconds) for the FDAX to catch up to the E-Mini, and that delay gives rise to latency arbitrage trading opportunities. For instance, when the E-Mini price goes up in Chicago, a U.S. trader with a low latency network can send a trading trigger to buy the FDAX in Germany before the rest of the market drives up the price. Then, having purchased the FDAX at a lower

---

[2] Christopher Steiner, *Wall Street's Speed War*, Forbes (July 16, 2012), https://www.forbes.com/forbes/2010/0927/outfront-netscape-jim-barksdale-daniel-spivey-wall-street-speed-war.html.

[3] *Ultra-Fast Telecom Cable from Herring Cove to Europe Nearly Complete*, Can. Broad. Corp. (Aug. 12, 2015), https://www.cbc.ca/news/canada/nova-scotia/ultra-fast-telecom-cable-from-herring-cove-to-europe-nearly-complete-1.3188581.

price than the rest of the market, the trader can turn a profit by selling the FDAX at the higher price.

### B. Skywave's Efforts To Launch And Commercialize Its Shortwave Network

31.     In 2016, entrepreneur Timothy Eloe and inventor Kevin Babich founded Skywave to commercially deploy technology for transcontinental wireless networks for trading.  Skywave's shortwave trading network technology is ideal for all trading strategies that rely on the transmission of time-sensitive data between distant financial markets, like the practice of latency arbitrage in HFT.

32.     Skywave developed trading network technology that provides traders with a quantum leap in communications speed, particularly for transoceanic communications.  For example, using Skywave's innovations, trade information can traverse the Atlantic Ocean faster than it could over traditional networks that used a combination of transoceanic optical fiber and microwave, previously the fastest communication method.

33.     Skywave's technology uses shortwave radio to transmit trade information over long distances.  Shortwave radio, which is commonly associated with older technologies such as AM radio, had generally been considered antiquated for modern communications before Skywave developed methods to leverage it in new ways.

34.     Radio transmissions typically travel faster than transmissions via optical fiber. However, unlike optical fiber transmissions, most common radio technology—*e.g.*, microwave— requires a line of sight between transmitter and receiver.  Such technology is not economically feasible for transcontinental communication because the curvature of the earth blocks the line of sight.

35.     Shortwave radio, in contrast, is well-suited for transcontinental communication because it does not require a line of sight between transmitter and receiver.  Shortwave radio signals can be refracted—*i.e.*, bounced—off the Earth's ionosphere to effectively transmit information around the curvature of the earth.

36.     Skywave planned to implement its innovative shortwave trading network technology through a transcontinental network between the United States and Europe ("Skywave Network").  The Skywave Network would include a shortwave transmitter that Skywave planned to operate under a Part 73 License.

37.     Skywave received microwave licenses in September and October 2016 for building out the Skywave Network through its radio license holding company, Spectrum Holding Company, LLC.

38.     On December 15, 2015, and February 19, 2016, the Skywave founders met with FCC officials, including Mindel De La Torre, the Chief of the International Bureau, to present Skywave's plans for a Part 73 License for the Skywave Network and seek guidance from the FCC panel.  During Skywave's February 19 meeting with the FCC, the FCC panel declared its support for the proposed Part 73 License.  Skywave proposed to design a multi-use Part 73 License that would split transmission periods between Commercial Trading and public broadcasting of higher art musical performances.  The musical performances were to be funded in part by the Commercial Trading activities on the Part 73 Licenses.  The FCC panel encouraged Skywave to proceed with filing its application for a Part 73 License.

39.     By 2016, Skywave was ready to commercialize its innovative shortwave trading network technology and went to the market in search of development partners.

40. In October 2016, Skywave executed agreements with ███████████████ ███████████████████████████████████ and ██████████████████ ██████. Under the terms of those agreements, ███ would ██████████████ ██████████████████████████████████████████████████████████ ████████, and ████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████. The parties agreed to ████████████████████████████.

41. Upon consummation of those agreements, ████, Skywave, and █████ proceeded as a unified team, working to build a trading operation in which ██████████████████, Skywave would supply the low-latency network, and █████████████████████████████ ██████. Skywave had the key elements to commercialize the Skywave Network—████ ██████, ████████████████████████████████████████████████████, and FCC endorsement of Skywave's proposed Part 73 License.

42. Using ███████████████████████ under the agreements, Skywave engineered and designed the Skywave Network and supporting infrastructure. From October 2016 through March 2017, Skywave completed the following tasks in building the Skywave Network: (1) executed a radio programming and broadcast contract, hired a studio engineer and a station manager, and began development of a broadcast studio; (2) took steps to buy transmitter and receiver sites, including assessing and selecting transmitter and receiver sites in the United States and Europe; (3) hired three radio engineers and two network specialists to support the Skywave Network infrastructure; (4) designed, engineered, and completed component specifications for customized transmitters, antennas, and patented fiber back-channel modems and shortwave

optimization methods; (5) completed installation of a network operations center, data center, security elements, connective elements, and microwave dishes; and (6) met with the FCC and prepared FCC construction permits and related filings, including applications for FCC licenses. Skywave also entered into contracts with third parties for the manufacture of transmitters, antennas, and modems for the Skywave Network.

### C. FCC Licensing

43.     Transmitting shortwave signals requires a license from the FCC.  In addition to providing a party permission to transmit signals, FCC licenses dictate the details of what can be transmitted, where transmissions can originate, and how those transmissions can be sent.  *See* 47 U.S.C. §§ 301, 314.  Section 301 makes clear that any such license is limited to the express terms and conditions of the license: "no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license."  *Id.* § 301.

44.     The FCC forbids "[w]illful false statements made" in FCC license "[a]pplications, amendments, and related statements of fact."  47 C.F.R. §§ 5.57(d), 73.3513(d).  Such willful false statements are "punishable by fine and imprisonment" pursuant to 18 U.S.C. § 1001.  *Id.*

45.     At least two types of FCC licenses for shortwave radio transmission are relevant to the allegations in this First Amended Complaint: commercial and experimental.  A Part 73 License provides access for commercial use with certain restrictions.  For example, Part 73 Licenses (i) have limited bandwidth to transmit data; (ii) are limited to fixed operation frequencies during specified hours; (iii) require emissions masking; and (iv) have high minimum transmission power requirements.  *See* 47 C.F.R. §§ 73.702, 73.751, 73.758.

46.     Experimental Licenses issue under 47 C.F.R. § 5 ("Part 5") and are limited to "experimentation," "product development," and "market trials."  *Id.* § 5.1(b).  Given those limited

purposes, applicants for Experimental Licenses are allowed to specify their own technical operating parameters for the transmission equipment for which they seek an Experimental License.

47.     Defendants custom designed a portfolio of Experimental Licenses for their HFT Enterprise to separately and collectively comprise operating parameters that offer significant advantages over Part 73 Licenses or other non-Experimental Licenses from the FCC.  Specifically, Experimental Licenses (i) have more bandwidth than a Part 73 License; (ii) provide access to and allow instant and frequent switching across a wide frequency range—*i.e.*, "frequency hopping"; (iii) do not have emissions-masking requirements; and (iv) do not have transmission power requirements.  With increased bandwidth, Defendants can transmit more data and do so more quickly.  With frequency hopping, Defendants can adjust and select the ideal frequency for given ionosphere conditions, which are constantly changing, and thus transmit data at the optimal latency. By relaxing emissions masking, Defendants reduce the latency attributable to that process, gaining a further speed advantage.  Finally, by avoiding the high transmission power requirements, Defendants also avoid the high costs and operational complexities of using high-powered tube transmitters.

48.     Importantly, Experimental Licenses do not authorize use of shortwave transmitters for commercial uses, such as Commercial Trading.  For example, 47 C.F.R. § 5.3 sets forth the operations that are permitted under an Experimental License.  None of those operations include Commercial Trading.  While Part 5 also includes "[p]roduct development and market trials," *id.*, those trials do not authorize for-hire Commercial Trading, such as the Commercial Trading conducted by Defendants using 10Band's Experimental Licenses.  Additionally, 47 C.F.R. § 5.601(c) provides that, for product development trials, "[m]arketing of devices . . . or provision of services for hire is not permitted."  By way of another example, 47 C.F.R. § 5.602(a) enables

14

"provision of services for hire . . . before the radio frequency device has been authorized by the Commission" only if the "device will be operated in compliance with existing Commission rules, waivers of such rules that are in effect at the time of operation, or rules that have been adopted by the Commission but that have not yet become effective." No such rules, waivers, or adopted rules permitting Commercial Trading under the HFT Enterprise's Experimental Licenses exist.

49. Additionally, 47 C.F.R. § 5.5 provides that a market trial is "[a] program designed to evaluate product performance and customer acceptability ***prior to*** the production stage[] and typically requires testing a specific product under expected use conditions to evaluate actual performance and effectiveness" (emphasis added). Defendants' regular use of the HFT Enterprise's shortwave infrastructure and Experimental Licenses for Commercial Trading exceeds this threshold from product evaluation to full commercial production. For example, in a report and order from 2013, the FCC directly addressed commentator concerns about Experimental License holders soft launching their products and services under the guise of market and product development trials in an attempt to "game" the licensing processes. *See* Ex. 51 at 805–08. There, the FCC adopted rules for product development trials indicating that the licensee must not market devices or offer services for hire. *Id.* at 808. The FCC also clarified that market trials have requirements that licensees retain ownership over all equipment, can sell the equipment only to another licensee similarly authorized to conduct a market trial, and are only permitted to lease trial equipment to unlicensed trial participants. *Id.* Defendants' Commercial Trading does not fall into any of the permitted categories and demonstrates a pattern of marketing devices and offering services for hire.

50. Irrespective of any rules or waivers that would have permitted Defendants to engage in Commercial Trading through their HFT Enterprise, Commercial Trading was not

included in the parameters of the HFT Enterprise's Experimental Licenses. Defendants willingly consented to limit their operations to experimental purposes—to the exclusion of Commercial Trading—and acknowledged they were not authorized "to operate on any basis other than experimental" in their Experimental License applications. *See, e.g.*, Ex. 42-A.

51.     Skywave, on the other hand, took tangible steps to obtain a Part 73 License. *See supra* ¶ 42. Defendants' misuse of Experimental Licenses made Skywave's Part 73 License arrangements and investments commercially untenable.

### D. Defendants' Shortwave Activities

#### i. Defendants' Commercial Trading Network

52.     Defendants, through their HFT Enterprise, have constructed a worldwide network of optical fiber, microwave transmitters, and shortwave connections between trading exchanges to leverage the speed of shortwave connections and profit from Commercial Trading, including latency arbitrage trading, at their competitors' expense ("Defendants' Commercial Trading Network"). Defendants' Commercial Trading Network includes the HFT Enterprise's HFT Network.



**Figure 1: Overview of Defendants' Commercial Trading Network**

53.    Defendants operate computer servers or other equipment inside the data centers where trading exchanges are managed. These servers are connected to Defendants' Commercial Trading Network and allow their trades to be executed. Defendants use the speed advantage of the HFT Enterprise's HFT Network (through the advantages of Experimental Licenses) to illegally dominate certain trades across global trading markets.

54.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the CME Group Data Center in Aurora, Illinois;[4] at data centers in Chicago, Illinois, including the CH4 Data Center and the CME (collectively, "Cermak Road Data

---

[4] CME Group, Inc. ("CME Group") operates CME, CBOT, NYMEX, and COMEX. William Shepard (labeled "4" in Fig. 3) serves on the Board of Directors of the CME Group. Shepard also owns an interest in Jump Trading. Saijel Kishan & Matthew Leising, *Don't Tell Anybody About This Story on HFT Power Jump Trading*, Bloomberg (July 23, 2014), https://www.bloomberg.com/news/articles/2014-07-23/don-t-tell-anybody-about-this-story-on-hft-power-jump-trading.

Centers"); at the NYSE Data Center in Mahwah, New Jersey; at data centers in Secaucus, New Jersey, including the NY2 Data Center, the NY4 Data Center, and the NY5 Data Center (collectively, "Secaucus Data Centers"); and at the NY11 Data Center in New Jersey.

55.     Jump Trading and Virtu, directly or through an intermediary, also operate one or more servers or other equipment at the LD4, LD5, or LD6 Data Centers in the United Kingdom; at the LSEG Data Center Docklands in the United Kingdom; at the NYSE Euronext Data Center in the United Kingdom; at the FR2 Data Center in Germany; at the Japan Exchange Group's data centers, including the OSE data center, in Japan; and at the B3 Data Center in Brazil.

56.     New Line Networks, LLC ("NLN"), a subsidiary of Virtu through NLN Holdings, LLC ("NLN Holdings"), maintains one or more microwave transmission links that transmit data to and from the CME Group Data Center; the Cermak Road Data Centers; the NYSE Data Center; the Secaucus Data Centers; and the NY11 Data Center.  NLN, directly or through an intermediary, also operates a series of microwave transmission links that relay trading signals between Illinois and New York/New Jersey; between Illinois, New Jersey, and Canada; and between the British Isles and London.  Exs. 6-A–9-B, 13-A–34-B, 36-A–40-B, 49-A, 49-B.

57.     10Band maintains one or more microwave transmission links that transmit data to and from the CME Group Data Center and the Secaucus Data Centers; two shortwave transmission stations in Elburn, Illinois that transmit trading signals to Europe, Japan, and Washington; one or more shortwave receiving stations in Elburn, Illinois that receive trading signals from Europe, the British Isles, South America, and Asia; a shortwave transmission station in Wayne, New Jersey that transmits trading signals to Europe; and a shortwave transmission station in Snohomish, Washington that transmits trading signals to Asia.  Exs. 10-A–12-B, 35-A, 35-B.

18

58.     10Band also maintains one or more shortwave receiving stations in Washington to accept incoming shortwave transmissions from transmitters in Illinois and Canada and a shortwave reception loop array station in the United Kingdom that receives shortwave signals from shortwave transmission stations in New Jersey, Illinois, and Canada.  Exs. 10-A–12-B.

59.     In March 2021, Defendants formed Canadian company 1291956 B.C. Unlimited Liability Company, which does business as Green Wave Radio.  Jump Trading's affiliate company Jump Operations, LLC ("Jump Operations") registered Green Wave Radio's website address, greenwaveradio.net, on July 20, 2023.  Ex. 50.  Jump Operations shares an address with Jump Trading in Chicago, Illinois, and Hinerfeld lists that same address as his address with the California State Bar.  *See Attorney Profile, Matthew Ben Hinerfeld #160961*, State Bar of Cal. (last accessed Feb. 13, 2025), https://apps.calbar.ca.gov/attorney/Licensee/Detail/160961.

60.     Green Wave Radio currently transmits shortwave trading signals from Defendants' shortwave transmission station in Ontario, Canada under a Canadian high-frequency developmental license, which is similar to U.S. Experimental Licenses.  *See Developmental License Playbook*, Gov't of Can. (Sept. 27, 2022), https://ised-isde.canada.ca/site/spectrum-management-telecommunications/en/licences-and-certificates/developmental-licence-playbook.  This link transmits shortwave signals to Defendants' receiving stations in the United Kingdom, Germany, Japan, Brazil, and Washington.

61.     Defendants constructed a hidden intermediary to connect their U.S. and Canadian networks rather than connecting them openly in their name.  For example, Defendants created a company called RuralConnect, LLC ("RuralConnect"), which acts as a local internet service provider and serves as an intermediary to Defendants.  RuralConnect owns a microwave path from

Green Wave Radio's transmitter in Ontario to a field near Dunbridge, Ohio. *See* Exs. 41-A, 41-B. Figure 2 below shows an aerial photograph of that link.



**Figure 2: Hidden Connection Between Defendants' U.S. and Canadian Networks**

62.     NLN operates a microwave link located across the street from RuralConnect's microwave link in Ohio. *See* Exs. 29-A, 29-B. There are no FCC licenses for microwave links between the NLN link and the RuralConnect link across the street.

63.     Instead of connecting these two microwave network links through a FCC license, Defendants built or caused to be built a hidden optical fiber cable that travels under a private driveway to connect the RuralConnect microwave link to the NLN microwave link. Fig. 2. This hidden optical fiber cable connects Defendants' shortwave transmission station in Ontario, Canada to Defendants' Commercial Trading Network.

### ii. The HFT Enterprise's Experimental Licenses

64.     The HFT Enterprise applied for its first Experimental License on September 21, 2016, under FCC Experimental Licensing System File Number 0089-EX-CN-2016 for a 60-month term at a station location in Elburn, Illinois ("Elburn I Experimental License Application").  Ex. 42-A.

65.     The Elburn I Experimental License Application listed 10Band as the "[c]orporat[e]" applicant.  Ex. 42-A.  Ronald Riley signed the application as an "[a]uthorized employee" of 10Band.  Ex. 42-A.  10Band requested that the Elburn I Experimental License Application be "withheld from public inspection" because, according to 10Band, disclosure of 10Band's narrative statement of its proposed research and experimentation supposedly "would cause significant commercial, economic, and competitive harm to 10Band and its affiliates."  Ex. 42-B.  The FCC granted 10Band's request for confidentiality.

66.     The FCC granted the Elburn I Experimental License with an effective date of November 10, 2016 and an expiration date of November 1, 2021 ("Elburn I Experimental License").  Ex. 42-C.

67.     On August 31, 2021, 10Band submitted a renewal application for the Elburn I Experimental License under FCC Experimental Licensing System File Number 0078-EX-TC-2020 ("Elburn I Experimental License Renewal I").  Ex. 42-D.  Hinerfeld—an "[a]uthorized [r]epresentative" of the 10Band "[c]orporation"—signed the Elburn I Experimental License Renewal I.  Ex. 42-D.  The FCC granted the Elburn I Experimental License Renewal I, extending the expiration date to November 1, 2023, while also specifying that the operation was "not permitted for market trial[s] or stock trading."  Ex. 42-E.  10Band requested that the Elburn I

Experimental License Renewal I be "withheld from public inspection" for the same reason as its earlier application. Ex. 42-F. The FCC granted 10Band's request for confidentiality.

68. On August 8, 2023, 10Band submitted another renewal application for the Elburn I Experimental License under FCC Experimental Licensing System File Number 0277-EX-CM-2022 ("Elburn I Experimental License Renewal II"). Ex. 42-G. Hinerfeld—an "[a]uthorized [r]epresentative" of the 10Band "[c]orporation"—signed the renewal application. Ex. 42-G. The FCC granted the Elburn I Experimental License Renewal II, extending the expiration date to November 1, 2025. Ex. 42-H.

69. 10Band submitted several other applications for modifications to the Elburn I Experimental License that were all granted.

    a. The modification application filed on May 1, 2020, under FCC Experimental Licensing System File Number 0078-EX-TC-2020 listed 10Band as the applicant. Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band. Ex. 42-I. The application identified 10Band as an "[o]ther" applicant. Ex. 42-I.

    b. The modification application filed on October 19, 2021, under FCC Experimental Licensing System File Number 0234-EX-CM-2021 listed 10Band as the applicant. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band. Ex. 42-J. The application identified 10Band as the "[c]orporate" applicant. Ex. 42-J.

    c. The modification application filed on November 25, 2022, under FCC Experimental Licensing System File Number 0277-EX-CM-2022 listed 10Band as the applicant. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band. Ex. 42-K. The application identified 10Band as the "[c]orporate" applicant. Ex. 42-K.

70.     The HFT Enterprise applied for another Experimental License on January 22, 2020, under FCC Experimental Licensing System File Number 0074-EX-CN-2020 for a 60-month term at a station location in Elburn, Illinois ("Elburn II Experimental License Application").  Ex. 43-A.

71.     The Elburn II Experimental License Application listed 10Band as the "[c]orporat[e]" applicant.  Ex. 43-A.  Hinerfeld signed the application as an "[a]uthorized employee" of 10Band.  Ex. 43-A.  10Band requested that the Elburn II Experimental License Application be "withheld from public inspection" for the same reason as its earlier applications.  Ex. 43-B.  The FCC granted 10Band's request for confidentiality.

72.     The FCC granted the Elburn II Experimental License with an effective date of February 12, 2020, and an expiration date of February 1, 2022 ("Elburn II Experimental License").  Ex. 43-C.

73.     10Band filed a modification application for the Elburn II Experimental License on May 1, 2020, under FCC Experimental Licensing System File Number 0079-EX-TC-2020.  Ex. 43-D.  The modification application listed 10Band as the applicant. Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band.  Ex. 43-D.  The application identified 10Band as an "[o]ther" applicant.  Ex. 43-D.  The FCC granted 10Band's application.

74.     The HFT Enterprise applied for another Experimental License on January 22, 2020, under FCC Experimental Licensing System File Number 0075-EX-CN-2020 for a 60-month term at a station location in Wayne, New Jersey ("Wayne Experimental License Application").  Ex. 44-A.

75.     The Wayne Experimental License Application listed 10Band as the "[c]orporat[e]" applicant.  44-A.  Hinerfeld signed the application as an "[a]uthorized employee" of 10Band.  Ex. 44-A.  10Band requested that the Wayne Experimental License Application be "withheld from

public inspection" for the same reason as its earlier applications.  Ex. 44-B.  The FCC granted 10Band's request for confidentiality.

76.     The FCC granted the Wayne Experimental License with an effective date of February 14, 2020, and an expiration date of February 1, 2022 ("Wayne Experimental License").  Ex. 44-C.

77.     10Band filed a modification application for the Wayne Experimental License on May 1, 2020, under FCC Experimental Licensing System File Number 0080-EX-TC-2020.  Ex. 44-D.  The modification application listed 10Band as the applicant.  Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band.  Ex. 44-D.  The application identified 10Band as an "[o]ther" applicant. Ex. 44-D.  The FCC granted 10Band's modification request.

78.     The HFT Enterprise applied for another Experimental License on January 22, 2020, under FCC Experimental Licensing System File Number 0077-EX-CN-2020 for a 60-month term at a station location in Everett, Washington ("Everett Experimental License Application").  Ex. 45-A.

79.     The Everett Experimental License Application listed 10Band as the "[c]orporat[e]" applicant.  Hinerfeld signed the application as an "[a]uthorized employee" of 10Band.  Ex. 45-A.  10Band requested that the Everett Experimental License Application be "withheld from public inspection" for the same reason as its earlier applications.  Ex. 45-B.  The FCC granted 10Band's request for confidentiality.

80.     The FCC granted the Everett Experimental License with an effective date of February 14, 2020, and an expiration date of February 1, 2022 ("Everett Experimental License").  Ex. 45-C.

81.    10Band filed a modification application for the Everett Experimental License on May 1, 2020, under FCC Experimental Licensing System File Number 0081-EX-TC-2020.  Ex. 45-D.  The modification application listed 10Band as the applicant.  Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band.  Ex. 45-D.  The application identified 10Band as an "[o]ther" applicant.  Ex. 45-D.  The FCC granted 10Band's modification request.

82.    On or about March 2020, NLN acquired substantially all of Western Maritime Broadcast LLC ("Western Maritime"), including Western Maritime's Experimental License, which was initially granted under FCC Experimental Licensing System File Number 0885-EX-CN-2018 for a 24-month term at a station location in Lynnwood, Washington with an effective date of February 8, 2019, and an expiration date of February 1, 2021 ("Lynnwood Experimental License").  Ex. 46-A.  On or about March 2020, NLN assigned its rights to the Lynnwood Experimental License to the HFT Enterprise.  *See* Exs. 5, 46-B.

83.    10Band filed an application for consent of assignment of the Lynnwood Experimental License on March 6, 2020.  Ex. 46-B.  The application listed 10Band as the applicant-assignee.  Hinerfeld signed the application as an "[o]fficer" of 10Band.  Ex. 46-B.

84.    The FCC granted the assignment of the Lynnwood Experimental License to 10Band effective April 3, 2020.  Ex. 46-C.

85.    10Band submitted several other applications for modifications to the Lynnwood Experimental License that were all granted.

a.  The modification application filed on April 17, 2020, under FCC Experimental Licensing System File Number 0094-EX-CM-2020 listed 10Band as the applicant.  Hinerfeld signed the application as an "[o]ffice[r]" of 10Band.  Ex. 46-D.  The application identified 10Band as the "[c]orporat[e]" applicant.  Ex. 46-D.  The

application was granted with the special conditions that the operation was "for experimental purposes only," that "provision of services [was] not permitted," and that no "market trial or stock trading" was permitted.  Ex. 46-G.

b.  The modification application filed on November 25, 2020, under FCC Experimental Licensing System File Number 0268-EX-CM-2020 listed 10Band as the applicant.  Hinerfeld signed the application as an "[a]uthorized employee" of 10Band.  Ex. 46-E.  The application identified 10Band as the "[c]orporat[e]" applicant. Ex. 46-E.  The application was granted with the special conditions that the operation was "for experimental purposes only," that "provision of services [was] not permitted," and that no "market trial or stock trading" was permitted.  Ex. 46-H.

c.  The modification application filed on December 8, 2020, under FCC Experimental Licensing System File Number 0118-EX-TC-2020 listed 10Band as the applicant. Hinerfeld signed the application as an "[o]ffice[r]" of 10Band.  Ex. 46-F.  The application identified 10Band as an "[o]ther" applicant. Ex. 46-F.  The application was granted with the special conditions that the operation was "for experimental purposes only," that "provision of services [was] not permitted," and that no "market trial or stock trading" was permitted.  Ex. 46-I.

## II.    DEFENDANTS' CONDUCT

### A.  Conducting Or Participating In A RICO Enterprise

#### i.  Defendants' Ordinary Business

86.    Figure 3 provides an overview of Defendants and their HFT Enterprise (10Band), including the relationships between Defendants.[5]  10Band filed an ownership chart with the FCC that reflects many of the same relationships shown in Figure 3.  Ex. 2.



**Figure 3: Overview of Defendants' HFT Enterprise**

87.    Defendants DiSomma (labeled "2" in Fig. 3), Gurinas (labeled "3" in Fig. 3), Hinerfeld (labeled "1" in Fig. 3), Madigan (labeled "16" in Fig. 3), Jump Trading (labeled "8" in

---

[5] Figure 3 represents a compilation of the information in Exhibit 1 (FINRA BrokerCheck Report for Jump Trading), Exhibit 2 (10Band Ownership Structure as Submitted to FCC), and Exhibit 3 (Declaration of John P. Madigan on Behalf of NLN Holdings as Submitted to FCC).

Fig. 3), and Virtu (labeled "14" in Fig. 3) carry on functions and operations that are independent and separate from that of the HFT Enterprise (shown in a red box labeled "17" in Fig. 3).

88.     DiSomma and Gurinas founded Jump Trading in 1999.  They collectively own and operate Jump Trading through several subsidiaries including the DiSomma Trust and Gurinas Trust (respectively), Jump Financial, LLC ("Jump Financial") (labeled "6" in Fig. 3), and Jump Trading Holdings, LLC ("Jump Trading Holdings") (labeled "7" in Fig. 3).

89.     Jump Trading operates, directly or through an intermediary, computer servers inside the data centers where trading exchanges are managed and conducts trading activity, including Commercial Trading.

90.     DiSomma and Gurinas own and control 40 percent of the HFT Enterprise.  Their interest in the HFT Enterprise is held through several subsidiaries including DiSomma Trust and Gurinas Trust (respectively), ECW Wireless, LLC ("ECW Wireless") (labeled "9" in Fig. 3), World Class Wireless, LLC ("World Class Wireless") (labeled "10" in Fig. 3), NLN Holdings (labeled "11" in Fig. 3), and NLN (labeled "12" in Fig. 3).

91.     Hinerfeld is a lawyer who is employed by Jump Trading as its general counsel. Hinerfeld also holds a position on the board of NLN Holdings, a parent entity of the HFT Enterprise.

92.     Madigan is employed by Jump Trading as a Technologist and Manager of Telecom Infrastructure.  Madigan also holds a position on the board of NLN Holdings, a parent entity of the HFT Enterprise.  Ex. 3.

93.     Virtu operates, directly or through an intermediary, computer servers inside the data centers where trading exchanges are managed and conducts trading activity, including Commercial Trading.

### ii. The HFT Enterprise

94.     10Band (labeled "13" in Fig. 3) forms an enterprise under 18 U.S.C. § 1961(4) for the purpose of building and operating an HFT network, including shortwave radio infrastructure.

95.     The HFT Enterprise's activities include applying for and operating the Elburn I, Elburn II, Wayne, Everett, and Lynnwood shortwave transmitters pursuant to 10Band's Experimental Licenses.  These activities started in 2016 and have continued to the present.

96.     The HFT Enterprise's HFT Network connects to Defendants' Commercial Trading Network, providing Defendants and the HFT Enterprise with access to a tranche of various optical fiber, microwave, and shortwave links and infrastructure, both domestically and internationally.

97.     Defendants control 10Band.  For example, Hinerfeld and Madigan—employees of Jump Trading—have directed and operated 10Band's affairs, including both legal and technical operations.  Both Hinerfeld and Madigan have held themselves out as representatives or employees of 10Band and have signed sworn documents on 10Band's behalf.  *See infra* ¶¶ 104–115.  For example, Jump Trading, through Hinerfeld as its general counsel, directed and operated 10Band's legal operations, including Hinerfeld's regular engagement with and participation in the preparation, submission, and prosecution of the HFT Enterprise's FCC filings for Experimental Licenses.  By way of another example, Jump Trading, through Madigan as its Technologist and Manager of Telecom Infrastructure, directed and operated 10Band's technical operations, as demonstrated by his regular engagement with and participation in the preparation, submission, and prosecution of the HFT Enterprise's FCC filings for Experimental Licenses.  By way of another example, DiSomma and Gurinas, as owners of Jump Trading, direct and control 10Band's operations through Jump Trading and its employees, including Hinerfeld and Madigan.  By way of another example, DiSomma, Gurinas, and Virtu are owners of NLN Holdings and NLN, which

direct and control 10Band's operations. DiSomma, Gurinas, and Virtu directed members of NLN Holdings' board—including Hinerfeld and Madigan—to regularly engage with and participate in the preparation, submission, and prosecution of the HFT Enterprise's FCC filings for Experimental Licenses. Many of 10Band's FCC applications direct mail to a physical 10Band address and email correspondence to an NLN email domain. *See, e.g.*, Ex. 42-D. Furthermore, NLN and 10Band are both registered in Illinois and maintain places of business at 600 West Chicago Avenue, Chicago, Illinois, albeit in different suites.

98. Madigan also has direct and indirect connections with Virtu. For example, Madigan was registered as a broker with Virtu Americas LLC, a subsidiary of Virtu, from 2014 to 2017. Exs. 52, 53 at 87. This overlapped with the time period during which Madigan was an employee of KCG Americas LLC ("KCG") and predated when Virtu formally acquired KCG in 2017. Exs. 52, 54 ¶ 29. Madigan has retained connections with Virtu traders and trading desks to this day, along with retaining a broker's license for conducting Commercial Trading.

### iii. Defendants' Association With The HFT Enterprise

99. DiSomma, Gurinas, Hinerfeld, Madigan, Jump Trading, and Virtu direct, control, manage, and conduct the affairs of the HFT Enterprise.

100. DiSomma, Gurinas, and Virtu own the HFT Enterprise. DiSomma, Gurinas, and two minority shareholders own 50 percent of the HFT Enterprise. DiSomma and Gurinas collectively own a controlling interest in ECW Wireless through DiSomma Trust and Gurinas Trust, respectively. ECW Wireless owns a controlling interest in World Class Wireless. World Class Wireless owns a 50 percent interest in NLN Holdings. Virtu owns the other 50 percent of NLN Holdings. NLN Holdings is a parent entity of 10Band, which is the HFT Enterprise. The HFT Enterprise is therefore ultimately owned and controlled by DiSomma, Gurinas, and Virtu,

which direct, control, and manage the HFT Enterprise. Jump Trading, DiSomma, and Gurinas also have control over Jump Trading employees who hold positions on NLN Holdings' board, including Madigan, Hinerfeld, and Marcus Washco, and direct, control, and manage the HFT Enterprise. Exs. 3, 5. Jump Trading and Virtu conduct Commercial Trading over the HFT Enterprise's HFT Network.

101.    Hinerfeld, Jump Trading's general counsel, has signed numerous statements on behalf of the HFT Enterprise in FCC filings for Experimental Licenses. Ex. 4. Hinerfeld has been identified in those submissions as an "[a]uthorized [r]epresentative of [c]orporation," part of the "[o]ffice of applicant corporation or association," an "[i]ndividual [a]pplicant," an "[o]fficer of [a]pplicant [c]orporation or [a]ssociation," and an "[a]uthorized employee" of the HFT Enterprise. *See, e.g.*, Exs. 42-D, 43-A, 43-D, 45-C, 46-D.

102.    Madigan supervised and participated in the preparation, submission, and prosecution of the HFT Enterprise's FCC filings for Experimental Licenses, and he supervised the development of the technology for the HFT Enterprise's transmission systems, all while holding a position as Jump Trading's Technologist and Manager of Telecom Infrastructure. *See* Ex. 3.

### iv. Defendants' Pattern Of Racketeering Activity

103.    Since 2016, DiSomma, Gurinas, Hinerfeld, Madigan, Jump Trading, and Virtu have worked and continue to work in concert to direct, control, manage, and conduct the affairs of the HFT Enterprise's HFT Network for Commercial Trading. Together, Defendants fraudulently obtained and then misused the HFT Enterprise's Experimental Licenses for shortwave communications to create the HFT Network through which Jump Trading and Virtu unlawfully conduct Commercial Trading. This allows Defendants to reap ill-gotten financial benefits by dominating Commercial Trading markets, including latency arbitrage markets, where the HFT

Network's speed advantage over other networks wins trades, resulting in profitable trading—profits Jump Trading and Virtu would not have made conducting Commercial Trading on slower networks. Each Defendant reaped ill-gotten financial gains from Jump Trading and Virtu's unlawful Commercial Trading: (1) Jump Trading and Virtu conducted the unlawful Commercial Trading and earned the resulting profits; (2) DiSomma and Gurinas reaped financial gains from Jump Trading's unlawful Commercial Trading profits as owners of Jump Trading; and (3) Hinerfeld and Madigan reaped financial gains from Jump Trading's unlawful Commercial Trading profits as senior employees of Jump Trading.

### 1. Fraudulent Filings With The FCC

104. Defendants, through the HFT Enterprise, devised and engaged in a scheme to defraud the FCC and the Commercial Trading market by intentionally making false statements, false promises, or material misrepresentations to the FCC over interstate wires for the purpose of obtaining shortwave Experimental Licenses for Commercial Trading. Defendants' scheme sought to leverage the speed advantage of shortwave communications operated under Experimental Licenses to gain a dominant advantage over market participants, including latency arbitrage, to win trades and reap the resulting financial benefits of those trades.

105. Defendants devised and engaged in a scheme to defraud the FCC and the Commercial Trading market by using their HFT Enterprise as a proxy for applying for shortwave Experimental Licenses. Defendants' scheme involved using Hinerfeld and Madigan, Jump Trading's employees and collaborators, to make numerous favorable certifications on the HFT Enterprise's FCC license applications, modification applications, renewal applications, consent of assignment applications, and confidentiality requests that ran counter to Defendants' real intention of using the shortwave Experimental Licenses for Commercial Trading.

32

106. Through the HFT Enterprise, Defendants made false statements, false promises, or material misrepresentations to the FCC. Defendants' predicate acts of racketeering include the submission of each license application, modification application, renewal application, consent of assignment application, and confidentiality request for the HFT Enterprise's Experimental Licenses—each of which constitutes the use of wire for the purpose of executing Defendants' racketeering scheme and is an act of wire fraud in violation of 18 U.S.C. § 1343.

107. On information and belief, DiSomma, Gurinas, Jump Trading, and Virtu directed Hinerfeld, Madigan, and 10Band to make false statements, false promises, or material misrepresentations on behalf of the HFT Enterprise in FCC license applications. Both Hinerfeld and Madigan hold positions on the board of NLN Holdings and are employees of Jump Trading. *See* Exs. 3–5.

108. In each license application, modification application, renewal application, and consent of assignment application, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge. *See* Fig. 4-A. In each renewal application, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were considered material representations. *See* Fig. 4-B.

**Certification**

THE APPLICANT CERTIFIES THAT:

    a. Copies of the FCC Rule Parts 2 and 5 are on hand; and
    b. Adequete financial appropriations have been made to carry on the program of experimentation which will be conducted by qualified personnel; and
    c. All operations will be on an experimental basis in accordance with Part 5 and other applicable rules, and will be conducted in such a manner and at such a time as to preclude harmful interference to any authorized station; and
    d. Grant of the authorization requested herein will not be construed as a finding on the part of the Commission:
        1. that the frequencies and other technical parameters specified in the authorization are the best suited for the proposed program of experimentation, and
        2. that the applicant will be authorized to operate on any basis other than experimental, and
        3. that the Comission is obligated by the results of the experimental program to make provision in its rules including its table of frequency allocations for applicant's type of operation on a regularly licensed basis.

THE APPLICANT FURTHER CERTIFIES THAT:

    e. All the statements in the application and attached exhibits are true, complete and correct to the best of the applicant's knowledge; and
    f. The applicant is willing to finance and conduct the experimental program with full knowledge and understanding of the above limitations; and
    g. The applicant waives any claim to the use of any particular frequency or of the electromagnetic spectrum as against the regulatory power of the USA.

**Figure 4-A: Exemplary Certification Excerpt from Exhibit 42-A**

**Certification**

- Neither the applicant nor any other party to the application is subject to a denial of Federal benefits that includes FCC benefits pursuant to Section 5301 of the Anti-Drug Abuse Act of 1988, 21 U.S.C. Section 862, because of a conviction for possession or distribution of a controlled substance.
- The applicant hereby waives any claim to the use of any particular frequency or electromagnetic spectrum as against the regulatory power of the United States because of the previous use of the same, whether by license or otherwise, and requests authorization in accordance with this application. (See Section 304 of the Communications Act of 1934, as amended.)
- The applicant acknowledges that all statements made in this application and attached exhibits are considered material representations, and that all the exhibits part hereof and are incorporated herein as if set out in full in this application; undersigned certifies that all statements in this application are true, complete and correct to the best of his/her knowledge and belief and are made in good faith.

**Figure 4-B: Exemplary Certification Excerpt from Exhibit 42-D**

109. The HFT Enterprise, through 10Band and Hinerfeld, falsely stated, falsely promised, or materially misrepresented that all of 10Band's activities and operations under the Experimental Licenses would be "experimental" in nature. However, the HFT Enterprise had already provided, would provide, or would continue to provide its HFT Network to Jump Trading and Virtu for Commercial Trading to exploit the technical advantages of shortwave transmitters operated under the custom-designed parameters of the HFT Enterprise's Experimental Licenses to gain a speed advantage over Commercial Trading competitors.

110. The HFT Enterprise, through 10Band and Hinerfeld, also falsely stated, falsely promised, or materially misrepresented that the modem equipment used under each of the HFT Enterprise's Experimental Licenses—TrellisWare TW-621—would not be capable of

broadcasting station identification. Broadcasting station identification has been possible since the advent of radio broadcasting through the use of equipment that could produce Morse code. In addition, the TrellisWare TW-621 is an advanced, modern modem. 10Band uses the TrellisWare TW-621 to broadcast station identification information in Canada. FirstToken, *Shortwave HFT (High Frequency Trading) Station, CGA984 with Morse ID, 20152 kHz, 30 October, 2022*, YouTube (Nov. 5, 2022), https://www.youtube.com/watch?v=yLWMnrRJd7U; Ex. 47.

111. The HFT Enterprise, through Madigan, signed at least one Experimental License declaratory statement on behalf of 10Band that contains false statements, false promises, or material misrepresentations. For example, Madigan falsely certified that 10Band had conducted its operations over the preceding six years "pursuant to experimental authority," despite knowingly exceeding the bounds of that authority with each commercial trade. *See* Ex. 3.

112. The HFT Enterprise, at least through 10Band, Hinerfeld, and Madigan, transmitted or caused to be transmitted the identified false statements, false promises, or material misrepresentations over wire communications between 10Band (in Chicago, Illinois) and the FCC (in Washington, DC) in interstate and foreign commerce and did so for the purpose of executing Defendants' scheme to defraud the FCC and the Commercial Trading market by obtaining shortwave Experimental Licenses and making false statements, false promises, or material misrepresentations in their applications for new licenses, modified applications, renewal applications, consent of assignment applications, and confidentiality requests for Experimental Licenses that their operations would only be experimental.

113. Even if the HFT Enterprise made truthful statements in its initial license application, each subsequent license application and modification application falsely stated, falsely promised, or materially misrepresented that "[a]ll operations" under the HFT Enterprise's

35

Experimental Licenses would "be on an experimental basis." 10Band and Hinerfeld knew at the time of the FCC filings that 10Band had operated or would soon thereafter operate shortwave transmitters under Experimental Licenses for Commercial Trading by Jump Trading and Virtu. In other words, 10Band and Hinerfeld knew at the time of the FCC filings that 10Band would be operating shortwave transmitters under the Experimental Licenses for purposes other than experimentation.

114. Each renewal application falsely stated, falsely promised, or materially misrepresented that the "[n]ature" of Defendants' activities under the HFT Enterprise's Experimental Licenses was "experimental." 10Band and Hinerfeld knew at the time of the FCC filings that 10Band had operated or would soon thereafter operate shortwave transmitters under Experimental Licenses for Commercial Trading by Jump Trading and Virtu. In other words, 10Band and Hinerfeld knew at the time of the FCC filings that 10Band would be operating shortwave transmitters under its Experimental Licenses for purposes other than experimentation.

115. Each license application, modification application, renewal application, consent of assignment application, and confidentiality request for the HFT Enterprise's Experimental Licenses was submitted in furtherance of Defendants' scheme to defraud the FCC and the Commercial Trading market by obtaining shortwave Experimental Licenses, making false statements, false promises, or material misrepresentations in their applications for new licenses, modified applications, renewal applications, consent of assignment applications, and confidentiality requests for Experimental Licenses that their operations would only be experimental.

## 2. *Unlawful Commercial Trading*

116.    Defendants, through the HFT Enterprise, devised and engaged in a scheme to defraud the FCC and the Commercial Trading market by making false statements, false promises, or material misrepresentations in their FCC license applications, modification applications, renewal applications, consent of assignment applications, and confidentiality requests.  Defendants then misused interstate wires to transmit orders for financial instruments in furtherance of that scheme.

117.    Defendants devised and engaged in a scheme to defraud the FCC and the Commercial Trading market by using their HFT Enterprise as a proxy for applying for shortwave Experimental Licenses.

118.    Through the HFT Enterprise, Defendants made false statements, false promises, or material misrepresentations to the FCC in the submission of each license application, modification application, renewal application, consent of assignment application, and confidentiality request.

119.    The HFT Enterprise operates shortwave transmitters under Experimental Licenses, and Defendants use those transmitters to engage in Commercial Trading.  Defendants' predicate acts of racketeering include each commercial trade made by Defendants using shortwave networks granted to 10Band under the Elburn I Experimental License, Elburn II Experimental License, Wayne Experimental License, Everett Experimental License, and Lynnwood Experimental License.  Each such commercial trade constitutes the use of wire for the purpose of executing Defendants' racketeering scheme and is an act of wire fraud in violation of 18 U.S.C. § 1343.

120.    Defendants violate and unlawfully use the HFT Enterprise's Experimental Licenses to engage in Commercial Trading.  On information and belief, no known Part 73 Licenses for Commercial Trading via shortwave exist.  Yet a retrospective analysis of latency arbitrage trading

shows that a large amount of Commercial Trading via shortwave has occurred since as early as 2017. That retrospective analysis reflects Defendants' Commercial Trading under Experimental Licenses through their HFT Enterprise. *See infra* ¶¶ 143–148. Defendants developed their extensive, global network to engage in Commercial Trading at major worldwide market exchanges, including the NASDAQ, ICE, CME, CBOT, NYMEX, COMEX, NYSE, CBOE, BATS, BZX, BYX, Chi-X, LSE, Deutsche Börse, JPX, TSE, OSE, TOCOM, and B3.

121. To date, Defendants have engaged in unlawful Commercial Trading using interstate or intercontinental wires.

122. On information and belief, DiSomma and Gurinas managed and directed the HFT Enterprise to use its shortwave infrastructure to carry out Commercial Trading through the HFT Enterprise's Experimental Licenses.

123. Jump Trading engages in Commercial Trading using one or more shortwave transmitters operated by 10Band under an Experimental License. On information and belief, Jump Trading managed and directed the HFT Enterprise, at least through DiSomma, Gurinas, Hinerfeld, and Madigan, to use its shortwave infrastructure to carry out Commercial Trading through the HFT Enterprise's Experimental Licenses.

124. Virtu engages in Commercial Trading using one or more shortwave transmitters operated by 10Band under an Experimental License. On information and belief, Virtu managed and directed the HFT Enterprise to use its shortwave infrastructure to carry out Commercial Trading through the HFT Enterprise's Experimental Licenses.

125. Virtu's SEC disclosures also suggest that it is part of joint ventures that use "microwave communication networks" to engage in "trading activities." Ex. 48. Specifically, in its 2024 SEC 10-K Form, Virtu states that it "pay[s] monthly fees for the use of the microwave

communication networks" of Virtu's joint ventures "in connection with" those joint ventures' "***respective trading activities***." Ex. 48 (emphasis added). Virtu specifies that it has a "50.0% noncontrolling interest in one of those joint ventures." Ex. 48. Upon information and belief, that joint venture includes the HFT Enterprise—*i.e.*, 10Band—as well as NLN Holdings and NLN. *See* Fig. 3. NLN, a parent entity of 10Band and the subsidiary of NLN Holdings, operates the microwave communications portions of Defendants' Commercial Trading Network. *Id.*

### B.  Conspiring To Conduct Or Participate In A RICO Enterprise

#### i.  Defendants' Intent To Effect A Racketeering Scheme

126.  Defendants understood that their goal was to direct, control, manage, and conduct the affairs of the HFT Enterprise through a pattern of racketeering activity. Upon information and belief, Defendants intended to further the conspiracy scheme through their actions, including making false statements, false promises, or material misrepresentations on behalf of the HFT Enterprise in FCC filings and engaging in Commercial Trading through the HFT Enterprise's Experimental Licenses.

#### ii.  Defendants' Agreement To Effect A Racketeering Scheme

127.  On information and belief, DiSomma, Gurinas, Hinerfeld, Madigan, Jump Trading, and Virtu agreed to direct, control, manage, and conduct the affairs of the HFT Enterprise through a pattern of racketeering activity by engaging in Commercial Trading through the HFT Enterprise's Experimental Licenses. Such an agreement has been in existence since at least 2017, as evidenced by Deutsche Börse's retrospective A7 analysis. *See infra* ¶¶ 143–148.

128.  On information and belief, DiSomma, Gurinas, Hinerfeld, Madigan, Jump Trading, and Virtu agreed to direct, control, manage, and conduct the affairs of an enterprise through a pattern of racketeering activity by making false statements, false promises, or material

misrepresentations on behalf of the HFT Enterprise in FCC filings for Experimental Licenses. Such an agreement has been in existence since at least 2016, as evidenced by their continuous submission of license applications, modification applications, renewal applications, consent of assignment applications, and confidentiality requests reciting the same false statements, false promises, or material misrepresentations.

129.     Defendants agreed that Hinerfeld, Madigan, 10Band, or another party on 10Band's behalf would commit at least two predicate acts to accomplish their goal of enacting their RICO scheme.

### iii.  Defendants' Overt Acts In Furtherance Of Their Conspiracy

130.     DiSomma, Gurinas, Jump Trading, and Virtu directed, controlled, managed, and conducted the affairs of the HFT Enterprise through a pattern of racketeering activity by directing their employees and collaborators to fraudulently obtain and misuse 10Band's Experimental Licenses to engage in Commercial Trading.  Such acts date back to at least 2017, as evidenced by Deutsche Börse's retrospective A7 analysis.  *See infra* ¶¶ 143–148.

131.     Hinerfeld and Madigan directed, controlled, managed, and conducted the affairs of the HFT Enterprise through a pattern of racketeering activity by preparing FCC filings containing false statements, false promises, or material misrepresentations for Experimental Licenses on behalf of the HFT Enterprise and then filing those submissions.  Such acts date back to at least 2016, as evidenced by their continuous submission of license applications, modification applications, renewal applications, consent of assignment applications, and confidentiality requests reciting the same false statements, false promises, or material misrepresentations.

132.     DiSomma, Gurinas, Jump Trading, and Virtu directed, controlled, managed, and conducted the affairs of an enterprise through a pattern of racketeering activity by preparing FCC

40

filings containing false statements, false promises, or material misrepresentations for Experimental Licenses on behalf of the HFT Enterprise and then filing those submissions. Such acts date back to at least 2016, as evidenced by their continuous submission of license applications, modification applications, renewal applications, consent of assignment applications, and confidentiality requests reciting the same false statements, false promises, or material misrepresentations.

133. Hinerfeld and Madigan directed, controlled, managed, and conducted the affairs of the HFT Enterprise through a pattern of racketeering activity by directing their employees and collaborators to fraudulently obtain and misuse the HFT Enterprise's Experimental Licenses to engage in Commercial Trading. Such acts date back to at least 2017, as evidenced by Deutsche Börse's retrospective A7 analysis. *See infra* ¶¶ 143–148.

134. Defendants agreed that Hinerfeld, Madigan, 10Band, or another party on 10Band's behalf would commit at least two predicate acts to accomplish their goal of enacting their RICO scheme. The agreement was carried out by Defendants through the HFT Enterprise.

### C. Skywave's Discovery Of Defendants' Racketeering Scheme

135. In December 2016, Skywave learned that 10Band had filed applications with the FCC to obtain Experimental Licenses to operate shortwave transmitters. At the time, however, Skywave had no reason to believe that Defendants or 10Band would misuse the HFT Enterprise's Experimental Licenses for Commercial Trading, nor that Jump Trading or Virtu were affiliated with 10Band as managing entities of the HFT Enterprise.

136. In 2017, █████ became concerned that if a person or entity were to use 10Band's shortwave transmitter under an Experimental License for Commercial Trading, that person or entity would have a dominant latency (*i.e.*, speed) advantage over other traders using optical fiber and microwave networks and over the Skywave Network, which would operate under Commercial

License conditions.  At that time, Skywave was not aware of any information that Jump Trading or Virtu were affiliated with 10Band as managing entities of the HFT Enterprise.  Nor was there any publicly available data showing, or any method available to determine, whether Jump Trading, Virtu, or others were misusing Experimental Licenses for Commercial Trading.

137. ████ did not believe the partnership could reasonably compete against persons or entities misusing the advantages of Experimental Licenses for Commercial Trading.  Given its concern about this possibility, ████ sought to exit the partnership with Skywave and ████.  In March 2017, Skywave, █████████ agreed to release ████ from the partnership.

138. In the fall of 2018, Skywave found ████████████████████ ████████.  ████████████████████ Skywave to further develop its innovative shortwave network technology.

139. In 2020, ████ requested, and Skywave agreed, to dissolve the original partnership. At that time, Skywave was still not aware of any information showing Jump Trading, Virtu, or any other trading firm was affiliated with 10Band.  Nor was there any publicly available data showing, or any method available to determine, whether Jump Trading, Virtu, or others were misusing Experimental Licenses for Commercial Trading.

140. In October 2020, █████████ and Virtu entered into a non-disclosure agreement to discuss Skywave's innovative shortwave network technology.  Representatives of █████████, Skywave, and Virtu subsequently met on or about October 8, 2020. ████████████████



████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████      ████████████████████████

████████

141.    Skywave continued to develop the Skywave Network.  Skywave focused on modem development, network architecture, site selection optimization, and microwave license applications and acquisitions.

142.    In October 2021, 10Band submitted a modification request for the Experimental License using call sign WI2XNX, the *first* among its portfolio of license applications, modifications, and renewals to be filed with a narrative statement that was ***not*** protected by a confidentiality request.  The modification request indicated 10Band's intention to use its Experimental License to conduct limited-scope market trials of high-frequency technology.  Ex. 42-L.

143.    In 2022, Skywave discovered that the German financial exchange services company, Deutsche Börse Group ("Deutsche Börse"), offered a market analytics tool called A7. The A7 tool enabled examination of Eurex—which was and continues to be owned and operated by Deutsche Börse[6]—and CME trading data for evidence of Commercial Trading using shortwave networks.  Such an analysis was previously unavailable.

---

[6] The Eurex financial exchange is operated by Eurex Frankfurt AG, which is a wholly owned subsidiary of Deutsche Börse.  Deutsche Börse became the sole owner of Eurex in 2012. *See* Rajeev Dhir, *Eurex: What It Is, History, Trading Technology*, Investopedia (May 30, 2022), https://www.investopedia.com/terms/e/eurex.asp; *Organisation*, Deutsche Börse Group, https://www.deutsche-boerse.com/dbg-en/about-us/deutsche-boerse-group/organisation/subsidiaries (last accessed Feb. 13, 2025).

144. Using the A7 tool, Skywave was first able to discover evidence of Commercial Trading using shortwave. For example, the A7 tool showed two different latencies for latency arbitrage trading of the E-Mini (abbreviated as "ES" in Fig. 5) and the FDAX. *See* Fig. 5. First, E-Mini price moves on the CME correlated with FDAX trading activity on the Eurex peaking approximately 37 milliseconds later. That 37-millisecond latency indicates trading over networks comprised of conventional optical fiber and microwave transmitters. Second, the A7 data also showed E-Mini price moves on the CME correlated with FDAX trading activity on the Eurex peaking approximately 28 milliseconds later. That relatively low 28-millisecond latency indicates trading over networks that included shortwave transmissions.



**Figure 5: XCME/XEUR Latency Data**[7]

_____

[7] Stefan Schlamp, *Stefan Schlamp's Post*, LinkedIn, https://www.linkedin.com/posts/stefanschlamp_cmegroup-eurex-marketdata-activity-6948926555855192064-eXrF/ (indicating a time of publication 2 years prior to Feb. 13, 2025).

145.    In fact, Deutsche Börse's head of quantitative analytics concluded that the A7 latency data showing this approximately 9-millisecond advantage in some trades was evidence of Commercial Trading using shortwave.  Fig. 6.



**Figure 6: Stefan Schlamp's A7 Analysis**[8]

146.    According to Deutsche Börse's retrospective A7 analysis, Commercial Trading using shortwave began in 2017, accelerated in 2019, and has dominated CME/Eurex latency arbitrage trading, such as E-Mini-FDAX trading, since 2020.  Correspondingly, Commercial Trading at the relatively slower optical fiber and microwave network latency gradually decreased

---

[8]    Stefan    Schlamp,    *Stefan    Schlamp's    Post*,    LinkedIn, https://www.linkedin.com/posts/stefanschlamp_cmegroup-eurex-marketdata-activity-6948926555855192064-eXrF/ (indicating a time of publication 2 years prior to Feb. 13, 2025).

after Commercial Trading using shortwave commenced.  Fig. 7 (heatmap showing shortwave network Commercial Trading on "Short-Wave" dotted line and optical fiber and microwave network Commercial Trading on "MW/Hibernia/MW" line, with white indicating activity and red indicating higher activity).



**Figure 7: XCME/XEUR Network Data**[9]

147.    The rise in use of shortwave networks for Commercial Trading evidenced by these low latencies precisely matches the decline of CME traders, such as the Drendel Brothers of Bruder, who used conventional network technologies (*e.g.*, optical fiber and microwave) and were

---

[9]    Stefan    Schlamp,    *Stefan    Schlamp's    Post*,    LinkedIn, https://www.linkedin.com/posts/stefanschlamp_cme-eurex-microwave-activity-7027298230296051712-bW6x (indicating a time of publication 2 years prior to Feb. 12, 2025).

eventually forced to cease CME/Eurex pairs trading because they could not compete with traders using shortwave networks.

148.    After the A7 tool became accessible in 2022, Skywave used it to identify a clear industry-based pattern of shortwave Commercial Trading for HFT, reaching back well before October 2021, when 10Band announced its ostensibly new intention to modify its license parameters to include market testing of high-frequency technology.  Upon its discovery of the clear and industry-based pattern of shortwave Commercial Trading, its knowledge and awareness of the HFT Enterprise's Experimental Licenses, and its knowledge and awareness of Jump Trading and Virtu's direction, control, management, and conduct through the HFT Enterprise, Skywave had no choice but to put its business plans on hold and pause efforts to commercialize the Skywave Network in view of the HFT Enterprise's HFT Network's dominant latency advantage for Commercial Trading.

149.    Despite efforts to try to determine whether the HFT Enterprise's Experimental Licenses could be or were being used by Defendants for Commercial Trading after Skywave's October 2020 meeting with Virtu, Skywave was unable to discover any information demonstrating or showing a reasonable likelihood of Defendants' misconduct or misuse of the HFT Enterprise's Experimental Licenses for Commercial Trading until the A7 tool became available in 2022.  Nor could Skywave have reasonably discovered Defendants' misconduct or misuse of the HFT Enterprise's Experimental Licenses for Commercial Trading prior to 2022 because of the lack of available tools for performing the same functions as A7.  Skywave had previously monitored Defendants' signals periodically but was only ever able to confirm that Defendants were transmitting shortwave data signals.  Skywave did not have access to financial exchange information to correlate the signals to actual Commercial Trading until the A7 data became

available. The HFT Enterprise, meanwhile, represented to the FCC in its application-related submissions that it was only experimenting with its shortwave transmission equipment.

150. Through Defendants' electronic communications to the FCC, Defendants also frustrated and obfuscated identification or investigation of the true commercial nature of the operations Defendants conducted under the Experimental Licenses for the purpose of executing Defendants' scheme. By repeatedly requesting that the FCC "with[o]ld from public inspection" 10Band's narrative description of its purported experimental work under the HFT Enterprise's Experimental Licenses, Defendants made information pertaining to their misuse of Experimental Licenses unavailable and prevented Skywave and other competitors from investigating and uncovering Defendants' unlawful scheme. Defendants, in their own words and by their own efforts, precluded information about their misuse of Experimental Licenses from being available to the public or made available from any other source. For example, in each license application, renewal, and modification accompanied by a confidentiality request, Defendants represented that their "[c]onfidential [i]nformation" was not "available to the public and . . . [was] not generally available from any other source." *See, e.g.*, Ex. 42-B.

151. Through Defendants' electronic communications to the FCC, Defendants also frustrated and obfuscated identification or investigation of the true commercial nature of the operations Defendants conducted under the Experimental Licenses for the purpose of executing Defendants' scheme. By repeatedly falsely stating, falsely promising, or materially misrepresenting that the equipment used under each of Defendants' Experimental Licenses was not capable of station identification, Defendants impeded the FCC, Skywave, and other competitors from investigating the connections between Defendants and Defendants' Commercial Trading Network. Had Defendants complied with the station identification requirements for their

Experimental Licenses, the FCC, Skywave, and other competitors would have been able to more readily track precisely when and where Defendants were using the HFT Enterprise's shortwave transmitters to send shortwave signals and then tie those signals to Commercial Trading data.

### D. Skywave's Injury

152.     Due to Defendants' unlawful conduct, Skywave has been unable to secure business partners, complete building the Skywave Network, operate the Skywave Network, access trading markets, or profit from the trading, including HFT trading, that would have been performed over the Skywave Network.  Defendants' misconduct is the direct and proximate cause of Skywave's economic injuries, including sunk costs and the loss of trading profits from its HFT network.

153.     Skywave ███████████████████████████ as part of the ███ Agreement.  Pursuant to its obligations under the ███ and ████████, Skywave ████████ ███████████████████ to develop the Skywave Network's infrastructure.  Now, that development work is a sunk cost.

154.     Because of Defendants' unlawful conduct, Skywave was forced to pause aspects of its network construction.  This delay resulted in further opportunity costs to Skywave and an inability to leverage its innovative technology in the market.  For example, Skywave was unable to (1) complete its purchase of transmitters and antennas; (2) close on land acquisitions for U.S. shortwave transmitter locations; and (3) develop shortwave receiver locations in the United Kingdom and Germany.

155.     As a result of the failure to complete its network construction, Skywave was never able to operate the planned Skywave Network.  Under the ███████████████, ███ had agreed to ████████████████ over the Skywave Network with Skywave and ███.  Similar to Defendants' trading structure, Skywave and ███ had agreed to ████████████████████



████████████████████████████████████████████████████
████████████████████████████████████████. Thus, Skywave lost ██

███████████████ due to Defendants' unlawful conduct. For example, ██████████████

██████████████████████ latency arbitrage trading, the success of which is predicated on

the speed of the trading network. If ███████████████ had a 1-millisecond speed advantage

over other traders in a latency arbitrage trade, it would win that trade and reap financial benefits.

The Skywave Network would have provided a speed advantage of more than 1 millisecond over

conventional optical fiber and microwave networks for Commercial Trading between, for example,

the CME and Eurex. But for Defendants' scheme to fraudulently obtain Experimental Licenses

and then unlawfully use them for Commercial Trading over the HFT Enterprise's HFT Network,

Skywave would have completed the Skywave Network, and ████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████.

156.    Due to Defendants' unlawful conduct and the resulting injury to traders (such as

Bruder and the Drendel Brothers) who have been forced out of business because they could not

compete with dominant speed advantages provided by the HFT Enterprise's HFT Network,

Skywave has also been unable to license its shortwave network technology, know-how, and patents.

### E.  Injury To Other Traders

157.    Defendants' racketeering scheme is also the direct and proximate cause of

economic injury to competitor traders, including pairs traders in cross-exchange international

markets, who had no choice but to cease trading operations because they could not compete with

Defendants' approximately 9-millisecond advantage due to misuse of shortwave transmitters

operated under the HFT Enterprise's Experimental Licenses.

158. The trading operations of the Drendel Brothers via Bruder is illustrative. As Defendants' racketeering scheme continued and advanced over time, competitor traders such as the Drendel Brothers and Bruder relinquished such cross-exchange trading or ceased operations altogether, and Skywave lost potential customers for its shortwave network technology, know-how, and patents.

159. After decades of floor trading at the CME, the Drendel Brothers launched Bruder to focus on algorithmic strategies in pairs trading. Algorithmic trading involves the use of algorithms, or specific sets of instructions, to execute trades, allowing traders to make profits faster and more often than traditional floor trading.

160. As high-frequency pairs traders, the Drendel Brothers took advantage of small but frequent changes in financial markets. They sought to make profits from these small changes by aggregating large quantities of high-frequency trades over time.

161. Bruder relied on the Algo Design Lab ("ADL"), a platform owned by Trading Technologies International, Inc., to place its trades. The ADL platform allows traders to customize their own trading algorithms.

162. The Drendel Brothers began using the ADL platform to trade independently in March 2013. By February 2015, they launched Bruder and continued to use ADL. Bruder customized the ADL platform's building blocks to account for variables including volatility, correlation, profitability, contract price, and volume.

163. In addition to customizing the algorithms, Bruder ran thousands of simulation trades that mirrored market activity. Bruder relied on those simulations to determine which trades to execute and how to refine its algorithms.

164.    Bruder's algorithms propelled the company to significant early success, generating more than $3 million in revenue from its launch through the end of 2016.  Bruder traded a variety of equity, currency, agriculture, and interest rate contracts.  At its peak, Bruder traded thousands of contracts per day and made a daily profit for roughly twenty days each month.

165.    Following its early success, Bruder expanded its business to collaborate with seven independent traders.  The independent traders paid licensing fees to Bruder for access to Bruder's proprietary algorithms.

166.    Although Bruder sometimes traded during regular market hours, its algorithms often targeted correlated markets in off-market hours and identified opportunities for greater profit at lower risk.  For example, Bruder traded pairs based on the correlation between the FDAX in Europe and the NASDAQ in the United States.  The FDAX opens at 8 a.m. local time, with pre-market trades starting an hour earlier.  Whenever one of Bruder's algorithms identified an opportunity for profit, the algorithm took a snapshot at 7 a.m. to serve as an origination point.  The algorithm then made trades from 7 a.m. to 8 a.m. every few ticks.[10]

167.    If the spread, or the difference in price between pairs, grew wider from the origination point every few ticks during that hour, the algorithm sold a FDAX contract and instantaneously purchased a NASDAQ contract.  The algorithm did the opposite if the spread grew narrower from the origination point.  Under normal circumstances—and prior to Defendants' misuse of Experimental Licenses—Bruder was able to profit off the trades as the spread ebbed and flowed.

168.    However, in 2017—shortly after the FCC granted the Elburn I Experimental License—Bruder began to observe market irregularities.  Bruder's algorithms would identify an

---

[10] A tick is the smallest possible change in price on an exchange.

opportunity for profit and automatically purchase the associated financial instrument. But prices would fluctuate faster than Bruder's algorithms could execute the corresponding trade. As a result, Bruder's revenue began to decline.

169. Those irregularities and Bruder's ensuing decline in revenue continued through 2018 and 2019. Bruder's simulations could no longer accurately predict market behavior, and Bruder was forced to stop certain types of trading activity. By February 2020—shortly after the FCC granted the Elburn II Experimental License, the Wayne Experimental License, and other licenses—Bruder ended its collaboration with some of the independent traders because Bruder's business could no longer support those relationships. Finally, in July 2021, the Drendel Brothers were forced to dissolve Bruder.

170. At the time, the Drendel Brothers did not suspect that Bruder was losing money due to a speed disadvantage. Bruder traded under the Rosenthal Collins Group, a Chicago-based entity that served as an intermediary between exchange members and customers like Bruder. The Drendel Brothers believed that they had access to all available tools and advantages through the Rosenthal Collins Group.

171. Deutsche Börse's retrospective A7 analysis confirms that trading at shortwave latencies began in 2017. This timing coincides with the market irregularities that Bruder observed and ultimately portended the company's end. That shortwave trading activity was the product of Defendants' misuse of Experimental Licenses for Commercial Trading. As a result of Defendants' misuse of Experimental Licenses, Bruder lost revenue, and the Drendel Brothers were ultimately forced to dissolve the company.

172.    Defendants' racketeering scheme is the direct and proximate cause of Bruder's losses. But for and as a result of Defendants' unlawful activity, Bruder would have earned at least $4 million more in revenue between November 2016 and its dissolution.

## III.    CAUSES OF ACTION

### A.  COUNT I: Violation Of 18 U.S.C. § 1962(c)

173.    Skywave repeats and realleges each and every allegation set forth in Paragraphs 1–172 as if fully set forth herein.

174.    The HFT Enterprise, which comprises 10Band, constitutes an enterprise as defined by 18 U.S.C. § 1961(4).

175.    The purpose of the HFT Enterprise is to build and operate its HFT Network, including shortwave radio infrastructure, and to obtain licenses from the FCC to operate that network.

176.    Defendants and the HFT Enterprise engage in interstate commerce.

177.    As required by 18 U.S.C. § 1962(c), each Defendant has continuously directed, controlled, managed, and conducted the affairs of the HFT Enterprise. Virtu directs, controls, manages, and conducts the affairs of the HFT Enterprise at least through its 50 percent ownership interest in NLN Holdings, the Virtu employees that hold positions on the board of NLN Holdings, and its use of the HFT Enterprise's HFT Network. Jump Trading directs, controls, manages, and conducts the affairs of the HFT Enterprise through the Jump Trading employees that hold positions on the board of NLN Holdings, its employees Hinerfeld and Madigan that manage and conduct the HFT Enterprise's operations, and its use of the HFT Enterprise's HFT Network. DiSomma directs, controls, manages, and conducts the affairs of the HFT Enterprise at least through his ownership interest in NLN Holdings, through Jump Trading, and through the Jump Trading

employees that hold positions on the board of NLN Holdings and in the HFT Enterprise. Gurinas directs, controls, manages, and conducts the affairs of the HFT Enterprise at least through his ownership interest in NLN Holdings, through Jump Trading, and through the Jump Trading employees that hold positions on the board of NLN Holdings and in the HFT Enterprise. Hinerfeld directs, controls, manages, and conducts the affairs of the HFT Enterprise. Madigan directs, controls, manages, and conducts the affairs of the HFT Enterprise.

178. Since 2016, each Defendant has continuously directed, controlled, managed, and conducted the affairs of the HFT Enterprise through a pattern of racketeering activity, including multiple—*i.e.*, more than two—varied acts of wire fraud, each of which is a violation of 18 U.S.C. § 1343 and a predicate act.

179. Defendants, through the HFT Enterprise, devised and engaged in a scheme to defraud the FCC and the Commercial Trading market to obtain shortwave Experimental Licenses for Commercial Trading.

180. In many—*i.e.*, more than two—of the HFT Enterprise's interstate FCC filings related to new Experimental Licenses and modifications, renewals, assignments of, and confidentiality requests for Experimental Licenses, the HFT Enterprise made multiple—*i.e.*, more than two—false statements, false promises, or material misrepresentations that the Experimental Licenses would be used for only experimental purposes. In each license application, modification application, renewal application, consent of assignment application, and confidentiality request, 10Band or Hinerfeld certified to the FCC that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge. In each license application, modification application, renewal application, consent of assignment application, and confidentiality request, 10Band or Hinerfeld certified to the U.S. government that all statements

in the application were considered material representations. Madigan signed Experimental License declaratory statements and other filings on behalf of 10Band that contain false statements, false promises, or material misrepresentations.

181. Defendants, through the HFT Enterprise, also used or caused the use of interstate wires to transmit orders for financial instruments. The HFT Enterprise operates shortwave transmitters under Experimental Licenses, and Defendants, including at least Jump Trading and Virtu, use those transmitters to engage in Commercial Trading. Each commercial trade made by Defendants uses shortwave networks granted to 10Band under the Elburn I Experimental License, Elburn II Experimental License, Wayne Experimental License, Everett Experimental License, or Lynnwood Experimental License. Defendants have conducted Commercial Trading over the HFT Enterprise's HFT Network from approximately 2017 through the present.

182. Defendants, through the HFT Enterprise, intended to defraud the FCC and the Commercial Trading market as demonstrated by the fact that the Experimental Licenses were intended for use in the HFT Enterprise's HFT Network, which Defendants created and use for Commercial Trading.

183. Defendants, through the HFT Enterprise, used or caused the use of interstate wires to transmit false statements, false promises, or material misrepresentations to the FCC, as well as orders for financial instruments to various trading exchanges.

184. To the extent that DiSomma, Gurinas, Jump Trading, and Virtu did not directly sign or certify the false statements, false promises, or material misrepresentations on behalf of the HFT Enterprise, they are responsible for those predicate acts because they agreed that the HFT Enterprise would commit those acts. DiSomma and Gurinas are responsible for the false statements, false promises, or material misrepresentations through their direction, control, and

56

management of the HFT Enterprise and through Madigan and Hinerfeld, who are employees of Jump Trading, which is owned by DiSomma and Gurinas. Jump Trading is responsible for and agreed to the false statements, false promises, or material misrepresentations through its direction, control, and management of the HFT Enterprise, as well as through Jump Trading's employees, Madigan and Hinerfeld. Virtu is responsible for and agreed to the false statements, false promises, or material misrepresentations through its direction, control, and management of the HFT Enterprise.

185. Defendants' racketeering acts reflect open-ended continuity or—at a minimum—closed-ended continuity. Defendants continue to direct, control, manage, and conduct the affairs of the HFT Enterprise to defraud the FCC and the Commercial Trading market in filings related to new Experimental Licenses and the modification or renewal of existing Experimental Licenses. Defendants continue to direct, control, manage, and conduct the affairs of the HFT Enterprise to misuse the Experimental Licenses for Commercial Trading and leverage the ill-gotten advantages of Experimental Licenses. Defendants' racketeering has harmed multiple different victims, including Skywave, the Drendel Brothers, Bruder, and other parties engaged in Commercial Trading. Because Skywave could not compete with the HFT Enterprise's HFT Network, Skywave suffered economic injury, including because it was forced to halt its efforts to commercialize its technology, and as a result, Skywave lost out on trading profits it would have acquired from operating its shortwave network. Similarly, traders such as the Drendel Brothers, through their trading operation, Bruder, lost trading profits they would have continued to realize had Defendants not misused Experimental Licenses.

186.     Defendants' individual racketeering acts through the HFT Enterprise are attributable to all Defendants.  Defendants' predicate acts exceed the requisite two required to sustain a RICO violation finding.

187.     Defendants' racketeering directly and proximately caused and continues to cause injury to Skywave and other trading entities.

### B.   COUNT II: Violation Of 18 U.S.C. § 1962(d)

188.     Skywave repeats and realleges each and every allegation set forth in Paragraphs 1–187 as if fully set forth herein.

189.     Since 2016, Defendants unlawfully, knowingly, and intentionally combine, conspire, and agree together to direct, control, manage, and conduct the affairs of an enterprise—as defined by 18 U.S.C. § 1961(4)—through a pattern of racketeering activity as required by 18 U.S.C. § 1962(d).

190.     Each Defendant participated in the conspiracy.

191.     Each Defendant agreed to direct the affairs of the HFT Enterprise.

192.     Defendants and Defendants' HFT Enterprise engage in interstate commerce.

193.     By facilitating the HFT Enterprise's racketeering activities, each Defendant intended to further their goal of defrauding the FCC and the Commercial Trading market by obtaining shortwave Experimental Licenses through the HFT Enterprise, making false statements, false promises, or material misrepresentations in their applications for new licenses, modified applications, renewal applications, consent of assignment applications, and confidentiality requests for Experimental Licenses that Defendants' operations would only be experimental, misusing the Experimental Licenses for Commercial Trading, and leveraging the ill-gotten

advantages of the HFT Enterprise's Experimental Licenses at their competitors' expense. Defendants' racketeering activities affect interstate commerce.

194.    Defendants' violations of 18 U.S.C. § 1343 were in furtherance of Defendants' conspiracy to conduct an enterprise and to defraud the FCC and the Commercial Trading market by obtaining shortwave Experimental Licenses through the HFT Enterprise, making false statements, false promises, or material misrepresentations in their applications for new licenses, modified applications, renewal applications, consent of assignment applications, and confidentiality requests for Experimental Licenses that their operations would only be experimental, misusing the Experimental Licenses for Commercial Trading, and leveraging the ill-gotten advantages of their Experimental Licenses at their competitors' expense.

195.    Defendants' conspiracy is attributable to all Defendants.  Defendants agreed to perform the requisite two required predicate acts to sustain a RICO violation finding.

196.    Defendants' racketeering directly and proximately caused and continues to cause injury to Skywave.

## **PRAYER FOR RELIEF**

WHEREFORE, Skywave requests the following relief:

A.    Entry of judgment holding each Defendant liable for violating 18 U.S.C. § 1961 *et seq.*;

B.    An injunction restraining each Defendant, and Defendants' officers, agents, employees, affiliates, and all other persons in concert with, in participation with, or for them, from any further direct or indirect misuse, including for Commercial Trading, of Experimental Licenses (1) held by 10Band, or (2) held by another entity under the direction or control of or acting in concert with Defendants, or (3) in the possession of any Defendant;

C.      An award of damages for the economic harm suffered by Skywave—including without limitation its lost profits and amounts by which Defendants have been unjustly enriched—due to Defendants' racketeering together with pre-judgment and post-judgment interest;

D.      An award of damages—including without limitation treble damages, attorney fees, and litigation costs—in accordance with the civil remedy provisions of 18 U.S.C. § 1964(c); and

E.      Any and all additional legal and equitable relief that may be available under law and that the Court may deem proper.

## DEMAND FOR A JURY TRIAL

Skywave hereby demands a trial by jury on all issues so triable.

Dated: February 13, 2025

Respectfully submitted,

/s/ Justin A. Barker

Justin Wilcox (admitted *pro hac vice*)
Goutam Patnaik (admitted *pro hac vice*)
Jamie Dohopolski (admitted *pro hac vice*)
Thomas Romanchek (admitted *pro hac vice*)
DESMARAIS LLP
1899 Pennsylvania Avenue, NW, Suite 400
Washington, D.C. 20006
Tel: 202.451.4900
Fax: 202.451.4901
jwilcox@desmaraisllp.com
gpatnaik@desmaraisllp.com
jdohopolski@desmaraisllp.com
tromanchek@desmaraisllp.com

Steven Balcof (admitted *pro hac vice*)
Peter Kotecki (admitted *pro hac vice*)
DESMARAIS LLP
230 Park Avenue, 26th Floor
New York, New York 10169
Tel: 202.351.3400
Fax: 202.351.3401
sbalcof@desmaraisllp.com
pkotecki@desmaraisllp.com

Justin A. Barker (IL 6274518)
Ariana Garcia-Moore
NELSON MULLINS RILEY & SCARBOROUGH LLP
123 N. Wacker Drive, 21st Floor
Chicago, Illinois 60606
Tel: 312.376.1014
Fax: 312.264.9491
justin.barker@nelsonmullins.com
ariana.garciamoore@nelsonmullins.com

*Attorneys for Plaintiff Skywave Networks, LLC*