# EXHIBIT 55

*[Different first page setting changed from on in original to off in modified.].*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SKYWAVE NETWORKS, LLC,

                    Plaintiff,

           v.

WILLIAM J. DISOMMA,
PAUL A. GURINAS,
MATTHEW HINERFELD,
~~WILLIAM DISOMMA TRUST~~JOHN MADIGAN,
~~PAUL A. GURINAS TRUST,~~
~~JUMP FINANCIAL, LLC,~~
JUMP TRADING ~~HOLDINGS~~, LLC,
and~~JUMP TRADING, LLC,~~
~~ECW WIRELESS, LLC,~~
~~WORLD CLASS WIRELESS, LLC,~~
VIRTU FINANCIAL, INC.,
~~NLN HOLDINGS, LLC,~~
~~NEW LINE NETWORKS, LLC, AND~~
~~10BAND, LLC,~~

                    Defendants.

Civil Action No. 1:24-cv-9650 ~~XXX~~

Judge Georgia N. Alexakis

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

Skywave Networks, LLC ("Skywave") files this First Amended Complaint against Defendants William J. DiSomma ("DiSomma"); Paul A. Gurinas ("Gurinas"); Matthew Hinerfeld ("Hinerfeld"); ~~William DiSomma Trust ("DiSomma Trust"); Paul A. Gurinas Trust ("Gurinas Trust"); Jump Financial, LLC ("Jump Financial"); Jump Trading Holdings, LLC ("Jump Trading Holdings~~John Madigan ("Madigan"); Jump Trading, LLC ("Jump Trading");

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

ECW Wireless, LLC ("ECW Wireless"); World Class Wireless, LLC ("World Class Wireless");and Virtu Financial, Inc. ("Virtu"); NLN Holdings, LLC ("NLN Holdings"); New Line Networks, LLC ("NLN"); and 10Band, LLC ("10Band") ) (collectively, "Defendants") and alleges as follows, based on personal knowledge as to Skywave and Skywave's acts and on information and belief as to all other matters.

*[Different first page setting changed from on in original to off in modified.].*

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 3

PARTIES, JURISDICTION, AND VENUE ...................................................... ~~4~~5

I.       BACKGROUND ................................................................................ 8

  A.   High-Frequency Trading (HFT) .............................................. 8

  B.   Skywave's Efforts To Launch And Commercialize Its Shortwave Network .............. 10

~~FACTS UNDERLYING THE CAUSES OF ACTION~~ ........................................ ~~9~~

~~Skywave~~ ..................................................................................................... ~~9~~

  ~~Skywave's Technology~~ ........................................................ ~~9~~

~~Background on~~ C.                                   FCC Licensing 13

  D.   Defendants' Shortwave Activities .......................................... 16

     i.    Defendants' Commercial Trading Network ...................... 16

     ii.   The HFT Enterprise's Experimental Licenses ................. 21

II.     DEFENDANTS' CONDUCT .......................................................... 27

  A.   Conducting Or Participating In A RICO Enterprise ................ 27

     i.    Defendants' Ordinary Business ...................................... 27

     ii.   The HFT Enterprise ...................................................... 29

     iii.  Defendants' Association With The HFT Enterprise ......... 30

     iv.  Defendants' Pattern Of Racketeering Activity ................ 31

        *1.    Fraudulent Filings With The FCC* ........................ 32

        *2.    Unlawful Commercial Trading* ............................. 37

  B.   Conspiring To Conduct Or Participate In A RICO Enterprise .. 39

     i.    Defendants' Intent To Effect A Racketeering Scheme ...... 39

     ii.   Defendants' Agreement To Effect A Racketeering Scheme .. 39

     iii.  Defendants' Overt Acts In Furtherance Of Their Conspiracy .. 40

  C.   Skywave's Discovery ~~of~~Of Defendants' Racketeering Scheme .. ~~15~~41

~~Defendants' Enterprise~~ ......................................................................... ~~20~~

  ~~Relationships Between Defendants~~ ...................................... ~~21~~

  ~~Defendants' Worldwide Trading Network and Associated Trading on that Network~~ ....... ~~24~~

    ~~Defendants' Worldwide Trading~~ ....................................... ~~25~~

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

Defendants' Trading Infrastructure: Illinois ........ 27

Defendants' Trading Infrastructure: New York/New Jersey ........ 29

Defendants' Trading Infrastructure: Washington ........ 30

Defendants' Trading Infrastructure: United Kingdom ........ 31

Defendants' Trading Infrastructure: Continental Europe ........ 32

Defendants' Trading Infrastructure: Japan ........ 32

Defendants' Trading Infrastructure: Brazil ........ 33

Defendants' Trading Infrastructure: Canada ........ 33

Defendants' Experimental Licenses ........ 36

Elburn I Experimental License ........ 36

Elburn II Experimental License ........ 40

Wayne Experimental License ........ 42

Everett Experimental License ........ 44

Lynnwood Experimental License ........ 46

Defendants' Racketeering ........ 48

Defendants' Predicate Acts: Fraud in Applying for, Modifying, and Renewing Experimental Licenses in Violation of 18 U.S.C. § 1343 ........ 48

Defendants' Predicate Acts: Unlawful Use of Experimental Licenses for Commercial Trading in Violation of 18 U.S.C. § 1343 ........ 51

D. Skywave's Injury ~~Caused by Defendants' Unlawful Racketeering Conduct~~ ........ 53 ~~49~~

E. Injury To Other Traders ........ 50

III. CAUSES OF ACTION ........ 54

A. COUNT I: Violation ~~of~~Of 18 U.S.C. § 1962(c) ........ 54

B. COUNT II: Violation ~~of~~Of 18 U.S.C. § 1962(d) ........ ~~55~~58

PRAYER FOR RELIEF ........ 59

DEMAND FOR A JURY TRIAL ........ 60

~~Prayer For Relief~~ ........ ~~56~~

~~Demand For Jury Trial~~ ........ ~~57~~

**INTRODUCTION**

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

1. This action arises from Defendants' long-term, continuous racketeering and conspiracy scheme to fraudulently obtain experimental shortwave radio licenses from the Federal Communications Commission ("FCC") to create a commercial trading network,[1] unlawfully use those experimental licenses for commercial trading of financial instruments ("Commercial Trading"), and leverage the ill-gotten advantages of experimental licenses to maximize their own financial benefit and to the detriment of their competitors.

1. Since at least 2016, Defendants have continuously directed, controlled, managed, and conducted the affairs of an enterprise through a pattern of racketeering activity. In 2016, Defendants created a high-frequency trading ("HFT") enterprise comprised of 10Band, LLC ("10Band") (the "HFT Enterprise"). Defendants' purpose for the HFT Enterprise was—and continues to be—to build and operate a HFT network that includes shortwave radio infrastructure (the "HFT Network"). Beginning in 2016, Defendants directed the HFT Enterprise to apply for, modify, renew, assign, and request confidentiality for ***experimental*** Federal Communications Commission ("FCC") shortwave radio licenses pursuant to 47 C.F.R. § 5 ("Experimental Licenses"). Experimental Licenses are limited to "experimentation," "product development," and "market trials" (*id.* § 5.1(b)) and are advantageous because they allow applicants to specify their own technical operating parameters. Defendants directed the HFT Enterprise to falsely state, falsely promise, or materially misrepresent to the FCC that the requested licenses were for experimental use and tailored them to have significant advantages over competing networks. Then—once those Experimental Licenses were granted—Defendants directed and controlled the HFT Enterprise to trade financial instruments ("Commercial Trading")—in violation of the Experimental Licenses—unlawfully leveraging the ill-gotten

---

[1] This Complaint uses the term "trading network" to refer to networks used to trade financial instruments.
*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

advantages of the HFT Enterprise's HFT Network at the expense of other market participants, including Skywave.

2.   Defendants also conspired to direct, control, manage, and conduct the affairs of the HFT Enterprise through a pattern of racketeering activity.   At least as early as 2016, Defendants intended to obtain Experimental Licenses through false statements, false promises, or material misrepresentations and to unlawfully use the Experimental Licenses for Commercial Trading beyond the scope of "experimentation," "product development," and "market trials." Defendants agreed to use the HFT Enterprise to enact their scheme.   Defendants devised and enacted their scheme by directing and conducting the HFT Enterprise to apply for Experimental Licenses and knowingly make false statements, false promises, or material misrepresentations in the HFT Enterprise's FCC license applications.   Defendants then used those Experimental Licenses to unlawfully engage in Commercial Trading.

3.   2. From 2013 to 2016, the founders of Skywave founders developed and began to patent revolutionary trading network technology, which it has continued Skywave continues to develop and improve through the present today.  In 2016, Skywave was formed and entered into a ███████████████████ partnership to commercialize its network technology. With the funding from that partnership, Skywave started to commercialize its trading network technology, including beginning the process to obtain a commercial FCC license to operate a shortwave transmitter under 47 C.F.R. § 73 ("Commercial Part 73 License").

3. Skywave's commercialization efforts came to a halt because of Defendants' unlawful activities detailed in this Complaint.  In short, Defendants circumvented U.S. law by fraudulently obtaining experimental FCC licenses not Commercial Licenses to operate shortwave transmitters under 47 C.F.R. § 5 ("Experimental Licenses").  Defendants then unlawfully used

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

~~and continue to use those Experimental Licenses for Commercial Trading. Defendants~~
~~custom designed the parameters of their Experimental Licenses to separately and collectively~~
~~give Defendants a dominant speed advantage over traders using other communications systems,~~
~~including Skywave's planned trading network using a shortwave transmitter under a Commercial~~
~~License. As a result of Defendants' unlawful activities detailed in this Complaint, Skywave's~~
~~partnerships fell apart, and its efforts to commercialize its technology were halted.~~

4.      Skywave's commercialization efforts were derailed by Defendants' unlawful conduct, which is detailed further below. Defendants—through the HFT Enterprise—fraudulently obtained and misused Experimental Licenses because such licenses allow applicants to tailor their own technical operating parameters. By doing so, Defendants ensured that the HFT Enterprise's HFT Network would have a dominant speed advantage over other communications networks—like Skywave's nascent HFT network with a Part 73 License or the networks of other parties granted non-Experimental Licenses by the FCC. Because it could not compete with the HFT Enterprise's HFT Network, Skywave's partnerships fell apart, it was unable to find new partners, it was forced to halt its efforts to commercialize its technology, and it lost access to markets and trading profits it would have acquired from operating its shortwave network.

5.      Skywave is not the only victim of Defendants' misconduct. Defendants' misconduct also injured financial "pairs traders" like Sean and Douglas Drendel ("the Drendel Brothers"). In 2015, the Drendel Brothers launched Bruder Trading Inc. ("Bruder") to trade pairs, such as the S&P 500 E-Mini ("E-Mini")/DAX future ("FDAX").[1]  Then, in 2021, Bruder

---

[1] Pairs trading is based on a correlation between two assets.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

was forced to cease trading because it was unable to compete with the HFT Enterprise's HFT Network.

6.       Defendants directed, controlled, managed, and conducted the affairs of the HFT Enterprise, including by creating the HFT Enterprise to build and operate the HFT Network, investing in the HFT Enterprise, holding leadership positions in the HFT Enterprise, directing the HFT Enterprise to apply for, modify, renew, assign, and request confidentiality for Experimental Licenses, submitting certifications on behalf of the HFT Enterprise in FCC filings, directing the HFT Enterprise to facilitate Defendants' Commercial Trading via its HFT Network, and conducting Commercial Trading via the HFT Network.

7.       4. Defendants concealed the true nature of their commercial activities behind an artifice of confidential, experimental work and a web of shell companies that ~~directed and controlled (and continue to direct and control)~~ obscured the connection between the HFT Enterprise and Defendants' racketeering scheme ~~to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.~~ Meanwhile, Defendants shared trading infrastructure, including the HFT Network, and coordinated their activities to carry out their scheme.

## PARTIES, JURISDICTION, AND VENUE

8.       5. Skywave is a limited liability company organized and existing under the laws of Delaware, with its principal place of business at 10525 West US Highway 30, Building 4 C, Wanatah, Indiana 46390.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

9.   ~~6.~~ DiSomma is an individual with a business address at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.  ~~Disomma~~DiSomma is also a resident of Illinois.

10.   ~~7.~~ Gurinas is an individual with a business address at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

11.   ~~8.~~ Hinerfeld is an individual with a business address at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

12.   ~~9. DiSomma Trust is a trust~~Madigan is an individual with a business address at 600 West Chicago Avenue, Suite ~~840~~600, Chicago, Illinois 60654.

~~10. Gurinas Trust is a trust with a business address at 600 West Chicago Avenue, Suite 840, Chicago, Illinois 60654.~~

~~11. Jump Financial is a limited liability company registered to do business in Illinois with its principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.~~

~~12. Jump Trading Holdings is a limited liability company registered to do business in Illinois with its principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.~~

13.   Jump Trading is a limited liability company registered to do business in Illinois, with its principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

~~14. ECW Wireless is a limited liability company organized and existing under the laws of Delaware with a registered agent address at 1209 Orange Street, Wilmington, Delaware 19801.~~

~~15. World Class Wireless is a limited liability company registered to do business in Illinois with its principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.~~

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

14. ~~16.~~ Virtu is a corporation organized and existing under the laws of Delaware, with a place of business at 233 ~~Sout~~South Wacker Drive, Suite 4020, Chicago, Illinois 60606.

~~17. NLN Holdings is a limited liability company organized and existing under the laws of Delaware with a registered agent address at 1209 Orange Street, Wilmington, Delaware 19801.~~

~~18. NLN is a limited liability company registered to do business in Illinois, with its principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.~~

~~19. 10Band is a limited liability company organized and existing under the laws of Delaware and has a place of business at 600 West Chicago Avenue, Suite 840, Chicago, Illinois 60654.~~

15. ~~20.~~ This is a civil action~~,~~ arising under the Racketeer Influenced Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*

16. ~~21.~~ This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

~~22. Personal jurisdiction is proper against Jump Financial because it has a principal place of business in the Northern District of Illinois.~~

~~23. Personal jurisdiction is proper against Jump Trading Holdings because it has a principal place of business in the Northern District of Illinois.~~

17. ~~24.~~ Personal jurisdiction is proper against Jump Trading because it has a principal place of business in the Northern District of Illinois.

18. ~~25.~~ Personal jurisdiction is proper against DiSomma ~~and DiSomma Trust~~ because DiSomma, through the William DiSomma Trust ("DiSomma Trust"), is an owner of Jump ~~Financial, Jump Trading Holdings, and Jump~~ Trading, which ~~all have~~has a principal ~~places~~place of business in the Northern District of Illinois.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

19. ~~26.~~ Personal jurisdiction is proper against Gurinas ~~and Gurinas Trust~~ because Gurinas, through the Paul A. Gurinas Trust ("Gurinas Trust"), is an owner of Jump ~~Financial, Jump Trading Holdings, and Jump~~ Trading, which ~~all have~~has a principal ~~places~~place of business in the Northern District of Illinois.

20. ~~27.~~ Personal jurisdiction is proper against Hinerfeld because he regularly transacts business on behalf of Jump Trading in the Northern District of Illinois as Jump Trading's general counsel.

~~28. Personal jurisdiction is proper against ECW Wireless because it participated in the activities alleged in this Complaint, a substantial portion of which occurred in the Northern District of Illinois. ECW Wireless has also purposefully availed itself of the benefits and protections of Illinois law through its effective 100 percent interest in World Class Wireless, 50 percent interest in NLN, and 50 percent interest in 10Band, all registered in Illinois and with principal places of business in Illinois. See supra ¶¶ 15, 18–19; infra Fig. 4. Further, the interests of justice require that co-conspirators not residing in this state be brought before the Court in a single trial.~~

21. ~~29.~~ Personal jurisdiction is proper against ~~World Class Wireless~~Madigan because ~~it has a principal place of~~he regularly transacts business on behalf of Jump Trading in the Northern District of Illinois as Jump Trading's Technologist and Manager of Telecom Infrastructure.

~~30. Personal jurisdiction is proper against NLN Holdings because it participated in the activities alleged in this Complaint, a substantial portion of which occurred in the Northern District of Illinois. NLN Holdings has also purposefully availed itself of the benefits and protections of Illinois law through its effective 50 percent interest in NLN and 50 percent~~

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

~~interest in 10Band, both registered in Illinois and with principal places of business in Illinois.~~ ~~*See supra* ¶¶ 18–19; *infra* Fig. 4.  Further, the interests of justice require that co-conspirators not~~ ~~residing in this state be brought before the Court in a single trial.~~

22. ~~31.~~ Personal jurisdiction is proper against Virtu because it has a place of business in the Northern District of Illinois, and it participated in the activities alleged in this First Amended Complaint, a substantial portion of which occurred in this District.  Further, Virtu ~~owns~~controls approximately 50 percent of ~~the control of~~ 10Band~~ through NLN Holdings and NLN ~~, which operates radio transmission links in this District related to the activities ~~and claims~~ alleged in this First Amended Complaint.

~~32. Personal jurisdiction is proper against NLN because it has a principal place of business in the Northern District of Illinois.~~

~~33. Personal jurisdiction is proper against 10Band because it participated in the activities alleged in this Complaint, a substantial portion of which occurred in the Northern District of Illinois.  Further, it operates radio transmission links in this District related to the activities and claims alleged in this complaint.~~

23. ~~34.~~ Personal jurisdiction is also proper against all Defendants in the Northern District of Illinois because they ~~engaged in a years' long~~devised and enacted a yearslong racketeering scheme to, among other things, defraud the FCC ~~to obtain a shortwave~~and the Commercial Trading market.  Defendants devised and enacted their scheme by obtaining Experimental ~~License~~Licenses to operate ~~a~~ shortwave ~~transmitter~~transmitters located in Elburn, Illinois (which is within this District)~~ and then unlawfully use that transmitter~~; making false statements, false promises, or material misrepresentations in applications for Experimental Licenses and modification applications, renewal applications, and confidentiality requests for

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

those Experimental Licenses that their operations would only be experimental; misusing the Experimental Licenses for Commercial Trading. ~~Defendants have engaged in activities in furtherance of that racketeering scheme in this District by, among other things, engaging in systematic and continuous Commercial Trading using the Elburn, Illinois transmitter.~~; and leveraging the ill-gotten advantages of their Experimental Licenses at their competitors' expense.

24. ~~35.~~ Venue is proper in this District under 28 U.S.C. § 1391 and 18 U.S.C. § 1965. ~~Defendants DiSomma Trust, Gurinas Trust, Jump Financial,~~ Jump Trading ~~Holdings, Jump Trading, World Class Wireless, and NLN are all residents~~is a resident of the Northern District of Illinois. ~~Defendants~~ DiSomma, Gurinas, Hinerfeld, ~~ECW Wireless, Virtu, NLN Holdings, and 10Band~~Madigan, and Virtu all transact business in the Northern District of Illinois, including through activities in furtherance of all Defendants' racketeering scheme in this District by, among other things, misusing their Experimental Licenses and engaging in systematic and continuous Commercial Trading using the Elburn, Illinois ~~transmitter~~transmitters. In addition, Jump ~~and NLN have~~Trading has a regular and established ~~places~~place of business in the Northern District of Illinois, and ~~they, as well as~~Jump Trading and Virtu ~~and 10Band,~~ engage in trading activities and network operations activities in this District.

### ~~FACTS UNDERLYING THE CAUSES OF ACTION~~

**I.** ~~Skywave~~**BACKGROUND**

    **A. High-Frequency Trading (HFT)**

~~36. In 2016, entrepreneur Timothy Eloe and inventor Kevin Babich founded Skywave to commercially deploy technology for transcontinental wireless networks for trading. Skywave's shortwave trading network technology is ideal for all trading strategies that rely on the~~

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

transmission of time-sensitive data between distant financial markets, like the practice of latency arbitrage in high-frequency trading ("HFT").

*Skywave's Technology*

37. Skywave developed trading network technology that provides traders with a quantum leap in communications speed, particularly for transoceanic communications. For example, using Skywave's innovations, trade information can traverse the Atlantic Ocean faster than over traditional networks using a combination of transoceanic optical fiber and microwave, previously the fastest communication method.

38. Skywave's technology uses shortwave radio to transmit trade information over long distances. Shortwave radio, which is commonly associated with older technologies like AM radio, had generally been considered antiquated for modern communications before Skywave developed methods to leverage it in new ways.

39. Radio transmissions typically travel faster than transmissions via optical fiber. However, unlike optical fiber transmissions, most common radio technology *e.g.*, microwave require a line of sight between transmitter and receiver. Such technology is not economically feasible for transcontinental communication because the curvature of the earth blocks line of sight.

40. Shortwave radio, in contrast, is well suited for transcontinental communication because it does not require a line of sight between transmitter and receiver. Shortwave radio signals can be refracted *i.e.*, bounced off the Earth's ionosphere to effectively transmit information around the curvature of the earth.

41. But the properties of shortwave radio signals also create challenges for transmitting trading information over long distances. One such challenge is low bandwidth. Shortwave radio

*[Different first page setting changed from on in original to off in modified.].*

~~can only carry a small fraction of the amount of information carried by optical fiber or microwave. As a result, shortwave signals alone are insufficient to operate a trading network.~~

~~42. Skywave overcame the challenges of trading via shortwave radio signals through its innovative and patented shortwave trading network technology.~~

~~43. The advantages of the increased communications speed provided by Skywave's technology is perhaps best illustrated via HFT and latency arbitrage examples.~~

25. ~~44.~~ HFT is a trading strategy where financial instruments, like stocks and futures, are traded at high frequency to take advantage of small but frequent changes in financial markets. ~~HFT~~High-frequency traders seek to make profits from these small changes by aggregating large quantities of high-frequency trades over time. While ~~HFT~~high-frequency traders might only make a relatively small profit on a single trade, they might make thousands of such trades per minute.

26. ~~45.~~ In HFT, successful trades are determined by small fractions of time—nanoseconds, microseconds, and milliseconds. The opportunities that ~~HFT~~high-frequency traders seek are often only available at the thinnest slices of time increments.

27. ~~46.~~ The fleeting nature of HFT opportunities dictates that the speed of the networks, computers, and algorithms used by each ~~HFT~~high-frequency trader ~~will determine~~determines whether ~~that~~a trader will be fast enough to capture an opportunity or lose it to a faster trader. ~~The HFT~~Only high-frequency traders with the fastest networks can dominate the opportunities presented by changing conditions in national and international financial markets.

*[Different first page setting changed from on in original to off in modified.].*

28. ~~47.~~ Put simply, for HFT, the fastest network wins the trade and reaps the economic benefits, and every ~~single~~ millisecond counts.  As a matter of illustration, one HFT networking firm spent approximately $300 million to build a domestic network to save 3 milliseconds[2] while another HFT networking firm spent $250 million to build an intercontinental network to save 5 milliseconds.[3]

29. ~~48.~~ Similarly, latency arbitrage trading is a form of trading that takes advantage of the time it takes for overseas financial markets to adjust to one another's changes.  ~~Latency~~The key for latency arbitrage is the speed (or low latency) of the network used by a trader.  To make a profit, latency arbitrage traders leverage the fact that they can receive signals about overseas market changes ~~several milliseconds~~hundreds of microseconds to one millisecond before other traders and then make trades before other traders are aware of those overseas changes.

30. ~~49.~~ To further illustrate, one example of latency arbitrage trading is trading based on the correlation between the ~~S&P 500~~ E-Mini ~~("E-Mini")~~, which is traded on the Chicago Mercantile Exchange ("CME"), and the ~~DAX future~~ ("FDAX"), which is traded on the Eurex market in Germany.  Specifically, an E-Mini price change can be a predictor of a future FDAX price change—*e.g.*, if the E-Mini price goes up or down, the FDAX price is likely to follow in the same direction.  Critically, however, it takes time (albeit milliseconds) for the FDAX to catch up to the E-Mini, and that delay gives rise to ~~a~~ latency arbitrage trading ~~opportunity~~opportunities.  For instance, when the E-Mini price goes up in Chicago, a U.S. trader

---

[2] Christopher Steiner, *Wall Street's Speed War*, Forbes (July 16, 2012), https://www.forbes.com/forbes/2010/0927/outfront-netscape-jim-barksdale-daniel-spivey-wall-street-speed-war.html.

[3] *Ultra-Fast Telecom Cable from Herring Cove to Europe Nearly Complete*, Can. Broad. Corp. (Aug. 12, 2015), https://www.cbc.ca/news/canada/nova-scotia/ultra-fast-telecom-cable-from-herring-cove-to-europe-nearly-complete-1.3188581.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

with a low latency network can send a trading trigger to buy the FDAX in Germany before the rest of the market drives up the price. Then, having purchased the FDAX at a lower price than the rest of the market, the trader can turn a profit by selling the FDAX at the higher price.

**B.  Skywave's Efforts To Launch And Commercialize Its Shortwave Network**

31.    In 2016, entrepreneur Timothy Eloe and inventor Kevin Babich founded Skywave to commercially deploy technology for transcontinental wireless networks for trading. Skywave's shortwave trading network technology is ideal for all trading strategies that rely on the transmission of time-sensitive data between distant financial markets, like the practice of latency arbitrage in HFT.

32.    Skywave developed trading network technology that provides traders with a quantum leap in communications speed, particularly for transoceanic communications.  For example, using Skywave's innovations, trade information can traverse the Atlantic Ocean faster than it could over traditional networks that used a combination of transoceanic optical fiber and microwave, previously the fastest communication method.

33.    Skywave's technology uses shortwave radio to transmit trade information over long distances.  Shortwave radio, which is commonly associated with older technologies such as AM radio, had generally been considered antiquated for modern communications before Skywave developed methods to leverage it in new ways.

34.    Radio transmissions typically travel faster than transmissions via optical fiber. However, unlike optical fiber transmissions, most common radio technology—*e.g.*, microwave—requires a line of sight between transmitter and receiver.  Such technology is not economically feasible for transcontinental communication because the curvature of the earth blocks the line of sight.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

35.     Shortwave radio, in contrast, is well-suited for transcontinental communication because it does not require a line of sight between transmitter and receiver.  Shortwave radio signals can be refracted—*i.e.*, bounced—off the Earth's ionosphere to effectively transmit information around the curvature of the earth.

36.     Skywave planned to implement its innovative shortwave trading network technology through a transcontinental network between the United States and Europe ("Skywave Network").  The Skywave Network would include a shortwave transmitter that Skywave planned to operate under a Part 73 License.

37.     Skywave received microwave licenses in September and October 2016 for building out the Skywave Network through its radio license holding company, Spectrum Holding Company, LLC.

38.     On December 15, 2015, and February 19, 2016, the Skywave founders met with FCC officials, including Mindel De La Torre, the Chief of the International Bureau, to present Skywave's plans for a Part 73 License for the Skywave Network and seek guidance from the FCC panel.  During Skywave's February 19 meeting with the FCC, the FCC panel declared its support for the proposed Part 73 License.  Skywave proposed to design a multi-use Part 73 License that would split transmission periods between Commercial Trading and public broadcasting of higher art musical performances.  The musical performances were to be funded in part by the Commercial Trading activities on the Part 73 Licenses.  The FCC panel encouraged Skywave to proceed with filing its application for a Part 73 License.

39.     ~~50.~~ By 2016, Skywave was ready to commercialize its innovative shortwave trading network technology and went to the market in search of development partners.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

40. ~~51.~~ In October 2016, Skywave executed agreements with ██████████ and ██████ ███████. Under the terms of those agreements, ██ would ~~provide~~ ██████ ████████████████████████████████████████████████████ ████████████████████, and ██████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████. The parties agreed to ██████████████████████████.

~~52. Skywave planned to implement its innovative shortwave trading network technology through a transcontinental network between the United States and Europe ("Skywave Network"). The Skywave Network would include a shortwave transmitter that Skywave planned to operate under a Commercial License.~~

41. Upon consummation of those agreements, ████ Skywave, and ███ proceeded as a unified team, working to build a trading operation in which ██████████████, Skywave would supply the low-latency network, and █████████████████ █████████. Skywave had the key elements to commercialize the Skywave Network—██████████████████████████████████████████ ██████████████████████████████████, and FCC endorsement of Skywave's proposed Part 73 License.

42. ~~53.~~ Using ████████████████████████ under the ~~Agreements~~agreements, Skywave engineered and designed the Skywave Network and supporting infrastructure. From October 2016 through March 2017, Skywave completed the following tasks in building the Skywave Network: (1) ~~assessed and selected~~executed a radio

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

programming and broadcast contract, hired a studio engineer and a station manager, and began development of a broadcast studio; (2) took steps to buy transmitter and receiver sites, including assessing and selecting transmitter and receiver sites in the United States and Europe; (2)3) hired three radio engineers and two network specialists to support the Skywave Network infrastructure; (4) designed, engineered, and completed component specifications for customized transmitters, antennas, and patented fiber back-channel modems and shortwave optimization methods; (35) completed installation of a network operations center, data center, security elements, connective elements, and microwave dishes; and (46) met with the FCC and prepared FCC construction permits and related filings, including applications for developmental FCC licenses. Skywave also entered into contracts with third parties for the manufacture of transmitters, antennas, and modems for the Skywave Network.

### C. *Background on* FCC Licensing

43. 54. Transmitting shortwave signals requires a license from the FCC. FCC licenses not only giveIn addition to providing a party permission to transmit signals, but they alsoFCC licenses dictate the details of what can be transmitted, where transmissions can originate, and how those transmissions arecan be sent. *See* 47 U.S.C. §§ 301, 314. Section 301 makes clear that any such license is limited to the express terms and conditions of the license: "no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license." *Id.* at § 301.

44. 55. The FCC forbids "[w]illful false statements made" in FCC license "applications[a]pplications, amendments, and related statements of fact." 47 C.F.R. §§ 5.57(d), 73.3513(d). Such willful false statements are "punishable by fine and imprisonment" pursuant to 18 U.S.C. § 1001. *Id.*

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

45.    ~~56. There are~~At least two types of FCC licenses for shortwave radio transmission are relevant to the allegations in this First Amended Complaint: commercial and experimental. ~~The FCC issues Commercial Licenses under 47 C.F.R. § 73 ("Part 73"). A Commercial~~A Part 73 License provides access for commercial use with certain restrictions. ~~Specifically, Commercial~~For example, Part 73 Licenses (i) have limited bandwidth to transmit data; (ii) are limited to fixed operation frequencies during specified hours; (iii) require emissions masking; and (iv) have high minimum transmission power requirements. *See* 47 C.F.R. §§ 73.702, 73.751, 73.758.

46.    ~~57.~~Experimental Licenses issue under 47 C.F.R. § 5 ("Part 5") and are limited to "experimentation," ~~and~~"product development," and "market trials." *Id.* § 5.1(b).[4]   Given ~~that~~those limited ~~purpose~~purposes, applicants for Experimental Licenses are allowed to specify their own technical operating parameters for the transmission equipment for which they seek an Experimental License.

47.    ~~58.~~Defendants ~~custom designed~~custom designed a portfolio of Experimental Licenses for their HFT Enterprise to separately and collectively comprise operating parameters that offer significant advantages over ~~Commercial~~Part 73 Licenses or other non-Experimental Licenses from the FCC.   Specifically, ~~Defendants'~~Experimental Licenses (i) have more bandwidth than a ~~Commercial~~Part 73 License; (ii) provide access to and allow instant and frequent switching across a wide frequency range—*i.e.*, "frequency hopping~~;~~"; (iii) do not have emissions-masking requirements; and (iv) do not have transmission power requirements.   With increased bandwidth, Defendants can transmit more data and do so more quickly.   With

---

[4] ~~The FCC also issues Experimental Licenses specific to "market trials" under Part 5, but there are no market trial licenses at issue in this Complaint.~~

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

frequency hopping, Defendants can adjust and select the ideal frequency for given ionosphere conditions, which are constantly changing, and thus transmit data at the optimal latency. By relaxing ~~emissions masking~~emissions masking, Defendants reduce the latency attributable to that process, gaining a further speed advantage. Finally, by avoiding the high transmission power requirements, Defendants also avoid the high costs and operational complexities of using ~~high powered~~high-powered tube transmitters.

48. ~~59.~~ Importantly, Experimental Licenses do not authorize use of shortwave transmitters for commercial uses, such as Commercial Trading ~~or Defendants' use of the shortwave transmitters in the manner described in this Complaint~~. For example, 47 C.F.R. § 5.3 sets forth the operations that are permitted under an Experimental License. None of those operations include Commercial Trading~~or Defendants' use of the shortwave transmitters in the manner described in this Complaint~~. While Part 5 also includes "[p]roduct development and market trials," *id.*, those trials do not authorize for-hire Commercial Trading~~or~~, such as the Commercial Trading conducted by Defendants~~' use of the shortwave transmitters in the manner described in this Complaint~~ using 10Band's Experimental Licenses. Additionally, 47 C.F.R. § 5.601(c) provides that, for product development trials, "[m]arketing of devices . . . or provision of services for hire is not permitted." By way of another example, 47 C.F.R. § 5.602(a) enables "provision of services for hire . . . before the radio frequency device has been authorized by the Commission" only if the "device will be operated in compliance with existing Commission rules, waivers of such rules that are in effect at the time of operation, or rules that have been adopted by the Commission but that have not yet become effective." No such rules, waivers, or adopted rules ~~exist that permit~~permitting Commercial Trading ~~or Defendants' use of the shortwave~~

*[Different first page setting changed from on in original to off in modified.].*

22

~~transmitters pursuant to an~~under the HFT Enterprise's Experimental ~~License in the manner described in this Complaint~~Licenses exist.

49.     Additionally, 47 C.F.R. § 5.5 provides that a market trial is "[a] program designed to evaluate product performance and customer acceptability ***prior to*** the production stage[] and typically requires testing a specific product under expected use conditions to evaluate actual performance and effectiveness" (emphasis added).  Defendants' regular use of the HFT Enterprise's shortwave infrastructure and Experimental Licenses for Commercial Trading exceeds this threshold from product evaluation to full commercial production.  For example, in a report and order from 2013, the FCC directly addressed commentator concerns about Experimental License holders soft launching their products and services under the guise of market and product development trials in an attempt to "game" the licensing processes.  *See* Ex. 51 at 805–08.  There, the FCC adopted rules for product development trials indicating that the licensee must not market devices or offer services for hire.  *Id.* at 808.  The FCC also clarified that market trials have requirements that licensees retain ownership over all equipment, can sell the equipment only to another licensee similarly authorized to conduct a market trial, and are only permitted to lease trial equipment to unlicensed trial participants.  *Id.*  Defendants' Commercial Trading does not fall into any of the permitted categories and demonstrates a pattern of marketing devices and offering services for hire.

50.     Irrespective of any rules or waivers that would have permitted Defendants to engage in Commercial Trading through their HFT Enterprise, Commercial Trading was not included in the parameters of the HFT Enterprise's Experimental Licenses.  Defendants willingly consented to limit their operations to experimental purposes—to the exclusion of Commercial

*[Different first page setting changed from on in original to off in modified.].*

Trading—and acknowledged they were not authorized "to operate on any basis other than experimental" in their Experimental License applications.  *See, e.g.*, Ex. 42-A.

*Skywave's Discovery of Defendants' Racketeering Scheme*

60. In December 2016, Skywave learned that 10Band had filed applications with the FCC to obtain Experimental Licenses to operate shortwave transmitters. 10Band had filed an application to operate in Elburn, Illinois, and the FCC granted that license.  Around that time, Skywave and its investors heard rumors in the industry that Jump or Virtu (both trading firms) may be affiliated with 10Band.

61. In 2017, ██ became concerned that if anyone were to use 10Band's shortwave transmitter under an Experimental License for Commercial Trading, they would have a dominant latency (*i.e.*, speed) advantage over other traders using optical fiber and microwave networks and the Skywave Network, which would operate under Commercial License conditions.  *See supra* ¶¶ 56–59.  At that time, Skywave was not aware of any information confirming the rumors that Jump or Virtu were affiliated with 10Band or using 10Band's shortwave transmitter for Commercial Trading.  Nor was Skywave aware of any data showing or any method to determine whether Jump, Virtu, or others were using Experimental Licenses for Commercial Trading.

62. ██ did not believe the partnership could reasonably compete against any unlawfully used 10Band Experimental License for Commercial Trading.  Given its concern about this possibility, ██ sought to exit the partnership with Skywave and ██.  In March 2017, Skywave, ██████ agreed to release ██ from the partnership.

63. Without ██████, Skywave was forced to pause or cancel aspects of its network construction.  Although ██ remained committed to the partnership, ██ did not provide ██ ██████ that Skywave lost when ██ left.

*[Different first page setting changed from on in original to off in modified.].*

24

*[Different first page setting changed from on in original to off in modified.].*

64. In the Fall of 2018, Skywave found ███████████████████████ , ████████████████████████ Skywave to further develop its innovative shortwave network technology. ██████████ did not, however, agree to ████████ ████████ to complete construction of the Skywave Network.

65. In early 2019, Skywave and ████████████ went to the market for additional capital investment, but they were unable to raise the funds necessary to complete construction of the Skywave Network.

66. In 2020, ████████████ asked ████████████ of the Skywave Network construction, but ████ declined because of its concerns that trading firms may have been using Experimental Licenses for Commercial Trading. ██████ also requested, and Skywave agreed, to dissolve the original partnership. At that time, Skywave was still not aware of any information showing Jump, Virtu, or any other trading firm was affiliated with 10Band or using 10Band's Experimental Licenses for Commercial Trading. Nor was Skywave aware of any data showing or any method to determine whether Jump, Virtu, or others were using Experimental Licenses for Commercial Trading.

67. In October 2020, ████████████ and Virtu entered into a non-disclosure agreement to discuss Skywave's innovative shortwave network technology. Representatives of ████████████ , Skywave, and Virtu subsequently met on or about October 8, 2020. ████████████



*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

68. In 2022, Skywave discovered that a German company, Deutsche Börse, offered a market analytics tool called A7. The A7 tool enabled examination of CME and Eurex trading data for evidence of trading using shortwave networks.

69. Using the A7 tool, Skywave discovered evidence of shortwave trading. For example, the A7 tool showed two different latencies for latency arbitrage trading of the E Mini (abbreviated as "ES" in Figure 1) and the FDAX (as described above). *See* Fig. 1. First, E Mini price moves on the CME correlated with FDAX trading activity on the Eurex peaking approximately 37 milliseconds later. That 37 millisecond latency indicates trading over networks comprised of conventional optical fiber and microwave transmitters. Second, the A7 data also showed E Mini price moves on the CME correlated with FDAX trading activity on the Eurex peaking approximately 28 milliseconds later. That relatively low 28 millisecond latency indicates trading over networks that included shortwave transmissions.

*[Different first page setting changed from on in original to off in modified.].*





**Figure 1: XCME/XEUR Latency Data**[§]

51. Skywave, on the other hand, took tangible steps to obtain a Part 73 License. *See supra* ¶ 42. Defendants' misuse of Experimental Licenses made Skywave's Part 73 License arrangements and investments commercially untenable.

70. In fact, Deutsche Börse's head of quantitative analytics concluded that the A7 latency data showing an approximately 9 millisecond advantage in some trades was evidence of shortwave trading. Fig. 2.

---

[§] Stefan Schlamp, *Stefan Schlamp's Post*, LinkedIn, https://www.linkedin.com/posts/stefanschlamp_cmegroup_eurex_marketdata_activity_6948926555885192064_eXrF/ (indicating a time of publication 2 years prior to Sept. 2024).

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*



**Figure 2: Stefan Schlamp's A7 Analysis**[6]

71. According to Deutsche Börse's retroactive A7 analysis, trading at shortwave latencies began in 2017, accelerated in 2019, and has dominated CME/EUREX latency arbitrage trading, such as E-Mini FDAX trading, since 2020. Correspondingly, trading activity at the relatively slower optical fiber and microwave network latency gradually decreased after shortwave trading commenced. Fig. 3 (heatmap showing shortwave network trading on "Short Wave" dotted line and optical fiber and microwave network trading on "MW/Hibernia/MW" line, with white indicating activity and red indicating higher activity).

---

[6] Stefan Schlamp, *Stefan Schlamp's Post*, LinkedIn, https://www.linkedin.com/posts/stefanschlamp_cmegroup-eurex-marketdata-activity-6948926555885192064-eXrF/ (indicating a time of publication 2 years prior to Sept. 2024).

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*



**Figure 3: XCME/XEUR Network Data**[7]

72. The rise in shortwave network trading evidenced by these low latencies precisely matches the decline of CME traders who used conventional network technologies (*e.g.*, optical fiber and microwave) and eventually ceased CME/EUREX arbitrage trading because they could not compete due to the low latencies enabled by shortwave networks.

**D.** **Defendants' ~~Enterprise~~Shortwave Activities**

73. Since 2016, DiSomma, Gurinas, Hinerfeld, DiSomma Trust, Gurinas Trust, Jump Financial, Jump Trading Holdings, Jump Trading, ECW Wireless, World Class Wireless, Virtu, NLN Holdings, NLN, and 10Band have worked and continue to work in concert to advance their

---

[7] Stefan Schlamp, *Stefan Schlamp's Post*, LinkedIn, https://www.linkedin.com/posts/stefanschlamp_cme-eurex-microwave-activity-7027298230296051712-bW6x (indicating a time of publication 1 year prior to Sept. 2024).

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

~~shared purpose to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.~~

*~~Relationships Between Defendants~~*

~~74. Defendants form a complex network of individuals, trusts, shell companies, trading companies, and other entities that are an association-in-fact enterprise under 18 U.S.C. § 1961(4) to facilitate and conduct Defendants' racketeering scheme.~~

(Deleted)



**Defendants' Enterprise**

~~75. Figure 4 provides an overview of the relationships between the Defendants.[8]~~

**~~Figure 4: Defendants' Enterprise Overview~~**

---

~~[8] Figure 4 represents a compilation of the information in Exhibit 1 (FINRA BrokerCheck Report for Jump Trading), Exhibit 2 (10Band Ownership Structure as Submitted to FCC), and Exhibit 3 (Declaration of John P. Madigan on Behalf of NLN Holdings as Submitted to FCC).~~

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

76. DiSomma (labeled "2" in Fig. 4), Gurinas (labeled "3" in Fig. 4), and Hinerfeld (labeled "1" in Fig. 4) are central figures in the coordination of the racketeering and conspiracy scheme. DiSomma and Gurinas collectively own a controlling interest in Jump Financial (labeled "6" in Fig. 4) through DiSomma Trust and Gurinas Trust, respectively. Jump Financial owns a controlling interest in Jump Trading Holdings (labeled "7" in Fig. 4). Jump Trading Holdings owns a controlling interest in Jump Trading (labeled "8" in Fig. 4). DiSomma and Gurinas are involved in the management and operation of Jump Financial, Jump Trading Holdings, and Jump Trading (collectively, "the Jump Defendants"). As part of the association in fact, the Jump Defendants engage in Commercial Trading using one or more shortwave transmitters operated by 10Band (labeled "13" in Fig. 4) under an Experimental License.

77. Hinerfeld is the General Counsel for Jump Trading. Ex. 4. Hinerfeld signed multiple fraudulent Experimental License applications and other filings on behalf of 10Band. *See infra* ¶¶ 142–180. Hinerfeld is also a Board Manager for NLN Holdings (labeled "11" in Fig. 4). Ex. 5.

78. Virtu (labeled "14" in Fig. 4) engages in Commercial Trading using one or more shortwave transmitters operated by 10Band under an Experimental License.

79. NLN Holdings is a joint venture between DiSomma, Gurinas, and Virtu. Virtu owns a 50 percent interest of NLN Holdings. DiSomma and Gurinas own a 50 percent interest of NLN Holdings through a web of corporate shells. DiSomma and Gurinas collectively own a controlling interest in ECW Wireless (labeled "9" in Fig. 4) through DiSomma Trust and Gurinas Trust, respectively. ECW Wireless owns a controlling interest in World Class Wireless (labeled "10" in Fig. 4). World Class Wireless owns a 50 percent interest in NLN Holdings (labeled "11" in Fig. 4). NLN Holding is therefore ultimately owned and controlled by

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

~~DiSomma, Gurinas, and Virtu, which direct the Commercial Trading of the association in fact enterprise.~~

~~80. NLN Holdings owns a controlling interest in NLN (labeled "12" in Fig. 4). NLN is also a joint venture of DiSomma, Gurinas, and Virtu. NLN's Board of Directors has been comprised of employees of the Jump Defendants (*e.g.*, John Madigan and Marcus Washko) and Virtu (*e.g.*, Mike Rosenthal and Jason Vopni). NLN owns a controlling interest in 10Band.~~

~~81. 10Band applied for Experimental Licenses to operate multiple shortwave transmitters (as explained further below), and in so doing, knowingly made material misrepresentations. 10Band operates shortwave transmitters under Experimental Licenses, and the Jump Defendants and Virtu use those transmitters to engage in Commercial Trading.~~

~~82. DiSomma, Gurinas, Hinerfeld, DiSomma Trust, Gurinas Trust, ECW Wireless, World Class Wireless, Virtu, NLN Holdings, NLN, and 10Band form an association in fact enterprise under 18 U.S.C. § 1961(4) to facilitate and conduct Defendants' racketeering scheme. Its purpose is to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.~~

### i. Defendants' ~~*Worldwide*~~Commercial Trading Network ~~*and Associated Trading on that Network*~~

52. Defendants, through their HFT Enterprise, have constructed a worldwide network of optical fiber, microwave transmitters, and shortwave connections between trading exchanges to leverage the speed of shortwave connections and profit from Commercial Trading, including latency arbitrage trading, at their competitors' expense ("Defendants' Commercial Trading

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

Network"). Defendants' Commercial Trading Network includes the HFT Enterprise's HFT Network.

(Modified)



Defendants' Commercial Trading Network

83. **Figure** 5 provides an overview **1: Overview** of Defendants' worldwide trading network ("Defendants' Worldwide **Commercial** Trading Network").

**Figure 5: Defendants' Worldwide Trading Network Overview**

Defendants' Worldwide Trading

84. Defendants operated and continue to operate a worldwide trading network that connects major trading exchanges throughout the world. Defendants assembled this network using the shortest possible paths between exchanges to ensure that Defendants' trading signals arrive faster than competing signals—allowing Defendants to dominate the trades between these

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

~~exchanges. Defendants' network uses a combination of optical fiber, microwave, and shortwave connections between trading exchanges.~~

53. ~~85.~~ Defendants operate computer servers or other equipment inside the data centers where trading exchanges are managed. These servers are connected to ~~the~~ Defendants' ~~Worldwide~~Commercial Trading Network and allow their trades to ~~execute. Operating their servers inside the data centers where trading exchanges are managed, in combination with the unlawful use of experimental shortwave transmitters, provides Defendants with a low latency network that is faster than networks that do not unlawfully operate shortwave transmitters under Experimental Licenses~~be executed. Defendants use the ~~lower latency~~speed advantage of ~~their trading network to~~the HFT Enterprise's HFT Network (through the advantages of Experimental Licenses) to illegally dominate certain trades across ~~worldwide~~global trading markets.

~~86. The following example illustrates how Defendants engage in Commercial Trading across the globe using Defendants' Worldwide Trading Network:~~

54. ~~a. Defendants~~Jump Trading and Virtu, directly or through an intermediary, operate ~~or use~~one or more servers ~~in~~nor other equipment at the CME Group Data Center in Aurora, Illinois~~.~~

~~b.~~ ~~;~~[4] at data centers in Chicago, Illinois, including the CH4 Data Center and the CME (collectively, "Cermak Road Data Centers"); at the NYSE Data Center in Mahwah, New Jersey; at data centers in Secaucus, New Jersey, including the NY2 Data Center, the NY4 Data Center,

---

[4] CME Group, Inc. ("CME Group") operates CME, CBOT, NYMEX, and COMEX. William Shepard (labeled "4" in Fig. 3) serves on the Board of Directors of the CME Group. Shepard also owns an interest in Jump Trading. Saijel Kishan & Matthew Leising, *Don't Tell Anybody About This Story on HFT Power Jump Trading*, Bloomberg (July 23, 2014), https://www.bloomberg.com/news/articles/2014-07-23/don-t-tell-anybody-about-this-story-on-hft-power-jump-trading.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

and the NY5 When a price change occurs in the E-Mini (managed by servers in the CME Group Data Center), Defendants' servers inside the CME Group Data Center will detect the change faster than other traders' servers that are not co-located in the data center because there are only a few meters of physical separation between Defendants' servers and the servers that manage the E-Mini.

c. Defendants' servers will send a signal to one of their servers at another location that manages a financial instrument that pairs with the E-Mini, such as the FDAX.

d. In this example, Defendants' servers in the CME Group Data Center will send a shortwave trading signal to Defendants' servers in the Deutsche Börse's FR2 Data Center in Frankfurt, Germany, where the FDAX is managed.

e. Because the FDAX is correlated to the price of the E-Mini, when the E-Mini drops in price, Defendants know that the FDAX will likely adjust downward, and they in turn want to sell the FDAX before other traders receive the E-Mini's drop information and the imminent FDAX drop. After the FDAX drops in price, the Defendants can purchase the FDAX at the lower price to capture a profit.

f. With this information and infrastructure, Defendants can use their Experimental Licenses to transmit that trading signal from Illinois to Germany to initiate the sale and buy orders faster than any other trader can legally do via optical fiber and microwave networks alone or a network that includes shortwave transmitters operated under a Commercial License.

87. Pursuant to the example above, Defendants will transmit the trading signal knowing that the FDAX is likely to adjust. That signal starts at Defendants' server inside the CME Group Data Center and travels to a microwave link just outside the building where it will be transmitted via microwave until it arrives at Defendants' Elburn, Illinois shortwave transmitter station,

*[Different first page setting changed from on in original to off in modified.].*

35

which is operated under an Experimental License. The Elburn shortwave transmitter then sends the trading signal to Germany. When it arrives, the signal will be received by a shortwave receiving station and then sent via microwave to Defendants' server in Deutsche Börse's FR2 Data Center in Germany. That server will then send the buy and sell orders to the server that manages the FDAX, which is also housed in the same FR2 Data Center. Data Center (collectively, "Secaucus Data Centers"); and at the NY11 Data Center in New Jersey.

88. In this example, Defendants can sell the FDAX and avoid a loss and position themselves for profit because Defendants' trade signal to sell the FDAX arrives at the Deutsche Börse and is executed before other traders' signals to sell the FDAX over other networks even arrive. Once the other traders' signals to sell arrive at Deutsche Börse, the market catches up, and the price of the FDAX begins to drop. Defendants can then unwind the trade for a profit by purchasing the FDAX at the lower market price. Thus, Defendants beat the market—avoiding a loss and making a profit—through the low latency afforded by their unlawful use of an Experimental License to operate the Elburn transmitter.

89. Defendants have constructed a worldwide network of optical fiber, microwave transmitters, and shortwave transmitters (including U.S. transmitters operated unlawfully under Defendants' Experimental Licenses) to, among other things, leverage the speed of shortwave transmissions to profit from latency arbitrage trading. Through their network, Defendants trade financial instruments on exchanges across the world, including NASDAQ, ICE, CME, CBOT, NYMEX, COMEX, NYSE, CBOE, BATS, BZX, BYX, Chi-X, LSE, Deutsche Börse, JPX, TSE, OSE, TOCOM, and B3.

Defendants' Trading Infrastructure: Illinois

*[Different first page setting changed from on in original to off in modified.].*

55. ~~90.~~Jump Trading and Virtu, directly or through an intermediary, <u>also</u> operate one or more servers or other equipment at the ~~CME Group Data Center, located at 2905 Diehl Road, Aurora, Illinois 60502.  Trading exchanges hosted at this data center include the CME, CBOT, NYMEX, and COMEX.[9]~~<u>LD4, LD5, or LD6 Data Centers in the United Kingdom; at the LSEG Data Center Docklands in the United Kingdom; at the NYSE Euronext Data Center in the United Kingdom; at the FR2 Data Center in Germany; at the Japan Exchange Group's data centers, including the OSE data center, in Japan; and at the B3 Data Center in Brazil.</u>

56. <u>New Line Networks, LLC ("NLN"), a subsidiary of Virtu through NLN Holdings, LLC ("NLN Holdings"), maintains one or more microwave transmission links that transmit data to and from the CME Group Data Center; the Cermak Road Data Centers; the NYSE Data Center; the Secaucus Data Centers; and the NY11 Data Center.  NLN, directly or through an intermediary, also operates a series of microwave transmission links that relay trading signals between Illinois and New York/New Jersey; between Illinois, New Jersey, and Canada; and between the British Isles and London.  Exs. 6-A–9-B, 13-A–34-B, 36-A–40-B, 49-A, 49-B.</u>

~~91. NLN maintains one or more microwave transmission links that transmit data to and from the CME Group Data Center, including transmission links with FCC call signs WRBQ634, WQYE600, WQTW361, WQWG200, and WQZD637.  Exs. 6–9, 49.~~

~~92.  10Band maintains one or more microwave transmission links that transmit data to and from the CME Group Data Center, including the transmission links with FCC call signs WRDY580, WRFA817, and WRJC512.  Exs. 10–12.~~

---

~~[9] CME Group, Inc. ("CME Group") operates CME, CBOT, NYMEX, and COMEX.  William Shepard (labeled "4" in Fig. 4) serves on the Board of Directors of the CME Group.  Shepard also owns an interest in Jump Trading.  Saijel Kishan & Matthew Leising, *Don't Tell Anybody About This Story on HFT Power Jump Trading*, Bloomberg (July 23, 2014), https://www.bloomberg.com/news/articles/2014-07-23/don-t-tell-anybody-about-this-story-on-hft-power-jump-trading.~~

*[Different first page setting changed from on in original to off in modified.].*

~~93.  Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the data centers located at 350 East Cermak Road, Chicago, Illinois 60616, including the CH4 Data Center and the CME (collectively, "Cermak Road Data Centers").  Trading exchanges hosted at these data centers include the NASDAQ, ICE, CME, CBOT, NYMEX, and COMEX.~~

57.     ~~94. NLN~~10Band maintains one or more microwave transmission links that transmit data to and from the ~~Cermak Road~~CME Group Data Center and the Secaucus Data Centers~~, including the transmission links with FCC call sign WQPE497 and WQZD637.  Exs. 13, 49.~~

~~95. ;~~ ~~10Band operates~~ two shortwave transmission stations in Elburn, Illinois that transmit trading signals to Europe, Japan, and Washington ~~with FCC call sign WI2XNX.~~

~~96. ;~~ ~~10Band operates~~ one or more shortwave receiving stations in Elburn, Illinois that receive trading signals from Europe ~~(48 kHz)~~, the British Isles ~~(48 kHz)~~, South America ~~(24 kHz)~~, and Asia ~~(12 kHz)~~.

~~97. ; NLN operates a series of microwave transmission links that relay trading signals between Illinois and New York/New Jersey.  These include links with FCC call signs WQWX694, WQWX695, WQXF336, WQUL202, WQYX983, WQPP781, WQUL201, WQYT727, WQXK971, WQWF975, WQPI470, WQWF990, WQWF989, WQPZ816, and WQZD637.  Exs. 14-27, 49.~~

~~98. NLN, directly or through an intermediary, operates a series of microwave transmission links that relay trading signals between Illinois, New Jersey, and Canada.  These include links with FCC call signs WROY220, WQQE624, and WQZD637.  Exs. 28-29, 49.~~

*[Different first page setting changed from on in original to off in modified.].*

99. Defendants' facilities in Illinois are connected, through optical fiber or microwave intermediaries, to facilities in Washington.

Defendants' Trading Infrastructure: New York/New Jersey

100. Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the NYSE Data Center, located at 1700 MacArthur Boulevard, Mahwah, New Jersey 07430. Trading exchanges hosted at this data center include the NYSE.

101. NLN maintains one or more microwave transmission links that transmit data to and from the NYSE Data Center, including the transmission links with FCC call signs WQYZ771, WRZQ793, and WQZD637. Exs. 30–31, 49.

102. Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at a series of affiliated data centers in Secaucus, New Jersey, including the NY2 Data Center, located at 755 Secaucus Road, Secaucus, New Jersey 07094; the NY4 Data Center, located at 275 Hartz Way, Secaucus, New Jersey 07094; and the NY5 Data Center, located at 800 Secaucus Road, Secaucus, New Jersey 07094 (collectively, "Secaucus Data Centers"). Trading exchanges hosted at these data centers include the NYSE, CBOE, BZX, BYX, and BATS.

103. NLN maintains one or more microwave transmission links that transmit data to and from the Secaucus Data Centers, including the transmission links with FCC call signs WQVP918, WQZD536, WRCR823, and WQZD637. Exs. 32–34, 49.

104. 10Band maintains one or more microwave transmission links that transmit data to and from the Secaucus Data Centers, including the transmission links with FCC call sign WRFL965. Ex. 35.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

105. Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the NY11 Data Center, located at 1400 Federal Boulevard Carteret, New Jersey 07008.  Trading exchanges hosted at this data center include the NASDAQ.

106. NLN maintains one or more microwave transmission links that transmit data to and from the NY11 Data Center, including the transmission links with FCC call signs WQWH561, WQWE641, WQXF496, WQXM804, WRPF418, and WQZD637.  Exs. 36–40, 49.

107. 10Band operates a shortwave transmission station in Wayne, New Jersey that transmits trading signals to Europe with FCC call sign WI2XNX.

108. ; and Defendants' facilities in New Jersey are connected, through optical fiber or microwave intermediaries, to a cross-ocean optical fiber network over which they transmit signals to Europe and Brazil.

Defendants' Trading Infrastructure: Washington

109. 10Band operates a shortwave transmission station in Snohomish, Washington that transmits trading signals to Asia with FCC call sign WI2XNX.  Exs. 10-A–12-B, 35-A, 35-B.

58.        110. 10Band operates also maintains one or more shortwave receiving stations in Washington to accept incoming shortwave transmissions from transmitters in Illinois and Canada.  For example, 10Band operates a shortwave receiving station at or near 47°5'12.6"N 121°55'21.3"W  a location near Lake Roesiger, Washington.

111. and a Defendants' facilities in Washington are connected, through optical fiber or microwave intermediaries, to a cross-ocean optical fiber network over which they transmit signals to Japan.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

Defendants' Trading Infrastructure: United Kingdom

112. 10Band has a shortwave reception loop array station located in Burchett's Green, Maidenhead, SL6 6QR in the United Kingdom. This location that receives shortwave signals from Defendants' shortwave transmission stations in New Jersey, Illinois, and Canada. Exs. 10-A–12-B.

113. Defendants operate a shortwave transmission station in the British Isles that transmits trading signals to the United States (48 kHz).

114. NLN operates a series of microwave links that relay signals between that location and London, including providing transmission links to the LD4, LD5, and LD6 Data Centers, the LSEG Data Center Docklands, and the NYSE Data Center. These microwave links transmit on over 200 microwave licenses issued to NLN throughout Europe.

115. Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the LD4, LD5, or LD6 Data Centers, located at 2 Buckingham Avenue, Slough Trading Estate Slough, United Kingdom, SL1 4NB. Trading exchanges hosted at these data centers include the BATS Chi-X.

116. Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the LSEG Data Center Docklands, located at Coriander Avenue, London E14 2AA. Trading exchanges hosted at this data center include the LSE.

117. Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the NYSE Euronext Data Center, located at 20 Cranes Farm Road Basildon SS14 3JD. Trading exchanges hosted at this data center include the NYSE.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

Defendants' Trading Infrastructure: Continental Europe

118. Defendants receive shortwave signals in Germany, either directly or when relayed through microwave transmissions from shortwave receiver sites in other locations in Europe, from Defendants' shortwave transmission stations in New Jersey, Illinois, and Canada.

119. Defendants operate one or more shortwave transmission stations in continental Europe that transmit trading signals to the United States (48 kHz).

120. NLN operates a series of microwave links that relay those signals to and from Frankfurt, including providing transmission links to the FR2 Data Center.

121. Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the FR2 Data Center, located at Kruppstraße 121, 60388 Frankfurt am Main, Germany. Trading exchanges hosted at this data center include the Deutsche Börse.

Defendants' Trading Infrastructure: Japan

122. Defendants, directly or through an intermediary, operate a shortwave receiving site near 1342-6 Chikurachō Kawato, Minamiboso, Chiba 295-0014, Japan. This location receives shortwave signals from Defendants' shortwave stations in Washington and Canada.

123. Defendants operate one or more shortwave transmission stations in Japan that transmit trading signals to the United States (12 kHz).

124. Defendants, directly or through an intermediary, operate a series of microwave links that relay signals between that location and Tokyo, including providing transmission links to one or more Japan Exchange Group Data Centers.

125. Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at one or more of the Japan Exchange Group's data centers, including

*[Different first page setting changed from on in original to off in modified.].*

42

*[Different first page setting changed from on in original to off in modified.].*

the OSE data center, located in Koto-ku, Tokyo, Japan. Trading exchanges hosted at this data center include the TSE, OSE, and TOCOM.

Defendants' Trading Infrastructure: Brazil

126. Defendants, directly or through an intermediary, operate a shortwave receiving site near Bairro do Castanho, Jundiaí—State of São Paulo, Brazil. This location receives shortwave signals from Defendants' shortwave stations in Canada.

127. Defendants operate one or more shortwave transmission stations in Brazil that transmit trading signals to the United States (24 kHz).

128. Defendants, directly or through an intermediary, operate a series of microwave links that relay signals between that location to Sao Paolo, including providing transmission links to the B3 Data Center.

129. Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the B3 Data Center, located at R. Ricardo Prudente de Aquino, 85—Res. Tambore III, Santana de Parnaíba—SP, Brazil. Trading exchanges hosted at this data center include the B3.

Defendants' Trading Infrastructure: Canada

130. To expand the scope of their scheme, Defendants constructed or had constructed and operated and continue to operate a shortwave transmission station in Ontario, Canada.

131. The Canadian government issues HF Developmental Licenses, which are comparable to U.S. Experimental Licenses. Similar to U.S. Experimental Licenses, Canadian HF Developmental Licenses are issued for the purpose of testing new wireless technologies and provide their licensees with advantages that can reduce latency and cost. *See Developmental License Playbook*, Gov't of Can. (Sept. 28, 2022),

*[Different first page setting changed from on in original to off in modified.].*

43

*[Different first page setting changed from on in original to off in modified.].*

~~https://ised-isde.canada.ca/site/spectrum management telecommunications/en/licences and certif~~

~~icates/developmental-licence-playbook.~~

59.    ~~132.~~ In March 2021, Defendants~~' enterprise~~ formed Canadian company 1291956 B.C. Unlimited Liability Company, which does business as Green Wave Radio. ~~Although Defendants have attempted to hide their relationship with Green Wave Radio,~~ Jump Trading's affiliate company Jump Operations, LLC ("Jump Operations") registered Green Wave Radio's website address, greenwaveradio.net, on July 20, 2023. ~~*Greenwaveradio.net*, Whois, https://www.whois.com/whois/greenwaveradio.net (last accessed Sept. 27, 2024)~~ Ex. 50. Jump Operations shares an address with Jump Trading ~~at 600 West Chicago Avenue Suite 600,~~ in Chicago, Illinois ~~60654~~, and ~~Matthew~~ Hinerfeld lists that same address as his address with the California State Bar.[10] *See Attorney Profile, Matthew Ben Hinerfeld #160961, State Bar of Cal. (last accessed Feb. 13, 2025), https://apps.calbar.ca.gov/attorney/Licensee/Detail/160961.*

60.    ~~133.~~ Green Wave Radio currently transmits shortwave trading signals from Defendants' shortwave transmission station in Ontario, Canada under a Canadian ~~HF~~ high-frequency developmental license, which is similar to U.S. Experimental Licenses. *See Developmental License* ~~with call sign CGA984~~ *Playbook, Gov't of Can. (Sept. 27, 2022),* https://ised-isde.canada.ca/site/spectrum-management-telecommunications/en/licences-and-certif icates/developmental-licence-playbook. This link transmits shortwave signals to Defendants' receiving stations in the United Kingdom, Germany, Japan, Brazil, and Washington.

61.    ~~134. Defendants went to considerable lengths to obfuscate the connection between Green Wave Radio in Canada and 10Band in the United States.~~

---

[10] ~~*See Attorney Profile, Matthew Ben Hinerfeld #160961, State Bar of Cal. (Sept. 2024), https://apps.calbar.ca.gov/attorney/Licensee/Detail/160961.*~~

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

~~Because the relationship between their respective broadcasting networks could have alerted U.S. authorities to Defendants' scheme to trade on networks which they claimed were merely experimental,~~ Defendants constructed a hidden intermediary to connect their U.S. and Canadian networks rather than connecting them openly~~.~~

~~135.~~ in their name.  For example, Defendants created a company called RuralConnect, LLC ("RuralConnect"), which ~~masquerades~~acts as a local internet service provider and serves as an intermediary to Defendants.   RuralConnect owns a microwave path from Green Wave Radio's transmitter in Ontario to a field near Dunbridge, Ohio~~, operating with FCC call sign WROX998.  Ex.~~ *See* Exs. 41-A, 41-B.  Figure 6̶2 below shows an aerial photograph of that link~~, labelled WROX998.~~



**Figure 6̶2: Hidden Connection Between Defendants' U.S. and Canadian Networks**

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

62. ~~136.~~ NLN operates a microwave link ~~with FCC call sign WQQE624, Ex. 29, which is~~ located across the street from RuralConnect's microwave link ~~near Dunbridge,~~ in Ohio~~.~~ *See* Exs. 29-A, 29-B.  There are no FCC licenses for microwave links between the NLN link and the RuralConnect link across the street.  ~~Figure 6 shows an aerial photograph of that link, labelled WQQE624.~~

63. ~~137.~~ Instead of connecting these two microwave network links through ~~an~~ a FCC license~~, which might have alerted U.S. regulators~~, Defendants built or caused to be built a hidden optical fiber cable that travels under a private driveway to connect the RuralConnect microwave link to the NLN microwave link.  ~~Figure 6 shows an aerial photograph of the hidden optical fiber's path between the link labelled WROX998 and the link labelled WQQE624.~~

~~138.~~ Fig. 2.  This hidden optical fiber cable connects Defendants' shortwave transmission station in Ontario, Canada to Defendants' ~~Worldwide~~ Commercial Trading Network.

**ii.  ~~Defendants'~~ The HFT Enterprise's Experimental Licenses**

*Elburn I Experimental License*

64. ~~139. Defendants~~ The HFT Enterprise applied for ~~their~~ its first Experimental License on September 21, 2016, under FCC Experimental Licensing System File Number 0089-EX-CN-2016 for a 60-month term at a station location in Elburn, Illinois ("Elburn I Experimental License Application").  Ex. 42-A.

65. ~~140.~~ The Elburn I Experimental License Application listed 10Band as the "[c]orporat[e]" applicant.  Ex. 42-A.  Ronald Riley signed the application as an "[a]uthorized employee" of 10Band.  ~~The application identified 10Band as a "[c]orporat[e]" applicant.  The application also directed mail to a Duane Morris LLP office and email correspondence to a~~

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

~~Duane Morris LLP email domain~~Ex. 42-A.  10Band requested that the Elburn I Experimental License Application be "withheld from public inspection" because, according to 10Band, disclosure of 10Band's narrative statement of its proposed research and experimentation supposedly "would cause significant commercial, economic, and competitive harm to 10Band and its affiliates." Ex. 42-B.  The FCC granted 10Band's request for confidentiality.

66.     ~~141.~~The FCC granted the Elburn I Experimental License with an effective date of November 10, 2016 and an expiration date of November 1, 2021 ("Elburn I Experimental License"). Ex. 42-C.

67.     ~~142.~~On August 31, 2021, 10Band submitted a renewal application for the Elburn I Experimental License under FCC Experimental Licensing System File Number 0078-EX-TC-2020 ("Elburn I Experimental License Renewal I"). Ex. 42-D.  Hinerfeld—an "[a]uthorized [r]epresentative" of the 10Band "[c]orporation"—signed the Elburn I Experimental License Renewal I.  ~~The application directed mail to a 10Band office but all email correspondence to a NLN email domain~~Ex. 42-D.  The FCC granted the Elburn I Experimental License Renewal I, extending the expiration date ~~of the Elburn I Experimental License by 2 years~~ to November 1, 2023., while also specifying that the operation was "not permitted for market trial[s] or stock trading."  Ex. 42-E.  10Band requested that the Elburn I Experimental License Renewal I be "withheld from public inspection" ~~because, according to 10Band, disclosure of 10Band's narrative statement of its proposed research and experimentation "would cause significant commercial, economic, and competitive harm to 10Band and its affiliates." Ex. 42-F.~~for the same reason as its earlier application.  Ex. 42-F.  The FCC granted 10Band's request for confidentiality.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

68. ~~143.~~ On August 8, 2023, 10Band submitted a~~another~~ renewal application for the Elburn I Experimental License under FCC Experimental Licensing System File Number 0277-EX-CM-2022 ("Elburn I Experimental License Renewal II"). Ex. 42-G. Hinerfeld—an "[a]uthorized [r]epresentative" of the 10Band "[c]orporation"—signed the renewal application. ~~The application directed mail to a 10Band office but all email correspondence to a NLN email domain~~Ex. 42-G. The FCC granted the Elburn I Experimental License Renewal II, extending the expiration date ~~of the Elburn I Experimental License by an additional 2 years~~ to November 1, 2025. Ex. 42-H.

69. ~~144.~~ 10Band submitted several other applications for modifications to the Elburn I Experimental License that were all granted.

    a. The modification application filed on May 1, 2020, under FCC Experimental Licensing System File Number 0078-EX-TC-2020 listed 10Band as the applicant. Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band. Ex. 42-I. The application identified 10Band as an "[o]ther" applicant. ~~It directed mail to a 10Band office but all email correspondence to a NLN email domain~~Ex. 42-I.

    b. The modification application filed on October 19, 2021, under FCC Experimental Licensing System File Number 0234-EX-CM-2021 listed 10Band as the applicant. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band. Ex. 42-J. The application identified 10Band as a~~the~~ "[c]orporate" applicant. ~~It directed mail to a 10Band office but all email correspondence to a NLN email domain~~Ex. 42-J.

*[Different first page setting changed from on in original to off in modified.].*

> c. The modification application filed on November 25, 2022, under FCC Experimental Licensing System File Number 0277-EX-CM-2022 listed 10Band as the applicant.  Hinerfeld signed the application as an "[a]uthorized employee" of 10Band.  Ex. 42-K.  The application identified 10Band as a~~the~~ "[c]orporate" applicant.  ~~It directed mail to a 10Band office but all email correspondence to a NLN email domain~~Ex. 42-K.

~~145. In each license application, modification application, and renewal application for the Elburn I Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge.   In each license application, modification application, and renewal application for the Elburn I Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were considered material representations.  In each license application, modification application, and renewal application for the Elburn I Experimental License, 10Band or Hinerfeld acknowledged to the U.S. government that willful false statements made in those applications were punishable by fine, imprisonment, license revocation, and license forfeiture.  *See* Fig. 7.~~

*[Different first page setting changed from on in original to off in modified.].*

(Deleted) ERTIFIES THAT:

a. Copies of the FCC Rule Parts 2 and 5 are on hand; and
b. Adequate financial appropriations have been made to carry on the program of experimentation which will be conducted by qualified personnel; and
c. All operations will be on an experimental basis in accordance with Part 5 and other applicable rules, and will be conducted in such a manner and at such a time as to preclude harmful interference to any authorized station; and
d. Grant of the authorization requested herein will not be construed as a finding on the part of the Commission:
    1. that the frequencies and other technical parameters specified in the authorization are the best suited for the proposed program of experimentation, and
    2. that the applicant will be authorized to operate on any basis other than experimental, and
    3. that the Comission is obligated by the results of the experimental program to make provision in its rules including its table of frequency allocations for applicant's type of operation on a regularly licensed basis.

THE APPLICANT FURTHER CERTIFIES THAT:

e. All the statements in the application and attached exhibits are true, complete and correct to the best of the applicant's knowledge; and
f. The applicant is willing to finance and conduct the experimental program with full knowledge and understanding of the above limitations; and
g. The applicant waives any claim to the use of any particular frequency or of the electromagnetic spectrum as against the regulatory power of the USA.

Name of Applicant: 10Band LLC
Signature (Authorized person filing form): Ronald Riley
Signature Date (Authorized person filing form): 09/21/2016
Title of Person Signing Application: Authorized Signatory
Classification: Authorized employee

WILLFUL FALSE STATEMENTS MADE ON THIS FORM ARE PUNISHABLE BY FINE AND/OR IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001), AND/OR REVOCATION OF ANY STATION LICENSE OR CONSTRUCTION PERMIT (U.S. CODE, TITLE 47, SECTION 312(A)(1)), AND/OR FORFEITURE (U.S. CODE, TITLE 47, SECTION 503).

**Figure 7: Exemplary Certification Excerpts from Exhibit 42-A**

146. 10Band or Hinerfeld willfully made at least the following material misrepresentations, *infra* ¶¶ 172–180, with respect to the Elburn I Experimental License:

a. Each license application and modification application falsely certified that "[a]ll operations" under Defendants' Experimental Licenses would "be on an experimental basis." 10Band and Hinerfeld knew at the time of the certifications that 10Band had operated or would soon thereafter operate a shortwave transmitter under the Elburn I Experimental License for Commercial Trading by the Jump Defendants and Virtu. In other words, 10Band and Hinerfeld knew at the time of the certifications that 10Band would be operating a shortwave transmitter under the Elburn I Experimental License for purposes other than experimentation in contravention of the certification.

b. Each license application and modification application falsely stated that equipment used under Defendants' Experimental Licenses was not capable of station identification.

*[Different first page setting changed from on in original to off in modified.].*

50

*[Different first page setting changed from on in original to off in modified.].*

~~10Band and Hinerfeld knew at the time of the certifications that 10Band's equipment was capable of station identification.~~

~~c. Each renewal application falsely certified that the "[n]ature" of Defendants' activities under Defendants' Experimental Licenses were "experimental." 10Band and Hinerfeld knew at the time of the certifications that 10Band had operated or would soon thereafter operate a shortwave transmitter under the Elburn I Experimental License for Commercial Trading by the Jump Defendants and Virtu. In other words, 10Band and Hinerfeld knew at the time of the certifications that 10Band would be operating a shortwave transmitter under the Elburn I Experimental License for purposes other than experimentation in contravention of the certification.~~

~~*Elburn II Experimental License*~~

70. ~~147. Defendants~~The HFT Enterprise applied for another Experimental License on January 22, 2020~~,~~ under FCC Experimental Licensing System File Number 0074-EX-CN-2020 for a ~~24~~60-month term at a station location in Elburn, Illinois ("Elburn II Experimental License Application"). Ex. 43-A.

71. ~~148.~~ The Elburn II Experimental License Application listed 10Band as the "[c]orporat[e]" applicant. Ex. 43-A. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band. ~~The application identified 10Band as a "[c]orporat[e]" applicant. The application also directed mail to a Duane Morris LLP office and email correspondence to a Duane Morris LLP email domain~~Ex. 43-A. 10Band requested that the Elburn II Experimental License Application be "withheld from public inspection" ~~because, according to 10Band, disclosure of 10Band's narrative statement of its proposed research and experimentation "would cause significant commercial, economic, and competitive harm to 10Band and its affiliates." Ex.~~

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

43 B.for the same reason as its earlier applications.  Ex. 43-B.  The FCC granted 10Band's request for confidentiality.

72.     149. The FCC granted the Elburn II Experimental License with an effective date of February 12, 2020, and an expiration date of February 1, 2022 ("Elburn II Experimental License").  Ex. 43-C.

73.     150. 10Band filed a modification application for the Elburn II Experimental License on May 1, 2020, under FCC Experimental Licensing System File Number 0079-EX-TC-2020.  Ex. 43-D.  The modification application listed 10Band as the applicant.  Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band.  Ex. 43-D.  The application identified 10Band as an "[o]ther" applicant.  TheEx. 43-D.  The FCC granted 10Band's application also directed mail to a 10Band office but all email correspondence to a NLN email domain.

151. In each license application and modification application for the Elburn II Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge.  In each license application and modification application for the Elburn II Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were considered material representations.  In each license application and modification application for the Elburn II Experimental License, 10Band or Hinerfeld acknowledged to the U.S. government that willful false statements made in those applications were punishable by fine, imprisonment, license revocation, and license forfeiture.

152. 10Band or Hinerfeld willfully made at least the following material misrepresentations, *infra* ¶¶ 172–180, with respect to the Elburn II Experimental License:

*[Different first page setting changed from on in original to off in modified.].*

52

*[Different first page setting changed from on in original to off in modified.].*

~~a. Each license application and modification application falsely certified that "[a]ll operations" under Defendants' Experimental Licenses would "be on an experimental basis." 10Band and Hinerfeld knew at the time of the certifications that 10Band had operated or would soon thereafter operate a shortwave transmitter under the Elburn II Experimental License for Commercial Trading by the Jump Defendants and Virtu. In other words, 10Band and Hinerfeld knew at the time of the certifications that 10Band would be operating a shortwave transmitter under the Elburn II Experimental License for purposes other than experimentation in contravention of the certification.~~

~~b. Each license application and modification application falsely stated that equipment used under Defendants' Experimental Licenses was not capable of station identification. 10Band and Hinerfeld knew at the time of the certifications that 10Band's equipment was capable of station identification.~~

*~~Wayne Experimental License~~*

<u>74.</u> ~~153. Defendants~~<u>The HFT Enterprise</u> applied for another Experimental License on January 22, 2020<u>,</u> under FCC Experimental Licensing System File Number 0075-EX-CN-2020 for a ~~24~~<u>60</u>-month term at a station location in Wayne, New Jersey ("Wayne Experimental License Application"). Ex. 44-A.

<u>75.</u> ~~154.~~ The Wayne Experimental License Application listed 10Band as the <u>"[c]orporat[e]"</u> applicant. <u>44-A</u>. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band. ~~The application identified 10Band as a "[c]orporat[e]" applicant. The application also directed mail to a Duane Morris LLP office and email correspondence to a Duane Morris LLP email domain~~<u>Ex. 44-A</u>. 10Band requested that the Wayne Experimental License Application be "withheld from public inspection" ~~because, according to 10Band, disclosure of~~

*[Different first page setting changed from on in original to off in modified.].*

53

*[Different first page setting changed from on in original to off in modified.].*

~~10Band's narrative statement of its proposed research and experimentation "would cause significant commercial, economic, and competitive harm to 10Band and its affiliates." Ex. 44-B.~~for the same reason as its earlier applications.  Ex. 44-B.  The FCC granted 10Band's request for confidentiality.

76.     ~~155.~~The FCC granted the Wayne Experimental License with an effective date of February 14, 2020, and an expiration date of February 1, 2022 ("Wayne Experimental License"). Ex. 44-C.

77.     ~~156.~~10Band filed a modification application for the Wayne Experimental License on May 1, 2020, under FCC Experimental Licensing System File Number 0080-EX-TC-2020. Ex. 44-D.  The modification application listed 10Band as the applicant.  Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band.  Ex. 44-D.  The application identified 10Band as an "[o]ther" applicant.  ~~The application also directed mail to a 10Band office but all email correspondence to a NLN email domain~~Ex. 44-D.  The FCC granted 10Band's modification request.

~~157. In each license application and modification application for the Wayne Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge.  In each license application and modification application for the Wayne Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were considered material representations.  In each license application and modification application for the Wayne Experimental License, 10Band or Hinerfeld acknowledged to the U.S. government that willful false statements made in those applications were punishable by fine, imprisonment, license revocation, and license forfeiture.~~

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

158.   10Band or Hinerfeld willfully made at least the following material misrepresentations, *infra* ¶¶ 172–180, with respect to the Wayne Experimental License:

a. Each license application and modification application falsely certified that "[a]ll operations" under Defendants' Experimental Licenses would "be on an experimental basis." 10Band and Hinerfeld knew at the time of the certifications that 10Band had operated or would soon thereafter operate a shortwave transmitter under the Wayne Experimental License for Commercial Trading by the Jump Defendants and Virtu.  In other words, 10Band and Hinerfeld knew at the time of the certifications that 10Band would be operating a shortwave transmitter under the Wayne Experimental License for purposes other than experimentation in contravention of the certification.

b. Each license application and modification application falsely stated that equipment used under Defendants' Experimental Licenses was not capable of station identification. 10Band and Hinerfeld knew at the time of the certifications that 10Band's equipment was capable of station identification.

*Everett Experimental License*

78.   159. DefendantsThe HFT Enterprise applied for another Experimental License on January 22, 2020, under FCC Experimental Licensing System File Number 0077-EX-CN-2020 for a 2460-month term at a station location in Everett, Washington ("Everett Experimental License Application").  Ex. 45-A.

79.   160.  The Everett Experimental License Application listed 10Band as the "[c]orporat[e]" applicant.  Hinerfeld signed the application as an "[a]uthorized employee" of 10Band.  The application identified 10Band as a "[c]orporat[e]" applicant.  The application also directed mail to a Duane Morris LLP office and email correspondence to a Duane Morris LLP

*[Different first page setting changed from on in original to off in modified.].*

~~email domain~~Ex. 45-A.  10Band requested that the Everett Experimental License Application be "withheld from public inspection" ~~because, according to 10Band, disclosure of 10Band's narrative statement of its proposed research and experimentation "would cause significant commercial, economic, and competitive harm to 10Band and its affiliates." Ex. 45 B.~~for the same reason as its earlier applications.  Ex. 45-B.  The FCC granted 10Band's request for confidentiality.

80.    ~~161.~~The FCC granted the Everett Experimental License with an effective date of February 14, 2020, and an expiration date of February 1, 2022 ("Everett Experimental License"). Ex. 45-C.

81.    ~~162.~~10Band filed a modification application for the Everett Experimental License on May 1, 2020, under FCC Experimental Licensing System File Number 0081-EX-TC-2020.  Ex. 45-D.  The modification application listed 10Band as the applicant. Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band.  Ex. 45-D.  The application identified 10Band as an "[o]ther" applicant.  ~~The application also directed mail to a 10Band office but all email correspondence to a NLN email domain~~Ex. 45-D.  The FCC granted 10Band's modification request.

~~163. In each license application and modification application for the Everett Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge.    In each license application and modification application for the Everett Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were considered material representations.  In each license application and modification application for the Everett Experimental License, 10Band or Hinerfeld~~

*[Different first page setting changed from on in original to off in modified.].*

acknowledged to the U.S. government that willful false statements made in those applications were punishable by fine, imprisonment, license revocation, and license forfeiture.

164. 10Band or Hinerfeld willfully made at least the following material misrepresentations, *infra* ¶¶ 172–180, with respect to the Everett Experimental License:

a. Each license application and modification application falsely certified that "[a]ll operations" under Defendants' Experimental Licenses would "be on an experimental basis." 10Band and Hinerfeld knew at the time of the certifications that 10Band had operated or would soon thereafter operate a shortwave transmitter under the Everett Experimental License for Commercial Trading by the Jump Defendants and Virtu. In other words, 10Band and Hinerfeld knew at the time of the certifications that 10Band would be operating a shortwave transmitter under the Everett Experimental License for purposes other than experimentation in contravention of the certification.

b. Each license application and modification application falsely stated that equipment used under Defendants' Experimental Licenses was not capable of station identification. 10Band and Hinerfeld knew at the time of the certifications that 10Band's equipment was capable of station identification.

*Lynnwood Experimental License*

82. 165. On or about March 2020, NLN acquired substantially all of Western Maritime Broadcast LLC ("Western Maritime"), including Western Maritime's Experimental License, which was initially granted under FCC Experimental Licensing System File Number 0885-EX-CN-2018 for a 24-month term at a station location in Lynnwood, Washington with an effective date of February 8, 20202019, and an expiration date of February 1, 2021 ("Lynnwood

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

Experimental License"). Ex. 46-A. On or about March 2020, NLN assigned its rights to the Lynnwood Experimental License to ~~10Band~~the HFT Enterprise. *See* Exs. 5, 46-B.

83.    ~~166.~~10Band filed an application for consent of assignment of the Lynnwood Experimental License on March 6, 2020. Ex. 46-B. The application listed 10Band as the applicant-assignee. Hinerfeld signed the application as an "[o]fficer" of 10Band. Ex. 46-B.

84.    ~~167.~~The FCC granted the assignment of the Lynnwood Experimental License to 10Band effective April 3, 2020. Ex. 46-C.

85.    ~~168.~~10Band submitted several other applications for modifications to the Lynnwood Experimental License that were all granted.

  a.  The modification application filed on April 17, 2020, under FCC Experimental Licensing System File Number ~~0005~~0094-~~EX AL~~EX-CM-2020 listed 10Band as the applicant. Hinerfeld signed the application as an "[o]ffice[r]" of 10Band. Ex. 46-D. The application identified 10Band as ~~a~~the "[c]orporat[e]" applicant. Ex. 46-D. The application ~~also directed mail to a Duane Morris LLP office and email correspondence to a Duane Morris LLP email domain.~~was granted with the special conditions that the operation was "for experimental purposes only," that "provision of services [was] not permitted," and that no "market trial or stock trading" was permitted. Ex. 46-G.

  b.  The modification application filed on November 25, 2020, under FCC Experimental Licensing System File Number 0268-EX-CM-2020 listed 10Band as the applicant. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band. Ex. 46-E. The application identified 10Band as ~~a~~the "[c]orporat[e]" applicant. Ex. 46-E. The application ~~also directed mail to a Duane Morris LLP~~

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

office and email correspondence to a Duane Morris LLP email domain.was granted with the special conditions that the operation was "for experimental purposes only," that "provision of services [was] not permitted," and that no "market trial or stock trading" was permitted.  Ex. 46-H.

    c.   The modification application filed on December 8, 2020, under FCC Experimental Licensing System File Number 0118-EX-TC-2020 listed 10Band as the applicant.  Hinerfeld signed the application as an "[o]ffice[r]" of 10Band.  Ex. 46-F.  The application identified 10Band as an "[o]ther" applicant.  Ex. 46-F.  The application also directed mail to a 10Band office but all email correspondence to a NLN email domain.was granted with the special conditions that the operation was "for experimental purposes only," that "provision of services [was] not permitted," and that no "market trial or stock trading" was permitted.  Ex. 46-I.

169. In each consent of assignment application and modification application for the Lynnwood Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge.  In each consent of assignment application and modification application for the Lynnwood Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were considered material representations.  In each consent of assignment application and modification application for the Lynnwood Experimental License, 10Band or Hinerfeld acknowledged to the U.S. government that willful false statements made in those applications were punishable by fine, imprisonment, license revocation, and license forfeiture.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

170.   10Band   or   Hinerfeld   willfully   made   at   least   the   following   material misrepresentations, *infra* ¶¶ 172–180, with respect to the Lynnwood Experimental License:

a. Each consent of assignment application and modification application falsely certified that "[a]ll operations" under Defendants' Experimental Licenses would "be on an experimental basis." 10Band and Hinerfeld knew at the time of the certifications that 10Band had operated or would soon thereafter operate a shortwave transmitter under the Lynnwood Experimental License for Commercial Trading by the Jump Defendants and Virtu.  In other words, 10Band and Hinerfeld knew at the time of the certifications that 10Band would be operating a shortwave transmitter under the Lynnwood Experimental License for purposes other than experimentation in contravention of the certification.

b. Each modification application falsely stated that equipment used under Defendants' Experimental Licenses was not capable of station identification.  10Band and Hinerfeld knew at the time of the certifications that 10Band's equipment was capable of station identification.

## II.     DEFENDANTS' CONDUCT

### A.  Conducting Or Participating In A RICO Enterprise

#### i.   Defendants' Ordinary Business

86.     Figure 3 provides an overview of Defendants and their HFT Enterprise (10Band), including the relationships between Defendants.[5]  10Band filed an ownership chart with the FCC that reflects many of the same relationships shown in Figure 3.  Ex. 2.

---

[5] Figure 3 represents a compilation of the information in Exhibit 1 (FINRA BrokerCheck Report for Jump Trading), Exhibit 2 (10Band Ownership Structure as Submitted to FCC), and Exhibit 3 (Declaration of John P. Madigan on Behalf of NLN Holdings as Submitted to FCC).

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

(Added)



**Figure 3: Overview of Defendants' HFT Enterprise**

87.     Defendants DiSomma (labeled "2" in Fig. 3), Gurinas (labeled "3" in Fig. 3), Hinerfeld (labeled "1" in Fig. 3), Madigan (labeled "16" in Fig. 3), Jump Trading (labeled "8" in Fig. 3), and Virtu (labeled "14" in Fig. 3) carry on functions and operations that are independent and separate from that of the HFT Enterprise (shown in a red box labeled "17" in Fig. 3).

88.     DiSomma and Gurinas founded Jump Trading in 1999.  They collectively own and operate Jump Trading through several subsidiaries including the DiSomma Trust and Gurinas Trust (respectively), Jump Financial, LLC ("Jump Financial") (labeled "6" in Fig. 3), and Jump Trading Holdings, LLC ("Jump Trading Holdings") (labeled "7" in Fig. 3).

89.     Jump Trading operates, directly or through an intermediary, computer servers inside the data centers where trading exchanges are managed and conducts trading activity, including Commercial Trading.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

90.     DiSomma and Gurinas own and control 40 percent of the HFT Enterprise.  Their interest in the HFT Enterprise is held through several subsidiaries including DiSomma Trust and Gurinas Trust (respectively), ECW Wireless, LLC ("ECW Wireless") (labeled "9" in Fig. 3), World Class Wireless, LLC ("World Class Wireless") (labeled "10" in Fig. 3), NLN Holdings (labeled "11" in Fig. 3), and NLN (labeled "12" in Fig. 3).

91.     Hinerfeld is a lawyer who is employed by Jump Trading as its general counsel. Hinerfeld also holds a position on the board of NLN Holdings, a parent entity of the HFT Enterprise.

92.     Madigan is employed by Jump Trading as a Technologist and Manager of Telecom Infrastructure.  Madigan also holds a position on the board of NLN Holdings, a parent entity of the HFT Enterprise.  Ex. 3.

93.     Virtu operates, directly or through an intermediary, computer servers inside the data centers where trading exchanges are managed and conducts trading activity, including Commercial Trading.

### ii. The HFT Enterprise

94.     10Band (labeled "13" in Fig. 3) forms an enterprise under 18 U.S.C. § 1961(4) for the purpose of building and operating an HFT network, including shortwave radio infrastructure.

95.     The HFT Enterprise's activities include applying for and operating the Elburn I, Elburn II, Wayne, Everett, and Lynnwood shortwave transmitters pursuant to 10Band's Experimental Licenses.  These activities started in 2016 and have continued to the present.

96.     The HFT Enterprise's HFT Network connects to Defendants' Commercial Trading Network, providing Defendants and the HFT Enterprise with access to a tranche of

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

various optical fiber, microwave, and shortwave links and infrastructure, both domestically and internationally.

97.    Defendants control 10Band.  For example, Hinerfeld and Madigan—employees of Jump Trading—have directed and operated 10Band's affairs, including both legal and technical operations.    Both  Hinerfeld  and  Madigan  have  held  themselves  out  as  representatives  or employees  of  10Band  and  have  signed  sworn  documents  on  10Band's  behalf.   *See infra* ¶¶ 104–115.  For example, Jump Trading, through Hinerfeld as its general counsel, directed and operated  10Band's  legal  operations,  including  Hinerfeld's  regular  engagement  with  and participation  in  the  preparation,  submission,  and  prosecution  of  the  HFT  Enterprise's  FCC filings for Experimental Licenses.  By way of another example, Jump Trading, through Madigan as  its  Technologist  and  Manager  of  Telecom  Infrastructure,  directed  and  operated  10Band's technical operations, as demonstrated by his regular engagement with and participation in the preparation,  submission,  and  prosecution  of  the  HFT  Enterprise's  FCC  filings  for  Experimental Licenses.  By way of another example, DiSomma and Gurinas, as owners of Jump Trading, direct  and  control  10Band's  operations  through  Jump  Trading  and  its  employees,  including Hinerfeld and Madigan.  By way of another example, DiSomma, Gurinas, and Virtu are owners of NLN Holdings and NLN, which direct and control 10Band's operations.  DiSomma, Gurinas, and Virtu directed members of NLN Holdings' board—including Hinerfeld and Madigan—to regularly engage with and participate in the preparation, submission, and prosecution of the HFT Enterprise's FCC filings for Experimental Licenses.  Many of 10Band's FCC applications direct mail to a physical 10Band address and email correspondence to an NLN email domain.  *See, e.g.*, Ex. 42-D.  Furthermore, NLN and 10Band are both registered in Illinois and maintain places of business at 600 West Chicago Avenue, Chicago, Illinois, albeit in different suites.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

98.     Madigan also has direct and indirect connections with Virtu.  For example, Madigan was registered as a broker with Virtu Americas LLC, a subsidiary of Virtu, from 2014 to 2017.  Exs. 52, 53 at 87.  This overlapped with the time period during which Madigan was an employee of KCG Americas LLC ("KCG") and predated when Virtu formally acquired KCG in 2017.  Exs. 52, 54 ¶ 29.  Madigan has retained connections with Virtu traders and trading desks to this day, along with retaining a broker's license for conducting Commercial Trading.

### iii.     Defendants' Association With The HFT Enterprise

99.     DiSomma, Gurinas, Hinerfeld, Madigan, Jump Trading, and Virtu direct, control, manage, and conduct the affairs of the HFT Enterprise.

100.     DiSomma, Gurinas, and Virtu own the HFT Enterprise.  DiSomma, Gurinas, and two minority shareholders own 50 percent of the HFT Enterprise.  DiSomma and Gurinas collectively own a controlling interest in ECW Wireless through DiSomma Trust and Gurinas Trust, respectively.  ECW Wireless owns a controlling interest in World Class Wireless.  World Class Wireless owns a 50 percent interest in NLN Holdings.  Virtu owns the other 50 percent of NLN Holdings.  NLN Holdings is a parent entity of 10Band, which is the HFT Enterprise.  The HFT Enterprise is therefore ultimately owned and controlled by DiSomma, Gurinas, and Virtu, which direct, control, and manage the HFT Enterprise.  Jump Trading, DiSomma, and Gurinas also have control over Jump Trading employees who hold positions on NLN Holdings' board, including Madigan, Hinerfeld, and Marcus Washco, and direct, control, and manage the HFT Enterprise.  Exs. 3, 5.  Jump Trading and Virtu conduct Commercial Trading over the HFT Enterprise's HFT Network.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

101.   Hinerfeld, Jump Trading's general counsel, has signed numerous statements on behalf of the HFT Enterprise in FCC filings for Experimental Licenses.  Ex. 4.  Hinerfeld has been identified in those submissions as an "[a]uthorized [r]epresentative of [c]orporation," part of the "[o]ffice of applicant corporation or association," an "[i]ndividual [a]pplicant," an "[o]fficer of [a]pplicant [c]orporation or [a]ssociation," and an "[a]uthorized employee" of the HFT Enterprise.  *See, e.g.*, Exs. 42-D, 43-A, 43-D, 45-C, 46-D.

102.   Madigan supervised and participated in the preparation, submission, and prosecution of the HFT Enterprise's FCC filings for Experimental Licenses, and he supervised the development of the technology for the HFT Enterprise's transmission systems, all while holding a position as Jump Trading's Technologist and Manager of Telecom Infrastructure.  *See* Ex. 3.

### iv.   Defendants' Pattern Of Racketeering Activity

171. Defendants have fraudulently obtained and renewed several Experimental Licenses for shortwave communications to unlawfully dominate the Commercial Trading market.

Defendants' Predicate Acts: Fraud in Applying for, Modifying, and Renewing Experimental Licenses in Violation of 18 U.S.C. § 1343

103.   Since 2016, DiSomma, Gurinas, Hinerfeld, Madigan, Jump Trading, and Virtu have worked and continue to work in concert to direct, control, manage, and conduct the affairs of the HFT Enterprise's HFT Network for Commercial Trading.  Together, Defendants fraudulently obtained and then misused the HFT Enterprise's Experimental Licenses for shortwave communications to create the HFT Network through which Jump Trading and Virtu unlawfully conduct Commercial Trading.  This allows Defendants to reap ill-gotten financial benefits by dominating Commercial Trading markets, including latency arbitrage markets, where

*[Different first page setting changed from on in original to off in modified.].*

65

*[Different first page setting changed from on in original to off in modified.].*

the HFT Network's speed advantage over other networks wins trades, resulting in profitable trading—profits Jump Trading and Virtu would not have made conducting Commercial Trading on slower networks.  Each Defendant reaped ill-gotten financial gains from Jump Trading and Virtu's unlawful Commercial Trading: (1) Jump Trading and Virtu conducted the unlawful Commercial Trading and earned the resulting profits; (2) DiSomma and Gurinas reaped financial gains from Jump Trading's unlawful Commercial Trading profits as owners of Jump Trading; and (3) Hinerfeld and Madigan reaped financial gains from Jump Trading's unlawful Commercial Trading profits as senior employees of Jump Trading.

### *1.   Fraudulent Filings With The FCC*

104.    Defendants, through the HFT Enterprise, devised and engaged in a scheme to defraud the FCC and the Commercial Trading market by intentionally making false statements, false promises, or material misrepresentations to the FCC over interstate wires for the purpose of obtaining shortwave Experimental Licenses for Commercial Trading.  Defendants' scheme sought to leverage the speed advantage of shortwave communications operated under Experimental Licenses to gain a dominant advantage over market participants, including latency arbitrage, to win trades and reap the resulting financial benefits of those trades.

105.    Defendants devised and engaged in a scheme to defraud the FCC and the Commercial Trading market by using their HFT Enterprise as a proxy for applying for shortwave Experimental Licenses.  Defendants' scheme involved using Hinerfeld and Madigan, Jump Trading's employees and collaborators, to make numerous favorable certifications on the HFT Enterprise's FCC license applications, modification applications, renewal applications, consent of assignment applications, and confidentiality requests that ran counter to Defendants' real intention of using the shortwave Experimental Licenses for Commercial Trading.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

106. ~~172.~~ Through the HFT Enterprise, Defendants made false statements, false promises, or material misrepresentations to the FCC. Defendants' predicate acts of racketeering include the submission of each license application, modification application, renewal application, consent of assignment application, and confidentiality request for ~~Defendants'~~the HFT Enterprise's Experimental Licenses—each of which constitutes the use of wire for the purpose of executing Defendants' racketeering scheme and is an act of wire fraud in violation of 18 U.S.C. § 1343.

~~173. Defendants purposefully made the material misrepresentations described in at least Paragraphs 146, 152, 158, 164, and 170 for the purpose of executing Defendants' scheme to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.~~

107. On information and belief, DiSomma, Gurinas, Jump Trading, and Virtu directed Hinerfeld, Madigan, and 10Band to make false statements, false promises, or material misrepresentations on behalf of the HFT Enterprise in FCC license applications. Both Hinerfeld and Madigan hold positions on the board of NLN Holdings and are employees of Jump Trading. *See* Exs. 3–5.

108. In each license application, modification application, renewal application, and consent of assignment application, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge. *See* Fig. 4-A. In each renewal application, 10Band or Hinerfeld

*[Different first page setting changed from on in original to off in modified.].*

67

*[Different first page setting changed from on in original to off in modified.].*

certified to the U.S. government that all statements in the application were considered material representations.  *See* Fig. 4-B.

(Added) CERTIFIES THAT:

    a. Copies of the FCC Rule Parts 2 and 5 are on hand; and
    b. Adequate financial appropriations have been made to carry on the program of experimentation which will be conducted by qualified personnel; and
    c. All operations will be on an experimental basis in accordance with Part 5 and other applicable rules, and will be conducted in such a manner and at such a time as to preclude harmful interference to any authorized station; and
    d. Grant of the authorization requested herein will not be construed as a finding on the part of the Commission:
        1. that the frequencies and other technical parameters specified in the authorization are the best suited for the proposed program of experimentation, and
        2. that the applicant will be authorized to operate on any basis other than experimental, and
        3. that the Comission is obligated by the results of the experimental program to make provision in its rules including its table of frequency allocations for applicant's type of operation on a regularly licensed basis.

THE APPLICANT FURTHER CERTIFIES THAT:

    e. All the statements in the application and attached exhibits are true, complete and correct to the best of the applicant's knowledge; and
    f. The applicant is willing to finance and conduct the experimental program with full knowledge and understanding of the above limitations; and
    g. The applicant waives any claim to the use of any particular frequency or of the electromagnetic spectrum as against the regulatory power of the USA.

Name of Applicant: 10Band LLC
Signature (Authorized person filing form): Ronald Riley
Signature Date (Authorized person filing form): 09/21/2016
Title of Person Signing Application: Authorized Signatory
Classification: Authorized employee

    WILLFUL FALSE STATEMENTS MADE ON THIS FORM ARE PUNISHABLE BY FINE AND/OR IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001), AND/OR REVOCATION OF ANY STATION LICENSE OR CONSTRUCTION PERMIT (U.S. CODE, TITLE 47, SECTION 312(A)(1)), AND/OR FORFEITURE (U.S. CODE, TITLE 47, SECTION 503).

**Figure 4-A: Exemplary Certification Excerpt from Exhibit 42-A**

(Add)ication

- Neither the applicant nor any other party to the application is subject to a denial of Federal benefits that includes FCC benefits pursuant to Section 5301 of the Anti-Drug Abuse Act of 1988, 21 U.S.C. Section 862, because of a conviction for possession or distribution of a controlled substance.
- The applicant hereby waives any claim to the use of any particular frequency or electromagnetic spectrum as against the regulatory power of the United States because of the previous use of the same, whether by license or otherwise, and requests authorization in accordance with this application. (See Section 304 of the Communications Act of 1934, as amended.)
- The applicant acknowledges that all statements made in this application and attached exhibits are considered material representations, and that all the exhibits part hereof and are incorporated herein as if set out in full in this application; undersigned certifies that all statements in this application are true, complete and correct to the best of his/her knowledge and belief and are made in good faith.

**Figure 4-B: Exemplary Certification Excerpt from Exhibit 42-D**

109.  174. Each of Defendants' material misrepresentations was false when it was made, and 10Band or Hinerfeld knew it was false.  10Band or Hinerfeld falsely represented that allThe HFT Enterprise, through 10Band and Hinerfeld, falsely stated, falsely promised, or materially misrepresented that all of 10Band's activities and operations under the Experimental Licenses werewould be "experimental" in nature.  Yet 10Band applied for and received Defendants' Experimental Licenses for the purposes of allowingHowever, the HFT Enterprise had already provided, would provide, or would continue to provide its HFT Network to Jump

*[Different first page setting changed from on in original to off in modified.].*

68

*[Different first page setting changed from on in original to off in modified.].*

Trading and Virtu for Commercial Trading to exploit the technical advantages of shortwave transmitters operated under the custom-designed parameters of ~~Defendants'~~ the HFT Enterprise's Experimental Licenses to gain a speed advantage over ~~competitors for~~ Commercial Trading competitors.

110. ~~175.~~ The HFT Enterprise, through 10Band ~~or~~ and Hinerfeld, also falsely ~~represented~~ stated, falsely promised, or materially misrepresented that the modem equipment used under each of ~~Defendants'~~ the HFT Enterprise's Experimental Licenses—TrellisWare TW-621— ~~was~~ would not be capable of broadcasting station identification. Broadcasting station identification has been possible since the advent of radio broadcasting ~~though~~ through the use of equipment that could produce Morse code. In addition, the TrellisWare TW-621 is an advanced, modern modem. 10Band uses the TrellisWare TW-621 to broadcast station identification information in Canada. FirstToken, *Shortwave HFT (High Frequency Trading) Station, CGA984 with Morse ID, 20152 kHz, 30 October, 2022*, YouTube (Nov. 5, 2022), https://www.youtube.com/watch?v=yLWMnrRJd7U; Ex. 47.

111. The HFT Enterprise, through Madigan, signed at least one Experimental License declaratory statement on behalf of 10Band that contains false statements, false promises, or material misrepresentations. For example, Madigan falsely certified that 10Band had conducted its operations over the preceding six years "pursuant to experimental authority," despite knowingly exceeding the bounds of that authority with each commercial trade. *See* Ex. 3.

112. ~~176.~~ The HFT Enterprise, at least through 10Band ~~or~~, Hinerfeld, and Madigan, transmitted or caused to be transmitted the identified false statements, false promises, or material misrepresentations over wire communications between 10Band (in Chicago, Illinois) and the FCC (in Washington, DC) in interstate and foreign commerce and did so for the purpose of

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

executing Defendants' scheme to defraud the FCC to obtain and the Commercial Trading market by obtaining shortwave Experimental Licenses for Commercial Trading, unlawfully use those and making false statements, false promises, or material misrepresentations in their applications for new licenses, modified applications, renewal applications, consent of assignment applications, and confidentiality requests for Experimental Licenses for Commercial Trading, and leverage the ill gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense. that their operations would only be experimental.

113. Even if the HFT Enterprise made truthful statements in its initial license application, each subsequent license application and modification application falsely stated, falsely promised, or materially misrepresented that "[a]ll operations" under the HFT Enterprise's Experimental Licenses would "be on an experimental basis." 10Band and Hinerfeld knew at the time of the FCC filings that 10Band had operated or would soon thereafter operate shortwave transmitters under Experimental Licenses for Commercial Trading by Jump Trading and Virtu. In other words, 10Band and Hinerfeld knew at the time of the FCC filings that 10Band would be operating shortwave transmitters under the Experimental Licenses for purposes other than experimentation.

114. Each renewal application falsely stated, falsely promised, or materially misrepresented that the "[n]ature" of Defendants' activities under the HFT Enterprise's Experimental Licenses was "experimental." 10Band and Hinerfeld knew at the time of the FCC filings that 10Band had operated or would soon thereafter operate shortwave transmitters under Experimental Licenses for Commercial Trading by Jump Trading and Virtu. In other words,

*[Different first page setting changed from on in original to off in modified.].*

10Band and Hinerfeld knew at the time of the FCC filings that 10Band would be operating shortwave transmitters under its Experimental Licenses for purposes other than experimentation.

115.    Each license application, modification application, renewal application, consent of assignment application, and confidentiality request for the HFT Enterprise's Experimental Licenses was submitted in furtherance of Defendants' scheme to defraud the FCC and the Commercial Trading market by obtaining shortwave Experimental Licenses, making false statements, false promises, or material misrepresentations in their applications for new licenses, modified applications, renewal applications, consent of assignment applications, and confidentiality requests for Experimental Licenses that their operations would only be experimental.

### 2.    *Unlawful Commercial Trading*

116.    Defendants, through the HFT Enterprise, devised and engaged in a scheme to defraud the FCC and the Commercial Trading market by making false statements, false promises, or material misrepresentations in their FCC license applications, modification applications, renewal applications, consent of assignment applications, and confidentiality requests.  Defendants then misused interstate wires to transmit orders for financial instruments in furtherance of that scheme.

117.    Defendants devised and engaged in a scheme to defraud the FCC and the Commercial Trading market by using their HFT Enterprise as a proxy for applying for shortwave Experimental Licenses.

118.    Through the HFT Enterprise, Defendants made false statements, false promises, or material misrepresentations to the FCC in the submission of each license application,

*[Different first page setting changed from on in original to off in modified.].*

modification application, renewal application, consent of assignment application, and confidentiality request.

177. Through Defendants' electronic communications to the FCC, Defendants unlawfully acquired Experimental Licenses under false pretenses. Defendants could not have obtained their Experimental Licenses without Defendants' material misrepresentations that all of 10Band's activities and operations under the Experimental Licenses were "experimental" in nature. *Supra* ¶¶ 54–59, 172–176.

178. Through Defendants' electronic communications to the FCC, Defendants also unlawfully extended the Elburn I Experimental License under false pretenses. Defendants could not have obtained either the Elburn I Experimental License Renewal I or the Elburn I Experimental License Renewal II without Defendants' material misrepresentations that all of 10Band's activities and operations under the Elburn I Experimental License were "experimental" in nature. *Supra* ¶¶ 54–59, 172–176.

179. Through Defendants' electronic communications to the FCC, Defendants frustrated and obfuscated identification or investigation of the true commercial nature of the operations Defendants conducted under Defendants' Experimental Licenses for the purpose of executing Defendants' scheme. By repeatedly requesting that the FCC "with[o]ld from public inspection" 10Band's narrative description of its purported experimental work under Defendants' Experimental Licenses, Defendants prevented Skywave and other competitors from investigating and uncovering Defendants' unlawful scheme.

180. Defendants further frustrated and obfuscated the investigation with material misrepresentations that the equipment used under each of Defendants' Experimental Licenses was not capable of station identification. As a result of those material misrepresentations,

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

Defendants prevented the FCC, Skywave, and other competitors from investigating the connections between Defendants' network infrastructure. *See supra* ¶¶ 83-138. Had Defendants complied with the station identification requirements for their Experimental Licenses, the FCC, Skywave, and other competitors would have been able to more readily track precisely when Defendants were using 10Band's shortwave transmitters to send shortwave signals and then tie those signals to Commercial Trading data.

181. Skywave is not the only victim of Defendants' fraud in applying for, modifying, and renewing their Experimental Licenses. Defendants' racketeering has also injured financial "pairs traders," who trade pairs, such as the E-Mini/FDAX arbitrage.

182. Skywave has knowledge of pairs traders that have ceased operations due to Defendants' racketeering. Because Defendants unlawfully used and continue to use 10Band's shortwave transmitters under Defendants' Experimental Licenses, they have achieved an approximately 9 millisecond advantage over pairs traders using conventional optical fiber and microwave networks, which enables Defendants to manipulate the pricing of paired assets and to take advantage of favorable asset prices. *See* Fig. 1.

Defendants' Predicate Acts: Unlawful Use of Experimental Licenses for Commercial Trading in Violation of 18 U.S.C. § 1343

119. 183. The HFT Enterprise operates shortwave transmitters under Experimental Licenses, and Defendants use those transmitters to engage in Commercial Trading. Defendants' predicate acts of racketeering include each commercial trade made by Defendants using shortwave networks granted to 10Band under the Elburn I Experimental License, Elburn II Experimental License, Wayne Experimental License, Everett Experimental License, and Lynnwood Experimental License each of which. Each such commercial trade constitutes the

*[Different first page setting changed from on in original to off in modified.].*

73

*[Different first page setting changed from on in original to off in modified.].*

use of wire for the purpose of executing Defendants' racketeering scheme and is an act of wire fraud in violation of 18 U.S.C. § 1343.

120. ~~184.~~ Defendants ~~use Defendants'~~ violate and unlawfully use the HFT Enterprise's Experimental Licenses to engage in Commercial Trading~~, contrary to 10Band's and Hinerfeld's sworn representations to the U.S. government that the licenses would be used for research or experimentation~~.  On information and belief, no known Part 73 Licenses for Commercial Trading via shortwave exist.  Yet a retrospective analysis of latency arbitrage trading shows that a large amount of Commercial Trading via shortwave has occurred since as early as 2017.  That retrospective analysis reflects Defendants' Commercial Trading under Experimental Licenses through their HFT Enterprise.  *See infra* ¶¶ 143–148.  Defendants developed their extensive, global network to engage in Commercial Trading at major worldwide market exchanges, including the NASDAQ, ICE, CME, CBOT, NYMEX, COMEX, NYSE, CBOE, BATS, BZX, BYX, Chi-X, LSE, Deutsche Börse, JPX, TSE, OSE, TOCOM, and B3.  ~~*See* Fig. 7.~~

121. ~~185.~~ To date, Defendants have ~~regularly~~ engaged in unlawful Commercial Trading ~~since approximately January 2020~~ using interstate or intercontinental wires.  ~~*See supra* ¶¶ 83–138.~~

~~186. Virtu has used 10Band's shortwave transmitter under an Experimental License to engage in Commercial Trading.  When Skywave met with Virtu in October 2020 to discuss a potential license to Skywave's network technology, Virtu declined Skywave's licensing offer. Virtu mentioned during the meeting that it had access to 10Band's shortwave network but did not mention whether it was trading over that network.  *See supra* ¶ 67.  At that time, 10Band only possessed shortwave Experimental Licenses from the FCC; it did not have any shortwave Commercial Licenses from the FCC.~~

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

122.    On information and belief, DiSomma and Gurinas managed and directed the HFT Enterprise to use its shortwave infrastructure to carry out Commercial Trading through the HFT Enterprise's Experimental Licenses.

123.    Jump Trading engages in Commercial Trading using one or more shortwave transmitters operated by 10Band under an Experimental License.  On information and belief, Jump Trading managed and directed the HFT Enterprise, at least through DiSomma, Gurinas, Hinerfeld, and Madigan, to use its shortwave infrastructure to carry out Commercial Trading through the HFT Enterprise's Experimental Licenses.

124.    Virtu engages in Commercial Trading using one or more shortwave transmitters operated by 10Band under an Experimental License.  On information and belief, Virtu managed and directed the HFT Enterprise to use its shortwave infrastructure to carry out Commercial Trading through the HFT Enterprise's Experimental Licenses.

125.    187. Virtu's SEC disclosures also suggest that it is part of joint ventures that use "microwave communication networks" to engage in "trading activities."  Ex. 48.  Specifically, in its 2024 SEC 10-K Form, Virtu states that it "pay[s] monthly fees for the use of the microwave communication networks" of Virtu's joint ventures "in connection with" those joint ventures' "***respective trading activities***."  Ex. 48 (emphasis added).  One of those joint ventures is NLN Holdings, which owns 10Band.  In addition to owning 10Band, NLN Holdings owns NLN, which operates the microwave communications portions of Defendants' Worldwide Trading Network. *Supra* ¶¶ 83–138. Virtu specifies that it has a "50.0% noncontrolling interest in one of those joint ventures." *Id.* Virtu has a 50 percent noncontrolling interest in Ex. 48.  Upon information and belief, that joint venture includes the HFT Enterprise—*i.e.*, 10Band—as well as NLN Holdings and NLN.  *See* Fig. 43.  The NLN, a parent entity of 10Band and the subsidiary of

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

NLN Holdings, operates the microwave ~~and shortwave~~communications portions of Defendants' ~~Worldwide~~Commercial Trading Network ~~are interconnected into a single trading network that connects worldwide trading exchanges~~. *Id*.

**B.   Conspiring To Conduct Or Participate In A RICO Enterprise**

**i.    Defendants' Intent To Effect A Racketeering Scheme**

126.    Defendants understood that their goal was to direct, control, manage, and conduct the affairs of the HFT Enterprise through a pattern of racketeering activity.  Upon information and belief, Defendants intended to further the conspiracy scheme through their actions, including making false statements, false promises, or material misrepresentations on behalf of the HFT Enterprise in FCC filings and engaging in Commercial Trading through the HFT Enterprise's Experimental Licenses.

**ii.    Defendants' Agreement To Effect A Racketeering Scheme**

127.    On information and belief, DiSomma, Gurinas, Hinerfeld, Madigan, Jump Trading, and Virtu agreed to direct, control, manage, and conduct the affairs of the HFT Enterprise through a pattern of racketeering activity by engaging in Commercial Trading through the HFT Enterprise's Experimental Licenses.  Such an agreement has been in existence since at least 2017, as evidenced by Deutsche Börse's retrospective A7 analysis.  *See infra* ¶¶ 143–148.

128.    On information and belief, DiSomma, Gurinas, Hinerfeld, Madigan, Jump Trading, and Virtu agreed to direct, control, manage, and conduct the affairs of an enterprise through a pattern of racketeering activity by making false statements, false promises, or material misrepresentations on behalf of the HFT Enterprise in FCC filings for Experimental Licenses.  Such an agreement has been in existence since at least 2016, as evidenced by their continuous

*[Different first page setting changed from on in original to off in modified.].*

submission of license applications, modification applications, renewal applications, consent of assignment applications, and confidentiality requests reciting the same false statements, false promises, or material misrepresentations.

129.　Defendants agreed that Hinerfeld, Madigan, 10Band, or another party on 10Band's behalf would commit at least two predicate acts to accomplish their goal of enacting their RICO scheme.

### iii.　Defendants' Overt Acts In Furtherance Of Their Conspiracy

130.　~~188.~~ DiSomma, Gurinas, Jump Trading ~~has used Defendants',~~ and Virtu directed, controlled, managed, and conducted the affairs of the HFT Enterprise through a pattern of racketeering activity by directing their employees and collaborators to fraudulently obtain and misuse 10Band's Experimental Licenses to engage in Commercial Trading ~~over the shortwave communication rights granted to 10Band. In addition to Jump Trading sharing 10Band's shortwave network with Virtu, *see supra* ¶¶ 67, 186, trading data also suggests that Jump Trading uses 10Band's shortwave network to engage in Commercial Trading, *supra* ¶¶ 83–138.~~. Such acts date back to at least 2017, as evidenced by Deutsche Börse's retrospective A7 analysis. *See infra* ¶¶ 143–148.

~~189. Defendants continue to engage in unlawful Commercial Trading over 10Band's network, including using 10Band's shortwave transmitters in Elburn, Illinois; Wayne, New Jersey; and Lynnwood, Washington, all operated under Defendants' Experimental Licenses.~~

131.　Hinerfeld and Madigan directed, controlled, managed, and conducted the affairs of the HFT Enterprise through a pattern of racketeering activity by preparing FCC filings containing false statements, false promises, or material misrepresentations for Experimental Licenses on behalf of the HFT Enterprise and then filing those submissions. Such acts date back

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

to at least 2016, as evidenced by their continuous submission of license applications, modification applications, renewal applications, consent of assignment applications, and confidentiality requests reciting the same false statements, false promises, or material misrepresentations.

132.    DiSomma, Gurinas, Jump Trading, and Virtu directed, controlled, managed, and conducted the affairs of an enterprise through a pattern of racketeering activity by preparing FCC filings containing false statements, false promises, or material misrepresentations for Experimental Licenses on behalf of the HFT Enterprise and then filing those submissions.  Such acts date back to at least 2016, as evidenced by their continuous submission of license applications, modification applications, renewal applications, consent of assignment applications, and confidentiality requests reciting the same false statements, false promises, or material misrepresentations.

133.    Hinerfeld and Madigan directed, controlled, managed, and conducted the affairs of the HFT Enterprise through a pattern of racketeering activity by directing their employees and collaborators to fraudulently obtain and misuse the HFT Enterprise's Experimental Licenses to engage in Commercial Trading.  Such acts date back to at least 2017, as evidenced by Deutsche Börse's retrospective A7 analysis.  *See infra* ¶¶ 143–148.

134.    Defendants agreed that Hinerfeld, Madigan, 10Band, or another party on 10Band's behalf would commit at least two predicate acts to accomplish their goal of enacting their RICO scheme.  The agreement was carried out by Defendants through the HFT Enterprise.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

**C.** **Skywave's** ~~Injury Caused by~~Discovery Of **Defendants'** ~~Unlawful~~

**Racketeering** ~~Conduct~~Scheme

135. In December 2016, Skywave learned that 10Band had filed applications with the FCC to obtain Experimental Licenses to operate shortwave transmitters.  At the time, however, Skywave had no reason to believe that Defendants or 10Band would misuse the HFT Enterprise's Experimental Licenses for Commercial Trading, nor that Jump Trading or Virtu were affiliated with 10Band as managing entities of the HFT Enterprise.

136. In 2017, ███ became concerned that if a person or entity were to use 10Band's shortwave transmitter under an Experimental License for Commercial Trading, that person or entity would have a dominant latency (*i.e.*, speed) advantage over other traders using optical fiber and microwave networks and over the Skywave Network, which would operate under Commercial License conditions.  At that time, Skywave was not aware of any information that Jump Trading or Virtu were affiliated with 10Band as managing entities of the HFT Enterprise.  Nor was there any publicly available data showing, or any method available to determine, whether Jump Trading, Virtu, or others were misusing Experimental Licenses for Commercial Trading.

137. ███ did not believe the partnership could reasonably compete against persons or entities misusing the advantages of Experimental Licenses for Commercial Trading.  Given its concern about this possibility, ███ sought to exit the partnership with Skywave and ███  In March 2017, Skywave, ██████ agreed to release ███ from the partnership.

138. In the fall of 2018, Skywave found ████████████████ ████████████████ in Skywave to further develop its innovative shortwave network technology.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

139.    In 2020, ███ requested, and Skywave agreed, to dissolve the original partnership.    At that time, Skywave was still not aware of any information showing Jump Trading, Virtu, or any other trading firm was affiliated with 10Band.  Nor was there any publicly available data showing, or any method available to determine, whether Jump Trading, Virtu, or others were misusing Experimental Licenses for Commercial Trading.

140.    In October 2020, ███ and Virtu entered into a non-disclosure agreement to discuss Skywave's innovative shortwave network technology.    Representatives of ███ ███ Skywave, and Virtu subsequently met on or about October 8, 2020.  ███

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████

141.    Skywave continued to develop the Skywave Network.  Skywave focused on modem development, network architecture, site selection optimization, and microwave license applications and acquisitions.

142.    In October 2021, 10Band submitted a modification request for the Experimental License using call sign WI2XNX, the ***first*** among its portfolio of license applications, modifications, and renewals to be filed with a narrative statement that was ***not*** protected by a

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

confidentiality request. The modification request indicated 10Band's intention to use its Experimental License to conduct limited-scope market trials of high-frequency technology. Ex. 42-L.

143. In 2022, Skywave discovered that the German financial exchange services company, Deutsche Börse Group ("Deutsche Börse"), offered a market analytics tool called A7. The A7 tool enabled examination of Eurex—which was and continues to be owned and operated by Deutsche Börse[6]—and CME trading data for evidence of Commercial Trading using shortwave networks. Such an analysis was previously unavailable.

144. Using the A7 tool, Skywave was first able to discover evidence of Commercial Trading using shortwave. For example, the A7 tool showed two different latencies for latency arbitrage trading of the E-Mini (abbreviated as "ES" in Fig. 5) and the FDAX. *See* Fig. 5. First, E-Mini price moves on the CME correlated with FDAX trading activity on the Eurex peaking approximately 37 milliseconds later. That 37-millisecond latency indicates trading over networks comprised of conventional optical fiber and microwave transmitters. Second, the A7 data also showed E-Mini price moves on the CME correlated with FDAX trading activity on the Eurex peaking approximately 28 milliseconds later. That relatively low 28-millisecond latency indicates trading over networks that included shortwave transmissions.

---

[6] The Eurex financial exchange is operated by Eurex Frankfurt AG, which is a wholly owned subsidiary of Deutsche Börse. Deutsche Börse became the sole owner of Eurex in 2012. *See* Rajeev Dhir, *Eurex: What It Is, History, Trading Technology*, Investopedia (May 30, 2022), https://www.investopedia.com/terms/e/eurex.asp; *Organisation*, Deutsche Börse Group, https://www.deutsche-boerse.com/dbg-en/about-us/deutsche-boerse-group/organisation/subsidiaries (last accessed Feb. 13, 2025).

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*



**Figure 5: XCME/XEUR Latency Data[7]**

145. In fact, Deutsche Börse's head of quantitative analytics concluded that the A7 latency data showing this approximately 9-millisecond advantage in some trades was evidence of Commercial Trading using shortwave. Fig. 6.

⁷ Stefan Schlamp, *Stefan Schlamp's Post*, LinkedIn, https://www.linkedin.com/posts/stefanschlamp_cmegroup-eurex-marketdata-activity-694892655 5855192064-eXrF/ (indicating a time of publication 2 years prior to Feb. 13, 2025).

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*



(Added)

**Figure 6: Stefan Schlamp's A7 Analysis**[8]

146.     According to Deutsche Börse's retrospective A7 analysis, Commercial Trading using shortwave began in 2017, accelerated in 2019, and has dominated CME/Eurex latency arbitrage trading, such as E-Mini-FDAX trading, since 2020.  Correspondingly, Commercial Trading at the relatively slower optical fiber and microwave network latency gradually decreased after Commercial Trading using shortwave commenced.  Fig. 7 (heatmap showing shortwave network Commercial Trading on "Short-Wave" dotted line and optical fiber and

---

[8]     Stefan Schlamp, *Stefan Schlamp's Post*, LinkedIn, https://www.linkedin.com/posts/stefanschlamp_cmegroup-eurex-marketdata-activity-694892655 5855192064-eXrF/ (indicating a time of publication 2 years prior to Feb. 13, 2025).

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

microwave network Commercial Trading on "MW/Hibernia/MW" line, with white indicating activity and red indicating higher activity).



**Figure 7: XCME/XEUR Network Data[9]**

147.    The rise in use of shortwave networks for Commercial Trading evidenced by these low latencies precisely matches the decline of CME traders, such as the Drendel Brothers of Bruder, who used conventional network technologies (*e.g.*, optical fiber and microwave) and were eventually forced to cease CME/Eurex pairs trading because they could not compete with traders using shortwave networks.

---

[9]    Stefan    Schlamp,    *Stefan    Schlamp's    Post*,    LinkedIn, https://www.linkedin.com/posts/stefanschlamp_cme-eurex-microwave-activity-7027298230296051712-bW6x (indicating a time of publication 2 years prior to Feb. 12, 2025).

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

148.    After the A7 tool became accessible in 2022, Skywave used it to identify a clear industry-based pattern of shortwave Commercial Trading for HFT, reaching back well before October 2021, when 10Band announced its ostensibly new intention to modify its license parameters to include market testing of high-frequency technology.  Upon its discovery of the clear and industry-based pattern of shortwave Commercial Trading, its knowledge and awareness of the HFT Enterprise's Experimental Licenses, and its knowledge and awareness of Jump Trading and Virtu's direction, control, management, and conduct through the HFT Enterprise, Skywave had no choice but to put its business plans on hold and pause efforts to commercialize the Skywave Network in view of the HFT Enterprise's HFT Network's dominant latency advantage for Commercial Trading.

149.    Despite efforts to try to determine whether the HFT Enterprise's Experimental Licenses could be or were being used by Defendants for Commercial Trading after Skywave's October 2020 meeting with Virtu, Skywave was unable to discover any information demonstrating or showing a reasonable likelihood of Defendants' misconduct or misuse of the HFT Enterprise's Experimental Licenses for Commercial Trading until the A7 tool became available in 2022.  Nor could Skywave have reasonably discovered Defendants' misconduct or misuse of the HFT Enterprise's Experimental Licenses for Commercial Trading prior to 2022 because of the lack of available tools for performing the same functions as A7.  Skywave had previously monitored Defendants' signals periodically but was only ever able to confirm that Defendants were transmitting shortwave data signals.  Skywave did not have access to financial exchange information to correlate the signals to actual Commercial Trading until the A7 data became available.    The HFT Enterprise, meanwhile, represented to the FCC in its

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

application-related submissions that it was only experimenting with its shortwave transmission equipment.

150. Through Defendants' electronic communications to the FCC, Defendants also frustrated and obfuscated identification or investigation of the true commercial nature of the operations Defendants conducted under the Experimental Licenses for the purpose of executing Defendants' scheme.  By repeatedly requesting that the FCC "with[o]ld from public inspection" 10Band's narrative description of its purported experimental work under the HFT Enterprise's Experimental Licenses, Defendants made information pertaining to their misuse of Experimental Licenses unavailable and prevented Skywave and other competitors from investigating and uncovering Defendants' unlawful scheme.  Defendants, in their own words and by their own efforts, precluded information about their misuse of Experimental Licenses from being available to the public or made available from any other source.  For example, in each license application, renewal, and modification accompanied by a confidentiality request, Defendants represented that their "[c]onfidential [i]nformation" was not "available to the public and . . . [was] not generally available from any other source."  *See, e.g.*, Ex. 42-B.

151. Through Defendants' electronic communications to the FCC, Defendants also frustrated and obfuscated identification or investigation of the true commercial nature of the operations Defendants conducted under the Experimental Licenses for the purpose of executing Defendants' scheme.  By repeatedly falsely stating, falsely promising, or materially misrepresenting that the equipment used under each of Defendants' Experimental Licenses was not capable of station identification, Defendants impeded the FCC, Skywave, and other competitors from investigating the connections between Defendants and Defendants' Commercial Trading Network.  Had Defendants complied with the station identification

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

requirements for their Experimental Licenses, the FCC, Skywave, and other competitors would have been able to more readily track precisely when and where Defendants were using the HFT Enterprise's shortwave transmitters to send shortwave signals and then tie those signals to Commercial Trading data.

**D. Skywave's Injury**

152. ~~190.~~ Due to Defendants' unlawful conduct, Skywave ~~was unable to build and operate~~ has been unable to secure business partners, complete building the Skywave Network, operate the Skywave Network, access trading markets, or profit from the trading, including HFT trading, that would have been performed over the Skywave Network. Defendants' ~~racketeering scheme~~ misconduct is the direct and proximate cause of ~~the termination of~~ Skywave's  ~~partnership with~~ █████ ~~and~~ █████ ~~and the associated resulting~~ economic injuries, including sunk costs and ~~losses~~ the loss of trading profits from its HFT network.

153. ~~191. Although~~ Skywave received ████████████ ████████████ as part of ██████ Agreement ~~, *supra* ¶ 53 Skywave did not receive the~~ ████████████████████████ ~~under their agreement.~~

~~192.~~ Pursuant to its obligations under the ████ and ██████████, Skywave ██████ ████████████████ to develop the ~~network~~ Skywave Network's infrastructure. Now, that development work is a sunk cost.

154. ~~193. Additionally~~ Because of Defendants' unlawful conduct, Skywave was forced to pause aspects of its network construction. This delay resulted in further opportunity costs to Skywave and an inability to leverage its innovative technology in the market. For example, Skywave was unable to (1) complete its purchase of transmitters and antennas; (2) close on land

*[Different first page setting changed from on in original to off in modified.].*

87

*[Different first page setting changed from on in original to off in modified.].*

acquisitions for U.S. shortwave transmitter locations; and (3) develop shortwave receiver locations in the United Kingdom and Germany. ~~See supra ¶ 53.~~

155. ~~194.~~ As a result of the failure to complete its network construction, Skywave was never able to operate the planned Skywave Network ~~through which~~ ███████████████. Under the ███████████████, ███ had agreed to ███████████████ over the Skywave Network with Skywave and ███. ~~Thus, the failure to complete~~ Similar to Defendants' trading structure, Skywave and ███ had agreed to ███████████████████████████████████████████████████████████████████████████████████████████████. Thus, Skywave lost ████████████████████████████████. For example, ████████████████ ████████████████ latency arbitrage trading, the success of which is predicated on the speed of the trading network. If █████████████ had a 1-millisecond speed advantage over other traders in a latency arbitrage trade, it would win that trade and reap financial benefits. The Skywave Network would have provided a speed advantage of more than 1 millisecond over conventional optical fiber and microwave networks for Commercial Trading between, for example, the CME and Eurex. But for Defendants' scheme to fraudulently obtain Experimental Licenses and then unlawfully use them for Commercial Trading over the HFT Enterprise's HFT Network, Skywave would have completed the Skywave Network, and █████████████ ████████████████████████████████████ Skywave's loss of at least ███████████████ ███████████████

156. ~~195.~~ Due to Defendants' unlawful conduct ~~, Skywave was~~ and the resulting injury to traders (such as Bruder and the Drendel Brothers) who have been forced out of business

*[Different first page setting changed from on in original to off in modified.].*



*[Different first page setting changed from on in original to off in modified.].*

because they could not compete with dominant speed advantages provided by the HFT Enterprise's HFT Network, Skywave has also been unable to license its shortwave network technology, know-how, and patents.

### E. Injury To Other Traders

157. Defendants' racketeering scheme is also the direct and proximate cause of economic injury to competitor traders, including pairs traders in cross-exchange international markets, who had no choice but to cease trading operations because they could not compete with Defendants' approximately 9-millisecond advantage due to ~~use~~misuse of shortwave transmitters operated under ~~Defendants'~~the HFT Enterprise's Experimental Licenses.

158. ~~As the scheme~~The trading operations of the Drendel Brothers via Bruder is illustrative. As Defendants' racketeering scheme continued and advanced over time, competitor traders such as the Drendel Brothers and Bruder relinquished such cross-exchange trading or ceased operations altogether, and Skywave lost potential customers for its shortwave network technology, know-how, and patents.

159. After decades of floor trading at the CME, the Drendel Brothers launched Bruder to focus on algorithmic strategies in pairs trading. Algorithmic trading involves the use of algorithms, or specific sets of instructions, to execute trades, allowing traders to make profits faster and more often than traditional floor trading.

160. As high-frequency pairs traders, the Drendel Brothers took advantage of small but frequent changes in financial markets. They sought to make profits from these small changes by aggregating large quantities of high-frequency trades over time.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

161.     Bruder relied on the Algo Design Lab ("ADL"), a platform owned by Trading Technologies International, Inc., to place its trades.  The ADL platform allows traders to customize their own trading algorithms.

162.     The Drendel Brothers began using the ADL platform to trade independently in March 2013.  By February 2015, they launched Bruder and continued to use ADL.  Bruder customized the ADL platform's building blocks to account for variables including volatility, correlation, profitability, contract price, and volume.

163.     In addition to customizing the algorithms, Bruder ran thousands of simulation trades that mirrored market activity.  Bruder relied on those simulations to determine which trades to execute and how to refine its algorithms.

164.     Bruder's algorithms propelled the company to significant early success, generating more than $3 million in revenue from its launch through the end of 2016.  Bruder traded a variety of equity, currency, agriculture, and interest rate contracts.  At its peak, Bruder traded thousands of contracts per day and made a daily profit for roughly twenty days each month.

165.     Following its early success, Bruder expanded its business to collaborate with seven independent traders.  The independent traders paid licensing fees to Bruder for access to Bruder's proprietary algorithms.

166.     Although Bruder sometimes traded during regular market hours, its algorithms often targeted correlated markets in off-market hours and identified opportunities for greater profit at lower risk.  For example, Bruder traded pairs based on the correlation between the FDAX in Europe and the NASDAQ in the United States.  The FDAX opens at 8 a.m. local time,

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

with pre-market trades starting an hour earlier.  Whenever one of Bruder's algorithms identified an opportunity for profit, the algorithm took a snapshot at 7 a.m. to serve as an origination point.  The algorithm then made trades from 7 a.m. to 8 a.m. every few ticks.[10]

167.    If the spread, or the difference in price between pairs, grew wider from the origination point every few ticks during that hour, the algorithm sold a FDAX contract and instantaneously purchased a NASDAQ contract.  The algorithm did the opposite if the spread grew narrower from the origination point.  Under normal circumstances—and prior to Defendants' misuse of Experimental Licenses—Bruder was able to profit off the trades as the spread ebbed and flowed.

168.    However, in 2017—shortly after the FCC granted the Elburn I Experimental License—Bruder began to observe market irregularities.  Bruder's algorithms would identify an opportunity for profit and automatically purchase the associated financial instrument.  But prices would fluctuate faster than Bruder's algorithms could execute the corresponding trade.  As a result, Bruder's revenue began to decline.

169.    Those irregularities and Bruder's ensuing decline in revenue continued through 2018 and 2019.  Bruder's simulations could no longer accurately predict market behavior, and Bruder was forced to stop certain types of trading activity.  By February 2020—shortly after the FCC granted the Elburn II Experimental License, the Wayne Experimental License, and other licenses—Bruder ended its collaboration with some of the independent traders because Bruder's business could no longer support those relationships.  Finally, in July 2021, the Drendel Brothers were forced to dissolve Bruder.

---

[10] A tick is the smallest possible change in price on an exchange.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

170.    At the time, the Drendel Brothers did not suspect that Bruder was losing money due to a speed disadvantage.  Bruder traded under the Rosenthal Collins Group, a Chicago-based entity that served as an intermediary between exchange members and customers like Bruder.  The Drendel Brothers believed that they had access to all available tools and advantages through the Rosenthal Collins Group.

171.    Deutsche Börse's retrospective A7 analysis confirms that trading at shortwave latencies began in 2017.  This timing coincides with the market irregularities that Bruder observed and ultimately portended the company's end.  That shortwave trading activity was the product of Defendants' misuse of Experimental Licenses for Commercial Trading.  As a result of Defendants' misuse of Experimental Licenses, Bruder lost revenue, and the Drendel Brothers were ultimately forced to dissolve the company.

172.    Defendants' racketeering scheme is the direct and proximate cause of Bruder's losses.  But for and as a result of Defendants' unlawful activity, Bruder would have earned at least $4 million more in revenue between November 2016 and its dissolution.

### III.    CAUSES OF ACTION

#### A.    COUNT I: Violation ~~of~~Of 18 U.S.C. § 1962(c)

173.    ~~196.~~ Skywave repeats and realleges each and every allegation set forth in Paragraphs ~~1–195~~1–172 as if fully set forth herein.

174.    The HFT Enterprise, which comprises 10Band, constitutes an enterprise as defined by 18 U.S.C. § 1961(4).

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

175.　The purpose of the HFT Enterprise is to build and operate its HFT Network, including shortwave radio infrastructure, and to obtain licenses from the FCC to operate that network.

176.　~~197.~~ Defendants ~~form an enterprise through association in fact~~and the HFT Enterprise engage in interstate commerce.

177.　As required by 18 U.S.C. § 1962(c), each Defendant has continuously directed, controlled, managed, and conducted the affairs of the HFT Enterprise.  Virtu directs, controls, manages, and conducts the affairs of the HFT Enterprise at least through its 50 percent ownership interest in NLN Holdings, the Virtu employees that hold positions on the board of NLN Holdings, and its use of the HFT Enterprise's HFT Network.  Jump Trading directs, controls, manages, and conducts the affairs of the HFT Enterprise through the Jump Trading employees that hold positions on the board of NLN Holdings, its employees Hinerfeld and Madigan that manage and conduct the HFT Enterprise's operations, and its use of the HFT Enterprise's HFT Network.  DiSomma directs, controls, manages, and conducts the affairs of the HFT Enterprise at least through his ownership interest in NLN Holdings, through Jump Trading, and through the Jump Trading employees that hold positions on the board of NLN Holdings and in the HFT Enterprise.  Gurinas directs, controls, manages, and conducts the affairs of the HFT Enterprise at least through his ownership interest in NLN Holdings, through Jump Trading, and through the Jump Trading employees that hold positions on the board of NLN Holdings and in the HFT Enterprise.  Hinerfeld directs, controls, manages, and conducts the affairs of the HFT Enterprise.  Madigan directs, controls, manages, and conducts the affairs of the HFT Enterprise.

178.　Since 2016, each Defendant has continuously directed, controlled, managed, and conducted the affairs of the HFT Enterprise through a pattern of racketeering activity, including

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

multiple—*i.e.*, more than two—varied acts of wire fraud, each of which is a violation of 18 U.S.C. § 1343 and a predicate act.

179. ~~198. The shared purpose of the enterprise and sub enterprises and the members thereof is~~Defendants, through the HFT Enterprise, devised and engaged in a scheme to defraud the FCC and the Commercial Trading market to obtain shortwave Experimental Licenses for Commercial Trading.

180. ~~, unlawfully use those~~In many—*i.e.*, more than two—of the HFT Enterprise's interstate FCC filings related to new Experimental Licenses ~~for Commercial Trading, and leverage the ill gotten advantages of~~and modifications, renewals, assignments of, and confidentiality requests for Experimental Licenses~~to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.~~, the HFT Enterprise made multiple—*i.e.*, more than two—false statements, false promises, or material misrepresentations that the Experimental Licenses would be used for only experimental purposes.  In each license application, modification application, renewal application, consent of assignment application, and confidentiality request, 10Band or Hinerfeld certified to the FCC that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge.  In each license application, modification application, renewal application, consent of assignment application, and confidentiality request, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were considered material representations.  Madigan signed Experimental License declaratory statements and other filings on behalf of 10Band that contain false statements, false promises, or material misrepresentations.

~~199. Each Defendant participated in the operation or management of Defendants' enterprise.~~

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

200. Each Defendant contributed to directing the enterprise's affairs.

201. Defendants and Defendants' enterprise engage in interstate commerce.

181. Defendants, through the HFT Enterprise, also used or caused the use of interstate wires to transmit orders for financial instruments. The HFT Enterprise operates shortwave transmitters under Experimental Licenses, and Defendants, including at least Jump Trading and Virtu, use those transmitters to engage in Commercial Trading. Each commercial trade made by Defendants uses shortwave networks granted to 10Band under the Elburn I Experimental License, Elburn II Experimental License, Wayne Experimental License, Everett Experimental License, or Lynnwood Experimental License. Defendants have conducted Commercial Trading over the HFT Enterprise's HFT Network from approximately 2017 through the present.

182. Defendants, through the HFT Enterprise, intended to defraud the FCC and the Commercial Trading market as demonstrated by the fact that the Experimental Licenses were intended for use in the HFT Enterprise's HFT Network, which Defendants created and use for Commercial Trading.

183. Defendants, through the HFT Enterprise, used or caused the use of interstate wires to transmit false statements, false promises, or material misrepresentations to the FCC, as well as orders for financial instruments to various trading exchanges.

184. To the extent that DiSomma, Gurinas, Jump Trading, and Virtu did not directly sign or certify the false statements, false promises, or material misrepresentations on behalf of the HFT Enterprise, they are responsible for those predicate acts because they agreed that the HFT Enterprise would commit those acts. DiSomma and Gurinas are responsible for the false statements, false promises, or material misrepresentations through their direction, control, and management of the HFT Enterprise and through Madigan and Hinerfeld, who are employees of

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

Jump Trading, which is owned by DiSomma and Gurinas.  Jump Trading is responsible for and agreed to the false statements, false promises, or material misrepresentations through its direction, control, and management of the HFT Enterprise, as well as through Jump Trading's employees, Madigan and Hinerfeld.  Virtu is responsible for and agreed to the false statements, false promises, or material misrepresentations through its direction, control, and management of the HFT Enterprise.

185.  Defendants' racketeering acts reflect open-ended continuity or—at a minimum—closed-ended continuity.  Defendants continue to direct, control, manage, and conduct the affairs of the HFT Enterprise to defraud the FCC and the Commercial Trading market in filings related to new Experimental Licenses and the modification or renewal of existing Experimental Licenses.  Defendants continue to direct, control, manage, and conduct the affairs of the HFT Enterprise to misuse the Experimental Licenses for Commercial Trading and leverage the ill-gotten advantages of Experimental Licenses.  Defendants' racketeering has harmed multiple different victims, including Skywave, the Drendel Brothers, Bruder, and other parties engaged in Commercial Trading.  Because Skywave could not compete with the HFT Enterprise's HFT Network, Skywave suffered economic injury, including because it was forced to halt its efforts to commercialize its technology, and as a result, Skywave lost out on trading profits it would have acquired from operating its shortwave network.  Similarly, traders such as the Drendel Brothers, through their trading operation, Bruder, lost trading profits they would have continued to realize had Defendants not misused Experimental Licenses.

186.  ~~202.~~  Defendants' ~~enterprise engages in a pattern of~~individual racketeering~~,~~ ~~including violations of 18 U.S.C. § 1343~~ acts through the HFT Enterprise are attributable to all

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

Defendants.  Defendants' ~~racketeering activities affect interstate commerce~~predicate acts exceed the requisite two required to sustain a RICO violation finding.

~~203.  At least as of 2016, Defendants' racketeering acts exhibit open ended or closed ended continuity.  Defendants' racketeering acts all relate to and are in furtherance of the enterprise's shared purpose to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.~~

187. ~~204.~~ Defendants' racketeering directly and proximately caused and continues to cause injury to Skywave and other trading entities.

### B. COUNT II: Violation ~~of~~Of 18 U.S.C. § 1962(d)

188. ~~205.~~ Skywave repeats and realleges each and every allegation set forth in Paragraphs ~~1–204~~1–187 as if fully set forth herein.

189. ~~206. From~~Since 2016, Defendants unlawfully, knowingly, and intentionally combine, conspire, and agree together to ~~engage in the aforesaid conduct in violation of~~direct, control, manage, and conduct the affairs of an enterprise—as defined by 18 U.S.C. § 1961(4)—through a pattern of racketeering activity as required by 18 U.S.C. § 1962(~~e~~d)~~, as set forth in Count I of this Complaint.~~

190. Each Defendant participated in the conspiracy.

191. Each Defendant agreed to direct the affairs of the HFT Enterprise.

192. Defendants and Defendants' HFT Enterprise engage in interstate commerce.

193. ~~207.~~ By facilitating the ~~enterprise's~~HFT Enterprise's racketeering activities, each Defendant intended to further ~~the shared purpose of the enterprise to defraud the FCC to obtain~~

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

~~shortwave~~their goal of defrauding the FCC and the Commercial Trading market by obtaining shortwave Experimental Licenses through the HFT Enterprise, making false statements, false promises, or material misrepresentations in their applications for new licenses, modified applications, renewal applications, consent of assignment applications, and confidentiality requests for Experimental Licenses that Defendants' operations would only be experimental, misusing the Experimental Licenses for Commercial Trading, ~~unlawfully use those Experimental Licenses for Commercial Trading, and leverage~~and leveraging the ill-gotten advantages of the HFT Enterprise's Experimental Licenses ~~to unfairly maximize the financial benefit that Defendants derive from trading financial instruments~~ at their competitors' expense. Defendants' racketeering activities affect interstate commerce.

194. ~~208.~~ Defendants' violations of 18 U.S.C. § 1343 were in furtherance of Defendants' conspiracy to conduct an enterprise ~~designed~~and to defraud the FCC ~~to obtain shortwave~~and the Commercial Trading market by obtaining shortwave Experimental Licenses through the HFT Enterprise, making false statements, false promises, or material misrepresentations in their applications for new licenses, modified applications, renewal applications, consent of assignment applications, and confidentiality requests for Experimental Licenses that their operations would only be experimental, misusing the Experimental Licenses for Commercial Trading, ~~unlawfully use those Experimental Licenses for Commercial Trading, and leverage~~and leveraging the ill-gotten advantages of their Experimental Licenses ~~to unfairly maximize the financial benefit that Defendants derive from trading financial instruments~~ at their competitors' expense.

195. Defendants' conspiracy is attributable to all Defendants. Defendants agreed to perform the requisite two required predicate acts to sustain a RICO violation finding.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

196. ~~209.~~ Defendants' ~~violations of 18 U.S.C. § 1343 have~~racketeering directly and proximately caused and ~~continue~~continues to cause injury to Skywave.

### ~~PRAYER FOR RELIEF~~PRAYER FOR RELIEF

WHEREFORE, Skywave requests the following relief:

A. Entry of judgment holding each Defendant liable for violating 18 U.S.C. § 1961 *et seq.*;

B. An injunction restraining each Defendant, and Defendants' officers, agents, employees, affiliates, and all other persons in concert with, in participation with, or for them, from ~~(i)~~ any further ~~unlawful~~ direct or indirect ~~use~~misuse, including for Commercial Trading, of Experimental Licenses (1) held by 10Band, or (2) held by another entity under the direction or control of or acting in concert with Defendants, or (3) in the possession of any Defendant; ~~and (ii) any other unlawful trading practice directed towards obtaining for any Defendant maximum financial benefit or acting to the detriment of competitors;~~

C. An award of damages for the economic harm suffered by Skywave—including without limitation ~~Skywave's~~its lost profits and amounts by which Defendants have been unjustly enriched—due to Defendants' racketeering together with pre-judgment and post-judgment interest;

D. An award of damages—including without limitation treble damages, attorney fees, and litigation costs—in accordance with the civil remedy provisions of 18 U.S.C. § 1964(c); and

E. Any and all additional legal and equitable relief that may be available under law and that the ~~court~~Court may deem proper.

*[Different first page setting changed from on in original to off in modified.].*

*[Different first page setting changed from on in original to off in modified.].*

### ~~DEMAND FOR JURY TRIAL~~

### DEMAND FOR A JURY TRIAL

Skywave hereby demands a trial by jury on all issues so triable.

~~Dated: October 7, 2024~~

*[Different first page setting changed from on in original to off in modified.]*

Dated: February 13, 2025

Respectfully submitted,

–/s/ Jeanne M. Gills Justin A. Barker

Justin Wilcox (admitted *pro hac vice* pending)
Goutam Patnaik (admitted *pro hac vice* pending)
Jamie Dohopolski (admitted *pro hac vice* pending)
Thomas Romanchek (admitted *pro hac vice*)
DESMARAIS LLP
1899 Pennsylvania Avenue, NW, Suite 400
Washington, D.C. 20006
Tel: 202.451.4900
Fax: 202.451.4901
jwilcox@desmaraisllp.com
gpatnaik@desmaraisllp.com
jdohopolski@desmaraisllp.com
tromanchek@desmaraisllp.com

Steven Balcof (admitted *pro hac vice* pending)
Peter Kotecki (admitted *pro hac vice*)
DESMARAIS LLP
230 Park Avenue, 26th Floor
New York, New York 10169
Tel: 202.351.3400
Fax: 202.351.3401
sbalcof@desmaraisllp.com
pkotecki@desmaraisllp.com

Jeanne M. Gills (IL 6225018)
James Dasso (IL 6193545)
Ariba Justin A. Ahmad Barker (IL 6343233 6274518)
Ariana Garcia-Moore
FOLEY & LARDNER NELSON MULLINS RILEY & SCARBOROUGH LLP
321 North Clark Street, Suite 3000
123 N. Wacker Drive, 21st Floor
Chicago, Illinois 60654-4762 60606
Tel: 312.832.4500 312.376.1014
Fax: 312.832.4700 312.264.9491
jmgills@foley justin.barker@nelsonmullins.com
jdasso@foley.com
aahmad@foley ariana.garciamoore@nelsonmullins.com

Justin M. Sobaje (*pro hac vice* pending)
FOLEY & LARDNER LLP
555 South Flower Street, Suite 3300
Los Angeles, California 90071
Tel: 213.972.4500
Fax: 213.486.0065
jsobaje@foley.com

*Attorneys for Plaintiff Skyward Networks, LLC*

*[Different first page setting changed from on in original to off in modified.]*