**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SKYWAVE NETWORKS, LLC, | |
| Plaintiff, | |
| v. | Civil Action No. 1:24-cv-9650 |
| | Judge Georgia N. Alexakis |
| WILLIAM J. DISOMMA, PAUL A. GURINAS, MATTHEW HINERFELD, JOHN MADIGAN, JUMP TRADING, LLC, VIRTU FINANCIAL, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

**DEFENDANTS' MEMORANDUM
IN SUPPORT OF THEIR MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

FACTUAL ALLEGATIONS OF THE FAC AND THE PUBLIC RECORD .............................. 4

ARGUMENT ...................................................................................................................... 7

I.   THE COURT LACKS JURISDICTION TO ADJUDICATE THE FAC. ............................. 7

II.  SKYWAVE HAS NOT ALLEGED AN INJURY "BY REASON OF" A VIOLATION OF
SECTION 1962. .................................................................................................... 12

   A.  Only the Victim Directly Injured by Racketeering Activity Can Sue Under RICO. ..... 12

   B.  Skywave's Claimed Injury. ............................................................................. 14

   C.  Skywave Was Not a Direct Victim Under *Holmes* and Its Progeny. ............................ 16

III.  SKYWAVE DOES NOT PROPERLY ALLEGE WIRE FRAUD. ..................................... 24

   A.  As a Matter of Law, the Alleged Misrepresentations to the FCC to Obtain Licenses Do
Not Constitute Wire Fraud. ............................................................................. 24

   B.  Skywave's Backup Theory Fares No Better. ................................................... 26

IV.  SKYWAVE'S CLAIMS ARE TIME-BARRED. ......................................................... 28

CONCLUSION ................................................................................................................ 33

## TABLE OF AUTHORITIES

**CASES**

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,*
  483 U.S. 143 (1987) ................................................................................................ 28

*All-Tone Commc'ns, Inc. v. Am. Info. Tech.,*
  1991 WL 166532 (N.D. Ill. Aug. 26, 1991) ........................................................... 22

*Anza v. Ideal Steel Supply Corp.,*
  547 U.S. 451 (2006) ........................................................................................... 12, 13

*Baker v. Atl. Richfield Co.,*
  2021 WL 3726050 (N.D. Ind. Aug. 23, 2021) ........................................................ 30

*Barr Laboratories, Inc. v. Quantum Pharmics, Inc.,*
  827 F. Supp. 111 (E.D.N.Y. 1993) .................................................................... 20, 21

*Bobb v. Swartz-Reston P.C.,*
  2018 WL 4384292 (N.D. Ill. Sept. 14, 2018) ......................................................... 22

*Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP,*
  559 F.3d 671 (7th Cir. 2009) ........................................................................... 28, 31

*CE Design Ltd. v. Prism Bus. Media, Inc.,*
  2009 WL 2496568 (N.D. Ill. Aug. 12, 2009) ........................................................... 8

*Ciminelli v. United States,*
  598 U.S. 306 (2023) ................................................................................................ 25

*Cleveland v. United States,*
  531 U.S. 12 (2000) .................................................................................................. 25

*Coal. for Pres. of Hisp. Broad. v. F.C.C.,*
  931 F.2d 73 (D.C. Cir. 1991) ................................................................................. 11

*Daniels v. Union Pac. R.R. Co.,*
  530 F.3d 936 (D.C. Cir. 2008) ................................................................................ 11

*Devon Drive Lionville, LP v. Parke Bancorp, Inc,*
  791 F. App'x 301 (3d Cir. 2019) ............................................................................ 19

*Eckstein v. Balcor Film Invs.,*
  58 F.3d 1162 (7th Cir. 1995) .................................................................................. 31

*Eli Lilly & Co. v. Roussel Corp.,*
  23 F. Supp. 2d 460 (D.N.J. 1998) ..................................................................... 19, 20

*F.C.C. v. ITT World Commc'ns, Inc.*,
    466 U.S. 463 (1984) ............................................................................... 7

*Gaunce v. deVincentis*,
    708 F.2d 1290 (7th Cir. 1983) ............................................................... 9

*Goren v. New Vision Int'l, Inc.*,
    156 F.3d 721 (7th Cir. 1998) ............................................................... 26

*Gov't App Sols., Inc. v. City of New Haven*,
    2024 WL 1299993 (9th Cir. Mar. 27, 2024) ................................... 18, 20

*Grow Michigan, LLC v. LT Lender, LLC*,
    50 F.4th 587 (6th Cir. 2022) .......................................................... 13, 14

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010) ................................................................................. 12

*Hollinger Int'l, Inc. v. Hollinger Inc.*,
    2004 WL 2278545 (N.D. Ill. Oct. 8, 2004) ......................................... 28

*Holmes v. Securities Investor Protection Corp.*,
    503 U.S. 258 (1992) ..................................................... 12, 13, 21, 22

*In re Honey Transshipping Litig.*,
    87 F. Supp. 3d 855 (N.D. Ill. 2015) ..................................................... 14

*In re NextWave Pers. Commc'ns, Inc.*,
    200 F.3d 43 (2d Cir. 1999) ..................................................................... 7

*In re Surescripts Antitrust Litig.*,
    2020 WL 4905692 (N.D. Ill. Aug. 19, 2020) ......................................... 4

*Kelly v. United States*,
    590 U.S. 391 (2020) ............................................................................. 25

*Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Del.*,
    805 F. Supp. 1277 (D.S.C. 1992) .................................................. 20, 21

*Longmont United Hosp. v. Saint Barnabas Corp.*,
    2007 WL 1850881 (D.N.J. June 26, 2007) ........................................... 19

*McKinney v. Panico*,
    2022 WL 4551695 (N.D. Ill. Sept. 29, 2022) ....................................... 28

*Metro Broad., Inc. v. F.C.C.*,
    497 U.S. 547 (1990) ............................................................................. 26

iii

*Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*,
877 F.2d 1333 (7th Cir. 1989) ................................................................ 14

*Muskegan Hotels, LLC v. Patel*,
986 F.3d 692 (7th Cir. 2021) .................................................................. 26

*N. Am. Catholic Educ. Programming Found., Inc. v. F.C.C.*,
437 F.3d 1206 (D.C. Cir. 2006) ................................................................ 8

*Nance v. NBCUniversal Media, LLC*,
2018 WL 1762440 (N.D. Ill. Apr. 12, 2018) .............................................. 5

*North v. Smarsh, Inc.*,
160 F. Supp. 3d 63 (D.D.C. 2015) ........................................................... 11

*Ordower v. Off. of Thrift Supervision*,
999 F.2d 1183 (7th Cir. 1993) .................................................................. 9

*Orgone Cap. III, LLC v. Daubenspeck*,
912 F.3d 1039 (7th Cir. 2019) .................................................................. 4

*Osundairo v. Geragos*,
447 F. Supp. 3d 727 (N.D. Ill. 2020) ....................................................... 30

*Otwell v. Ala. Power Co.*,
747 F.3d 1275 (11th Cir. 2014) ........................................................ 8, 9, 10

*Ray v. City of Chicago*,
629 F.3d 660 (7th Cir. 2010) .................................................................. 24

*Rotella v. Wood*,
528 U.S. 549 (2000) ................................................................... 9, 28, 32

*RWB Servs., LLC v. Hartford Computer Grp., Inc.*,
539 F.3d 681 (7th Cir. 2008) .................................................................. 22

*Schmude v. Sheahan*,
312 F. Supp. 2d 1047 (N.D. Ill. 2004) ..................................................... 30

*Self v. Bellsouth Mobility, Inc.*,
700 F.3d 453 (11th Cir. 2012) .................................................................. 8

*Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*,
249 F.3d 1068 (D.C. Cir. 2001) .............................................................. 14

*Sidney Hillman Health Ctr. of Rochester v. Abbott Lab's*,
873 F.3d 574 (7th Cir. 2017) .................................................................. 21

iv

*Slaney v. Int'l Amateur Athletic Fed'n,*
    244 F.3d 580 (7th Cir. 2001) ........................................................................ 26

*Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.,*
    884 F.3d 489 (4th Cir. 2018) ........................................................................ 14

*Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.,*
    990 F.3d 31 (1st Cir. 2021) .................................................................... 13, 18

*Telecommunications Rsch. & Action Ctr. v. F.C.C.,*
    750 F.2d 70 (D.C. Cir. 1984) ........................................................................ 11

*United States v. Griffin,*
    76 F.4th 724 (7th Cir. 2023) ........................................................................ 25

*United States v. Schwartz,*
    924 F.2d 410 (2d Cir. 1991) ........................................................................ 25

*United States v. Weimert,*
    819 F.3d 351 (7th Cir. 2016) ........................................................................ 27

*Walters v. McMahen,*
    684 F.3d 435 (4th Cir. 2012) ........................................................................ 14

*Williams v. Dow Chem. Co.,*
    255 F. Supp. 2d 219 (S.D.N.Y. 2003) ........................................................ 25

**STATUTES**

18 U.S.C. § 1343 ............................................................................................ 2, 24

18 U.S.C. § 1964 ...................................................................................... 3, 12, 28

28 U.S.C. § 1927 ................................................................................................. 4

47 U.S.C. § 151 ................................................................................................. 26

47 U.S.C. § 153 ................................................................................................. 23

47 U.S.C. § 155 ................................................................................................. 11

47 U.S.C. § 402 ................................................................................................... 8

**REGULATIONS**

47 C.F.R. § 1.115 ................................................................................................ 7

47 C.F.R. § 5.3 .................................................................................................. 10

47 C.F.R. § 5.5 ..................................................................................................................... 10

47 C.F.R. § 73 ...................................................................................................................... 23

47 C.F.R. § 73.701 .............................................................................................................. 23

## INTRODUCTION

This is a classic case of a plaintiff misusing the RICO statute in an attempt to redress purported injuries not cognizable in any court. On October 7, 2024, Skywave Networks, LLC ("Skywave") filed a racketeering complaint naming 14 defendants. Dkt. 7. Skywave's basic claim was that Defendants Jump Trading, LLC ("Jump Trading") and Virtu Financial, Inc. ("Virtu") conducted an enterprise that allegedly lied to the Federal Communications Commission ("FCC") to obtain experimental licenses to use shortwave radio for commercial trading in their high-frequency trading ("HFT") businesses.[1] Skywave alleged that Defendants' speed advantage using shortwave radio injured competitive trading firms and caused those competitors lost profits, and it asserted that Defendants' FCC submissions amounted to a pattern of wire fraud. Skywave is not itself a competitive trading firm; rather, it sought to be a telecommunications network technology provider to HFT firms.

Skywave claimed that it wanted to apply for a different kind of FCC shortwave license, which, if granted, would have permitted Skywave to use its "nascent" shortwave technology to provide wireless telecommunication services to trading firms that competed with Defendants. Skywave alleged that it lost an investor and a potential trading-firm client for its proposed technology because they were discouraged by Defendants' allegedly unlawful competitive advantage. As a result, Skywave said, it was injured by not being able to build out or commercialize its proposed shortwave network. Rather than accept the limitations of its own business, Skywave sought to blame others, and Defendants became its target.

---

[1] Skywave does not allege that Jump Trading and Virtu collaborate on trading. Their alleged collaboration is in connection with telecommunications technology, including shortwave technology that transmits data to facilitate each firm's independent trades.

Defendants responded with a joint motion to dismiss demonstrating that the Complaint was meritless because, among other defects: (1) the Court had no subject matter jurisdiction; (2) Skywave did not allege a direct injury or even an injury-in-fact resulting from Defendants' alleged conduct; (3) the alleged wire fraud predicates were not directed at obtaining property as required by 18 U.S.C. § 1343, and the fraud was not alleged with particularity; and (4) the statute of limitations had long passed. Dkt. 74.

Rather than attempt to dispute these points, Skywave filed a First Amended Complaint ("FAC"), Dkt. 90, but that effort is not a whit better. The FAC dropped nine of the entity defendants, but it doubled down on the incurable defects in the Complaint, even adding another individual defendant to the list of people accused of criminal conduct on legal theories consistently rejected by the Supreme Court. In a vain effort to avoid some of the fatal problems in the Complaint, Skywave resorts to simply omitting prior factual allegations. Ultimately, the FAC fails for the same reasons as Skywave's original complaint:

***First***, the Court lacks subject matter jurisdiction over Skywave's claims. The FAC still asks the Court to second guess the issuance and use of FCC licenses. This is a clear collateral attack on FCC agency action that cannot be heard by this Court. Skywave does not even attempt to plead around this fatal defect. Skywave's claims turn on the validity of experimental licenses issued to an entity owned by Jump Trading and Virtu, but that matter is committed exclusively to the jurisdiction of the FCC and the U.S. Court of Appeals for the D.C. Circuit. Moreover, almost all of the challenged licenses are final agency actions that Skywave never appealed or challenged at the time they were issued, meaning it cannot now ask *any* court to consider the propriety of those license grants.

**Second**, the FAC continues to allege that the direct victims of the supposed racketeering activity here are Defendants' competitors in the high-frequency trading business, but Skywave is a tech company, not a trading entity. Under 18 U.S.C. § 1964(c), a RICO plaintiff must be the directly injured victim of the purported racketeering activity—but on Skywave's own theory, its injury is remote and derivative, and it depends on independent decisions by intervening actors. Indeed, Skywave still has not even alleged but-for causation because, as it admits, the type of license it claims that it would have used for its own shortwave technology does not even exist. *See* FAC ¶ 120. On the contrary, the FCC has rejected license applications essentially identical to the license application that Skywave says it would have made (but never did make), and Defendants are not alleged to have interfered with Skywave's never-submitted "application" in any way.

**Third**, Skywave's wire fraud theory has not changed and fails as a matter of law. It still alleges two purported varieties of what it characterizes as "wire fraud," but neither exists. The first theory—that Defendants defrauded the FCC to obtain the shortwave licenses—fails because a government license is not "property" within the meaning of the wire fraud statute. The second theory—that Defendants somehow committed wire fraud against their respective counterparties to trades—fails because (i) Skywave never explains the nature of the fraud on these counterparties, neither with particularity nor even generally; (ii) Skywave does not have standing to pursue alleged frauds committed against third parties; and (iii) claims of wire fraud in the purchase of securities are not cognizable under Section 1964(c).

**Fourth**, RICO's four-year statute of limitations requires dismissal: Skywave pleads knowledge in 2017 of its purported "injury" from the very licenses it complains about. Skywave attempts to retract some of its prior allegations that it was put on notice of Defendants' activities

seven years before the Complaint was filed, but this cannot salvage its claims. The FAC still makes clear that Skywave knew of these injuries well outside of the limitations period.

Plaintiff's filing of an amended complaint rather than simply dismissing the case serves no purpose other than to vexatiously multiply the proceedings. *See* 28 U.S.C. § 1927. The FAC should be dismissed with prejudice.

## FACTUAL ALLEGATIONS OF THE FAC AND THE PUBLIC RECORD

Defendants Jump Trading and Virtu are high-frequency algorithmic trading firms that operate on exchanges worldwide. FAC ¶¶ 89, 93. Jump Trading and Virtu indirectly formed a joint venture known as New Line Networks LLC (referred to as "NLN" in the FAC) and a subsidiary shortwave transmission research company called 10Band.[2] *Id.* ¶¶ 86, 123–24. Both Jump Trading and Virtu had been participants in the low-latency trading community for years. In 2016, 10Band first applied to the FCC for an "[e]xperimental" license under Part 5 of the FCC regulations to test the use of shortwave radio technology to transmit financial market data. *Id.* ¶ 64. In December of that year, Skywave became aware of that application, *id.* ¶ 135, and around that same time, it "heard rumors" that Jump Trading or Virtu may have been affiliated with 10Band, Dkt. 7, Compl. ¶¶ 60–61.[3] The FCC staff granted 10Band's application for a five-year term, ending in 2021. FAC ¶ 66.

---

[2] Plaintiffs have also named Jump Trading's owners, general counsel, and a networking employee as defendants.

[3] After seeing Defendants' initial motion to dismiss, which argued that knowledge of these rumors in 2016 barred Skywave's claims under the statute of limitations, Dkt. 74 at 24–28, Skywave omitted this critical fact from the FAC. But Skywave cannot elide this admitted fact from the record, and the Court can and should consider it. "An amended pleading does not operate as a judicial *tabula rasa*. Under some circumstances, a party may offer earlier versions of its opponent's pleadings as evidence of the facts therein." *Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1048 (7th Cir. 2019) (citation omitted) (upholding dismissal); *see also In re Surescripts Antitrust Litig.*, 2020 WL 4905692, at *4 (N.D. Ill. Aug. 19, 2020) (granting summary judgment on antitrust

Beginning in January 2020, 10Band applied for multiple renewals and modifications of this license, as well as for related licenses and their renewals and modifications, and the FCC granted the applications each time.[4] *Id.* ¶¶ 67–85. In 2023, 10Band's renewal was granted for a two-year term to expire on November 1, 2025. *Id.* ¶ 68. Until this 2023 license renewal, Skywave never challenged or appealed any of these license grants. Skywave alleges that Defendants used the licenses for shortwave radio signals that transmit data to facilitate inter-continental HFT and other low-latency trading. *Id.* ¶¶ 52–53. Skywave contends that this usage is akin to commercial trading and thus not authorized under an "experimental" license. *Id.* ¶ 48.

Skywave also asserts that it wanted to get into the business of licensing its own shortwave radio technology and capability to other HFT firms. *Id.* ¶¶ 32, 39, 40. It alleges that it "planned" to acquire—but does not allege that it actually did receive (or even applied for)—a different type of FCC license, a multi-use "Part 73" "commercial" license. *Id.* ¶¶ 36, 38. Even Skywave acknowledges that this type of license did not actually exist. *Id.* ¶¶ 38, 120. In fact, Skywave's business plan never materialized: in 2017, one of Skywave's business partners withdrew from their venture, because it "did not believe the partnership could reasonably compete" against 10Band's network. *Id.* ¶¶ 136–39; *see also* Dkt. 7, Compl. ¶ 62.

Six years after Skywave's investor raised the issue, in September 2023, Skywave filed with the FCC staff a "Petition for Reconsideration" of 10Band's August 2023 license renewal. *See*

---

complaint where plaintiffs engaged in artful pleading to disguise their failure to allege they were direct purchasers). In particular, a court may consider an original pleading in the interests of justice and to determine the plausibility of an amended pleading. *See Nance v. NBCUniversal Media, LLC*, 2018 WL 1762440, at *5 (N.D. Ill. Apr. 12, 2018) (dismissing claim because plaintiff "simply change[d] his story"). Here, it is not plausible to assume that Skywave was unaware of any relationship between Jump Trading, Virtu, and 10Band until within the statute of limitations period when Skywave previously admitted that it heard rumors of their affiliation as early as 2016.

[4] Since the filing of the FAC, 10Band has applied for another license renewal on April 12, 2025.

Declaration of Neema Sahni ("Sahni Decl."), Ex. A ("Petition"). This Petition argues that 10Band "uses the experimental authorization for regular day-to-day trading," and so an experimental license "should not have been granted." *Id.* at 1. It asks the FCC staff to "reconsider and deny 10Band's application for renewal of the Experimental License"—*i.e.*, to revoke the license. *Id.* at 7. 10Band filed an Opposition to Skywave's Petition on September 28, 2023, explaining that its activity was consistent with the FCC's rules, and Skywave filed a Reply on October 12, 2023. Sahni Decl., Exs. B, C. Skywave's Petition remains pending. Unsatisfied with petitioning the FCC, Skywave has now tried to transform the very conduct it has complained of in the Petition into a RICO racketeering claim.

In the FAC, as in the original Complaint, Skywave accuses Defendants of substantive and conspiracy violations of the RICO statute based on wire fraud predicates. Although the FAC contains a substantial number of amendments—*e.g.*, adding and dropping defendants, deleting allegations that Skywave now realizes are harmful to its case, and adding more detail on Skywave's failed shortwave network—the substance remains the same. The FAC still alleges, at its core, that 10Band misled the FCC staff about the "experimental" nature of its shortwave licenses. FAC ¶ 1. Likewise, Skywave's theory of harm remains the same: this alleged fraudulent activity of lying to the FCC, in turn, supposedly allowed Defendants' network to compete effectively against other HFT firms, costing other HFT traders lost profits. *Id.* ¶ 23 (Defendants "leverag[e] the ill-gotten advantages of their Experimental Licenses at their competitors' expense"); *id.* ¶ 53 (same); *id.* ¶ 193 (same); *id.* ¶ 194 (same); *id.* ¶ 103 (Defendants used licenses to gain a "speed advantage over" Commercial Trading competitors); *id.* ¶ 109 (same). The FAC alleges that Defendants' speed and profitability advantage over competitors in turn harmed Skywave because this purported advantage caused an investor ("Investor 1") and a commercial trading firm ("Trader 1") to drop

out of a partnership. *Id.* ¶¶ 136–39, 152, 156. Skywave seeks two forms of relief: treble damages and an injunction barring Defendants from using the licenses issued by the FCC. *Id.*, Prayer for Relief.

## ARGUMENT

## I. THE COURT LACKS JURISDICTION TO ADJUDICATE THE FAC.

Skywave impermissibly asks this Court to second-guess the FCC's grant and renewal of licenses to Defendants. Federal district courts must dismiss such collateral attacks on agency decisions.

Under the Communications Act of 1934, the FCC has exclusive jurisdiction over spectrum licensing decisions. *See, e.g.*, *In re NextWave Pers. Commc'ns, Inc.*, 200 F.3d 43, 54 (2d Cir. 1999). Accordingly, the question of whether the Part 5 experimental licenses obtained by 10Band were properly granted and renewed must be decided—and has been decided—in the first instance by the FCC. To the extent that Skywave wanted to challenge those final determinations, its only recourse would have been to seek review by the FCC and, in turn, seek review of that final FCC order in the D.C. Circuit, which has exclusive jurisdiction to review FCC agency actions.[5] *F.C.C. v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984); 47 U.S.C. § 402(b)(6) ("Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia . . . [b]y any [] person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application[.]").

For all but one of the seven grants and renewals alleged in the FAC, the time for raising such a challenge in the proper forum has long since passed, so those decisions are final and may not be challenged, in this Court or anywhere else. *See* 47 C.F.R. § 1.115(d) (applications for review

---

[5] Skywave is of course aware of this proper procedure given its pending Petition for Reconsideration.

of staff licensing decisions must be filed with the full Commission within 30 days of staff action); 47 U.S.C. § 402(b) (challenges to an FCC final licensing decision must be filed with the D.C. Circuit); *N. Am. Catholic Educ. Programming Found., Inc. v. F.C.C.*, 437 F.3d 1206, 1209–10 (D.C. Cir. 2006) (requiring dismissal of challenge to FCC licensing-related decision when complainant waited more than 30 days). As for the one license renewal for which Skywave did timely file a Petition for Reconsideration, the FCC has not yet rendered a final decision on Skywave's Petition, which is all the more reason why this Court has no jurisdiction to hear a challenge to it.

Skywave nevertheless seeks to launch a belated collateral attack on final regulatory decisions committed to the FCC's and D.C. Circuit's exclusive jurisdiction. In asking the Court to assess whether Defendants lied to the FCC by representing that 10Band qualified for an experimental license, Skywave necessarily asks this Court to overrule the FCC's determination that 10Band *did so qualify*. Skywave's attempt to sidestep Congress's carefully prescribed process for challenging the FCC's licensing determination by pleading to this Court that Defendants defrauded the FCC is blatantly improper. *See CE Design Ltd. v. Prism Bus. Media, Inc.*, 2009 WL 2496568, at *12 (N.D. Ill. Aug. 12, 2009) (claim is impermissible collateral attack where "the complaint filed in the district court raise[s] the same issues and seek[s] the same relief in substance as" in the FCC's proceedings (citation omitted)), *aff'd*, 606 F.3d 443 (7th Cir. 2010).[6] And because the FCC's licensing decisions can be challenged only through the administrative process and

---

[6] *Accord Self v. Bellsouth Mobility, Inc.*, 700 F.3d 453, 462 (11th Cir. 2012) (affirming dismissal for lack of jurisdiction where "claims necessarily conflict with final orders of the FCC and thereby depend on the district court being able to collaterally review the correctness or validity of those orders"); *Otwell v. Ala. Power Co.*, 747 F.3d 1275, 1282 (11th Cir. 2014) ("[N]on-parties to the proceedings before the [agency] may not contest the agency's final decision in an alternative forum by bringing challenges that are inescapably intertwined with a review of the agency's final determination.").

reviewed only in the D.C. Circuit—steps which Skywave failed to timely take as to the earlier license grants—Skywave's RICO claims predicated on those earlier grants cannot now be heard in *any* court.

Even more fundamentally, in seeking treble damages for use of the licenses and to enjoin any further use of them, Skywave is expressly asking this Court to penalize and undo a licensing decision made by the FCC. *See* FAC, Prayer for Relief; *Rotella v. Wood*, 528 U.S. 549, 557–58 (2000) (purpose of civil RICO treble-damages remedy is to deter and penalize the prohibited practices). But the Seventh Circuit has made clear that where, as here, "Congress places review of an administrative decision in the court of appeals, *district judges may not enjoin or penalize action that the agency has approved* or that is the natural outcome of the agency's decision." *Ordower v. Off. of Thrift Supervision*, 999 F.2d 1183, 1188 (7th Cir. 1993) (emphasis added). In other words, this Court has no jurisdiction to grant Skywave the remedies it seeks. *Id.*; *see also Gaunce v. deVincentis*, 708 F.2d 1290, 1292–93 (7th Cir. 1983) (dismissing for lack of jurisdiction where lawsuit was "in derogation of the well settled principle that collateral attacks upon administrative orders are not permissible"). And it makes no difference that Skywave has styled its challenge under the guise of RICO; that does not and cannot fix its jurisdictional problem. *See Otwell*, 747 F.3d at 1281 ("[Litigants] cannot escape [the statute's] strict judicial review provision by arguing that they are pursuing different claims and different relief than the parties before the [agency].").

*Otwell v. Alabama Power Co.* is instructive. There, the Federal Energy Regulatory Commission ("FERC") had renewed Alabama Power's license to operate a dam project on a lake. *Id.* at 1278. An association of local property owners participated in and opposed the license proceedings, and filed a petition for rehearing with FERC. *Id.* FERC denied the petition, and the property owners brought a number of tort claims against Alabama Power in federal district court,

alleging unreasonable actions in operating the dam project. *Id.* at 1278–79. The Eleventh Circuit held that the lawsuit was an impermissible collateral attack because—under a statute analogous to that governing review of FCC orders—the court of appeals has exclusive jurisdiction to set aside an order of FERC. *Id.* at 1281. It did not matter that the plaintiffs technically "assert[ed] different claims and request[ed] different relief," because their requested injunction involved "proposals expressly considered and rejected by FERC in its relicensing proceedings, in the order issuing the 2010 License, and in its order denying rehearing." *Id* at 1281–82. Because the plaintiffs were "attempting to obtain the same results and to place the same constraints on Alabama Power rejected by the agency in the exercise of its institutional expertise, and their claims [were] inescapably intertwined with a review of the FERC's final decision," the district court lacked jurisdiction to hear the claims. *Id.* at 1282. So too here.

There is no better illustration of the FAC's failings in this regard than Skywave's currently pending Petition for Reconsideration of the Elburn I Renewal Grant—the *only* licensing decision that Skywave chose to timely challenge before the FCC (and one that issued well after Skywave's alleged harm occurred in 2017, *see infra* Section IV). There, Skywave makes the very same arguments to the FCC that the FAC asks *this Court* to consider: that 10Band "uses the experimental authorization for regular day-to-day trading," and so its experimental license "should not have been granted." Pet. at 1.[7] The agency has not yet adjudicated Skywave's Petition for Reconsideration, which was filed with the FCC's Office of Engineering & Technology. If that Office issues a decision on the Petition adverse to Skywave, Skywave would need to file an

---

[7] These claims are based on a false dichotomy between "experimental" and commercial activities. The FCC's rules permit experimental licensees to perform "[p]roduct development and market trials," 47 C.F.R. § 5.3(k), the latter of which the agency defines as "[a] program designed to evaluate product performance and customer acceptability," *id.* § 5.5, and the Commission found 10Band's activity consistent with the rules.

application for review of that decision to the full Commission before Skywave would be permitted to appeal *that* decision to the D.C. Circuit. 47 U.S.C. § 155(c)(7) ("The filing of an application for review under this subsection shall be a condition precedent to judicial review of any order, decision, report, or action made or taken pursuant to a delegation under paragraph (1) of this subsection."); *Coal. for Pres. of Hisp. Broad. v. F.C.C.*, 931 F.2d 73, 76–77 (D.C. Cir. 1991) ("In general, failure to exhaust administrative remedies bars judicial review of FCC orders.").

In other words, to the extent Skywave's RICO claims are based on this license renewal (and could somehow survive the many other defects set forth herein), this Court cannot hear those claims either. Skywave's challenge belongs with the FCC unless and until Skywave's administrative remedies have been exhausted, and then with the D.C. Circuit, pursuant to the exclusive administrative scheme and review process that Congress has carefully delineated. *See Telecommunications Rsch. & Action Ctr. v. F.C.C.*, 750 F.2d 70, 75 (D.C. Cir. 1984) ("[W]e hold that where a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's *future* jurisdiction is subject to the *exclusive* review of the Court of Appeals." (first emphasis added)); *Daniels v. Union Pac. R.R. Co.*, 530 F.3d 936, 942 (D.C. Cir. 2008) ("the district court lacks subject matter jurisdiction over [plaintiffs' claims] because those claims, *once final*, are subject to this Court's exclusive jurisdiction" (emphasis in original)); *North v. Smarsh, Inc.*, 160 F. Supp. 3d 63, 84 (D.D.C. 2015) (dismissing claim for lack of jurisdiction where "Plaintiffs are barred from launching such collateral attacks because they 'almost certainly implicate[ ] issues that would be addressed by the Court of Appeals upon final review of [the agency's] ruling'" (citation omitted)). In any case, even if everything went Skywave's way with its singular FCC Petition and an eventual appeal to the D.C. Circuit, Skywave still would be unable bring the RICO claims pleaded in FAC for the reasons set forth below.

## II. SKYWAVE HAS NOT ALLEGED AN INJURY "BY REASON OF" A VIOLATION OF SECTION 1962.

### A. Only the Victim Directly Injured by Racketeering Activity Can Sue Under RICO.

Only a "person injured in his business or property by reason of a violation of section 1962 . . . may sue." 18 U.S.C. § 1964(c). Section 1964 requires "a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992). When determining proximate causation, "the central question [to] ask is whether the alleged violation led *directly* to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (emphasis added). Only "the victim directly injured" by the racketeering conduct, not an "indirectly injured victim," can sue. *Holmes*, 503 U.S. at 274. "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes*, 503 U.S. at 271, 274). Where a plaintiff's "theory of causation requires [a court] to move well beyond the first step, that theory cannot meet RICO's direct relationship requirement." *Id.* at 10.

Three important considerations underlie the direct-relationship requirement. *First* is "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action." *Anza*, 547 U.S. at 458. "[T]he less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Holmes*, 503 U.S. at 269. *Second*, "recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury." *Id. Third*, "directly injured victims can generally be counted on to vindicate the law" without the difficulties caused by allowing suits "by plaintiffs injured more remotely." *Id.* at 269–70.

The direct-relationship requirement is applied rigorously to dismiss RICO complaints where the plaintiff is not the party that suffers the direct harm. The leading case is *Holmes*, 503 U.S. 258. There, the defendant lied to manipulate the price of certain stocks, brokers bought those stocks with their own money at inflated prices, the market learned of the deception, and the ensuing price collapse forced the brokers into liquidation. *Id.* at 262–63. SIPC (which oversees the liquidation of bankrupt securities brokers) asserted RICO claims for losses to customers who did not purchase the manipulated stocks, but whose losses resulted from the liquidation of the brokers who had. *Id.* The Supreme Court held that because the direct victims of the fraud were the brokers, their customers were only indirect victims. *Id.* at 270–74. As the Court explained, "the link [was] too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers." *Id.* at 271.

The Supreme Court applied the same direct-relationship analysis to deny the plaintiff a cause of action in *Anza*, 547 U.S. 451. There, the defendant steel products company cheated the State of New York by not charging its customers sales taxes. *Id.* at 453–54. A rival company brought a RICO suit alleging that the defendant's failure to charge sales taxes to customers and filing of false tax returns allowed the defendant to charge lower prices to customers, causing losses to the plaintiff. *Id.* at 454, 457–58. The Court, relying on *Holmes*, found that the direct victim of the fraud was the State of New York and that the competitor was only an indirect victim and therefore could not state a claim. *Id.* at 458.

The directness requirement of Section 1964(c) is "demanding," *Grow Mich., LLC v. LT Lender, LLC*, 50 F.4th 587, 594 (6th Cir. 2022), and the cases applying it to reject a downstream plaintiff's RICO claims are legion. *See, e.g.*, *Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*, 990 F.3d 31, 36 (1st Cir. 2021) (plaintiff failed to establish standing because its injury was

"entirely derivative" of its potential business partner's injury); *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*, 877 F.2d 1333, 1335 (7th Cir. 1989) (company's owners could not establish proximate causation to sue bank under RICO because their injury was derivative of injury to the company); *Walters v. McMahen*, 684 F.3d 435, 444 (4th Cir. 2012) (although false attestations that undocumented employees were eligible to work "are one step in the chain of events that ultimately may have resulted in the employment of unauthorized aliens," depressed wages for authorized workers was not a "direct" result); *Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1071, 1074 (D.C. Cir. 2001) (dismissing RICO claims against tobacco companies brought by health trust funds because "the alleged harm arising from payment of medical expenses by the funds and the nations is itself derivative of alleged injuries to individual smokers"); *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 494–95 (4th Cir. 2018) (subcontractor did not have standing to bring RICO claim against building owner's insurance company because subcontractor's alleged injury was derivative of harm to building owner); *Grow Mich.*, 50 F.4th at 595–96 (6th Cir. 2022) (dismissing RICO claim where plaintiff's injury was only derivative of harm to its debtor); *In re Honey Transshipping Litig.*, 87 F. Supp. 3d 855, 863–65 (N.D. Ill. 2015) (commercial bee-keepers did not suffer direct injury under RICO from scheme by importers and suppliers to defraud the government of customs duties by misbranding Chinese honey).

## B. Skywave's Claimed Injury.

Skywave claims that Jump Trading and Virtu committed a pattern of wire fraud by lying to the FCC to obtain experimental shortwave transmission licenses. FAC ¶¶ 1, 64–85, 103–05. Armed with those licenses, Skywave says, Jump Trading and Virtu gained a "dominant speed advantage," *id.* ¶ 4, and used it "to illegally dominate certain trades across global trading markets," *id.* ¶ 53. According to Skywave, this trading allegedly permitted Jump Trading and Virtu to "reap ill-gotten

14

financial benefits by dominating Commercial Trading markets . . . [where they] win[] trades, resulting in profitable trading." *Id.* ¶ 103.

But Skywave is not even in those trading markets; rather, it is at most a would-be licensor to high-frequency trading firms. Skywave says that the speed advantage and concomitant trading profit, according to the FAC, "derailed" Skywave's own efforts to commercialize a shortwave trading technology and platform it could license to other trading firms. *Id.* ¶¶ 3–4. As a result, Skywave claims it was "forced to halt its efforts to commercialize its technology." *Id.* ¶ 4; *see also id.* ¶¶ 152–56.

This is not a direct injury cognizable under RICO. In an effort to establish some linkage between the licenses obtained by Jump Trading and Virtu and Skywave's "derailed" efforts, Skywave points to the effect Defendants' speed-powered advantage supposedly had on *other* parties. It alleges that Investor 1 asked to drop out of Skywave's proposed project in 2017 because it did not believe that Skywave could compete with Jump Trading and Virtu's shortwave technology. *Id.* ¶¶ 136–37; *see also* Dkt. 7, Compl. ¶ 62. Skywave agreed to allow Investor 1 to drop out. FAC ¶ 137. Skywave also had an agreement with an HFT firm, Trader 1. ██████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████ *Id.* ¶ 40. In 2020, Trader 1, apparently also discouraged, asked to be let out of the agreement, and Skywave agreed. *Id.* ¶ 139. Skywave alleges that other potential trader clients were forced out of business by Defendants' speed advantage. *Id.* ¶ 156. Skywave claims as damages, among other things, a share of the profits it speculates traders would have paid to Skywave in payment for licensing its technology and network platform if all this had not happened. *Id.* ¶¶ 152, 155–56, Prayer for Relief.

15

### C. Skywave Was Not a Direct Victim Under *Holmes* and Its Progeny.

      1.     *On the allegations of the FAC, the direct victims of the alleged racketeering were other trading firms, not Skywave.*

Under Skywave's theory, the direct financial victims of Defendants' alleged scheme, if any, are Jump Trading's and Virtu's competitors in the business of trading financial instruments, not Skywave. As Skywave alleged in eight distinct places in its original Complaint, Defendants allegedly schemed:

> *to defraud the FCC* to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses *to unfairly maximize the financial benefit that Defendants derive from trading financial instruments <u>at their competitors' expense</u>*.

Dkt. 7 ¶ 4 (emphasis added); *id.* ¶¶ 73, 82, 173, 176, 198, 203, 207–08. Accordingly, Defendants moved to dismiss that Complaint for, among other things, failure to allege proximate causation. *See* Dkt. 74 at 6–17.

Recognizing that it previously pled itself out of court with these eight express allegations that the alleged harm befell Jump Trading's and Virtu's "competitors" in high-frequency trading, Skywave deletes them, now claiming that the harm befell what it obscurely calls "market participants, including Skywave." FAC ¶ 1. This purge-*cum*-sleight-of-hand is unavailing for two reasons. Initially, it is barred by the artful-pleading doctrine. *See supra* note 3. In addition, the purge was incomplete, and the FAC still makes unmistakably clear that any direct injury fell on competitive traders, not on Skywave. Skywave repeatedly alleges, for example, that the key thing Defendants did wrong was to leverage the supposedly ill-gotten experimental licenses "at their competitors' expense." *Id.* ¶ 23; *id*. ¶ 52 (same); *id.* ¶ 193 (same); *id*. ¶ 194 (same). Defendants allegedly used the licenses to "gain a speed advantage over *Commercial Trading competitors.*" *Id.* ¶ 109 (emphasis added). Investor 1 pulled out of its deal with Skywave because of alleged concerns

16

about Defendants' speed "advantage over *other traders*." *Id.* ¶ 136 (emphasis added). And some traders who allegedly might have otherwise licensed Skywave's patents and technology were "forced out of business" by Defendants' dominant speed advantage. *Id.* ¶ 156; *see also id.* ¶ 103 (Defendants reaped illegal profits by "dominating Commercial Trading markets"); *id.* ¶¶ 112, 117, 120 (Defendants schemed to "defraud . . . the Commercial Trading market"); *id.* ¶ 53 (Defendants use shortwave to "dominate certain trades across global trading markets"); *id.* ¶ 179 (Defendants "scheme[d] to defraud . . . the Commercial Trading market").

Skywave still does not (and cannot) allege that it has ever been or was going to be a high-frequency (or, for that matter, any other type of) trader. In fact, the FAC shows—just as the original Complaint did—that it was not. Instead, Skywave merely proposed to provide a telecommunications network service to such traders. ██████████████████████████ ███████████████████████████████████████████████████████████ *Id.* ¶ 41 (emphasis added). █████████████████████████████████████████████████ *Id.* ¶ 40. But for Defendants' conduct, *Trader 1* would have conducted "latency arbitrage trading" via Skywave's network and (Skywave speculates) would have made successful trades. *Id.* ¶ 155. The same is true of other potential trader clients of Skywave: the injury to these other traders has resulted in Skywave being "unable to license its shortwave network technology, know-how, and patents." *Id.* ¶ 156.

This case thus falls squarely within the teachings of *Holmes*, *Anza,* and their progeny. Just like the investors seeking to recover funds lost in the collapse of their broker in *Holmes* or the competitor in *Anza* whose prices were undercut by the defendant's not paying or passing on sales taxes to customers, the financial harm (if any) to Skywave is purely derivative of the alleged harm to some other party.

17

*Sterling Suffolk Racecourse*, 990 F.3d 31, is right on point. There, plaintiff Sterling was the proposed landlord for a casino that an applicant for a gaming license hoped to build. *Id.* at 34. Sterling brought a RICO claim against the winning bidder for the license, Wynn Resorts, claiming that Wynn lied to the Massachusetts Gaming Commission on its application, the alleged fraud cost Wynn's rival to lose out on the gaming license, and that, in turn, cost Sterling its opportunity to lease its land to the rival. *Id.* at 34–35. There, as here, the alleged misrepresentation was directed at a government agency in order to obtain a governmental license. There, like Trader 1 and other trading firms here, a potential business partner of the plaintiff was allegedly injured as a result of the issuance of the license. And there, as here, the downstream plaintiff who allegedly stood to be paid by the directly injured victim sought to recover under RICO. The First Circuit, applying *Holmes* and *Anza*, affirmed dismissal of the complaint, rejecting the argument that "persons who do business with an entity harmed by a RICO conspiracy may recover against the conspirators." *Id.* at 37. That perfectly describes Skywave's claim here.

       2.    *The causal chain is broken because it depends on a series of independent and intervening factors, as well as baseless speculation.*

That a claimed injury is indirect, like Skywave's, is itself sufficient to defeat the proximate-cause requirement of Section 1964(c). But the causal chain Skywave posits between Defendants' supposed misrepresentations to the FCC and its purported injury is not merely attenuated. It is actually *broken* by a long series of independent, intervening acts by third parties, including rank speculation as to what might have happened if a chain of multiple events that never happened had happened. That independently forecloses meeting Section 1964(c)'s directness requirement because "a 'theory of liability [that] rests not just on separate *actions*, but separate actions carried out by separate *parties*' is insufficiently direct." *See Gov't App Sols., Inc. v. City of New Haven*,

2024 WL 1299993, at *2 (9th Cir. Mar. 27, 2024) (quoting *Hemi Grp.*, 559 U.S. at 11 (finding no direct injury)).

In the first place, the supposed misrepresentations were made to the FCC, and the FCC then made a series of decisions to grant the experimental shortwave licenses to 10Band. FAC ¶¶ 66–85. Even if those FCC decisions were, as Skywave alleges, based on false statements, they are intervening acts that break the causal chain. *See Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 485 (D.N.J. 1998). *Eli Lilly* is instructive. There, Lilly brought a RICO claim against a competitor, contending that the competitor's lies to the FDA to obtain approval for bulk sales of a drug reduced Lilly's own sales. The court held that Lilly had failed to allege proximate causation because its "injury result[ed] from many intervening acts and causes," *including the FDA's approval*. *Id.*

Many other courts have reached the same conclusion where an injury involves an intervening decision by a regulator who was allegedly misled. For example, in *Devon Drive Lionville, LP v. Parke Bancorp, Inc*, 791 F. App'x 301, 306 (3d Cir. 2019), the plaintiffs claimed they were RICO victims based on the contention that the FDIC relied on the defendant bank's fraud, and that reliance caused their injuries. The court rejected the plaintiffs' proximate-causation theory because the regulators were "intervening actors who [broke] the chain of causation." *Id.* at 307. "Where a government body is an intervening actor between an alleged RICO violation and the alleged harm, courts . . . uniformly dismiss the claims for lack of proximate cause[.]" *Longmont United Hosp. v. Saint Barnabas Corp.*, 2007 WL 1850881, at *4 (D.N.J. June 26, 2007) (rejecting RICO theory that hospital chain fraudulently overbilling CMS for Medicare reduced reimbursements to plaintiff), *aff'd*, 305 F. App'x 892, 894 (3d Cir. 2009) ("[T]he Centers for Medicare & Medicaid Services ('CMS') stands between SBC's conduct and Longmont's

injuries."); *see also Barr Lab'ys, Inc. v. Quantum Pharmics, Inc.*, 827 F. Supp. 111, 115–16 (E.D.N.Y. 1993) (rejecting RICO claim based on theory that defendant "fraudulently obtained approval to market a competing product" in part because plaintiff's "losses depend on the intervening actions of the FDA"); *Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Del.*, 805 F. Supp. 1277, 1291 (D.S.C. 1992) (rejecting RICO claim in part because "[a]ny harm from the alleged conspiracy would be purely contingent on how the rate bureaus and the [Interstate Commerce Commission] acted based on the alleged predicate acts"), *aff'd*, 998 F.2d 1009 (4th Cir. 1993).

Besides the FCC's intervening decisions, the FAC also explicitly alleges another set of independent intervening actors: its prospective business partners and ultimately Skywave itself. Specifically, it alleges that as a result of Jump Trading's and Virtu's supposedly unlawfully obtained speed advantage in trading, first Investor 1 and then Trader 1 decided they wanted to get out of the partnerships they had with Skywave. Skywave agreed that they could do so. FAC ¶¶ 136–37, 139.

Independent decisions like these by other commercial actors, including Skywave itself, vitiate any claim of proximate causation under Section 1964(c). "[L]awful actions, like . . . choosing not to do business with a company, can serve as [an] independent factor[] rendering the purported injury too indirect from the predicate RICO acts." *Gov't App Sols.,* 2024 WL 1299993, at *2. In *Government App Solutions*, the plaintiff claimed it was the victim of racketeering because, after one of its contractors became involved in a bribery scheme with the mayor of Sacramento, other municipalities refused to do business with it. The court, applying the three *Holmes* factors, determined that that plaintiff had no standing to sue under the direct-relation test. *Id.*; *see also Eli Lilly*, 23 F. Supp. 2d at 485 (emphasizing the contingent nature of decisions by manufacturers,

distributors, pharmacies, and consumers as intervening between the fraudulent statements and the alleged injury to plaintiff); *Lifschultz Fast Freight*, 805 F. Supp. at 1291 (harm to plaintiff was contingent on "the customers' taking action based on the ICC action"); *Barr Laboratories*, 827 F. Supp. at 115–16 (plaintiff's losses depended in part on defendants' customers' actions).

Beyond these intervening decisions, Skywave's lost-profits claim depends on a number of other speculative and contingent events, including that: (1) Skywave would actually have submitted an FCC license application; (2) the FCC would have granted it a Part 73 license for trading (even though such a license does not exist, *see infra* Section II(C)(4), and Skywave itself acknowledges as much, *see* FAC ¶ 120); (3) Skywave would have built out its network by purchasing transmitters and antennas, closing on land acquisitions for U.S. transmitter locations, and "develop[ing]" receiver locations in the U.K. and Germany, each of which is dependent on third parties' actions (*id.* ¶ 154); (4) Skywave's technology would have been effective and better than any competing technology; (5) traders would have wanted to do business with Skywave (a dubious proposition given the history of one of its founders[8]); and (6) traders who licensed its technology would have traded successfully and made profits.

3. *The principles underlying the Supreme Court's Section 1964(c) jurisprudence highlight why Skywave is not a proper RICO plaintiff.*

Each of the reasons articulated by the Supreme Court in *Holmes* and *Anza* for permitting only the direct victim to sue applies here. Specifically, there is no way to disentangle the effects of the alleged misconduct from other independent acts and decisions that led to Skywave's alleged damages. *See Holmes*, 503 U.S. at 269; *Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys*,

---

[8] One of the co-founders of the company is Kevin Babich. FAC ¶ 31. Babich—when running a former company—skimmed $680,000 in payments from a client to pay personal bills and other expenses (and, as a result, pled guilty to federal mail and wire fraud). *See United States v. Babich*, Plea Agreement, 2:14-cr-56-RLM, Dkt. No. 2 (N.D. Ind. 2015). Babich was still on probation at the time Skywave was allegedly ready to commercialize its business.

873 F.3d 574, 577 (7th Cir. 2017). Moreover, because any harm Skywave alleges fell first on Jump Trading's and Virtu's HFT competitors, the Court would have to create complicated apportionment of damages rules—first apportioning them among those competitors and only then to Skywave if Skywave could show that one of more of those competitors would have contracted with Skywave. *See Holmes*, 503 U.S. at 269. And even if Skywave were right about the purported scheme it alleges and any resulting harm to HFT competitors—to be clear, it is not—then there are more directly injured parties who could vindicate the law. *Id.* at 269–70.

4. *Skywave has not even alleged but-for causation.*

There is also a second, independent reason why this claim fails the test of Section 1964(c): Skywave has not even adequately alleged but-for causation. "The typical question asked in determining cause-in-fact is counterfactual: would the claimed injury still have happened if the defendant had not engaged in the tortious conduct alleged?" *RWB Servs., LLC v. Hartford Comput. Grp., Inc.*, 539 F.3d 681, 686 (7th Cir. 2008); *see also Bobb v. Swartz-Retson P.C.*, 2018 WL 4384292, at *8 (N.D. Ill. Sept. 14, 2018) (finding no but-for causation); *All-Tone Commc'ns, Inc. v. Am. Info. Tech.*, 1991 WL 166532, at *4 (N.D. Ill. Aug. 26, 1991) (same).

Here, to establish but-for causation, Skywave would have to plausibly allege that it could and would have entered the market for providing shortwave services to trading firms with a Part 73 license, which it refers to as a "commercial license." On its theory, getting the Part 73 license was the *sine qua non* of selling shortwave services to such firms. However, Skywave does not allege that it ever even applied for a Part 73 license, only that it planned to do so. FAC ¶¶ 3, 36. Nor does it allege that the FCC rules provide for issuance of such a license for the purpose that Skywave has posited: to privately transmit market or trading data between an HFT firm in the U.S. and its servers at European exchanges using transoceanic shortwave communications. *Id.* ¶¶ 31–36.

22

It is little wonder that Skywave omits these allegations: there is no such license under Part 73. Part 73 pertains to "Radio Broadcast Services." *See* 47 C.F.R. § 73 ("Radio Broadcast Services"). The term "broadcasting" for purposes of the Federal Communications Act "means the dissemination of radio communications *intended to be received by the public*, directly or by the intermediary of relay stations." 47 U.S.C. § 153(7) (emphasis added); 47 C.F.R. § 73.701(a) ("*directly by the general public*" (emphasis added)). But Skywave's proposed transmissions, by design and definition, are not to the general public, but rather private and point-to-point, so a particular trader with uniquely fast access to data can make a split-second profit. *See* FAC ¶¶ 29–30.

The FAC in fact admits that there is no license under Part 73 for private data transmission for purposes of trading financial instruments (as opposed to broadcasting programs to the general public). *Id.* ¶ 120. Instead, it says Skywave wanted to sidestep the rules and "*design* a multi-use Part 73 license" under which it would split transmission of private commercial trading data and public high-class "musical performances." *Id.* ¶ 38 (emphasis added). It spoke to FCC staff about the idea almost a decade ago and claims that the staff "encouraged" Skywave to apply. *Id.* However, tellingly, Skywave never alleges that it actually applied for such a license, let alone received one, nor that the Commission has ever granted such a license to anyone.

Skywave also omits to mention that, whatever the opinion of FCC staff may have been years ago, the Commission itself has recently rejected the same multi-use proposal from other parties. *See In the Matter of DPA Mac LLC,* IHF-C/P-20201228-00010 (FCC DA 25-70A Jan. 17, 2025) (rejecting proposal to pair shortwave transmission of "investment data" that requires "purpose-built equipment to transmit, receive, encode, and decode the supplemental datacast for the benefit of fee-for-service customers" with free over-the-air broadcast of financial news); *In the*

23

*Matter of Parable Broad. Co., LLC*, IHF-C/P-20200427-00001 (FCC DA 25-71 Jan. 17, 2025) (rejecting attempt to pair private encrypted datacast with public broadcasting of religious programs); *In the Matter of Turms Tech LLC*, IHF-C/P- 20200710-00002 (FCC DA 25-67 Jan. 17, 2025) ("[T]he station must provide only the international broadcasting service, as defined in 47 CFR § 73.701, ensuring the broadcast is not encoded or encrypted."). These orders of the Commission, holding that private data transmissions like that which Skywave considered are not "broadcasting" under Part 73, are properly the subject of judicial notice. *See Ray v. City of Chicago*, 629 F.3d 660, 665 (7th Cir. 2011) ("[D]istrict courts may take judicial notice of certain documents—including records of administrative actions—when deciding motions to dismiss."). They demonstrate that even if Jump Trading and Virtu had not obtained experimental licenses— indeed, even if neither company ever existed—Skywave could not have obtained the license it claims to have wanted and that it claims would have allowed it to build and provide its shortwave network to prospective investors and clients. Therefore, any action by Defendants could not have been the but-for cause of Skywave's supposed injury.

## III.   SKYWAVE DOES NOT PROPERLY ALLEGE WIRE FRAUD.

The pattern of racketeering activity alleged here consists entirely of a supposed set of wire frauds in violation of 18 U.S.C. § 1343. But the FAC does not properly allege even a single wire fraud by any Defendant, let alone a pattern of wire fraud pleaded with the required particularity against each Defendant.

### A.   As a Matter of Law, the Alleged Misrepresentations to the FCC to Obtain Licenses Do Not Constitute Wire Fraud.

The heart of Skywave's case is that Defendants sent misrepresentations to the FCC through interstate wire communications in order to defraud the FCC into issuing Part 5 experimental licenses to them. FAC ¶¶ 104–15. The Supreme Court has established, however, that "the federal

fraud statutes criminalize only schemes to deprive people of traditional property interests," *Ciminelli v. United States*, 598 U.S. 306, 309 (2023), and a license is not property in the hands of the licensing authority, *Cleveland v. United States*, 531 U.S. 12, 26–27 (2000). *Cleveland* forecloses Skywave's wire-fraud theory.

In *Cleveland*, the defendant was charged with mail fraud for lying about the ownership of his video poker business to obtain a state license required to operate video poker machines. *Id.* at 16–17. The Court determined that the State's core concern in requiring such licenses was "regulatory"—to prevent gaming activities from being infiltrated by criminal elements. *Id.* at 20–21. While the State also received application fees and made money on taxing video poker machines, the Court held that a government regulator does not part with "property" when it issues a license because "a license is not 'property' in the government regulator's hands." *Id.* at 20; *see also Kelly v. United States*, 590 U.S. 391, 400 (2020) (reversing a wire fraud conviction for a scheme to restrict the traffic flow over a toll bridge because the object of the scheme was not to obtain money or property from the victim but to affect regulatory interests); *United States v. Griffin*, 76 F.4th 724, 738 (7th Cir. 2023) (a "scheme to alter a regulatory decision, such as a scheme to obtain a state or municipal license from a government regulator" does not suffice as a scheme to deprive the government of property as required for wire fraud).

The same rule applies where, as here, the regulatory authority issuing the license is an agency of the United States. *See United States v. Schwartz*, 924 F.2d 410, 418 (2d Cir. 1991) ("[T]he government's interest in the unissued export licenses is ancillary to its power to regulate, and is not a property interest within the meaning of the wire fraud statute."); *Williams v. Dow Chem. Co.*, 255 F. Supp. 2d 219, 225–26 (S.D.N.Y. 2003) (alleged lie by chemical company to

obtain EPA regulatory approval did not constitute mail or wire fraud because it was not directed at money or property).

There can be no doubt that the FCC's interest in issuing radio spectrum licenses here is regulatory, not one based in property. The FCC was created "[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio . . . ." 47 U.S.C. § 151. The agency is charged with granting licenses in the "public interest, convenience, or necessity," and that licensing authority is necessitated by "the limited number of frequencies on the electromagnetic spectrum." *See Metro Broad., Inc. v. F.C.C.*, 497 U.S. 547, 597 (1990), *overruled on other grounds by Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995). Because the FCC is exercising sovereign powers in issuing radio spectrum licenses, the Part 5 licenses at issue here are not property in the FCC's hands, and there can be no wire fraud predicated on obtaining such a license. Without wire fraud predicates, there can be no RICO claim.

### B. Skywave's Backup Theory Fares No Better.

Skywave also alludes to a second type of supposed wire fraud, namely, that the alleged false statements to the FCC to obtain the experimental licenses somehow turn each commercial trade into a fraud against the commercial trading market, that is, competitive HFT firms. FAC ¶¶ 116–25. This effort to recast its fraud on the FCC theory in another guise is equally doomed.

First, it fails the particularity requirement of Federal Rule of Civil Procedure 9(b). Where, as here, the alleged predicate acts of racketeering involve fraud, the plaintiff must plead with specificity the "who, what, when, where, and how" of the alleged fraudulent activity. *Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 698 (7th Cir. 2021) (citation omitted); *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001); *Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 729 (7th Cir. 1998). Skywave has failed to even plead the basic elements of wire fraud, which require that the defendant make "a material false statement, misrepresentation, or promise, or

26

conceal[] a material fact"; have a specific intent to defraud; and have used the wires in furtherance of a scheme to defraud. *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016). Most fundamentally, Skywave never explains *what* the nature of the fraud against competitors was, *what* any alleged false statement in connection with any trade was, or *how* Defendants transmitting trading-related information by shortwave amounts to a fraud on its counterparties to trades. There is no allegation that Defendants bought or sold instruments at other than market prices. There is no allegation of market manipulation or spoofing or any other recognized form of securities or commodities fraud. There is no allegation that the counterparties to trades with Jump Trading or Virtu have any expectation about what technologies Defendants use to transmit market information, or even that they know who they are trading against. There is no allegation that Jump Trading or Virtu made any fraudulent representation—or any representation at all—to counterparties about how their market information is being transmitted. And there is not a single particularized allegation of a fraudulent trade—and certainly no allegation of who, what, when, or how any was allegedly made.

Second, this theory of "fraudulent trading" highlights that, at its heart, the FAC is trying to transmute an alleged fraud on other parties—the FCC and competitive HFT trading firms—into a fraud against Skywave. There is no authority supporting this theory, and it underlines that Skywave itself has not suffered an injury proximately caused by the alleged pattern of wire fraud as required by Section 1964(c). *See supra* Section II.

Third, the FAC says that the purpose of the HFT enterprise was "to trade financial instruments," which it defines as "Commercial Trading." FAC ¶ 1.[9] Financial instruments include

---

[9] The FAC goes on to use the term "Commercial Trading"—that is, trading financial instruments—another 114 times.

"stocks." *Id*. ¶ 25. But the trading of securities is not actionable under Section 1964(c), which specifically exempts "any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). The bar extends not only to explicit securities fraud claims but also those that "plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO *if such offenses are based on conduct that would have been actionable as securities fraud*." *Hollinger Int'l, Inc. v. Hollinger Inc.*, 2004 WL 2278545, at *5 (N.D. Ill. Oct. 8, 2004) (emphasis in original) (quoting H.R. Rep. No. 104-369, at 47 (1995) (Conf. Rep.)); *see also McKinney v. Panico*, 2022 WL 4551695, at *8–9 (N.D. Ill. Sept. 29, 2022). In other words, if Skywave's secondary fraud theory is based on some allegedly fraudulent trading of financial instruments including securities, such a claim is not cognizable under the civil RICO statute.

## IV.    SKYWAVE'S CLAIMS ARE TIME-BARRED.

Even if Skywave could have stated a plausible RICO claim, the time has long since passed for it to bring such a claim, providing yet another reason to dismiss the FAC with prejudice.

Civil RICO claims have a four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). The four-year period begins to run when a plaintiff knows "or should have known of [its] injury." *Rotella*, 528 U.S. at 553–54. "A plaintiff does not need to know that his injury is actionable to trigger the statute of limitations—the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim." *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). Thus, if Skywave knew or reasonably should have known of its alleged injuries before October 2020 (four years before the Complaint was filed), its claims are time-barred.

Skywave's own allegations make clear that it knew of its injuries *by March 2017*. Skywave alleges harm from the "termination of Skywave's [valuable] partnership with [Investor 1 and

28

Trader 1] and the associated resulting costs and losses." Dkt. 7, Compl. ¶ 190; *see also* FAC ¶¶ 152 ("Due to Defendants' unlawful conduct, Skywave has been unable to secure business partners . . . . Defendants' misconduct is the direct and proximate cause of Skywave's economic injuries, including sunk costs[.]"); *id.* ¶ 153 (describing termination of partnerships with Investor 1 and Trader 1 as a "sunk cost"); *id.* ¶ 155 (further alleging harms from termination of partnerships with Investor 1 and Trader 1). And Skywave alleges that it knew—in 2017—that this termination and associated sunk costs and losses purportedly resulted from the 10Band experimental licenses it complains about.

Specifically, Skywave alleges that "[i]n 2017, [Investor 1] became concerned that if a person or entity were to use *10Band's shortwave transmitter under an Experimental License* for Commercial Trading, that person or entity would have a dominant latency (*i.e.*, speed) advantage over other traders . . . operat[ing] under Commercial License conditions." FAC ¶ 136 (emphasis added). Because "[Investor 1] did not believe the partnership could reasonably compete against persons or entities misusing the advantages of Experimental Licenses for Commercial Trading, [it] . . . sought to exit the partnership with Skywave and [Trader 1]." *Id.* ¶ 137; *see also* Dkt. 7, Compl. ¶ 62 (Investor 1 did not believe partnership could "reasonably compete against any unlawfully used 10Band Experimental License for Commercial Trading"). In March 2017, in light of Investor 1's concerns about the use of 10Band's license, "Skywave . . . agreed to release [Investor 1] from the partnership." FAC ¶ 137. In other words, taking its allegations as true, Skywave knew of the injuries about which it now complains by March 2017, and it knew the alleged (albeit remote) cause of those injuries was the licenses granted to 10Band.

Skywave has also made allegations and submitted materials showing that it knew or could easily have discovered before October 2020 that *all* Defendants were affiliated with those 10Band

experimental licenses that allegedly caused it harm. For example, Skywave (1) previously pleaded that, around December 2016, it had "heard rumors in the industry that Jump or Virtu (both trading firms) may be affiliated with 10Band," Dkt. 7, Compl. ¶ 60; (2) pleads that Defendant Hinerfeld was the signatory on 10Band's license applications in January, March, and May 2020—which were publicly available at the time, *e.g.*, FAC ¶¶ 69, 70–71, 73, 75, 77, 79, 81, 83; (3) included in the FAC as an exhibit an ownership chart publicly filed with the FCC in May 2020 that names Defendants DiSomma and Gurinas as indirect owners of 10Band, *see id.* ¶ 86 & n.5; *compare* FAC, Ex. 2, *with* Sahni Decl., Ex. D[10]; and (4) pleads that "Madigan was registered as a broker with Virtu Americas, LLC, a subsidiary of Virtu, from 2014 to 2017," citing the publicly available "BrokerCheck" database run by the Financial Industry Regulatory Authority, FAC ¶ 98, Ex. 52. Although Skywave's FAC omits to mention what Skywave alleged in its original complaint—that Skywave had heard rumors, as of December 2016, of a Jump Trading-Virtu-10Band affiliation (*see* Dkt. 7, Compl. ¶ 60)—the Court can consider that allegation, *see supra* note 3—and in all events, Skywave cannot even attempt to plead around the wealth of public information available to it before October 2020 that linked Defendants to 10Band.

Skywave nonetheless attempts to plead around this defect by claiming it "was not aware of any information that Jump Trading or Virtu were affiliated with 10Band as managing entities of

---

[10] Available at https://wireless2.fcc.gov/UlsEntry/attachments/attachmentViewRD.jsp?applType=search&fileKey=1307651602&attachmentKey=20870671&attachmentInd=applAttach. The Court may consider these records in determining whether Skywave had sufficient constructive notice. *Baker v. Atl. Richfield Co.*, 2021 WL 3726050, at *1 (N.D. Ind. Aug. 23, 2021) ("Public records—such as court orders, agency decisions, administrative body reports, and government websites—are appropriate subjects of judicial notice." (collecting cases)); *Schmude v. Sheahan*, 312 F. Supp. 2d 1047, 1064 (N.D. Ill. 2004) ("[I]t is routine for courts to take judicial notice of both newspaper articles and court records, among other things."); *accord Osundairo v. Geragos*, 447 F. Supp. 3d 727, 740 n.8 (N.D. Ill. 2020) (applying *Schmude* and taking judicial notice of a *Chicago Tribune* article).

the HFT Enterprise." FAC ¶ 136; *see also* Dkt. 7, Compl. ¶ 61 ("At that time, Skywave was not aware of any information *confirming the rumors that Jump or Virtu were affiliated with 10Band* . . . ." (emphasis added)). That cannot rescue Skywave's untimely claim. Plaintiffs are "not allowed to bury their heads in the sand—to know you've been injured and make no effort to find out by whom is the very laxity that statutes of limitations are designed to penalize." *Cancer Found.*, 559 F.3d at 676. Based on public records, Skywave easily could have confirmed that Jump Trading and Virtu were affiliated with 10Band before October 2020. *See Eckstein v. Balcor Film Invs.*, 58 F.3d 1162, 1168–69 (7th Cir. 1995) (claims barred under the statute of limitations where registration statements available to the plaintiffs furnished information about the defendants).

Indeed, it requires almost no effort to connect the Defendants and entities named in Exhibit 2 of the FAC—again, a publicly available May 2020 chart setting forth 10Band's owners filed with the FCC—to Jump Trading or Virtu. For example, the same chart identifies Jump Trading's co-founders—Defendants DiSomma and Gurinas—as indirect owners of 10Band. *See* FAC, Ex. 2. That Defendants DiSomma and Gurinas are the owners of Jump Trading, LLC and Jump Financial, LLC is very well known and has been well known for more than a decade. Citing just some judicially noticeable sources on this point: *as early as 2008*, Jump Financial, LLC's registration with the Illinois Secretary of State (also available online) listed William DiSomma and Paul A. Gurinas as managers. *See* Sahni Decl., Ex. G[11]; *see also id.*, Ex. H[12] (publicly available "BrokerCheck" database run by the Financial Industry Regulatory Authority listing DiSomma and Gurinas as associated with Jump Trading since 2006, and listing Madigan as associated with Jump

---

[11] Available at https://apps.ilsos.gov/businessentitysearch/businessentitysearch.

[12] Available at https://brokercheck.finra.org/.

Trading since 2017); *id.*, Ex. I.[13] Defendant John Madigan was also identified in dozens of public applications and other filings with the FCC as the individual to contact for New Line Networks, *see, e.g.*, *id.*, Ex. J[14]; *id.*, Ex. K[15]; *id.*, Ex. L[16], and in at least six such filings as the individual to contact for 10Band LLC, *see, e.g.*, *id.*, Ex. M[17]; *id.*, Ex. N[18]; *id.*, Ex. O[19]—all before October 2020. Finally, at least as early as 2018, news articles publicly announced that New Line Networks LLC— which owns 10Band LLC, as set forth on Exhibit 2 to the FAC—is a "joint venture of Chicago-based Jump Trading LLC and New York-based Virtu Financial Inc., according to Kane County records," and that "public records point to [New Line Networks'] testing the idea of using shortwave technology to convey data between the CME facility and key exchanges around the globe." *See id.*, Ex. E[20]; *see also id.* Ex. F[21] (2019 Bloomberg article also announcing that New Line Networks LLC is a "joint venture of Chicago's Jump Trading LLC and Virtu Financial Inc.").

Moreover, "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Rotella*, 528 U.S. at 555. Here, Skywave knew of its injury when Investor 1 exited

---

[13] Available at
http://online.wsj.com/article/SB10001424052702303918204577447222628346192.html.

[14] Available at
https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applMain.jsp?applID=11637775.

[15] Available at
https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applMain.jsp?applID=11637946.

[16] Available at
https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applMain.jsp?applID=11919511.

[17] Available at
https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applMain.jsp?applID=11472072.

[18] Available at
https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applMain.jsp?applID=11472086.

[19] Available at
https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applMain.jsp?applID=11472093.

[20] Available at https://www.bloomberg.com/news/articles/2018-06-18/hft-traders-dust-off-19th-century-tool-in-search-of-market-edge.

[21] Available at https://www.bloomberg.com/news/features/2019-03-08/the-gazillion-dollar-standoff-over-two-high-frequency-trading-towers.

the partnership, citing concerns about "use [of] 10Band's shortwave transmitter under an Experimental License for Commercial Trading." *See* FAC ¶ 136–37. Notably, even Skywave's 2023 Petition for Reconsideration to the FCC of 10Band's August 2023 license renewal grant came more than six years after it alleges it knew it was injured. Skywave could have timely challenged 10Band's earlier grants and renewals—including those granted in 2020 and 2021, *see, e.g.*, *id.* ¶¶ 67, 72, well after it knew of its injuries—but chose not to. The time for doing so has long since passed.[22]

Simply put, Skywave knew of its alleged financial injury and the supposed causes of that injury *seven years ago*. It further knew of every Defendant's alleged connection to that harm by around that time, and to the extent it chose to avoid such knowledge in the face of "rumors" and public records making abundantly clear the individuals and entities affiliated with 10Band, such willful blindness cannot toll the limitations period. Skywave is at least three years too late.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants respectfully submit that this matter should be dismissed in its entirety with prejudice.

---

[22] Thus, even if Skywave were made to wait until after it exhausted its administrative remedies to bring suit and any limitations period was tolled in the interim, *see* Section I, *supra*, it would still be too late.

Dated: April 21, 2025

Neema Sahni (admitted *pro hac vice*)
J. Hardy Ehlers (admitted *pro hac vice*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
(424) 332-4757
nsahni@cov.com
jehlers@cov.com

Gerard J. Waldron (admitted *pro hac vice*)
COVINGTON & BURLING LLP
850 10th St NW
Washington, DC 20001
(202) 662-6000
gwaldron@cov.com

Respectfully submitted,

/s/ Chris Gair
Chris Gair (ARDC # 6190781)
Ingrid Yin (ARDC # 6339857)
GAIR GALLO EBERHARD LLP
1 East Wacker Drive, Suite 2600
Chicago, IL 60601
(312) 600-4900
cgair@gairgallo.com
iyin@gairgallo.com

*Attorneys for Defendants William J. DiSomma, Paul A. Gurinas, Matthew Hinerfeld, John Madigan, and Jump Trading, LLC*

Robert Y. Sperling (ARDC #2688093)
Katherine B. Forrest (admitted *pro hac vice*)
Andrew G. Gordon (admitted *pro hac vice*)
Jessica S. Carey (admitted *pro hac vice*)
Kristina A. Bunting (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3148
rsperling@paulweiss.com
kforrest@paulweiss.com
agordon@paulweiss.com
jcarey@paulweiss.com
kbunting@paulweiss.com

*Attorneys for Defendant Virtu Financial, Inc.*