**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SKYWAVE NETWORKS, LLC,

                Plaintiff,

      v.

WILLIAM J. DISOMMA,
PAUL A. GURINAS,
MATTHEW HINERFELD,
JOHN MADIGAN,
JUMP TRADING, LLC, and
VIRTU FINANCIAL, INC.,

             Defendants.

Civil Action No. 1:24-cv-9650

Judge Georgia N. Alexakis

**JURY TRIAL DEMANDED**

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ....................................................................................................1

BACKGROUND ......................................................................................................2

ARGUMENT ...........................................................................................................5

I.     SKYWAVE DOES NOT—AS DEFENDANTS ARGUE—SEEK TO RECOVER FOR INJURIES TO THIRD PARTIES AND DOES NOT SEEK TO PRECLUDE 10BAND'S LAWFUL USE OF ITS EXPERIMENTAL LICENSES..............................5

II.    THIS COURT HAS JURISDICTION OVER SKYWAVE'S RICO CLAIMS, WHICH DO NOT CHALLENGE AN FCC DECISION...................................................7

    A.    Skywave's RICO Claims Challenge Defendants' Independent Actions And Are Not A Collateral Attack On Any FCC Decision Or Order.............................8

    B.    Defendants Do Not—And Cannot—Cite Any Authority For The Proposition That The D.C. Circuit Or The FCC Retain Exclusive Jurisdiction Over Skywave's RICO Claims. .......................................................11

        1.    Section 402(b) Does Not Grant The D.C. Circuit Jurisdiction Over Skywave's RICO Claims Because Skywave's RICO Claims Are Not An Appeal Of Any FCC Decision Or Order, And § 402(b)'s Jurisdictional Grant Is Not Exclusive........................................................11

        2.    The FCC Does Not Have Original Jurisdiction Over This Action Because Skywave's RICO Claims Are Not Within The FCC's Regulatory Authority............................................................................13

III.    SKYWAVE ALLEGES FACTS SUFFICIENT TO STATE A PLAUSIBLE CLAIM TO RELIEF UNDER 18 U.S.C. § 1962(C). .....................................................16

    A.    Defendants' Misconduct Proximately Caused Skywave's Claimed Injuries. ...................................................................................................................16

        1.    Skywave's Claimed Injuries Were Directly (And Thus Proximately) Caused By Defendants' Unlawful Conduct, And Defendants' Analogies To Cases About Indirect Injuries Fail.....................................17

        2.    Skywave Is A Proper RICO Plaintiff, And Defendants Are Proper RICO Defendants, Contrary To Defendants' Policy Arguments Otherwise. ...........................................................................................22

       B.     But For Defendants' Misconduct, Skywave Would Not Have Suffered Its Claimed Injuries Because Skywave Would Have Completed and Utilized Its Network. ....................................................................................24

       C.     Defendants Committed More Than Two Requisite Predicate Acts Of Wire Fraud Through Their FCC Filings And, Independently, Through Their Commercial Trades. ............................................................................27

             1.     Skywave Properly Pleads Defendants' FCC Filings Are Predicate Acts Of Wire Fraud. ...........................................................27

             2.     Defendants' Unlawful Commercial Trades Constitute Wire Fraud, Which Skywave Properly Pleads Under Rule 9(b). ...............................29

IV.    SKYWAVE COULD NOT HAVE REASONABLY DISCOVERED DEFENDANTS' MISCONDUCT CAUSED ITS INJURIES UNTIL 2022, WHEN THE A7 TOOL BECAME ACCESSIBLE ...................................................32

CONCLUSION.......................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006) ....................................................................................*passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .........................................................................................5, 6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................5

*Blye v. Cal. Sup. Ct.*,
    2014 WL 295022 (N.D. Cal. Jan. 21, 2014) ......................................................25

*Bridge v. Phoenix Bond & Indemnity Co.*,
    553 U.S. 639 (2008) ....................................................................................*passim*

*Cancer Found., Inc., v. Cerberus Cap. Mgmt., LP*,
    559 F.3d 671 (7th Cir. 2009) .............................................................................33

*CE Design Ltd. v. Prism Bus. Media, Inc.*,
    2009 WL 2496568 (N.D. Ill. Aug. 12, 2009) ................................................9, 12

*Ciminelli v. United States*,
    598 U.S. 306 (2023) ..........................................................................................28

*Cleveland v. United States*,
    531 U.S. 12 (2000) ................................................................................2, 27, 28

*Coal. for Pres. of Hispanic Broad. v. FCC*,
    931 F.2d 73 (D.C. Cir. 1991) ...............................................................................9

*Corley v. Rosewood Care Ctr., Inc.*,
    142 F.3d 1041 (7th Cir. 1998) ...........................................................................30

*D'Addario v. D'Addario*,
    75 F.4th 86 (2d Cir. 2023) .................................................................................32

*Daniels v. Union Pac. R. Co.*,
    530 F.3d 936 (D.C. Cir. 2008) .............................................................................9

*Devon Drive Lionville, LP v. Parke Bancorp, Inc.*,
    791 F. App'x 301 (3d Cir. 2019) ......................................................................23

*In the Matter of DPA MAC LLC*,
　　2025 WL 251498 (FCC Jan. 17, 2025) .................................................................26

*Empress Casino Joliet Corp. v. Johnston*,
　　763 F.3d 723 (7th Cir. 2014) .................................................................... 22, 23

*FCC v. ITT World Commc'ns, Inc.*,
　　466 U.S. 463 (1984) .................................................................................. 9, 12

*Folden v. United States*,
　　379 F.3d 1344 (Fed. Cir. 2004) ...................................................................13

*Friedman v. FCC*,
　　263 F.2d 493 (D.C. Cir. 1959) ...................................................................13

*Gov't App Sols., Inc. v. City of New Haven*,
　　2024 WL 1299993 (9th Cir. Mar. 27, 2024) ...................................................23

*Grow Mich., LLC v. LT Lender, LLC*,
　　50 F.4th 587 (6th Cir. 2022) .......................................................................23

*Guance v. deVincentis*,
　　708 F.2d 1290 (7th Cir. 1983) ...................................................................10

*Hennessy v. Penril Datacomm Networks, Inc.*,
　　69 F.3d 1344 (7th Cir. 1995) .......................................................................25

*Hernandez v. Ill. Inst. of Tech.*,
　　63 F.4th 661 (7th Cir. 2023) .......................................................................31

*Holmes v. Sec. Inv. Prot. Corp.*,
　　503 U.S. 258 (1992) ...........................................................................*passim*

*In re Honey Transshipping Litig.*,
　　87 F. Supp. 3d 855 (N.D. Ill. 2015) ...........................................................23

*Jennings v. Auto Meter Prods., Inc.*,
　　495 F.3d 466 (7th Cir. 2007) .......................................................................23

*Katz v. Household Int'l, Inc.*,
　　91 F.3d 1036 (7th Cir. 1996) .......................................................................30

*Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Del.*,
　　805 F. Supp. 1277 (D.S.C. 1992) ...........................................................23

*Liqui-Box Corp. v. Scholle IPN Corp.*,
　　449 F. Supp. 3d 790 (N.D. Ill. 2020) .........................................................5

*Longmont United Hosp. v. Saint Barnabas Corp.*,
   2007 WL 1850881 (D.N.J. June 26, 2007)............................................................ 14, 15, 23

*Menzies v. Seyfarth Shaw LLP*,
   943 F.3d 328 (7th Cir. 2019) ...................................................................................... 31, 32

*Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*,
   877 F.2d 1333 (7th Cir. 1989) ............................................................................................23

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
   583 U.S. 109 (2018) ............................................................................................................13

*Nat'l Broad. Co. v. United States*,
   319 U.S. 190 (1943) ............................................................................................................14

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*,
   414 U.S. 453 (1974) ............................................................................................................16

*In re Nextwave Personal Commc'ns, Inc.*,
   200 F.3d 43 (2d Cir. 1999) ...........................................................................................12, 14

*North American Catholic Educational Programming Foundation, Inc. v. FCC*,
   437 F.3d 1206 (D.C. Cir. 2006) ...........................................................................................9

*North v. Smarsh, Inc.*,
   160 F. Supp. 3d 63 (D.D.C. 2015) ......................................................................................10

*Ordower v. Office of Thrift Supervision*,
   999 F.2d 1183 (7th Cir. 1993) ..............................................................................................9

*Otwell v. Alabama Power Co.*,
   747 F.3d 1275 (11th Cir. 2014)..............................................................................9, 10, 11

*In the Matter of Parable Broad. Co.*,
   2025 WL 251378 (FCC Jan. 17, 2025) ...............................................................................26

*R.E. Davis Chem. Corp. v. Nalco Chem. Co.*,
   757 F. Supp. 1499 (N.D. Ill. 1990) .....................................................................................27

*Rotella v. Wood*,
   528 U.S. 549 (2000) ............................................................................................................33

*Russello v. United States*,
   464 U.S. 16 (1983) ..............................................................................................................13

*Schmuck v. United States*,
   489 U.S. 705 (1989) ......................................................................................................29, 32

*SEC v. Zandford*,
535 U.S. 813 (2002) ........................................................................................... 31

*Self v. Bellsouth Mobility Inc.*,
700 F.3d 453 (11th Cir. 2012) ........................................................................ 9, 12

*Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*,
249 F.3d 1068 (D.C. Cir. 2001) ..................................................................... 22, 23

*Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*,
884 F.3d 489 (4th Cir. 2018) ................................................................................. 23

*Smith v. AFSCME Council 31*,
2025 WL 790855 (N.D. Ill. Mar. 12, 2025) ........................................................ 25

*Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*,
990 F.3d 31 (1st Cir. 2021) ........................................................... 16, 17, 20, 23

*Sykes v. Jenny Wren Co.*,
78 F.2d 729 (D.C. Cir. 1935) ................................................................................. 13

*Tafflin v. Levitt*,
493 U.S. 455 (1990) ................................................................................................ 13

*Telecomms. Rsch. & Action Ctr v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) ................................................................................. 12

*In the Matter of Turms Tech LLC*,
2025 WL 257232 (FCC Jan. 17, 2025) ................................................................. 25

*United States v. Kubrick*,
444 U.S. 111 (1979) ................................................................................................ 33

*United States v. Palumbo Bros., Inc.*,
145 F.3d 850 (7th Cir. 1998) ................................................................................. 15

*United States v. Turner*,
551 F.3d 657 (7th Cir. 2008) ................................................................................. 30

*United States v. Vorley*,
420 F. Supp. 3d 784 (N.D. Ill. 2019) .................................................................... 28

*Walters v. McMahen*,
684 F.3d 435 (4th Cir. 2012) ................................................................................. 23

**Statutes**

15 U.S.C. § 78j(b) ..................................................................................................... 31

vi

16 U.S.C. § 825*l*(b) ............................................................................................................ 10

18 U.S.C. § 1341 ........................................................................................................... 27, 28

18 U.S.C § 1343 ............................................................................................................ 28, 29

18 U.S.C. § 1962 ....................................................................................................... 7, 16, 31

18 U.S.C. § 1964 ..................................................................................................... 7, 13, 16

28 U.S.C. § 1331 ..................................................................................................................... 7

28 U.S.C. § 2342(1) ............................................................................................................. 12

47 U.S.C. § 151 ..................................................................................................................... 14

47 U.S.C. § 402 ............................................................................................................ *passim*

47 U.S.C. § 414 ..................................................................................................................... 16

**Other Authorities**

17 C.F.R. § 240.10b-5 .......................................................................................................... 31

47 C.F.R. § 1.80(a)(6) ........................................................................................................... 14

47 C.F.R. § 5.83(b) ............................................................................................................... 14

Fed. R. Civ. P. 9 .............................................................................................................. 29, 30

Fed. R. Evid. 201 .................................................................................................................. 25

## INTRODUCTION

Defendants' years-long racketeering scheme financially injured Skywave Networks, LLC ("Skywave") by rendering Skywave's investments into its shortwave network for the trading of financial instruments ("Commercial Trading" or "Commercial Trades") sunk costs and preventing Skywave from realizing the financial benefits of its trading network ("Skywave Network"). Because Defendants cannot contest these facts, their Motion to Dismiss ("Motion") is based on mischaracterizations of Skywave's claimed injuries to manufacture legal arguments, misstatements of the law to create defects where none exist, and improper requests that the Court take "judicial notice" of Defendants' version of disputed facts. For at least *four* reasons, the Court should deny Defendants' Motion.

*First*, Defendants' assertion that Skywave seeks recompense for the injuries of others and to enjoin Defendants' lawful use of Experimental Licenses is a blatant mischaracterization intended to fabricate legal pleading defects. To the contrary, Skywave pleads its *own* financial injuries from Defendants' misconduct and seeks an injunction *only* to prevent such *unlawful* use in the future.

*Second*, this Court has subject matter jurisdiction to resolve Skywave's federal civil RICO claims against Defendants. Contrary to Defendants' arguments, no basis exists for the D.C. Circuit or the Federal Communications Commission ("FCC") to have exclusive jurisdiction over Skywave's claims. The FCC never issued an order or decision condoning Defendants' misuse of Experimental Licenses for Commercial Trading that Skywave could appeal to the D.C. Circuit. And even if the D.C. Circuit or the FCC could hear Skywave's federal civil RICO suit—they cannot—that authority would not deprive this Court of its federal question jurisdiction.

*Third*, Skywave pleads more than sufficient facts—facts that must be assumed as true—to "plausibly" show proximate cause, but-for causation, and a pattern of racketeering. Defendants'

theory that, as a matter of law, only the target of their fraud can recover under RICO was rejected by the Supreme Court in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008)—a case on *certiorari* from the Seventh Circuit that Defendants conspicuously ignore in their Motion. Defendants' remaining causation arguments improperly reach for contradictory facts outside the pleadings in an effort to dispute the merits of Skywave's claims at the motion to dismiss stage. And when disputing the predicate acts that comprise their racketeering pattern, Defendants rely on misinterpretations of both *Cleveland v. United States*, 531 U.S. 12 (2000), and RICO statutes.

***Finally***, Skywave brought this suit in 2024, two years before the statute of limitations ended in 2026. Skywave was only able to connect unlawful Commercial Trading to Defendants and Defendants' misuse of their Experimental Licenses in 2022, when the A7 tool became accessible. That tool allowed Skywave to analyze available shortwave Commercial Trading data and link the timing and frequency of those trades to Defendants. Only then was Skywave able to determine that Defendants were the cause of its claimed injuries. Defendants' narrative to the contrary ignores (a) Skywave's pled facts, which are assumed to be true, and (b) that the four-year statute of limitations does not start until a plaintiff knows of both its injury ***and*** who caused that injury.

Defendants present no serious dispute as to the sufficiency of Skywave's RICO pleadings. Instead, their mischaracterizations and assertions of fact contradictory to those pled illustrate that this case should proceed to discovery so that Skywave's claims may be resolved on the merits.

## BACKGROUND

In 2016, Skywave was in the midst of building out its shortwave trading network. D.I. 88 ¶¶31, 36–41. Skywave had entered into a ██████████ partnership with an investor and a trading firm; secured employees and a location for radio broadcasting; selected shortwave transmitter and receiver sites domestically and internationally; designed and engineered a variety

of radio and optical fiber devices; installed certain data, security, connective, and microwave elements for the network; and received initial approval from the FCC to apply for a commercial license that would enable those using Skywave's network to lawfully engage in Commercial Trading using shortwave. *Id.* ¶¶38, 40–42. Indeed, Skywave was set to be the first provider of a shortwave network for Commercial Trading. *Id.* ¶¶1, 3–4, 120. Once its network was complete and Skywave procured a commercial FCC license, its trading firm partner would have used the Skywave Network to execute Commercial Trades, including high-frequency trading ("HFT"). *Id.* ¶¶40–41. Skywave also planned to license the Skywave Network to others who engaged in HFT. *Id.* ¶¶40, 140, 156. In fact, Skywave invested heavily in its network to maximize speed because, "for HFT, the fastest network wins." *Id.* ¶¶25, 28.

Skywave's partnerships with its investor and its trading firm partner faltered in 2017 and 2020, respectively, because of rumors that FCC Experimental Licenses for shortwave transmissions might be misused for commercial purposes, like Commercial Trading, unlawfully undercutting Skywave's path to be the first and fastest shortwave network provider.[1] *Id.* ¶¶135–

---

[1] Defendants criticize the fact that the First Amended Complaint ("FAC") (D.I. 88) no longer includes the word "rumors" to describe how Skywave heard information suggesting that Jump Trading, LLC ("Jump Trading") or Virtu Financial, Inc. ("Virtu") were affiliated with 10Band, LLC ("10Band"). *See* D.I. 104 at 4–5 n.3, 29–33. Defendants argue that, by this "omi[ssion]," Skywave has changed its story in an attempt to evade the statute of limitations. *Id.* That is false. In its original complaint and its FAC, Skywave has consistently maintained that, in 2017 (when Defendants argue that the statute of limitations clock started), Skywave lacked "information confirming the rumors that Jump [Trading] or Virtu were affiliated with 10Band or ***using 10Band's shortwave transmitter for Commercial Trading***." D.I. 4 ¶61. The substance of that allegation is repeated in Skywave's FAC, which states that Skywave lacked "information that Jump Trading or Virtu were affiliated with 10Band as managing entities of the HFT Enterprise." D.I. 88 ¶136; *compare* D.I. 4 ¶¶61, 66, *with* D.I. 88 ¶¶136, 139. Skywave's knowledge about Defendants' use of 10Band as the HFT Enterprise for Commercial Trading is what is relevant, not whether Skywave knew Jump Trading or Virtu were merely affiliated with 10Band. For the statute of limitations clock to start, Skywave had to know it was injured ***and*** know who caused that injury, which Skywave was unable to discover until 2022. *See infra* Part IV.

37, 139.  Critically, however, neither Skywave nor its partners could ascertain if any entities were in fact misusing Experimental Licenses, let alone which entities were engaging in such misuse. *Id.* ¶¶135–37, 139, 143.  Spooked nonetheless, Skywave's investor and trading firm partner exited the partnership.  *Id.* ¶¶137, 139.  Skywave persisted as it was determined to follow through on its now multi-million-dollar investment into its network.  *Id.* ¶¶42, 137–41.  Skywave found a new investor and held meetings with other potential trading partners, including ███.  *Id.* ¶¶138, 140.  Skywave also continued development of its network, including modem design, network architecture plans, searches for additional shortwave transmission sites, acquisition of microwave licenses, and applications for new microwave licenses.  *Id.* ¶141.  But Skywave was unable to bring on a new trading partner, which brought its network development to a halt.

Skywave was unable to ascertain who was responsible for its injuries until 2022, when the A7 tool demonstrated that its prior investor's and trading firm partner's concerns were in fact a reality:  someone was misusing Experimental Licenses for Commercial Trading.  *Id.* ¶¶135–37, 139, 143–49.  Skywave diligently worked backwards from the A7 analysis to map the shortwave activity to Defendants' Commercial Trading, *id.* ¶¶144–49, and connect that same Commercial Trading to Defendants' global network, *id.* ¶52 Fig. 1, which includes Defendants' HFT Enterprise and their Experimental Licenses, *id.* ¶¶64–85—all connections successfully hidden by Defendants' intentional obfuscation efforts, *id.* ¶¶150–51.  Only from the newly available A7 information was Skywave able to identify Defendants as the cause of Skywave's injuries and determine that those injuries resulted from Defendants' (1) fraudulent FCC filings to obtain Experimental Licenses, *id.* ¶¶103–15; and (2) unlawful use of those experimental-use-only licenses for Commercial Trading, *id.* ¶¶103, 116–25.

With that information finally compiled, Skywave filed its initial complaint on October 7, 2024, in which it alleged that the Defendants—certain individuals, trusts, companies, and corporations—violated RICO and caused injury to Skywave. D.I. 4. Defendants then filed a motion to dismiss the action in its entirety for failure to state a claim. D.I. 70. That motion became moot once Skywave filed its FAC on February 13, 2025. D.I. 94. In its FAC, Skywave maintains its claims under RICO but narrows the named defendants. Specifically, Skywave requests "[a]n award of damages for the economic harm suffered by Skywave . . . due to Defendants' racketeering" ("Skywave's Injuries") and "[a]n injunction restraining each Defendant . . . from any further direct or indirect misuse, including for Commercial Trading, of Experimental Licenses" that Defendants possess or control. D.I. 88, Prayer for Relief. Defendants moved to dismiss Skywave's FAC on April 21, 2025. D.I. 101.

## ARGUMENT

A complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A sufficient complaint "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" regarding the alleged misconduct. *Twombly*, 550 U.S. at 556. "Resolving factual disputes is not appropriate at the motion to dismiss stage." *Liqui-Box Corp. v. Scholle IPN Corp.*, 449 F. Supp. 3d 790, 803 (N.D. Ill. 2020). Accordingly, to assess whether Skywave's FAC is legally sufficient, *each* factual allegation must be *presumed true*, and *all* reasonable inferences are drawn in Skywave's favor. *Iqbal*, 556 U.S. at 678.

## I. SKYWAVE DOES NOT—AS DEFENDANTS ARGUE—SEEK TO RECOVER FOR INJURIES TO THIRD PARTIES AND DOES NOT SEEK TO PRECLUDE 10BAND'S LAWFUL USE OF ITS EXPERIMENTAL LICENSES.

Defendants ignore Skywave's detailed pleading of its injuries and the relief it seeks for those injuries. Instead, Defendants base their arguments on fundamental mischaracterizations of

Skywave's claims. In particular, they recast Skywave's racketeering claims as an attempt to recover for harm to "competitor" traders and to revoke Defendants' Experimental Licenses. *See, e.g.*, D.I. 104 at 1, 6, 15.[2] The Court should reject those mischaracterizations.

Although Skywave alleges that Defendants harmed third-party traders (D.I. 88 ¶¶5, 157–72), it does not—as Defendants argue—seek to recover for those injuries. *Compare* D.I. 104 at 14–18, *with* D.I. 88, Prayer for Relief. Rather, Skywave's claims arise from ***its own injuries*** and ***its own financial harm***. As a result of Defendants' misconduct, ***Skywave***—not third parties—was unable to "secure business partners, complete building the Skywave Network, operate the Skywave Network, access trading markets, or profit from the trading, including HFT, that would have been performed over the Skywave Network." D.I. 88 ¶152. As recompense for that harm, Skywave seeks "[a]n award of damages . . . including without limitation its lost profits and amounts by which Defendants have been unjustly enriched—***due to Defendants' racketeering***." *Id.*, Prayer for Relief. For example, Skywave's lost profits include ███████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████. *Id.* ¶¶153, 155. Moreover, due to Defendants' misconduct, Skywave was unable to "(1) complete its purchase of transmitters and antennas; (2) close on land acquisitions for U.S. shortwave transmitter locations; and (3) develop shortwave receiver locations in the United Kingdom and Germany." *Id.* ¶154. Those express allegations establish that Skywave seeks to recover for only economic harm that ***it*** has suffered from Defendants' misconduct—not harm done to others.

---

[2] As one example, Defendants' insistence that "Skywave is not . . . a . . . trading firm" is a red herring. *See* D.I. 104 at 1. Skywave does not allege to be a "trading firm," and its claims against Defendants do not assume Skywave is a "trading firm."

Further, Skywave does not—as Defendants assert—seek to revoke 10Band's Experimental Licenses or preclude lawful use of those Experimental Licenses. *See, e.g.*, D.I. 104 at 7 (incorrectly stating that "Skywave seeks . . . an injunction barring Defendants from using the licenses issued by the FCC"); *see also id.* at 8–9. Indeed, despite their bluster, Defendants cannot point to any portion of the FAC where Skywave asks this Court to revoke those licenses. Rather, Skywave seeks an injunction to stop Defendants "from any further ***direct or indirect misuse***, including for Commercial Trading, of Experimental Licenses (1) held by 10Band, or (2) held by another entity under the direction or control of or acting in concert with Defendants, or (3) in the possession of any Defendant." D.I. 88, Prayer for Relief. In other words, Skywave asks this Court to stop Defendants' misuse of 10Band's Experimental Licenses that has directly harmed and continues to directly harm Skywave.

Without those foundational mischaracterizations, Defendants' arguments collapse under their own weight.

## II.  THIS COURT HAS JURISDICTION OVER SKYWAVE'S RICO CLAIMS, WHICH DO NOT CHALLENGE AN FCC DECISION.

This Court has jurisdiction over Skywave's claims under 28 U.S.C. § 1331 and 18 U.S.C. § 1964. "[D]istrict courts . . . shall have jurisdiction to prevent and restrain violations of [18 U.S.C. §] 1962." 18 U.S.C. § 1964(a). Because Skywave's causes of action arise under 18 U.S.C. § 1962 (*see* D.I. 88 ¶¶173–96), this Court possesses subject matter jurisdiction over the FAC.

Defendants do not challenge the blackletter law that district courts have jurisdiction over RICO claims, such as Skywave's. Instead, Defendants manufacture a jurisdictional argument based on their mischaracterizations of Skywave's claims as an attempt to revoke the Experimental Licenses or challenge the FCC's decision to award those licenses in the first place. Indeed, Defendants' jurisdictional arguments—that Skywave's suit is a collateral attack on an FCC

decision or order and that the D.C. Circuit or FCC retains exclusive jurisdiction over Skywave's

RICO claims—should be rejected as bereft of factual and legal support.

A. **Skywave's RICO Claims Challenge Defendants' Own Actions, Not The FCC's Award Of The Experimental Licenses, And Are Therefore Not A Collateral Attack On Any FCC Decision Or Order.**

To argue that this Court lacks jurisdiction over this suit, Defendants frame Skywave's

RICO claims as a supposed "collateral attack" on the FCC's award of the Experimental Licenses.

D.I. 104 at 7–11. In Defendants' view, Skywave supposedly improperly "style[s]" its

disagreement with the FCC's licensing decision "under the guise of RICO" to "undo a licensing

decision made by the FCC." *Id.* at 9. That is false. Skywave's FAC does not challenge any FCC

licensing decision, and Defendants notably ***fail to identify any*** portion of Skywave's FAC that

indicates otherwise. For example, Defendants assert—***without citation to the FAC***—that in

"asking this Court to assess whether Defendants lied to the FCC by representing that 10Band

qualified for an experimental license, Skywave necessarily asks this Court to overrule the FCC's

determination that 10Band did *so qualify*." *Id.* at 8 (emphasis in original). Not only does Skywave

never ask this Court to overrule any FCC determination, but Defendants' assertion is also a logical

fallacy. The Court can no doubt assess whether Defendants lied to the FCC in the context of

Skywave's RICO claims without overruling the FCC's grant of Experimental Licenses.

Adjudication of Skywave's RICO claims against Defendants does not require this Court to

act contrary to any FCC decision, as Defendants suggest (*see id.* at 7–11). The Court need not

consider the propriety of any decision related to the Experimental Licenses because the resolution

of Skywave's RICO claims requires consideration of only Defendants' own misconduct: their

fraudulent filings to the FCC, their unlawful Commercial Trading, their illicit profiteering scheme,

and their attempts to keep their misconduct from public view. *See* D.I. 88 ¶¶103–25, 150–51,

Prayer for Relief. None of those circumstances involve FCC action or require the Court to consider

the FCC's grant of 10Band's Experimental Licenses. Indeed, unlike the circumstances in *North American Catholic Educational Programming Foundation, Inc. v. FCC*, 437 F.3d 1206, 1209–10 (D.C. Cir. 2006), *Otwell v. Alabama Power Co.*, 747 F.3d 1275, 1281–82 (11th Cir. 2014), and *Ordower v. Office of Thrift Supervision*, 999 F.2d 1183, 1188 (7th Cir. 1993) (cited by Defendants at D.I. 104 at 8–10), Skywave's allegations that Defendants misuse those licenses for Commercial Trading are not "ancillary" to, "inescapably intertwined" with, or a "natural outcome" of authorized activities under the Experimental Licenses.

Defendants' remaining arguments also lack merit. Skywave does not, as Defendants argue, "attempt to sidestep Congress's carefully prescribed process for challenging the FCC's licensing determination." D.I. 104 at 8. Nor do Skywave's claims run afoul of the guidance in Defendants' cited case law (*id.* at 7–11); they do not:

- "raise the same issues and seek the same relief in substance as" in FCC proceedings, *see CE Design Ltd. v. Prism Bus. Media, Inc.*, 2009 WL 2496568, at *12 (N.D. Ill. Aug. 12, 2009);

- ask this Court to substantively interpret or apply any challenged FCC regulations, *see id.*; *Daniels v. Union Pac. R. Co.*, 530 F.3d 936, 942–43 (D.C. Cir. 2008);

- seek to "unseat" 10Band from its licenses to give them to Skywave, *see Coal. for Pres. of Hispanic Broad. v. FCC*, 931 F.2d 73, 78–79 (D.C. Cir. 1991);

- "depend on the district court being able to collaterally review the correctness or validity of" FCC orders, *see Self v. Bellsouth Mobility Inc.*, 700 F.3d 453, 462 (11th Cir. 2012);

- "necessarily conflict" with the FCC's grant of the Experimental Licenses, *see id.*;

- "require the [FCC] to" adopt rules it previously rejected in a petition for rulemaking, *see FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 465–68, 468 n.5 (1984);

- raise issues that are "necessarily intertwined with the factual setting" of FCC adjudicative procedures, *see Guance v. deVincentis*, 708 F.2d 1290, 1292–93, 1293 n.3 (7th Cir. 1983); or

- implicate an FCC ruling, let alone "issues that would be addressed by the Court of Appeals upon final review of [such a] ruling," *see North v. Smarsh, Inc.*, 160 F. Supp. 3d 63, 84 (D.D.C. 2015).

Also, Defendants' arguments are incorrectly based on the presumption that Skywave's request for relief requires the Court to revoke or enjoin all use of the Experimental Licenses.  D.I. 104 at 9 ("[I]n seeking treble damages for use of the licenses and to enjoin any further use of them, Skywave is expressly asking this Court to penalize and undo a licensing decision made by the FCC.").  Again, not so.  Skywave seeks to enjoin ***only the misuse of those licenses***.  The Court can plainly adjudicate Skywave's RICO claims without an order that prohibits 10Band's lawful use of the Experimental Licenses for actual experimental purposes.

Notably, *Otwell*—Defendants' principal case for their "collateral attack" argument—is not applicable here.  *See* D.I. 104 at 9–10.[3]  In *Otwell*, Smith Lake property owners opposed the renewal of Alabama Power Company's license to "construct, operate, and maintain" a dam and hydroelectric power houses.  *Otwell*, 747 F.3d at 1277.  After the property owners and Alabama Power submitted competing proposals, the Federal Energy Regulatory Commission ("FERC") adopted Alabama Power's proposal and granted the renewal.  *Id.* at 1278.  The property owners

---

[3] Contrary to Defendants' bald assertion otherwise (*see* D.I. 104 at 10), the appellate review statute (16 U.S.C. § 825*l*(b)) at issue in *Otwell* is not "analogous to" the statute (47 U.S.C. § 402(b)) that Defendants contend governs review of the unidentified, nonexistent FCC order from which Skywave purportedly should have appealed, here.  Section 825*l*(b) explicitly states that an appeal from a FERC decision grants the appellate court "exclusive" jurisdiction.  16 U.S.C. § 825*l*(b). Section 402(b), on the other hand, does not include any express language denoting exclusivity. *Infra* Part II.B.1.

10

then filed a class action suit that ***rehashed their rejected proposal*** and alleged that Alabama Power "unreasonably decreased lake levels during certain months of the year to such an extent that they could not enjoy their property or the lake." *Id.* The Eleventh Circuit held that the property owners' suit was an impermissible collateral attack on FERC's licensing determination. *Id.* at 1281–83.

Here, in stark contrast with *Otwell*, the FCC did not consider Skywave's RICO claims and reject them, and Skywave did not previously seek monetary relief for its financial injuries or an injunction against Defendants' misuse of 10Band's Experimental Licenses from the FCC. And Defendants do not (and cannot) identify a single case holding that a district court lacks jurisdiction over RICO claims based on a defendant's own misconduct—independent of any agency action. *See* D.I. 104 at 7–11 (citing multiple cases, none of which address a RICO claim). Put simply, because Skywave's RICO claims do not challenge any aspect of an FCC decision, the Court should reject Defendants' collateral attack arguments.

B.      **Defendants Do Not—And Cannot—Cite Any Authority For The Proposition That The D.C. Circuit Or The FCC Retain Exclusive Jurisdiction Over Skywave's RICO Claims.**

1.      Section 402(b) Does Not Grant The D.C. Circuit Jurisdiction Over Skywave's RICO Claims Because Skywave's RICO Claims Are Not An Appeal Of Any FCC Decision Or Order, And § 402(b)'s Jurisdictional Grant Is Not Exclusive.

Defendants argue that 47 U.S.C. § 402(b)(6) requires Skywave to bring this action in the Court of Appeals for the D.C. Circuit. D.I. 104 at 7–8. Not so.

Section 402(b) provides that the D.C. Circuit has jurisdiction to hear appeals "from decisions and orders of the [FCC]" in only ten enumerated cases. 47 U.S.C. § 402(b). As a gating matter, § 402(b) does not apply to Skywave's RICO claims because, as explained above, this suit does not challenge an FCC "decision[] or order[]." *Id.* Rather, Skywave challenges ***Defendants' conduct***—*i.e.*, committing numerous acts of wire fraud as part of a racketeering scheme that

financially injured Skywave. D.I. 88 ¶¶106, 119. Skywave is not aware of—and Defendants fail to identify—any FCC decisions or orders permitting Defendants to engage in the wire fraud alleged in this case from which Skywave could appeal.

Even if the FCC issued a decision or order that condoned Defendants' wire fraud, § 402(b) would not, as Defendants suggest (D.I. 104 at 7–11), vest the D.C. Circuit with "**exclusive** jurisdiction" over this action and deprive this Court of its jurisdiction. The plain language of § 402(b) does *not* provide the D.C. Circuit with exclusive jurisdiction over appeals from FCC decisions and orders. *See* 47 U.S.C. § 402(b) (providing that "[a]ppeals may be taken from" certain enumerated decisions to the D.C. Circuit).

To support their § 402*(b)* arguments, Defendants actually rely on case law regarding § 402*(a)*, which is a different subsection that *does* provide for exclusive jurisdiction. *See* D.I. 104 at 7–11 (citing *CE Design*, 2009 WL 2496568, at *12; *ITT*, 466 U.S. at 468; *In re Nextwave Personal Commc'ns, Inc.*, 200 F.3d 43, 54 (2d Cir. 1999); *Self*, 700 F.3d at 462; and *Telecomms. Rsch. & Action Ctr v. FCC*, 750 F.2d 70, 75 (D.C. Cir. 1984)).[4] Specifically, in contrast to subsection (b), § 402(a) provides appeals "shall be brought" pursuant to 28 U.S.C. § 2342(1), which gives "[t]he court[s] of appeal[s]" the "*exclusive* jurisdiction to enjoin, set aside, suspend . . ., or . . . determine the validity of" those § 402(a) decisions. *See CE Design*, 2009 WL 2496568, at *6–7, *12; *ITT*, 466 U.S. at 468; *NextWave*, 200 F.3d at 49, 54; *Self*, 700 F.3d at 461; *Telecomms.*, 750 F.2d at 75. Critically, subsections (a) and (b) are "mutually exclusive," which means that an FCC decision that falls under § 402(a), by statutory definition, does not fall under

---

[4] Section 402(a) provides: "Any proceeding to enjoin, set aside, annul, or suspend any *order* of the [FCC] under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of title 28." Again, Skywave does not challenge any FCC order, so that provision is also inapplicable to this case.

§ 402(b).  *Friedman v. FCC*, 263 F.2d 493, 494 (D.C. Cir. 1959) ("[T]he provisions for judicial review contained in §§ 402(a) and 402(b) are mutually exclusive."); *see Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 126 (2018) ("Courts are required to give effect to Congress' express inclusions and exclusions, not disregard them." (citing *Russello v. United States*, 464 U.S. 16, 23 (1983))).  Accordingly, Defendants' attempt to import the exclusionary language from § 402(a) into § 402(b), where it was expressly omitted, "does violence" to those provisions and thus provides no support for the proposition that the D.C. Circuit retains exclusive jurisdiction over this action.  *N. Am. Cath.*, 437 F.3d at 1208–09.

Thus, even in Defendants' irrational hypothetical that the FCC has blessed their racketeering scheme, the D.C. Circuit's appellate jurisdiction under § 402(b) is not exclusive and would not preclude this Court's jurisdiction over Skywave's claims.[5]

2.    The FCC Does Not Have Original Jurisdiction Over This Action Because Skywave's RICO Claims Are Not Within The FCC's Regulatory Authority.

It is blackletter law that district courts have jurisdiction over RICO claims.  18 U.S.C. § 1964(a).  Yet Defendants argue that Skywave somehow should have brought its RICO claims to the FCC in the first instance.  D.I. 104 at 7–8.  Defendants are wrong.  The FCC lacks authority and expertise to consider such claims or, at the very least, lacks the exclusive jurisdiction so to do.

Indeed, Defendants fail to identify any statute, regulation, or case that stands for the proposition that the FCC has the authority to resolve civil RICO suits.  Skywave is also unaware

---

[5] The Federal Circuit and D.C. Circuit hold otherwise and interpret § 402(b)'s grant of jurisdiction to the D.C. Circuit as "exclusive," depriving other courts of jurisdiction over review of FCC decisions that fall under § 402(b).  *See Folden v. United States*, 379 F.3d 1344, 1356–57 (Fed. Cir. 2004) (citing D.C. Circuit case law); *Sykes v. Jenny Wren Co.*, 78 F.2d 729, 732 (D.C. Cir. 1935).  Those decisions are not binding on this Court and, for the same reasons explained above, contradict the weight of judicial authority interpreting jurisdictional grants as exclusive only when the statute expressly says so.  *See, e.g.*, *Nat'l Ass'n*, 583 U.S. at 126; *Tafflin v. Levitt*, 493 U.S. 455, 460–63 (1990).

of any such authority.  Instead, Defendants' cited authorities, 47 U.S.C. § 402 and *NextWave*, suggest just the opposite—that the FCC has **no jurisdiction** to hear Skywave's civil RICO claims. Section 402 grants the Courts of Appeals with jurisdiction "over claims brought against the FCC **in its regulatory capacity**."  *See NextWave*, 200 F.3d at 54; *see also* 47 U.S.C. § 151 (stating the regulatory "purpose[s]" of the FCC).  In turn, the FCC's regulatory capacity is defined by its decisions as to "which entities are entitled to spectrum licenses."  *NextWave*, 200 F.3d at 54 (explaining that "the **full extent**" of the FCC's authority is its licensing authority).

But whether Defendants are liable for RICO is neither within the FCC's regulatory licensing authority, nor "touch[ed] upon" by it.  *Id.* at 55.  *National Broadcasting* is instructive. There, the Supreme Court reasoned that the FCC's authority does not extend to "administer[ing] the antitrust laws" merely because the FCC "may refuse to grant a license to persons adjudged . . . in a court of law" to have violated those antitrust laws.  *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 222–24 (1943).  Likewise, the FCC's authority does not extend to administration of civil RICO claims predicated on wire fraud even if the FCC "may" revoke an FCC license from "any person found to have" committed wire fraud or otherwise "cancel[]" an Experimental License "if in its discretion the need for such action arises."  47 C.F.R. §§ 1.80(a)(6), 5.83(b).

That same problem also dooms Defendants' argument that Skywave failed to exhaust its administrative remedies by not raising its RICO claims to the FCC.  D.I. 104 at 10–11; *see Longmont United Hosp. v. Saint Barnabas Corp.*, 2007 WL 1850881, at *3 (D.N.J. June 26, 2007) (rejecting a similar argument because plaintiff sued a private entity, not a government entity). Because the FCC lacks authority to adjudicate Skywave's RICO claims, Skywave could not have raised the issue of Defendants' racketeering, including Defendants' wire fraud, to the FCC.

Contrary to Defendants' assertion that Skywave has already raised its RICO claims to the FCC through its petition for reconsideration of the FCC's second renewal of Defendants' Elburn I Experimental License, *see* D.I. 104 at 10–11, that petition makes no mention of Defendants' misconduct at issue in this case. Instead, that petition describes how the FCC's second renewal should be reconsidered for three primary reasons: (1) the second renewal "exceeded the bounds of the [FCC]'s rule" that permits only "one renewal term . . . and no more;" (2) Defendants did not provide any "supporting information" as to why the second renewal was warranted; and (3) Defendants' "experiment is over." D.I. 104-1 at 3–5. Although the petition also mentions that 10Band seems to improperly use the license for "day-to-day trading," *see* D.I. 104 at 10–11 (citing D.I. 104-1 (Ex. A)), the petition does not reference, let alone accuse, Jump Trading, Virtu, or the other Defendants of improper trading or wire fraud. *See* D.I. 104-1 at 1, 7. The petition mentions that Jump Trading and Virtu are related to New Line Networks LLC, which the petition argues each "must have its own experimental license" to use the "experimental facilities" "currently licensed to 10Band." *Id.* at 6. So, contrary to Defendants' argument, the FCC has never "consider[ed]," or been asked to consider, Skywave's RICO claims or the predicate acts underlying them. D.I. 104 at 10–11.

Further, even if the FCC had jurisdiction to adjudicate Skywave's RICO claims—which it does not—that jurisdiction is not exclusive and would not deprive this Court of jurisdiction. "Congressional intent behind one federal statute should not be thwarted by the application of another federal statute if it is possible to give effect to both." *United States v. Palumbo Bros., Inc.*, 145 F.3d 850, 861–76 (7th Cir. 1998) (holding that the NLRA and LMRA did not preempt similar or overlapping ERISA, mail fraud, and RICO claims). Similarly, "when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to

subsume other such remedies." *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974). Thus, even if the FCC had jurisdiction over Skywave's RICO claims—as Defendants posit—it would not preclude Skywave from pursuing those claims and remedies in this Court under federal question jurisdiction. *See* 18 U.S.C. § 1964(a). The procedural and administrative provisions of the "wire or radio communication" chapter of Title 47 reiterate that expressly—FCC-provided remedies are "***in addition to*** . . . remedies" "existing at common law or by statute," 47 U.S.C. § 414, like those remedies provided by the courts for violations of 18 U.S.C. § 1962. In short, the Court should reject Defendants' arguments that it lacks jurisdiction over Skywave's RICO claims.

### III. SKYWAVE ALLEGES FACTS SUFFICIENT TO STATE A PLAUSIBLE CLAIM TO RELIEF UNDER 18 U.S.C. § 1962(C).

Defendants argue that Skywave fails to plead three elements of its § 1962(c) claim: proximate cause, but-for cause, and a pattern of racketeering. Each argument fails.

#### A. Defendants' Misconduct Proximately Caused Skywave's Claimed Injuries.

The proximate cause requirement "is a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.'" *Bridge*, 553 U.S. at 654. Under RICO, allegations of "some direct relation between the injury asserted and the injurious conduct alleged" satisfies the pleading requirement for proximate cause. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). Skywave sufficiently alleges proximate causation through its allegations of a "direct relation" between its injuries and Defendants' unlawful conduct. *Holmes*, 503 U.S. at 268.

Defendants offer two arguments that Skywave fails to plead proximate cause. Both fail. ***First***, Defendants assert that Skywave fails to plead proximate cause under *Holmes*, *Anza*, and *Sterling* because Skywave's Injuries were only "indirectly" caused by Defendants' misconduct. D.I. 104 at 16–18. But Defendants' analogies to those cases falter on their facts, fail to accept

16

Skywave's allegations as true, and ignore *Bridge*, a key Supreme Court decision on proximate cause in civil RICO actions.

**Second**, Defendants contend that Skywave fails to plead proximate cause because, as a matter of policy, Skywave is "not a proper RICO plaintiff." *See* D.I. 104 at 18–22. But Defendants' out-of-context string cites about "derivative" injuries and "intervening actors" do not change that (1) the proximate cause standard requires "some direct relation" between the alleged injury and misconduct, and (2) Skywave's pleadings meet that standard.

        1.    <u>Defendants' Analogies To Cases About Indirect Injuries Are Inapposite— Skywave's Claimed Injuries Were Directly (And Thus Proximately) Caused By Defendants' Unlawful Conduct.</u>

Defendants liken this case to the circumstances before the Supreme Court in *Holmes* and *Anza*, and before the First Circuit in *Sterling*. But those comparisons are unavailing because Skywave's Injuries were caused **directly** by Defendants' misconduct whereas the injuries in *Holmes, Anza* and *Sterling*, were only **indirectly** related to the alleged bad acts. Surprisingly, Defendants fail even to mention the Supreme Court's opinion in *Bridge*—on *certiorari* from the Seventh Circuit—which distinguished both *Holmes* and *Anza* in concluding that a tax lien bidder's alleged economic injury through "the loss of valuable liens" in municipal auctions was "the direct result of [RICO defendants' mail] fraud" of false certifications to municipal authorities. *Bridge*, 553 U.S. at 658. For those reasons—explained further below—Defendants' cases are readily distinguishable from this case, while *Bridge* is directly on point.

**Holmes.** The Supreme Court determined that a nonprofit could not pursue RICO claims about a stock-manipulation scheme on behalf of customers who had not purchased the manipulated stocks due to a lack of proximate cause. *Holmes*, 503 U.S. at 261. The defendants fraudulently manipulated the stocks of certain companies, and two broker-dealers purchased a substantial amount of stocks for their funds. *Id.* When the defendants' fraud became apparent, the two broker-

dealers shuttered, leaving them unable to pay the claims of their customers—both the customers who had purchased the manipulated stocks ("purchasing customers") and customers who had not ("non-purchasing customers"). *Id.* at 262–63. The two shuttered broker-dealers were members of the plaintiff nonprofit. *Id.* at 261–62, 271. The question in *Holmes* was whether the nonprofit could pursue a RICO claim on behalf of *only* the broker-dealers' non-purchasing customers—the ones who had *not* purchased the manipulated stocks. *Id.* at 271–72.

The plaintiff nonprofit argued that it had been directly injured because of the defendants' fraud because, as required by statute, it had to advance money to cover the non-purchasing customers' claims against the two shuttered broker-dealers. *Id.* at 270–71; *id.* at 261 n.1. But the Supreme Court determined that the nonprofit's purported injury (subrogating the non-purchasing customers' claims) was not proximately caused by the defendants' misconduct (fraudulent market manipulation). *Id.* at 270–74. The defendant reasoned that the nonprofit's purported injury lacked a "direct relation" to the market fraud and that to find otherwise "could . . . circumvent the relative priority [those non-purchasing customers'] claim[s] would have" in the shuttered broker-dealers' liquidation proceedings as set by statute. *Id.* at 261 n.1, 268, 273–74; *id.* at 274. Notably, the defendant did not contest proximate cause for RICO claims brought by the two shuttered broker-dealers themselves (via, at that point, their trustees), *id.* at 264 n.8, 273–74, or by customers of those broker-dealers who purchased the manipulated stocks, *id.* at 271 & 271 n.18.

Skywave's Injuries, unlike those claimed in *Holmes*, do not involve any circumvention of relative priority for recovery. To the contrary, ████████████████████—Skywave's trading firm partner—and ██████████████████—Skywave's investor—agreed

to .[6]

D.I. 88 ¶155.  In addition, Skywave and █████ had agreed to ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████  *Id.*  But, due to Defendants'

unlawful conduct, Skywave could not complete its network and its joint operation never got off

the ground, and, as a result, Skywave lost profits and suffered additional economic injuries.

*Anza.*  Defendants' analogy to *Anza* similarly fails.  There, the Supreme Court held that a

plaintiff business owner could not satisfy the proximate cause requirement when its competitor

defrauded New York tax authorities.  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006).

The plaintiff sold steel mill products and operated stores in New York.  *Id.* at 453–54.  The

defendants' company was a competitor.  *Id.* at 454.  The plaintiff alleged that the defendants

offered some of their customers lower prices by not charging New York sales tax.  *Id.*  According

to the plaintiff, defendants' resulting lower prices allowed the defendants to "gain[] sales and

market share at [the plaintiff's] expense."  *Id.*  But the Supreme Court determined that New York

State—not the plaintiff—was the correct party to bring a claim against the defendants: "the

State . . . lost tax revenue as a result" of the defendants' fraudulent scheme.  *Id.* at 458.  The Court

concluded that "[t]he attenuation between the plaintiff's harms and the claimed RICO violation

arises from a different source in this case than in *Holmes*" but that "the absence of proximate

causation [was] equally clear," principally due to the Court's concern that the plaintiff's RICO suit

"could blur the line between RICO and the antitrust laws."  *Id.* at 458–60.

---

[6] Defendants organized their scheme to include trading firms—Jump Trading and Virtu—that
execute Commercial Trading using 10Band's shortwave infrastructure.  D.I. 88 ¶¶123–24.

Skywave does not claim an ambiguous loss in market share downstream of Defendants'
misconduct like that claimed in *Anza*. Instead, Skywave alleges that Defendants' misuse of
Experimental Licenses is the reason that Skywave was unable to complete its network, execute its
trading partnership with ███, and license its shortwave network technology, know-how, and
patents to other trading firms. *See* D.I. 88 ¶156.

**Sterling.** Skywave's Injuries are also unlike those in *Sterling*, where the First Circuit relied
on *Holmes* and *Anza* to dismiss the complaint. *Sterling Suffolk Racecourse, LLC v. Wynn Resorts,
Ltd.*, 990 F.3d 31 (1st Cir. 2021). There, the plaintiff owned property on which a bidder proposed
to build a casino. *Id.* at 33. The plaintiff signed a contract leasing the property to the bidder. The
plaintiff alleged that the defendants had conspired to deprive the bidder of a casino license, thus
costing the plaintiff the chance to lease the site. *Id.* The First Circuit held that the license-bidder
was a "better situated plaintiff" than the property owner because it was a direct competitor for the
license. *Id.* at 36. The court reasoned that "any causal link" between the defendants' actions and
the plaintiff's lost income was "purely contingent" because the lease agreement contained
language that may have excused performance of using the plaintiff's property for the casino. *Id.*

Skywave's claims are not akin to the "purely contingent" one considered in *Sterling*.
Skywave, ███, and ███ had agreed to ████████████████████████████



████████████████████████████████████. ███ and ███ are
therefore ***not*** "better situated" plaintiffs than Skywave.

**Bridge.** Unlike Defendants' cases, *Bridge* is directly on point, and it supports the direct
relation between Defendants' misconduct and Skywave's Injuries. In *Bridge*, the Cook County
Treasurer's Office held public auctions to sell tax liens on the properties of delinquent taxpayers
that could then "be sold at a significant profit." *Bridge*, 553 U.S. at 642. Because of the stiff

competition for the profitable liens, the county adopted a rule designed to prevent any given buyer from purchasing a disproportionate share. *Id.* at 642–43. The plaintiffs alleged that the defendants filed false compliance statements with the county to participate in the auctions and fraudulently obtain a disproportionate share of liens. *Id.* at 641–44. The Supreme Court held that the plaintiffs had sufficiently alleged proximate cause for their civil RICO claims. *Id.* at 644–45, 661 (affirming the Seventh Circuit's reversal of the district court's dismissal of the RICO claims). The plaintiffs' injury—"the loss of valuable liens"—was the direct result of the defendants' fraud because "[i]t was a foreseeable and natural consequence of petitioners' scheme to obtain more liens for themselves that other bidders would obtain fewer liens." *Id.* at 657–58. Although the defendants argued that the county would also be injured, the Court found such an "eventuality, in contrast to [plaintiffs'] direct financial injury, . . . speculative and remote." *Id.*

Defendants' attempt to paint Skywave as an "indirect victim" of Defendants' fraud is contrary to the Supreme Court's analysis and conclusion in *Bridge*. Like the injured bidders in that case, Skywave pleads a "direct relation" between its economic injuries and Defendants' fraud, *i.e.*, the false certifications to the FCC that resulted in the Experimental Licenses that they then misused for Commercial Trading. D.I. 88 ¶¶103–15.[7] As Skywave has explained, "every millisecond counts" in HFT, and "the fastest network wins the trade and reaps the economic benefits." *Id.* ¶28. "Skywave was ready to commercialize its innovative shortwave trading network technology" so that it would be the first and fastest shortwave network provider for Commercial Trading. *Id.* ¶¶39, 135–37, 139. But, due to Defendants' fraudulent FCC filings and

---

[7] In *Bridge*, the Supreme Court reasoned that,"[i]f, for example, the county had not accepted petitioners' false attestations of compliance with the Single, Simultaneous Bidder Rule, and as a result had not permitted petitioners to participate in the auction, respondents' injury would never have materialized." *Bridge*, 553 U.S. at 658.

subsequent unlawful Commercial Trading, Skywave suffered a direct financial injury, including its (a) inability to complete its network for Commercial Trading, like HFT, and (b) lost income from its trading partnership. *Id.* ¶¶152, 154; *see Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 734 (7th Cir. 2014) (allowing RICO claims to proceed where plaintiff sought "damages from a private party for an alleged conspiracy to use the power of state government to take money from them").

> 2.  Skywave Is A Proper RICO Plaintiff, And Defendants Are Proper RICO Defendants, Contrary To Defendants' Policy Arguments Otherwise.

Defendants alternatively contend that Skywave fails to plead proximate cause because "Skywave is not a proper RICO plaintiff." D.I. 104 at 21; *see id.* at 16–22. According to Defendants, Skywave is not a proper plaintiff because its direct injuries are otherwise "derivative" or caused by an "intervening actor." *See id.* at 16–21. Defendants are incorrect.

For Skywave to be a proper RICO plaintiff and Defendants to be proper RICO defendants, Skywave need only plead that Defendants' racketeering was the proximate cause of Skywave's claimed injuries. As Defendants' misconduct ***directly*** caused the injuries that give rise to Skywave's claims, *see supra* Part III.A.1, there can be no credible dispute that Skywave and Defendants are proper parties to this suit.

Defendants' generic policy arguments to the contrary are based on misapprehensions of the law. D.I. 104 at 21–22; *see also Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1072 (D.C. Cir. 2001) (characterizing the *Holmes* factors as "policy factors"). Skywave need not plead that it is the singular best plaintiff or that Defendants' misconduct is the only cause of Skywave's Injuries. *Serv. Emps.*, 249 F.3d at 1072, 1075–76 (holding that RICO's proximate cause requirement merely demands "a proper plaintiff," so the defendants "err[ed] in assuming that the proximate cause analysis . . . is a quest for the 'best' (or,

22

realistically, 'least bad') plaintiff"); *Empress Casino*, 763 F.3d at 732–33 (holding that under RICO, the defendants "may be 'jointly and severally liable for any indivisible injury legally caused by [their] tortious conduct,' regardless of innocent alternative causes" (cleaned up)). Notably, despite Defendants' refrain that there are better plaintiffs to pursue Skywave's requested relief, they fail to identify any such party. *See* D.I. 104 at 17 (arguing Skywave's injuries are derivative of those to "some other party").

For similar reasons, the morass of proximate cause case law that Defendants cite is not on point. In each case, a better plaintiff was readily apparent,[8] a better defendant was readily apparent,[9] or there was no legitimate RICO claim.[10] As this case presents none of those circumstances, the Court should set aside Defendants' cited law.

---

[8] *Anza*, 547 U.S. at 457–60 (New York State was a better plaintiff); *Holmes*, 503 U.S. at 273–74 (brokers and stock-purchasing customers were better plaintiffs); *In re Honey Transshipping Litig.*, 87 F. Supp. 3d 855, 864 (N.D. Ill. 2015) (federal government was a better plaintiff); *Serv. Emps.*, 249 F.3d at 1070 (beneficiaries of a fund were better plaintiffs); *Grow Mich., LLC v. LT Lender, LLC*, 50 F.4th 587, 595–96 (6th Cir. 2022) (company plaintiff invested in was a better plaintiff); *Sterling*, 990 F.3d at 36 (license-competitor was a better plaintiff); *Gov't App Sols., Inc. v. City of New Haven*, 2024 WL 1299993, at *2 (9th Cir. Mar. 27, 2024) (municipalities were better plaintiffs); *Longmont*, 2007 WL 1850881, at *6–7, *9 (federal government was a better plaintiff); *Devon Drive Lionville, LP v. Parke Bancorp, Inc.*, 791 F. App'x 301, 306–07 (3d Cir. 2019) (federal regulators were better plaintiffs); *Walters v. McMahen*, 684 F.3d 435, 444 (4th Cir. 2012) (federal government was a better plaintiff).

[9] *Hemi Group*, 559 U.S. at 11–12 (New York citizens were better defendants); *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 490–91, 494 (4th Cir. 2018) (property owner or main contractor were better defendants).

[10] *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*, 877 F.2d 1333, 1334 (7th Cir. 1989) (indicating that plaintiffs' RICO claims were an attempt to manufacture federal question jurisdiction); *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 473 (7th Cir. 2007) ("[A]t root this is a dispute over who invented an aftermarket dashboard bezel."); *Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Del.*, 805 F. Supp. 1277, 1298 (D.S.C. 1992) (granting summary judgment where a plaintiff "charged the defendants with" a "conspiracy . . . of monstrous proportions" but failed to "produce plausible evidence that support[ed] its allegations").

Skywave has therefore sufficiently pled proximate cause. Skywave's Injuries were directly caused by Defendants' misconduct, so Skywave is a proper RICO plaintiff, and Defendants are proper RICO defendants. Defendants' contrary arguments ignore *Bridge* and fail to accept Skywave's allegations as true.

### B. But For Defendants' Misconduct, Skywave Would Not Have Suffered Its Claimed Injuries Because Skywave Would Have Completed and Utilized Its Network.

Defendants argue that because Skywave fails to allege "it could have and would have" commercialized its technology under a Part 73 license, Skywave could not have been injured by Defendants' unlawful activities. D.I. 104 at 22–24. Not so.

Skywave sufficiently alleges but-for causation, and Defendants' contrary arguments fail for at least three reasons. ***First***, Defendants mischaracterize the FAC to invent allegations that Skywave never made. For example, Defendants suggest that "Skywave's proposed transmissions, by design and definition, are not to the general public"—*i.e.*, are "point-to-point" transmissions for HFT. D.I. 104 at 23. But Defendants ignore that Skywave's contemplated license also included transmission of higher-art musical performances. D.I. 88 ¶¶29–30. Defendants also wrongly contend that Skywave "in fact admits that there is no license under Part 73 for private data transmissions for purposes of trading financial instruments." D.I. 104 at 23. Skywave merely alleges that "no known Part 73 Licenses for Commercial Trading via shortwave" has been granted ***at this time***. D.I. 88 ¶120. Stated differently, not only did Defendants prevent Skywave from obtaining its own Part 73 license, but they appear to have also prevented other entities as well. Similarly, Defendants fixate on Skywave's use of the word "design" in connection with its prospective Part 73 license to argue that Skywave sought a license that the FCC would never grant. D.I. 104 at 23. However, Skywave's references to "design" refer to a license for hybrid trading-

and-higher-art—a framework for which the FCC had expressed support—not the creation of a novel license that the FCC might never grant. D.I. 88 ¶38.

**Second**, Defendants invoke judicial notice to apply legal reasoning from recent FCC decisions to discussions between Skywave and FCC officials in 2015 and 2016. *See* D.I. 104 at 23–24. Defendants' use of judicial notice is improper. "In order for a fact to be judicially noticed, indisputability is a prerequisite." *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995) (citing Fed. R. Evid. 201). "A request for judicial notice is" therefore "not a proper vehicle for legal argument," like "argument by analogy." *Blye v. Cal. Sup. Ct.*, 2014 WL 295022, at *1 (N.D. Cal. Jan. 21, 2014); *see* Fed. R. Evid. 201. Yet, Defendants attempt just that: they argue that three recent FCC orders "are properly the subject of judicial notice" because they purportedly "hold[] that private data transmissions *like that* which Skywave considered are not 'broadcasting' under Part 73." D.I. 104 at 24. Stated differently, Defendants improperly ask the Court to take judicial notice of recent FCC decisions to serve as purported legal precedent for Defendants argument that licenses "like" Skywave's "are not" appropriate under Part 73. *Id.* This Court has rejected similar attempts to pass off legal arguments about the merits of a claim as judicially noticeable facts. *See Smith v. AFSCME Council 31*, 2025 WL 790855, at *1 (N.D. Ill. Mar. 12, 2025) (declining to take judicial notice of an arbitration award to evaluate the "facts or the strength of . . . legal reasoning"). Defendants' attempts to do the same should similarly fail.

**Third**, even if the Court were to take notice of the identified FCC decisions, the applications at issue in those decisions are distinguishable from Skywave's application. In *Turms Tech*, the FCC **granted** a license for an International Broadcast Station in New Jersey and did not even consider an application for multiple or hybrid uses. *See In the Matter of Turms Tech LLC*, 2025 WL 257232, at *1–3 (FCC Jan. 17, 2025) (stating only that the applicant sought to broadcast

"financial, economic news and data through distribution of programs generally prepared on the basis of requests by clients"). The other two cases—*Parable* and *DPA MAC*—involved denials for applications that proposed **simultaneous** transmission of public broadcast data and private encrypted data. *See In the Matter of Parable Broad. Co.*, 2025 WL 251378, at *1–2 (FCC Jan. 17, 2025) (stating that the applicant sought to transmit encoded data "alongside the audio content" of "religious and educational programming"); *In the Matter of DPA MAC LLC*, 2025 WL 251498, at *1 (FCC Jan. 17, 2025) (stating that the applicant sought a license "to transmit simultaneously two separate programming streams: '(1) an over-the-air, commercial-free audio broadcast of U.S. financial news and similar information . . . and (2) investment data . . .'"). The license Skywave sought, however, "would split transmission periods between Commercial Trading and public broadcasting of higher art musical performances." D.I. 88 ¶38. In addition, Skywave's proposed license would allow for the transmission of multiple uses on the same frequency channel **at different times of day**. *Id.* Skywave's proposed license was thus fundamentally different from the licenses proposed and denied in *Parable* and *DPA MAC.* So, even if the FCC's decisions in 2025 could possibly inform the Court regarding what the FCC would have done in 2016—they cannot—the license denials in *Parable* and *DPA MAC* bear no resemblance to Skywave's FCC-supported license and are thus irrelevant.

Without distorted facts or judicial notice of inapposite FCC decisions, Defendants are left to raise factual disputes about the likelihood of Skywave's ability to obtain a Part 73 license. But at this stage, the Court must accept Skywave's well-pled allegations as true. Skywave has pled that after its founders met with FCC officials, including the Chief of the International Bureau, in December 2015 and February 2016, the FCC declared its support for Skywave's proposal to apply for a multi-use license that would split transmission periods between Commercial Trading and

broadcasting of higher-art musical performances.  D.I. 88 ¶38.  Skywave has therefore sufficiently

pled that it would have obtained a multi-use license under Part 73 but for Defendants' misconduct.

C.     **Defendants Committed More Than Two Requisite Predicate Acts Of Wire Fraud Through Their FCC Filings, And Independently, Through Their Commercial Trades.**

Each of Defendants' fraudulent FCC filings and unlawful Commercial Trades constitutes

a predicate act because ***each*** transmission "constitutes a ***separate*** violation of the . . . wire fraud

statute[] and thus a ***separate*** predicate act for purposes of the racketeering statute."  *See R.E. Davis*

*Chem. Corp. v. Nalco Chem. Co.*, 757 F. Supp. 1499, 1513 (N.D. Ill. 1990).  To successfully argue

to the contrary, Defendants must demonstrate that ***both*** categories of predicate acts—the FCC

filings ***and*** the Commercial Trades—cannot legally constitute wire fraud.  Defendants fail so to

do.   And their arguments suffer two critical flaws: they misstate the law and once again

mischaracterize Skywave's allegations.

1.     Skywave Properly Pleads Defendants' Fraudulent FCC Filings Are Predicate Acts Of Wire Fraud.

Defendants argue that, under *Cleveland*, their fraudulent Experimental License filings

cannot be wire fraud because Defendants did not "deprive" the FCC of a property right when they

received those licenses.  D.I. 104 at 24–26 (citing *Cleveland*, 531 U.S. 12).  That is incorrect.

*Cleveland* does not—as Defendants contend—"foreclose" Skywave's allegations that

Defendants committed wire fraud when they submitted their fraudulent FCC filings.  *See id.*  In

*Cleveland*, the United States charged a Louisiana resident with mail fraud under § 1341 for

submitting a fraudulent gambling license application.  *Cleveland*, 531 U.S. at 15–18.  The Supreme

Court held that the application was not mail fraud under § 1341 because the statute requires "the

object of the fraud" to be "property in the hands of the victim"—there, the government regulator.

*Id.* at 15.  *Cleveland* determined that the government regulator lacked a property interest in the

gambling license before it issued, so the government failed to plead that the defendant's mail fraud deprived it of property. *Id.* at 26–27. The circumstances here are substantially different. The object of Defendants' fraud is the money that Skywave lost as a result of Defendants' fraudulent scheme—not a license—and the victim is Skywave—not the government entity issuing the relevant license (*i.e.*, the FCC). *See Ciminelli v. United States*, 598 U.S. 306, 312 (2023) ("that money or property was an object of their fraud") (internal quotation omitted). Thus, that the FCC lacks a property interest in Defendants' pre-issuance Experimental Licenses is irrelevant.

Section 1343 creates liability for "[w]hoever" uses interstate wires to effectuate "any scheme" to "defraud" or "obtain[] money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C § 1343. As Skywave alleges, Defendants used interstate wires to transmit their fraudulent FCC filings, which were required to obtain the Experimental Licenses necessary to effectuate their racketeering scheme and achieve Defendants' goal of obtaining money through unlawful Commercial Trading. *See* D.I. 88 ¶¶103–15. That racketeering scheme injured Skywave's business by depriving Skywave of money that it (a) lost in sunk investment costs, and (b) would have otherwise obtained. *Supra* Parts I & III.A–III.B. Accordingly, Skywave has pled a viable claim because it was "injured in [its] business or property by reason of" Defendants' fraudulent FCC filings. *Bridge*, 553 U.S. at 649 (cleaned up).

To the extent Defendants suggest that RICO requires a plaintiff like Skywave to have been the ***target*** of the defendants' underlying fraud for the plaintiff to use that fraud as a predicate act, Defendants are wrong. *Bridge*, which was decided after *Cleveland*, expressly held otherwise. In *Bridge*, RICO plaintiffs pled that the defendants' acts of mail fraud under 18 U.S.C. § 1341 were predicate acts for a racketeering scheme that injured plaintiffs. *Id.* at 647–48; *see United States v. Vorley*, 420 F. Supp. 3d 784, 789 n.8 (N.D. Ill. 2019) ("[T]he mail and wire fraud statutes should

28

be interpreted in [the] same manner.").  The *Bridge* defendants argued that the plaintiffs could not premise their RICO claims on those mail fraud predicate acts because the defendants sent the fraudulent mail—registrations to participate in public auctions—to a local government entity, not the plaintiffs.  *Bridge*, 553 U.S. at 643–48.  As a result, and like Defendants here, the defendants reasoned that the plaintiffs could not have relied on the misrepresentations in the fraudulent mailings because the plaintiffs were not the targets of those mailings.  *Id.* at 648.  Although presented in the context of proximate cause (and not a pattern of racketeering), the Supreme Court rejected that argument outright:  a RICO plaintiff does not need to "plead [or] prove that it relied on [a] defendant's alleged misrepresentations" for the plaintiff to use those misrepresentations as predicate acts in the plaintiff's RICO suit.  *Id.* at 641–42.

2.     <u>Defendants' Unlawful Commercial Trades Constitute Wire Fraud, Which<br>Skywave Properly Pleads Under Rule 9(b).</u>

Defendants offer three arguments that their Commercial Trades do not constitute wire fraud.  The Court should reject each argument.

***First***, Defendants argue that Skywave failed to satisfy the Rule 9(b) pleading standard for Defendants' Commercial Trades.  Specifically, Defendants assert Skywave failed to plead "the nature of the fraud" or "what [the] alleged false statement . . . was" in addition to "how" Defendants' unlawful Commercial Trades "amount[] to a fraud."  D.I. 104 at 27.  But Defendants attack a strawman.

The statute defines wire fraud, in relevant part, as a "scheme . . . to defraud" during which the accused party "transmitt[ed] or caus[ed] to be transmitted" wires "for the purpose of executing such scheme."  18 U.S.C. § 1343.  As such, the Supreme Court has held that even "innocent" wirings—*i.e.*, wirings that are not fraudulent in and of themselves—can (and often do) constitute wire fraud.  *Schmuck v. United States*, 489 U.S. 705, 714–15 (1989).  Likewise, the Seventh Circuit

29

has recognized that to constitute wire fraud, accused wirings merely need to be "incident to an essential part of the scheme or a step in the plot." *United States v. Turner*, 551 F.3d 657, 666 (7th Cir. 2008) (cleaned up). "In other words, the success of the scheme must in some measure depend on the . . . wire transmission." *Id.* And ***that*** is the thrust of Skywave's claims as to Defendants' Commercial Trades. Those trades—which were executed through interstate wires—are incident to Defendants' scheme to "defraud the FCC and the Commercial Trading market." D.I. 88 ¶116. The "success of [Defendants'] scheme" depends on Commercial Trades because those trades are how Defendants reap their ill-gotten gains. *Turner*, 551 F.3d at 666; D.I. 88 ¶¶103, 116–19. Put another way: the Commercial Trades are the goal of Defendants' scheme, which they can achieve only through misuse of the Experimental Licenses that were also procured through wire fraud.

Defendants also criticize Skywave for being unable to plead granular details about Defendants' Commercial Trades—*i.e.*, the "who, what, when, where, and how." D.I. 104 at 26–27. However, Skywave has no way of knowing that information from the public domain, and the Seventh Circuit has held Rule 9(b)'s "particularity" requirement "does not require plaintiffs to plead facts to which they lack access prior to discovery." *Katz v. Household Int'l, Inc.*, 91 F.3d 1036, 1040 (7th Cir. 1996). And where—as here—Skywave alleges fraud against six third-parties, "the particularity requirement of Rule 9(b) ***must be relaxed***" because Skywave lacks access to all facts necessary to detail its claims. *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998).

Against that backdrop, Defendants' criticism under Rule 9(b) is not credible. Skywave describes the "what, when, where, and how" of Defendants' Commercial Trade predicate acts to the best of its ability. Indeed, Skywave collected and analyzed hundreds of public documents to map Defendants' often-obscured business relationships, worldwide Commercial Trading network,

and evidence of their Commercial Trades via shortwave infrastructure licensed to 10Band for only experimental purposes. *See, e.g.*, D.I. 88 ¶52 Fig. 1, ¶86 Fig. 3, ¶¶143–49.

**Second**, Defendants assert that their unlawful Commercial Trades "highlight[] that . . . [Skywave] is trying to transmute . . . fraud on other parties" without legal "authority." D.I. 104 at 27. As an initial matter, Skywave is required to plead facts, not law. *See Hernandez v. Ill. Inst. of Tech.*, 63 F.4th 661, 668 (7th Cir. 2023) ("[T]he Federal Rules of Civil Procedure do not require a plaintiff to plead legal theories."). In any event, this argument is a rinse-and-repeat of Defendants' faulty proximate cause argument and should be rejected for the same reasons. *See supra* Part III.A & Part III.C.1. *Bridge*—the seminal Supreme Court case on civil RICO that Defendants fail even to cite—establishes that a civil RICO plaintiff can use defendants' fraud on other parties as predicate acts when pursuing RICO claims against those defendants. *Bridge*, 553 U.S. at 641–42.

**Third**, Defendants argue that their unlawful Commercial Trades fall under the § 1964(c) securities fraud exception, so those trades cannot be predicate acts of wire fraud under § 1962. D.I. 104 at 27–28. That exception is not applicable to Defendants' Commercial Trades.

The securities fraud exception of § 1964(c) applies only to "***actionable*** . . . securities fraud under [S]ection 10(b) of the Securities and Exchange Act of 1934 . . . and SEC Rule 10b-5." *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 334 (7th Cir. 2019) (citing 15 U.S.C. § 78j(b) (Section 10(b), and 17 C.F.R. § 240.10b-5 (Rule 10b-5)). As the Seventh Circuit has explained, the § 1964(c) securities fraud exception requires that "the scheme to defraud [under RICO] and the sale of securities coincide," leaving "no daylight between the alleged [RICO] fraud and the securities sale." *Id.* at 334–35 (citing *SEC v. Zandford*, 535 U.S. 813 (2002)). For the § 1964(c) exception to apply, a RICO plaintiff must allege that its losses were "a more direct consequence

31

of [the] misrepresentations that closely touched the ***stock sale itself***'—as opposed to other consequences of the stock sale. *Id.* at 335. For example, allegations that fraud "influenc[ed] the sales price" of the stock likely "satisfy the 'in connection with' requirement for an actionable claim under [S]ection 10(b) or Rule 10b-5." *Id.* at 335–36; *see D'Addario v. D'Addario*, 75 F.4th 86, 93–94 (2d Cir. 2023) (collecting cases and explaining that § 1964(c) requires "the actual purchase or sale of securities [to be] fraudulent; it is not enough for securities to be an incidental feature of an overall scheme"). None of those circumstances are present in this case.

Skywave does ***not*** allege that Defendants' scheme to defraud coincides with their Commercial Trading activities. To the contrary, Defendants' scheme does not center on the ***securities sales themselves*** but on Defendants improperly obtaining and then misusing Experimental Licenses, and it is the creation and use of the infrastructure that is at issue in Skywave's claims. *E.g.*, D.I. 88 ¶¶103–04, 116–25; *see supra* Part III.C.2 (discussing *Schmuck*, 489 U.S. 705). In addition, Skywave does not allege that Defendants manipulated the price of securities or executed sales that their clients did not authorize. *Cf. Menzies*, 943 F.3d at 334–36; *D'Addario*, 75 F.4th at 95. The Commercial Trading at issue is, at most, an incidental feature of the overall scheme. Thus, Defendants' Commercial Trading predicate acts do not fall under the § 1964(c) exception.

## IV.    SKYWAVE COULD NOT HAVE REASONABLY DISCOVERED DEFENDANTS' MISCONDUCT CAUSED ITS INJURIES UNTIL 2022, WHEN THE A7 TOOL BECAME ACCESSIBLE.

Defendants argue that Skywave's claims are barred under the four-year RICO statute of limitations. Specifically, Defendants allege that the limitations period started to run in March 2017, when one of Skywave's partnerships dissolved, and expired in 2021. D.I. 104 at 28–33. Defendants are incorrect as a matter of law and fact.

On the law, discovery of injury alone is not sufficient, as Defendants suggest (*id.* at 28), to start the clock of the civil RICO statute of limitations. The injured party must also know or have been able to reasonably ascertain *who* caused the injury. While a plaintiff need not "know that [its] injury is actionable" to start the clock, the plaintiff must know or reasonably have been able to discover that it was injured and that it was injured "*by the defendants*." *Cancer Found., Inc., v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009) (citing *Rotella v. Wood*, 528 U.S. 549, 555, 558 (2000)[11]); *see also Rotella*, 528 U.S. at 555–56 (citing *United States v. Kubrick*, 444 U.S. 111, 122 (1979)).

Even if Defendants were correct that Skywave somehow knew or should have known of its injuries as of March 2017, their argument fails as a matter of law. Indeed, Defendants do not even attempt to argue that Skywave knew or should have known that *Defendants* were the cause of its injuries in March 2017. Defendants instead pose a non sequitur: Skywave knew or should have known that *Defendants were connected* to one another as of 2017, so Skywave also knew or should have known that *Defendants caused Skywave's Injuries* at that time. That is illogical[12]—

---

[11] Defendants quote *Rotella* out of context when implying that discovery of an injury, alone, is sufficient to start the clock for the four-year statute of limitations for civil RICO claims. *See* D.I. 104 at 28, 32. *Rotella* resolved a split among the Courts of Appeals in favor of "some form" of the "injury discovery rule" by "eliminat[ing]" the alternative "injury and pattern discovery rule." *Rotella*, 528 U.S. at 554. But *Rotella* expressly refused to adopt a single standard for the "injury discovery rule." *Id.* at 554 n.2. Accordingly, *Rotella* does not overrule or abrogate the "injury discovery rule" as applied by the Seventh Circuit, which requires *both* identification of injury and *who caused* that injury. *See Cancer Found.*, 559 F.3d at 674 (applying *Rotella* and specifying that the civil RICO statute of limitations does not begin until "the plaintiffs discover, or should, if diligent, have discovered, that they had been injured *by the defendants*").

[12] The premise is also illogical, as demonstrated by Defendants' own evidence. To support their contention that Skywave knew or should have known of Defendants' intricate web of connections by March 2017, Defendants rely on news articles and public filings from 2018–2023. D.I. 104 at 31–33.

that Defendants are interrelated does not create a connection between them and Skywave, let alone Skywave's Injuries.

Defendants' statute of limitations argument also fails as a matter of fact because Skywave did not know and could not have reasonably determined that **Defendants** were the cause of its injuries until 2022, when the A7 tool became available. Defendants concealed their misuse of Experimental Licenses by confidentially filing their narrative statements, rendering them publicly unavailable. D.I. 88 ¶¶65, 67, 71, 75, 79, 150. Defendants further hid their misconduct by misrepresenting to the FCC that their equipment was technically incapable of transmitting station identification information, preventing public tracking of Defendants' transmission activities. *Id.* ¶¶110, 151. Moreover, "Defendants concealed the true nature of their commercial activities behind . . . a web of shell companies that obscured the connection between the HFT Enterprise and Defendants' racketeering scheme." *Id.* ¶7. Skywave thus not only lacked information showing Defendants were responsible for its injuries but also could not have reasonably accessed that information precisely because Defendants hid it from public view.

The A7 tool—which Defendants ignore (D.I. 104 at 28–33)—enabled Skywave to examine latency data on trading exchanges for the first time in 2022. D.I. 88 ¶¶143–44. Although Defendants continued to hide behind their artifices of confidentiality and transmitter anonymity at the FCC, Skywave finally was able to connect the dots with A7. *Id.* ¶¶143–51. Contrary to Defendants' assertion that Skywave buried its head in the sand, D.I. 104 at 31, Skywave diligently mapped the A7 data to various FCC filings, leading Skywave to Defendants, their web of companies, and those companies' international commercial trading network. *See* D.I. 88 Figs. 1 & 3. That backward look was the only way to connect the dots. For example, in October 2021, Defendants submitted their first non-confidential narrative statement for one of their Experimental

Licenses; that statement provided the first public description of 10Band's previous experimental use of HFT technology and its intention to use HFT technology in market trials. *Id.* ¶142. The data from the A7 tool in 2022, when looking back, demonstrated that Commercial Trading using shortwave began as early as 2017 and was a staple in latency arbitrage trading by 2020. *Id.* ¶146 & Fig. 7. This timeline substantially aligns with Defendants' acquisition of Experimental Licenses from the FCC for HFT technology starting in late 2016 and their expansion of Commercial Trading operations over time from 2017 to the present. *Id.* ¶¶64–85. Identifying Defendants as the source of Skywave's Injuries, therefore, was only possible in 2022 at the earliest, once the A7 data was coupled with publicly available FCC filings to shed light on who was doing what and when in the HFT market.

Without both a demonstrated injury and reasonably discoverable information connecting the injury to the defendants at fault, the statute of limitations clock does not start. In this case, the earliest possible date for that was in 2022—meaning Skywave timely filed suit years short of the four-year statute of limitations.

## CONCLUSION

Skywave respectfully asks this Court to deny Defendants' Motion to Dismiss.

Dated: May 21, 2025

Respectfully submitted,

/s/ Justin A. Barker

Justin Wilcox (admitted *pro hac vice*)
Goutam Patnaik (admitted *pro hac vice*)
Thomas Derbish (admitted *pro hac vice*)
Jamie Dohopolski (admitted *pro hac vice*)
Thomas Romanchek (admitted *pro hac vice*)
**DESMARAIS LLP**
1899 Pennsylvania Avenue, NW, Suite 400
Washington, D.C. 20006
Tel: 202.451.4900
Fax: 202.451.4901
jwilcox@desmaraisllp.com
gpatnaik@desmaraisllp.com
jdohopolski@desmaraisllp.com
tromanchek@desmaraisllp.com

Steven Balcof (admitted *pro hac vice*)
Peter Kotecki (admitted *pro hac vice*)
**DESMARAIS LLP**
230 Park Avenue, 26th Floor
New York, New York 10169
Tel: 202.351.3400
Fax: 202.351.3401
sbalcof@desmaraisllp.com
pkotecki@desmaraisllp.com

Justin A. Barker (IL 6274518)
Ariana Garcia-Moore
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
123 N. Wacker Drive, 21st Floor
Chicago, Illinois 60606
Tel: 312.376.1014
Fax: 312.264.9491
justin.barker@nelsonmullins.com
ariana.garciamoore@nelsonmullins.com

*Attorneys for Plaintiff Skywave Networks, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing sealed document and all attachments thereto are being served via email on all counsel of record on this May 21, 2025.